# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ansly DAMUS, Geauga County Safety Center, 12450 Merritt Road, Chardon, OH 44024; N.J.J.R., Essex County Correctional Facility, 354 Doremus Ave., Newark, NJ 07105; Abelardo Asensio CALLOL, York County Prison, 3400 Concord Rd., York, PA 17402; Alexi Ismael Montes CASTRO, York County Prison, 3400 Concord Rd., York, PA 17402;  H.A.Y., El Paso Processing Center, 8915 Montana Ave., El Paso, TX 79925; A.M.M., Otero County Processing Center, 26 McGregor Range Road, Chaparral, NM 88081; L.H.A., El Paso Processing Center, 8915 Montana Ave., El Paso, TX 79925; E.E.C.S., James A. Musick Facility, 13502 Musick Road, Irvine, CA 92618; and L.I.L.M., James A. Musick Facility, 13502 Musick Road, Irvine, CA 92618, on behalf of themselves and others similarly situated, | Civil Action No. _____ |
| *Plaintiffs,* | **Class Complaint for Injunctive and Declaratory Relief** |
| *v.* | |
| Kirstjen NIELSEN, Secretary of the Dep't of Homeland Security, in her official capacity, Washington, DC 20528; Thomas HOMAN, Acting Director for U.S. Immigration and Customs Enforcement, in his official capacity, 500 12th Street, SW, Washington, DC 20536; Rebecca ADDUCCI, Director of the ICE Detroit Field Office, in her official capacity, c/o Office of the General Counsel, Department of Homeland Security, Mail Stop 3650, Washington, DC 20528; William JOYCE, Acting Director of the ICE El Paso Field Office, in his official capacity, c/o Office of the General Counsel, Department of Homeland Security, Mail Stop 3650, Washington, DC 20528; David MARIN, Director of the ICE Los Angeles Field Office, in his official capacity, c/o Office of the General Counsel, Department of Homeland Security, Mail Stop 3650, Washington, DC 20528; John TSOUKARIS, Director of the ICE Newark Field Office, in his official capacity, c/o Office of the General Counsel, Department of Homeland Security, Mail Stop 3650, Washington, DC 20528; Greg BRAWLEY, Director of the ICE Philadelphia Field Office, in his official capacity, c/o Office of the General Counsel, Department of Homeland Security, Mail Stop 3650, Washington, DC 20528; Jefferson B. SESSIONS, III, U.S. Attorney General, in his official capacity, 950 Pennsylvania Ave., NW, Washington, DC 20530; James MCHENRY, Director of the Exec. Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041, | |
| *Defendants.* | |

**CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**INTRODUCTION**

1.      Plaintiffs bring this class action to enjoin a Department of Homeland Security ("DHS") policy and practice of categorically detaining asylum seekers in order to deter others from seeking refuge in the United States.

2.      Plaintiffs are all asylum seekers who traveled to the United States, were found to have a credible fear of persecution, and were referred for immigration proceedings to decide their asylum claims.  All of them have sponsors in the United States who are prepared to provide them with housing and ensure they attend their court hearings, and none of them have criminal records or history of violence.  Yet DHS has imprisoned them during the pendency of their asylum cases, with no individualized review of whether their detention is necessary.

3.      In *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015), this Court preliminarily enjoined a DHS policy of detaining families seeking asylum that was designed to "send[] a message of deterrence" to other migrants.  *Id*. at 188-89.  Applying established Supreme Court precedent, the Court held in its preliminary-injunction ruling that immigration detention could not lawfully be founded on general deterrence—which may inform criminal, but not civil, detention.  The Court, moreover, found that the government's conclusory incantations of "national security" could not support a deterrence-based detention policy.  *Id*. at 189-90.

4.      Notwithstanding *R.I.L-R.*, DHS has now unlawfully embarked on an even *broader* policy of detaining asylum seekers on deterrence grounds at five U.S. Immigration and Customs Enforcement ("ICE") Field Offices across the country (the

"Deterrence Policy").  With the approval of ICE Headquarters, and in violation of a longstanding DHS directive precluding detention of asylum seekers except in unusual cases ("Parole Directive"), these five Field Offices have detained virtually all adults who request asylum at a port of entry to the United States.  The five Field Offices have detained these asylum seekers based not on individualized determinations that they pose a flight risk or a danger to the community, but rather to deter other migrants from seeking refuge here.

5.  Detaining asylum seekers to deter others, without even considering whether individuals are flight risks or dangers to the community, violates the Parole Directive (which generally bars the detention of asylum seekers who pose neither a flight risk nor a danger to the community), the Immigration and Naturalization Act ("INA"), regulations promulgated thereunder, and the Due Process Clause of the Fifth Amendment.  Indeed, even if DHS's current parole policy were not based on deterrence, it would be unlawful for DHS to engage in virtually blanket detention of asylum seekers without individualized determinations of flight risk or danger to the community.  The fact that the Policy *is* based on general deterrence—which cannot be a basis for civil detention—makes it even clearer that the Policy is unlawful.  *See R.I.L-R.*, 80 F. Supp. at 189.

6.  Ensuring that asylum seekers have access to a meaningful parole process has become even more critical in light of the Supreme Court's recent decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).  The Court in *Jennings* held that parole is the only exception to detention under the INA for asylum seekers who presented themselves at ports of entry to the United States, and that this "express exception to detention implies

that there are no other circumstances under which [such] aliens . . . may be released." *Id.* at 844 (emphasis omitted). The Deterrence Policy, however, effectively and unlawfully eliminates this opportunity for release at the five ICE Field Offices, leaving asylum seekers within these Field Offices with no meaningful way to avoid detention during the pendency of their asylum cases.

7. ICE data suggests that, as a result of the Deterrence Policy, more than a thousand individuals in the last year have been unlawfully deprived of their liberty for nothing more than seeking refuge in a nation that has provided it to countless others since its founding. Each additional day of detention exacerbates the grave risk to the mental and physical health of these individuals. Absent intervention by this Court, thousands more asylum seekers will suffer the same fate. The Court should enjoin the Deterrence Policy and require Defendants to provide Plaintiffs and other proposed class members with individualized determinations of flight risk and danger to the community before subjecting them to detention.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity pursuant to 5 U.S.C. § 702.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because multiple defendants reside in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

10.     Plaintiffs are asylum seekers who presented themselves to immigration authorities at a U.S. port of entry, were found to have a credible fear of persecution or torture in their home countries, and have been referred for proceedings inside the United States to decide their asylum claims.  They are all detained pursuant to the Deterrence Policy.

11.     Ansly Damus, a former ethics teacher, is seeking asylum in the United States after fleeing political persecution—including beating and death threats—in his home country, Haiti.  Fearing for his life, Mr. Damus came to the United States in October 2016.  An asylum officer found that he had a credible fear of persecution and referred him for removal proceedings.  Although an immigration judge has granted him asylum—twice—the government appealed both determinations, and Mr. Damus has remained in detention pending the government's repeated appeals.  In late January 2017 and February 2018, the Detroit ICE Field Office denied Mr. Damus' requests for release on parole pursuant to the Deterrence Policy, even though he established his identity, identified a sponsor with whom he could live, and showed that he poses no flight risk or danger to the community.  As a result, Mr. Damus has been detained in ICE custody for the last 16 months—with no end in sight.  Mr. Damus is currently detained at the Geauga County Safety Center in Chardon, Ohio.

12.     N.J.J.R. is seeking asylum in the United States after fleeing beating and threats from armed groups that seek to eliminate opposition to the Venezuelan government.  Fearing for his life, N.J.J.R. presented himself to immigration officers in October 2017.  An asylum officer found that N.J.J.R. had a credible fear of persecution

and referred him for removal proceedings.  The Newark ICE Field Office denied

N.J.J.R's requests for release on parole pursuant to its Deterrence Policy, even though he

has established his identity, identified a sponsor with whom he could live, and shown he

poses no flight risk or danger to the community.  N.J.J.R. has been detained for over four

months.  He is currently detained at the Essex County Correctional Facility in Newark,

New Jersey.

      13.    Abelardo Asensio Callol is seeking asylum in the United States after

fleeing persecution at the hands of the Cuban government due to his refusal to be a part

of the Cuban Communist Party and attend a rally held in memory of Fidel Castro.

Fearing for his life, Mr. Callol presented himself to immigration officers in December

2017.  An asylum officer found that Mr. Callol had a credible fear of persecution and

referred him for removal proceedings.  ICE denied Mr. Callol parole without ever

interviewing him on his eligibility for parole.  Mr. Callol submitted several requests to

ICE asking how to submit additional documentation that would establish his identity and

demonstrate that he is not a flight risk and that he has sponsors with whom he can live.

ICE has not responded to any of his requests.  Mr. Callol has been detained for over three

months.  Currently he is detained at the York County Prison in York, Pennsylvania.

      14.    Alexi Ismael Montes Castro is seeking asylum in the United States after

fleeing harassment, assault, and threats at gunpoint in Honduras because he is gay.

Fearing for his life, Mr. Montes Castro presented himself to immigration officers and

sought asylum in November 2017.  An asylum officer found that Mr. Montes Castro had

a credible fear of persecution and referred him for removal proceedings.  Mr. Montes

Castro was not even aware that he could request release on parole until he received a

boilerplate letter from ICE in January 2018, denying him parole pursuant to the

Deterrence Policy.  ICE never interviewed him to determine his eligibility for parole.

ICE denied Mr. Montes Castro parole even though he provided the government with his

birth certificate and explained that he had a relative in Virginia willing to provide him

housing and support in the course of requesting asylum.  Mr. Montes Castro has been

detained for about four months.  Currently he is detained at the York County Prison in

York, Pennsylvania.

15.     H.A.Y. and A.M.M. are a wife and husband seeking asylum in the United

States after fleeing a criminal cartel in Mexico that sought to take control of their home,

cattle, and farm.  Fearing for their lives, the couple came to the United States in

December 2017.  Asylum officers found that they each had a credible fear of persecution

and referred them both for removal proceedings.  In February 2018, the El Paso ICE

Field Office denied both H.A.Y.'s and A.M.M.'s requests for parole pursuant to the

Deterrence Policy, even though they had established their identities, identified a sponsor

with whom they could live, and shown that they pose no flight risk or danger to the

community.  H.A.Y. and A.M.M. have been detained for over two months.  H.A.Y. is

currently detained at the El Paso Processing Center in El Paso, Texas.  A.M.M. was

separated from his wife and is currently detained at the Otero County Processing Center

in Chaparral, New Mexico.

16.     L.H.A. is seeking asylum in the United States after fleeing a dangerous

gang in El Salvador, which attempted to recruit and extort money from him, and

threatened to kill him and his family.  Fearing for his life, L.H.A. came to the United

States in May 2016.  An asylum officer found that L.H.A. had a credible fear of

persecution and referred him for removal proceedings.  On June 14, 2017, L.H.A. applied

for parole, but the El Paso ICE Field Office denied L.H.A.'s request for parole pursuant

to the Deterrence Policy, even though he had established his identity, identified a sponsor

with whom he could live, and shown he poses no flight risk or danger to the community.

L.H.A. has been detained for more than twenty-one months.  He is currently detained at

the El Paso Processing Center in Texas.

17.     E.E.C.S. is seeking asylum in the United States after the dangerous MS-13

gang in El Salvador beat him and threatened to kill him, and Salvadoran police targeted

him.  Fearing for his life, E.E.C.S. presented himself to U.S. immigration officers in

December 2017.  An asylum officer found that E.E.C.S. had a credible fear of

persecution and referred him for removal proceedings.  The Los Angeles ICE Field

Office denied E.E.C.S.'s request for parole pursuant to the Deterrence Policy, even

though he has established his identity, identified a sponsor with whom he could live, and

shown that he poses no flight risk or danger to the community.  E.E.C.S. has been

detained for over three months.  E.E.C.S. is currently detained at the James A. Musick

detention facility in Irvine, California.

18.     L.I.L.M. is seeking asylum in the United States after fleeing a dangerous

criminal cartel in Mexico.  Fearing for his life, L.I.L.M. presented himself to U.S.

immigration officers in October 2017.  An asylum officer found that L.I.L.M. had a

credible fear of persecution and referred him for removal proceedings.  L.I.L.M.

submitted two requests for parole, submitting evidence of his identity and letters of

support from a family member who can serve as his sponsor.  The Los Angeles ICE Field

Office orally denied both his parole requests without providing him any explanation or

written decision.  L.I.L.M. has been detained for over four months.  L.I.L.M. is currently

detained at the James A. Musick detention facility in Irvine, California.

19.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary

of Department of Homeland Security ("DHS").  In this capacity, she directs each of the

component agencies within DHS, including U.S. Immigration and Customs Enforcement

("ICE").  Defendant Nielsen is responsible for the administration of immigration laws

and policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the

detention of arriving asylum seekers.

20.     Defendant Thomas D. Homan is sued in his official capacity as the Deputy

Director and Senior Official Performing the Duties of the Director of ICE, the sub-agency

that operates the government's immigration detention system.  In this capacity,

Defendant Homan directs the administration of ICE's detention policies and operations,

including those policies and operations regarding the detention of arriving asylum

seekers.

21.     Defendant Rebecca Adducci is sued in her official capacity as Director of

the Detroit ICE Field Office.  In this capacity, Defendant Adducci is responsible for ICE

detention policies and operations in the Detroit District, which covers detention facilities

in Michigan and Ohio, including those policies and operations regarding the detention of

arriving asylum seekers.

22.     Defendant William P. Joyce is sued in his official capacity as Acting

Director of the El Paso ICE Field Office.  In this capacity, Defendant Joyce is responsible

for ICE detention policies and operations in the El Paso District, which covers detention

facilities in New Mexico and West Texas, including those policies and operations regarding the detention of arriving asylum seekers.

23.     Defendant David Marin is sued in his official capacity as Director of the Los Angeles ICE Field Office.  In this capacity, Defendant Marin is responsible for ICE detention policies and operations in the Los Angeles District, which covers detention facilities in the Los Angeles area, including those policies and operations regarding the detention of arriving asylum seekers.

24.     Defendant John Tsoukaris is sued in his official capacity as Director of the Newark ICE Field Office.  In this capacity, Defendant Tsoukaris is responsible for ICE detention policies and operations in the Newark District, which covers detention facilities in the New Jersey area, including those policies and operations regarding the detention of arriving asylum seekers.

25.     Defendant Greg Brawley is sued in his official capacity as Director of the Philadelphia ICE Field Office.  In this capacity, Defendant Brawley is responsible for ICE detention policies and operations in the Philadelphia District, which covers detention facilities in Pennsylvania, including those policies and operations regarding the detention of arriving asylum seekers.

26.     Defendant Jefferson Sessions is the Attorney General of the United States and the most senior official in the U.S. Department of Justice ("DOJ").  He has the authority to interpret the immigration laws and adjudicate custody hearings for detained immigrants.  The Attorney General delegates this responsibility to the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the Board of Immigration Appeals ("BIA").  He is named in his official capacity.

27.     Defendant James McHenry is the Director of EOIR, the agency within DOJ responsible for the immigration courts and the BIA.  He is named in his official capacity.

## FACTUAL BACKGROUND

**A.      Legal Framework Governing Parole of Asylum Seekers.**

28.     Under the INA, a person who is subjected to expedited removal who requests asylum at a port of entry to the United States must first demonstrate a credible fear of persecution in his or her home country during an interview with an immigration officer—meaning there is a "significant possibility" that the individual is eligible for asylum.  8 U.S.C. § 1225(b)(1)(B)(v).  If an individual establishes a credible fear of persecution, he or she is then entitled to a hearing before an immigration judge to adjudicate the asylum claim.  *See id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

29.     There typically is an interval of several months between an asylum seeker's credible-fear interview with an immigration officer and a decision on his or her asylum claim by an immigration judge.  During that period, DHS must determine whether the individual should be detained or released pending resolution of the asylum claim.  That resolution can take more than a year or even several years if it involves appeals to the Board of Immigration Appeals ("BIA") or a federal court of appeals.

30.     Pursuant to the INA and implementing regulations, asylum seekers who do not pose a flight risk or a danger to the community may be paroled by DHS during the pendency of their immigration cases on a "case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A), 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

31.     DHS issued the Parole Directive in 2009.[1]  The Parole Directive defines the circumstances under which there is a "significant public benefit" to granting parole pursuant to the INA and implementing regulations.  The Parole Directive provides that, absent exceptional overriding factors, an asylum seeker who has established a credible fear of persecution should be granted parole in the "public interest" and released from detention while pursuing his or her asylum claims if the individual (a) establishes his or her identity to the satisfaction of DHS; and (b) presents neither a flight risk nor danger to the community.  Parole Directive ¶ 6.2.

32.     DHS's policy, reflected in the Parole Directive, against the detention of asylum seekers who have credible claims to asylum ensures that the government adheres to constitutional prohibitions against arbitrary detention.  Asylum seekers, including those detained at ports of entry into the United States, are "persons" who may not be deprived of liberty without due process of law under the Due Process Clause. Accordingly, the Due Process Clause, as well as the INA and its implementing regulations, preclude DHS from subjecting a *bona fide* asylum seeker to long-term civil immigration detention absent an individualized determination that the individual poses a flight risk or is a danger to the community.

33.     Until recently, DHS relied on the Parole Directive to grant parole to thousands of asylum seekers with a credible fear, based on individualized findings that their detention was unnecessary.  This is not surprising:  the overwhelming majority of asylum seekers who establish a credible fear lack any criminal history, pose no threat to

---

[1] ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

public safety, and do not need to be detained to ensure their appearance for court proceedings.[2]

34.     DHS has not revoked or amended the Parole Directive.  Indeed, in February 2017, then-DHS Secretary John Kelly stated that the Parole Directive "remain[s] in full force and effect" pending the DHS Secretary's "further review and evaluation."[3]  DHS has not withdrawn or amended the Parole Directive since that time.

35.     The government also represented to the Supreme Court of the United States last year that the Parole Directive remains "in 'full force and effect.'"[4]  The government emphasized that the Parole Directive generally requires DHS "to release the alien if he establishes his identity [and] demonstrates that he is not a flight risk or danger," and requires an individualized analysis that "calls for far more than checking a box on a form."[5]

36.     So long as the Parole Directive remains in effect, it is binding on ICE, and its provisions must be applied to asylum seekers who establish a credible fear of persecution.  *See Abdi v. Duke*, 280 F. Supp. 3d 373, 2017 WL 5599521, at *28

---

[2] *See, e.g.*, Mark Noferi, *A Humane Approach Can Work: The Effectiveness of Alternatives to Detention for Asylum Seekers*, at 1, 3 (July 2015), https://www.americanimmigrationcouncil.org/sites/default/files/research/a_humane_appr oach_can_work_the_effectiveness_of_alternatives_to_detention_for_asylum_seekers.pdf (summarizing research showing that asylum seekers are predisposed to comply with legal processes).

[3] *See* Memorandum from John Kelly, *Implementing the President's Border Security and Immigration Enforcement Improvements Policies*, at 9-10 (Feb. 20, 2017) ("Kelly Memorandum"), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

[4] Pet. Suppl. Reply Br., *Jennings v. Rodriguez*, No. 15-1204, at 6 n.2 (U.S. filed Feb. 21, 2017) (quoting the Kelly Memorandum at 10).

[5] *Id.* at 6-7 (internal quotations and citation omitted).

(W.D.N.Y. Nov. 17, 2017), *injunction clarified*, 2018 WL 798747 (W.D.N.Y. Feb. 9, 2018), *appeal pending*, No. 18-94 (2d Cir. filed Jan. 12, 2018).

> **B.**     **The Unlawful Detention of Virtually All Asylum Seekers at Five ICE Field Offices.**

37.     DHS has, since the Trump Administration took office last year, implemented a *de facto* policy of denying parole in virtually all cases at its Detroit, El Paso, Los Angeles, Newark, and Philadelphia Field Offices ("the ICE Field Offices"). Altogether, these ICE Field Offices detain approximately 24 percent of ICE's total average daily detention population.

38.     ICE data suggests that the ICE Field Offices likely denied at least 1,000 requests for parole by arriving asylum seekers during 2017.  Between February and September 2017,[6] the ICE Field Offices denied parole at the following rates:  Detroit officers denied 63 of 64 parole requests, or 98 percent of cases; El Paso officers denied 349 of 349 parole requests, or 100 percent of cases; Los Angeles officers denied 326 of 354 parole requests, or 92 percent of cases; Newark officers denied 10 of 10 parole requests, or 100 percent of cases; and Philadelphia officers denied 43 of 43 cases, or 100 percent of cases.

39.     This is a dramatic change from ICE's past practice pursuant to the Parole Directive.  Between 2011 and 2013, the ICE Field Offices paroled 92 percent of arriving asylum seekers pursuant to the Directive.  More recently, the parole rate began to fall, dropping to less than 4 percent on average across the ICE Field Offices during the period from February through September 2017.

---

[6] September 2017 data is the the most recent data available to Plaintiffs.

40.     Since the Trump Administration came into office, officers in the ICE Field Offices repeatedly have told detainees and their attorneys that parole will no longer be granted.

41.     The ICE Field Offices are no longer following the requirements of the Parole Directive.  Asylum seekers routinely are not notified of the availability of parole, in violation of the Parole Directive.  *See* Parole Directive, §§ 6.1, 8.1 (requiring DHS officers to provide asylum seeker with parole advisal "[a]s soon as practicable following a credible fear determination").  When notification is provided, the ICE officer does not "explain the contents of the notification to the [asylum seeker] in a language he or she understands," also in violation of the Parole Directive.  *Id.* § 8.1.  Some asylum seekers are denied parole even before they are notified of their ability to seek it, again in violation of the Parole Directive.  Others are not given interviews before their parole requests are denied, likewise in violation of the Parole Directive.  *See id.* § 8.2 (requiring parole interview generally "no later than seven days" after asylum seeker passes credible fear screening).  Indeed, sometimes the ICE Field Offices simply do not respond to asylum seekers' parole requests at all.

42.     Even where the ICE Field Offices ostensibly consider parole requests, they no longer provide individualized determinations of flight risk and danger, in violation of the Parole Directive.  *See id.* § 6.2.  Instead, the ICE Field Offices issue denials that give no indication that the evidence in support of the parole request has been considered.  The denials typically come in the form of very short form letters that contain boilerplate language and/or checkboxes indicating that the asylum seeker poses a "flight risk" or has not sufficiently demonstrated her identity.  These form denials provide no

explanation of why the asylum seeker has been denied parole or any indication that the request was given any individualized consideration at all, again in violation of the Parole Directive. *See id.* § 8.2 ("The letter must include a brief explanation of the reasons for denying parole."). The form denials also typically come in English, including for asylum seekers who do not understand English—another violation of the Parole Directive. *See id.* The denials also often do not inform the asylum seeker of her right to seek redetermination of the denial, which is yet another violation. *See id.*

43.     As a result, many asylum seekers who clearly satisfy the Parole Directive's criteria for release are denied parole. The ICE Field Offices grant release only in extremely narrow circumstances—such as medical emergencies or a shortage in detention bed space. The result is that numerous individuals for whom detention serves no permissible purpose are being deprived of their liberty—for months or even years—as they wait for their asylum claims to be adjudicated.

44.     Officials at ICE Headquarters are fully aware of and have permitted the ICE Field Offices to implement this policy. The Parole Directive specifically requires ICE Headquarters to analyze periodic reporting on parole decisions and take corrective action as needed. *See* Parole Directive ¶¶ 8.11, 8.12. Although ICE Headquarters has been aware of detention practices across the ICE Field Offices for more than a year, it has taken no action to require the ICE Field Offices to follow the Parole Directive.

45.     Another federal court recently held that ICE officers at ICE's Buffalo, New York Field Office violated the Parole Directive through their blanket detention of asylum seekers. In November 2017, the U.S. District Court for the Western District of New York found that the government had engaged in a class-wide practice of issuing

"blanket denials" to parole requests that failed to analyze each case "'on its own merits and based on the facts of the individual alien's case,'" in violation of the Parole Directive. *Abdi*, 2017 WL 5599521, at *23. The court granted a preliminary injunction requiring, among other things, that the Buffalo ICE Field Office "immediately adjudicate" the parole requests of a class of detained asylum seekers "in conformance with [its] legal obligations, including [its] obligations under the [Parole] Directive." *Id.* at *28.

### C. The Deterrence Motive Behind the Virtually Blanket Detention at the ICE Field Offices.

46. DHS's *de facto* policy of denying parole in virtually all cases at the ICE Field Offices, without individualized determinations of flight risk or danger to the community, would be unlawful regardless of the motive behind that policy. But here, that illegality is exacerbated by the policy's unlawful motive. The Deterrence Policy is plainly motivated by the Trump Administration's goal of deterring *other* asylum seekers from seeking refuge in the United States. As this Court found in its preliminary injunction ruling in *R.I.L-R.*, deterrence of others—which is a function of criminal law— is not a permissible basis for civil immigration detention. *See R.I.L-R.*, 80 F. Supp. 3d at 189-90.

47. The Trump Administration's own words establish that the Deterrence Policy is indeed deterrence-based. Executive Order No. 13767, *Border Security and Immigration Enforcement Improvements*, 82 Fed. Reg. 8793 (Jan. 30, 2017), makes detention central to the Administration's efforts to deter what it considers unauthorized migration. The Order makes it the policy of the Executive Branch to "detain individuals apprehended on suspicion of violating . . . Federal immigration law, pending further

proceedings regarding those violations." *Id.* at 8793.  This new detention policy aims, in part, "to secure the Nation's southern border" and "prevent further illegal immigration into the United States."  *Id.* at 8793.

48.    On February 20, 2017, then-DHS Secretary John Kelly issued the Kelly Memorandum, which implemented the Executive Order through "new policies designed to stem illegal immigration and facilitate the . . . . detention and removal of aliens who have no lawful basis to enter or remain in the United States."[7]  The Kelly Memorandum did not rescind the Parole Directive, and, indeed, stated that the Directive "remain[s] in full force and effect" pending the DHS Secretary's "further review and evaluation."[8]  Nonetheless, the Kelly Memorandum articulated that DHS would broadly detain migrants as a means of deterring other migrants from coming to the United States.  This in turn has resulted in Defendants violating the Parole Directive at the ICE Field Offices by effectuating the Deterrence Policy.

49.    With respect to detention, the Kelly Memorandum states that "[t]he President has determined that the lawful detention of aliens arriving in the United States . . . pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders."[9]  To that end, "[p]olicies that facilitate the release of removable aliens apprehended at and between the ports of entry . . . collectively referred to as 'catch-and-release,' shall end."[10]

---

[7] Kelly Memorandum at 1.
[8] *Id.* at 9-10.
[9] *Id.* at 2.
[10] *Id.*

50.    An earlier draft of the Kelly Memorandum states the Administration's deterrence goals in even clearer terms.  The draft expressly states that DHS's new enforcement policies—including its expanded use of detention to end "catch-and-release"—were "designed to *deter* illegal immigration," and that "[t]he President has determined that the lawful detention of arriving aliens pending a determination of their inadmissibility and eligibility for immigration relief has a significant *deterrent* effect on illegal immigration."[11]  The final version of the memorandum merely replaces "deter illegal immigration" with "stem illegal immigration," and "significant deterrent effect" with "most efficient means by which to enforce the immigration laws."  Despite these cosmetic revisions, which were presumably made to create the appearance that the memo does not violate *R.I.L-R.* and the authorities on which it is based, the purpose of DHS's new detention policies remains clear: the *deterrence* of migration to the United States.

51.    Since the Kelly Memorandum was issued, the Trump Administration has continued to emphasize its goal of deterring migration through detention.  A recent White House Framework on Immigration Reform & Border Security provides that "[t]he Department of Homeland Security must have tools to deter illegal immigration."  Specifically, the Administration pledges to "[d]eter illegal entry" by ending "catch-and-release and by closing legal loopholes that have eroded our ability to secure the immigration system and protect public safety."[12]

---

[11] Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies, at 1 (Jan. 25, 2017) (draft) (emphases added), http://www.aila.org/infonet/leaked-dhs-memo-on-implementation-of-presidents.
[12] White House Framework on Immigration Reform & Border Security (Jan. 25, 2018), https://www.whitehouse.gov/briefings-statements/white-house-framework-immigration-reform-border-security/.

52.     The ICE Field Offices' detention practices for asylum seekers directly reflect the Trump Administration's commitment to arbitrary detention as a strategy of immigration enforcement and deterrence.

53.     Notwithstanding the Trump Administration's deterrence goals, detaining current asylum seekers will not deter future asylum seekers.  Individuals who flee violence and persecution and come to the United States in fear of their lives and safety will not be deterred by the threat of detention.[13]

**D.     The Deterrence Policy Causes Plaintiffs and Proposed Class Members Irreparable Harm.**

54.     Defendants' categorical detention of Plaintiffs and those similarly situated, without any individualized review of flight risk and danger to the community, has caused Plaintiffs and those similarly situated irreparable harm.

55.     Detention facilities for asylum seekers are punitive and abusive.[14]  ICE uses secure facilities to detain asylum seekers, including jails designed to hold individuals charged with or convicted of crimes.  Asylum seekers detained in secure facilities are often subjected to physical and verbal abuse at the hands of security personnel.  Medical and mental healthcare at ICE detention facilities is typically inadequate.

---

[13] *See* Jonathan Hiskey, et al., *Understanding the Central American Refugee Crisis: Why They Are Fleeing and How U.S. Policies Are Failing to Deter Them* (American Immigration Council 2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/understanding_the_central_american_refugee_crisis.pdf.

[14] *See, e.g.*, USCIRF, *Report on Asylum Seekers in Expedited Removal, Volume I: Findings and Recommendations*, at 60-61, 68-69 (2005), http://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf.

56.     The detention of asylum seekers causes them psychological and physical trauma.  Confined detainees have little information or control over their environments and often experience circumstances similar to "sensory deprivation."[15]  They develop feelings of "helplessness and hopelessness that lead to debilitating depressive symptoms, chronic anxiety, despair, dread," Post-Traumatic Stress Disorder ("PTSD"), and suicidal ideation.[16]  Some attempt suicide.

57.     Asylum seekers are particularly vulnerable to trauma because detention may exacerbate traumas they have experienced in the past.[17]  The court in the *Abdi* case found that class members' "physical and psychological impairments" resulting from their "prolonged confinement" established that detainees were irreparably harmed.  2017 WL 5599521, at *23.  These deleterious impacts of detention begin immediately and worsen over time.

58.     Detention also impairs asylum seekers' ability to adequately prepare for and litigate their asylum hearings.  *See id.*  Representation is crucial to prevailing on an asylum claim,[18] yet detention makes it much less likely that asylum seekers can secure lawyers, gather evidence, and prepare their asylum cases.  Detention centers under the

---

[15] Physicians for Human Rights, *Punishment Before Justice: Indefinite Detention in the U.S.*, at 7-11 (2011), https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.

[16] *Id*. at 11.

[17] *Id*. at 26-27; *see also* Physicians for Human Rights and Bellevue/NYU Program for Survivors of Torture, *From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers* at 2 (2003) (study of 70 detained asylum seekers finding that 86 percent experienced symptoms of depression, 77 percent anxiety, and 50 percent PTSD).

[18] *See, e.g.*, TRAC Immigration, *Asylum Representation Rates Have Fallen Amid Rising Denial Rates* (Nov. 28, 2017), http://trac.syr.edu/immigration/reports/491/ (reporting government data showing represented asylum seekers are five times more likely to win asylum than *pro se* litigants).

jurisdiction of several of the ICE Field Offices are located in remote locations, far from

*pro bono* immigration lawyers, making it very difficult for individuals to obtain legal

advice.  Detention further curtails access to counsel by imposing strict limitations on

attorney access and attorney communications.  For those asylum seekers able to secure

representation, the conditions of detention impair their ability to develop trusting

relationships with attorneys, which are necessary to prepare their claims for protection.

## CLASS ACTION ALLEGATIONS

59.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure

23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated.  The

proposed class is defined as follows:

> (1) All arriving asylum seekers; (2) who are found to have a credible fear
> of persecution or torture; and (3) who are or will be detained by U.S.
> Immigration and Customs Enforcement; (4) after having been denied
> parole under the authority of ICE's Detroit, El Paso, Los Angeles,
> Newark, or Philadelphia Field Office.

60.     The class is so numerous that joinder of all members is impracticable.

According to ICE data, from February to September 2017 alone, the ICE Field Offices

denied nearly 800 requests for parole by asylum seekers who passed their credible fear

interviews.  This data suggests that, since late January 2017, more than 1,000 asylum

seekers likely have been detained and denied parole pursuant to Defendants' Deterrence

Policy, and therefore have satisfied the class definition.  Many more individuals will

become class members in the future.

61.     Whether the Deterrence Policy is lawful presents common questions of

fact and law.  All class members have been subjected to a common Deterrence Policy.

The facts and circumstances surrounding that policy thus concern all class members.  The issues regarding the legality of the Deterrence Policy also apply to the class as a whole.

62.     The claims of the representative parties are typical of the claims of the class.  Plaintiffs and the class of individuals they seek to represent have all been detained pursuant to the policies and practices described above.  The legal claims raised by Plaintiffs are identical to the class claims.

63.     Plaintiffs are adequate representatives because they seek the same relief as the other members of the class:  that Defendants be enjoined from applying the Deterrence Policy and required to determine custody based on an individualized determination of each migrant's flight risk and danger to the community through the parole process and at a custody hearing before an immigration judge.  Plaintiffs do not have any interests adverse to those of the class as a whole.

64.     The proposed class would be represented by counsel from the ACLU, Covington & Burling LLP, the Center for Gender and Refugee Studies, and Human Rights First.  Counsel have extensive experience litigating class action lawsuits, including lawsuits on behalf of immigration detainees.  Counsel also have significant legal and factual expertise on the detention of asylum seekers.

65.     Defendants have acted on grounds generally applicable to the class by applying the Deterrence Policy to all class members.  Thus, injunctive and declaratory relief is appropriate with respect to the class as a whole.

## CAUSES OF ACTION

**First Claim**
**(Administrative Procedure Act)**
**Unlawful Failure to Follow and/or Effective Rescission the ICE Parole Directive**

66.     All of the foregoing allegations are repeated and realleged as though fully

set forth herein.

67.     Pursuant to the Deterrence Policy, Defendants have detained Plaintiffs and

similarly-situated persons without parole reviews that conform to the requirements of the

Parole Directive.

68.     Through the Deterrence Policy, DHS has violated and/or *de facto*

rescinded the Parole Directive without providing any reasoned justification for its change

in policy.

69.     DHS's violation and/or effective rescission of its own Parole Directive

while representing that the Directive remains in full force and effect is unlawful.

70.     Defendants' actions are arbitrary and capricious and contrary to law, in

violation of the APA.  *See* 5 U.S.C. § 706(2).

**Second Claim**
**(Administrative Procedure Act – Violation of the Immigration and Nationality Act**
**and Implementing Regulations)**
**Failure to Provide an Individualized Determination of Flight Risk and Danger**

71.     All of the foregoing allegations are repeated and realleged as though fully

set forth herein.

72.     Pursuant to the Deterrence Policy, Defendants have detained Plaintiffs and

persons similarly situated, without having made individualized determinations through

the parole-review process that such detention is necessary based on flight risk or danger

to the community.  Defendants have done so to deter other asylum seekers from seeking refuge in the United States.

73.     Defendants' Deterrence Policy constitutes final agency action for which there is no other adequate remedy.  This action governs parole decisions made by ICE agents at the ICE Field Offices pursuant to INA § 212(d)(5), 8 U.S.C. § 1182(d)(5), 8 C.F.R. § 212.5(b), and will govern parole decisions made at those field offices in the future.  Because of the Deterrence Policy, Plaintiffs and those similarly situated have been or will be detained without individualized parole review on flight risk or danger.

74.     Under the INA and implementing regulations, immigration detention of an asylum seeker must be based on an individualized determination that the asylum seeker constitutes a flight risk or a danger to the community.  Detention based on general deterrence of others is not permissible.  Accordingly, the Deterrence Policy violates the INA and its implementing regulations.

**Third Claim**
**(Due Process Clause of the Fifth Amendment to the United States Constitution)**
**Failure to Provide an Individualized Determination of Flight Risk and Danger**

75.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

76.     The Due Process Clause provides that "no person . . . shall be deprived of . . . liberty . . . without due process of law."  U.S. Const., amend. V.

77.     Asylum seekers who present themselves at a port of entry to the United States are "persons" who may not be deprived of liberty without due process of law under the Due Process Clause.

78.     The Due Process Clause permits civil immigration detention of an asylum seeker only where such detention is reasonably related to the government's interests in preventing flight or protecting the community from danger.  Thus, due process requires an individualized assessment of flight risk or danger to the community to determine whether detention is justified.

79.     In addition, particularly where detention is prolonged, due process requires a custody hearing before a neutral decision-maker to determine if detention is necessary.

80.     Pursuant to the Deterrence Policy, Defendants have detained Plaintiffs and similarly situated persons without individualized determinations of flight risk or danger to the community through the parole process or at a custody hearing before a neutral decision-maker.  Thus, the Deterrence Policy violates the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Certify this case as a class action lawsuit, as proposed herein, appoint Plaintiffs as class representatives, and appoint the undersigned counsel as class counsel;

b.  Declare that the Deterrence Policy is arbitrary and capricious and contrary to law;

c.  Enter an order enjoining Defendants from detaining Plaintiffs and proposed class members absent parole reviews that result in individualized determinations that detention is necessary to prevent flight or danger to the community and that conform to the other requirements of the Parole Directive;

d.  Enter an order enjoining Defendants from subjecting Plaintiffs and proposed class members to prolonged detention absent a custody hearing before an immigration

judge to determine if detention is necessary to prevent flight or danger to the community;

e.   Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act and any other applicable statute or regulation; and

f.   Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: March 15, 2018

Respectfully submitted,

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS
PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Hardy Vieux (D.C. Bar No. 474762)
Laura Gault*
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692

Josie Cardoso-Rojo
HUMAN RIGHTS FIRST
75 Broad Street, 31st floor
New York, NY 10004
(212) 845-5200

Dennis B. Auerbach (D.C. Bar No. 418982)
Philip J. Levitz (D.C. Bar No. 1018430)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

Eunice Lee
Blaine Bookey
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA
915 15th Street, NW, 2nd floor
Washington, D.C. 20005-2302
(202) 457-0800

Farrin R. Anello
Edward Barocas
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
P.O. Box 32159
Newark, NJ 07102
(973) 642-2084

*Although LCvR 83.2(c) and (d) do not apply to Ms. Gault, she appears before the Court pursuant to LCvR 83.2(g), which states, "ATTORNEYS REPRESENTING INDIGENTS. Notwithstanding (c) and (d) above, an attorney who is a member in good standing of the District of Columbia Bar or who is a member in good standing of the bar of any United States Court or of the highest court of any State may appear, file papers and practice in any case handled without a fee on behalf of indigents upon filing a certificate that the attorney is providing representation without compensation." Ms. Gault is not receiving compensation for her services.

Michael J. Steinberg
Abril Valdes
AMERICAN CIVIL LIBERTIES UNION
FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814

Leon Howard
Kristin Greer Love
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87104
(505) 266-5915, x1007

Witold J. Walczak
Golnaz Fakhimi
ACLU OF PENNSYLVANIA
247 Ft. Pitt Blvd., 2nd floor
Pittsburgh, PA 15222
(412) 681-7864

Freda J. Levenson
ACLU OF OHIO
4506 Chester Ave.
Cleveland, OH 44103
(216) 472-2220

Ahilan T. Arulanantham
Sameer Ahmed
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232

Edgar Saldivar
Andre Segura
ACLU FOUNDATION OF TEXAS, INC.
1500 McGowen, Suite 250
Houston, TX 77004
(713) 942-8146 x111