**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANSLY DAMUS, *et al.*, on behalf of themselves and others similarly situated, )<br><br>*Plaintiffs,* )<br><br>*v.* )<br><br>KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security, in her official capacity, *et al.*, )<br><br>*Defendants.* ) | Civil Action No. 1:18-cv-00578 (JEB) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Dennis B. Auerbach (D.C. Bar No. 418982)
Philip J. Levitz (D.C. Bar No. 1018430)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

*Additional counsel listed at end of memorandum*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 3

    A.    Legal Framework Governing Parole Decisions .......................................... 3

        1.    INA and Implementing Regulations ................................................. 3

        2.    The Parole Directive ........................................................................ 5

    B.    Unlawful Detention of Virtually All Asylum Seekers at the Five ICE Field Offices ....................................................................................... 7

    C.    Deterrence Motive Behind the Virtually Blanket Detention at the ICE Field Offices ..................................................................................... 11

    D.    Application of the Deterrence Policy to Plaintiffs .................................... 13

LEGAL STANDARD ......................................................................................... 16

ARGUMENT ...................................................................................................... 16

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ....................... 16

    A.    The Deterrence Policy Violates the APA. ................................................ 16

        1.    DHS's Departure from the Parole Directive Is Arbitrary, Capricious, and Contrary to Law. ................................................. 17

        2.    DHS's Refusal to Provide Individualized Parole Determinations Violates the INA and Its Implementing Regulations. ................................................................................... 23

        3.    All the Other Requirements for APA Relief Are Satisfied. .......... 32

    B.    The Deterrence Policy Violates the Due Process Clause .......................... 36

        1.    Arriving Asylum Seekers Are Protected by the Due Process Clause ............................................................................................. 36

        2.    DHS's Refusal to Provide Individualized Parole Determinations Violates the Due Process Clause. ....................... 39

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF. .................................................................................... 41

III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF. ...................................................................... 42

CONCLUSION ................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke*,
280 F. Supp. 3d 373 (W.D.N.Y. 2017) ............................................................... *passim*

*Ahad v. Lowe*,
235 F. Supp. 3d 676 (M.D. Pa. 2017) ...................................................................37, 38

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*,
522 U.S. 359 (1998)...........................................................................................23

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ..................................................................................23

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) ............................................................................33, 34

*Bell v. Wolfish*,
441 U.S. 520 (1979)...........................................................................................29, 40

*Bellarno Int'l Ltd. v. Food & Drug Admin.*,
678 F. Supp. 410 (E.D.N.Y. 1988) ...........................................................................20

*Bennett v. Spear*,
520 U.S. 154 (1997)...........................................................................................33, 34

*Boumediene v. Bush*,
553 U.S. 723 (2008)...........................................................................................39

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)...........................................................................................35

*Bowen v. Michigan Academy of Family Physicians*,
476 U.S. 667 (1986)...........................................................................................36

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ............................................................................41, 42

*Clark v. Martinez*,
543 U.S. 371 (2005)...........................................................................................27

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
637 F.3d 408 (D.C. Cir. 2011) ..................................................................................34

*Darby v. Cisneros*,
   509 U.S. 137 (1993)................................................................................35

*Diaz v. Schiltgen*,
   946 F. Supp. 762 (N.D. Cal. 1996) ......................................................25, 31

*Doe v. Hampton*,
   566 F.2d 265 (D.C. Cir. 1977)............................................................17, 18

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health &*
   *Human Servs.*,
   396 F.3d 1265 (D.C. Cir. 2005) ..............................................................35

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)......................................................................22, 23

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...............................................................................22

*Foucha v. Louisiana*,
   504 U.S. 71 (1992)...........................................................................29, 40

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ...................................................................43

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012) .................................................................33

*Hubbard v. EPA*,
   809 F.2d 1 (D.C. Cir. 1986) ....................................................................37

*INS v. St. Cyr*,
   533 U.S. 289 (2001)...............................................................................36

*Jackson v. Indiana*,
   406 U.S. 715 (1972)...............................................................................40

*Jean v. Nelson*,
   472 U.S. 846 (1985)....................................................................... *passim*

*Jefferson v. Harris*,
   2018 WL 324209 (D.D.C. Jan. 5, 2018)..............................................17, 18

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018).............................................................24, 27, 31, 45

*Kansas v. Crane*,
   534 U.S. 407 (2002)...........................................................................28, 40

*Kansas v. Hendricks*,
    521 U.S. 346 (1997) ...............................................................................28, 29, 40

*Lopez v. Fed. Aviation Admin.*,
    318 F.3d 242 (D.C. Cir. 2003) .................................................................................18

*Maldonado v. Macias*,
    150 F. Supp. 3d 788 (W.D. Tex. 2015)....................................................................37

*Marczak v. Greene*,
    971 F.2d 510 (10th Cir. 1992) .................................................................................25

*Mass. Fair Share v. Law Enforcement Assistance Admin.*,
    758 F.2d 708 (D.C. Cir. 1985)..........................................................................17, 18

*McLouth Steel Prod. Corp. v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988) ........................................................................20, 26

*Morton v. Ruiz*,
    415 U.S. 199 (1974)...........................................................................................17, 18

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804).....................................................................................32

*Nat'l Venture Capital Ass'n v. Duke*,
    2017 WL 5990122 (D.D.C. Dec. 1, 2017)...............................................................24

*Ngo v. INS*,
    192 F.3d 390 (3d Cir. 1999)....................................................................................37

*O'Donnell Const. Co. v. D.C.*,
    963 F.2d 420 (D.C. Cir. 1992) ................................................................................44

*Pharm. Research & Manufacturers of Am. v. United States Dep't of
    Health & Human Servs.*, 138 F. Supp. 3d 31 (D.D.C. 2015).....................................34

*R.I.L-R. v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................. *passim*

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ..................................................................................36

*Rosales-Garcia v. Holland*,
    322 F.3d 386 (6th Cir. 2003) .......................................................................37, 38, 39

*Seretse-Khama v. Ashcroft*,
    215 F. Supp. 2d 37 (D.D.C. 2002) ....................................................................43, 44

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953)................................................................38, 39

*Sottera, Inc. v. FDA,*
    627 F.3d 891 (D.C. Cir. 2010) ...............................................16

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) ...............................................37

*U.S. Tel. Ass'n v. F.C.C.,*
    28 F.3d 1232 (D.C. Cir. 1994) ...........................................20, 26

*United States v. Ali,*
    718 F.3d 929 (D.C. Cir. 2013) ...............................................32

*United States v. Bogle,*
    855 F.2d 707 (11th Cir. 1988) ...............................................43

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954)....................................................17, 18, 21, 22

*Venetian Casino Resort, L.L.C. v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ...............................................23

*Washington Legal Found. v. Kessler,*
    880 F. Supp. 26 (D.D.C. 1995) ...............................................33

*Zadvydas v. Davis,*
    533 U.S. 678 (2001)................................................... *passim*

**Statutes**

5 U.S.C. § 701(a) ..............................................................................32

5 U.S.C. § 704.....................................................................................32

5 U.S.C. § 706(2)(A)...................................................................16, 37

8 U.S.C. § 1101....................................................................................2

8 U.S.C. § 1182(d)(5) ...............................................................4, 24, 25,26

8 U.S.C. § 1225(b)(1)(B) ..............................................................3, 4, 23

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102....................44

**Other Authorities**

8 C.F.R. § 208.30(f) ..............................................................................4

8 C.F.R. § 212.5(b) ..........................................................................4, 18, 19, 26

8 C.F.R. § 235.3(c) .........................................................................................4

UNHCR, *Guideline on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, Guideline No. 4.1.4  (2012), http://www.refworld.org/docid/503489533b8.html ....................................................32

Draft Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies, at 1 (Jan. 25, 2017), http://www.aila.org/infonet/leaked-dhs-memo-on-implementation-of-presidents ......................................................................13

Executive Order No. 13767, "Border Security and Immigration Enforcement Improvements," 82 Fed. Reg. 8793 (Jan. 30, 2017) ..............................11

ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/ ..............................................................5

ICE Directive 11032.3, *Identification and Monitoring of Pregnant Detainees* (Dec. 14, 2017), https://www.ice.gov/sites/default/files/documents/Document/2018/110 32_3_PregnantDetaines.pdf ........................................................................20

ICE ERO Custody Management Division Authorized DMCP Facility List, https://www.detentionwatchnetwork.org/sites/default/files/Confidentia l%20ICE%20ERO%20Facility%20List%2007-10-2017-1-1.xlsx ..............................7

International Covenant on Civil and Political Rights, Dec. 19, 1966, 1916 U.S.T. 521, art. 9 ........................................................................................31

Mark Noferi, *A Humane Approach Can Work: The Effectiveness of Alternatives to Detention for Asylum Seekers* (July 2015), https://www.americanimmigrationcouncil.org/sites/default/files/resear ch/a_humane_approach_can_work_the_effectiveness_of_alternatives_ to_detention_for_asylum_seekers.pdf ............................................................6

Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_ Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf .............................................................7

Rafael Bernal, *ICE Will Detain Pregnant Women, Ending Previous Policy*,
   The Hill (Mar. 29, 2018), http://thehill.com/latino/380827-ice-will-
   detain-pregnant-women-ending-previous-policy ........................................................20

Supplemental Reply Brief for Petitioner, *Jennings v. Rodriguez*,
   No. 15-1204, 2017 WL 727754 (U.S. filed Feb. 21, 2017) ................................ *passim*

United Nations Convention Relating to the Status of Refugees, July 28,
   1951, 19 U.S.T. 6259, arts. 26 & 31 ..........................................................................31

White House Framework on Immigration Reform & Border Security (Jan.
   25, 2018), https://www.whitehouse.gov/briefings-statements/white-
   house-framework-immigration-reform-border-security/ .............................................13

## INTRODUCTION

In *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015), this Court preliminarily enjoined a Department of Homeland Security ("DHS") policy of detaining families seeking asylum that was designed to "send[] a message of deterrence" to other migrants. *Id*. at 188-89.  Applying established Supreme Court precedent, the Court held in its preliminary-injunction ruling that immigration detention could not lawfully be founded on general deterrence—which may inform criminal, but not civil, detention.

Notwithstanding *R.I.L-R.*, DHS has now unlawfully embarked on an even *broader* policy of detaining asylum seekers on deterrence grounds at five U.S. Immigration and Customs Enforcement ("ICE") Field Offices across the country.  With the approval of ICE Headquarters, these five Field Offices have detained virtually all adults who request asylum at a port of entry to the United States and show a credible fear of persecution. The five Field Offices have detained these asylum seekers based *not* on individualized determinations that they pose a flight risk or a danger to the community, but rather to deter other migrants from seeking refuge here (the "Deterrence Policy").

Detaining asylum seekers without even considering whether they are flight risks or dangers to the community is unlawful on multiple grounds, and Plaintiffs thus are likely to succeed on the merits of their claims.  The fact that DHS is detaining virtually all asylum seekers at the five ICE Field Offices based on *deterrence* makes it even clearer that its new policy is contrary to law.

*First*, the new Deterrence Policy violates a longstanding DHS directive that bars the detention of asylum seekers absent a determination by ICE that an individual asylum seeker poses a flight risk or a danger to the community (the "Parole Directive").  The Government represented to the Supreme Court last year that the Parole Directive remains

in full force and effect, and the law is clear that government agencies are bound to follow their own rules. Yet DHS is violating the Parole Directive every day at the five ICE Field Offices. Another federal court held last November that an ICE field office in Buffalo, New York was unlawfully violating the Parole Directive by failing to provide individualized parole reviews to determine whether detention of asylum seekers was justified based on flight risk or danger to the community, and preliminarily enjoined those violations. *See Abdi v. Duke*, 280 F. Supp. 3d 373 (W.D.N.Y. 2017). This Court should do the same with respect to the ICE Field Offices at issue here.

*Second*, detention of asylum seekers without considering whether they pose flight or security risks also violates the Immigration and Naturalization Act, 8 U.S.C. § 1101, *et seq.* ("INA") and regulations promulgated thereunder. In *Jean v. Nelson*, 472 U.S. 846 (1985), the Supreme Court held that a predecessor version of the INA's parole provision requires immigration authorities to "make individualized determinations of parole." *Id.* at 857. The current version of the parole statute contains the same operative language that formed the basis for the Supreme Court's ruling in *Jean* and thus likewise mandates "individualized determinations of parole." Pursuant to INA regulations, such individualized review must be based on flight risk, danger to the community, and the public interest. Rather than conducting such individualized assessments, however, Defendants instead are unlawfully denying parole to virtually all asylum seekers based on deterrence at the five ICE Field Offices.

*Finally*, detaining asylum seekers without considering whether detention is necessary based on the specific circumstances of each individual's case violates the Due Process Clause. As this Court held in *R.I.L-R.*, due process requires that civil

immigration detention be based on "characteristics inherent in the alien himself" such as whether he or she is likely to flee or poses a danger to the community. 80 F. Supp. 3d at 188. By contrast, detaining asylum seekers "for the sake of sending a message of deterrence" to others—*i.e.*, the Deterrence Policy—is "out of line" with Supreme Court precedent applying the Due Process Clause to civil detention. *Id*. at 188-89.

ICE data suggests that, as a result of the Deterrence Policy, more than a thousand individuals in the last year have been unlawfully deprived of their liberty for nothing more than seeking refuge in a nation that has provided it to countless others since its founding. Each additional day of detention exacerbates ongoing irreparable harm to these individuals, who may be detained for many months—or even years. Absent intervention by this Court, thousands more asylum seekers will suffer the same fate. No public interest justifies such unlawful detention. Accordingly, the Court should preliminarily enjoin the Deterrence Policy and require Defendants to provide Plaintiffs and other proposed class members with individualized determinations of flight risk and danger to the community before they can be detained.

## FACTUAL BACKGROUND

### A.       Legal Framework Governing Parole Decisions

#### 1.       *INA and Implementing Regulations*

Under the INA, a person who requests asylum at a port of entry to the United States must first demonstrate a credible fear of persecution in his or her home country— meaning there is a "significant possibility" that the individual is eligible for asylum— during an interview with an immigration officer. 8 U.S.C. § 1225(b)(1)(B)(v). If an individual establishes a credible fear of persecution, he or she is entitled to a hearing

before an immigration judge to adjudicate the asylum claim.  *See id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

The time from an asylum seeker's credible fear interview with an immigration officer to a decision on his or her asylum claim by an immigration judge is typically several months.  *See, e.g.*, Ex. 1, Stambaugh Decl. ¶ 13; Ex. 2, Spector Decl. ¶ 9; Ex. 3, Ford Decl. ¶ 15; Ex. 4, Miles Decl. ¶ 9; Ex. 5, Knowles Decl. ¶ 9; Ex. 6, Major Decl. ¶ 13.  If either the asylum seeker or DHS appeals the immigration judge's asylum decision to the Board of Immigration Appeals or a federal court of appeals, the process can take longer than a year.  *See, e.g.*, Ex. 7, Damus Decl. ¶¶ 5-9 (Plaintiff in immigration detention for over a year); Ex. 2, Spector Decl. ¶ 9 (arriving asylum seeker clients in immigration detention for two and a half years).

While the asylum seeker's claim is being decided, DHS must determine whether the individual should be detained or released pending resolution of the asylum claim. Pursuant to the INA, the Secretary of DHS "may . . . in his discretion parole into the United States" "any alien applying for admission to the United States," including any asylum seeker, "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  The INA's implementing regulations provide that DHS must exercise its parole discretion on a "case-by-case basis" and that it may parole arriving aliens who "present neither a security risk nor a risk of absconding" and "whose continued detention is not in the public interest."  8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

4

2. *The Parole Directive*

In 2009, DHS issued the Parole Directive.[1]  The Parole Directive defines

circumstances under which there is a "public interest" in granting parole pursuant to the

INA and implementing regulations.  It provides that, absent exceptional overriding

factors, an asylum seeker who has established a credible fear of persecution should be

granted parole in the "public interest" and released from detention while pursuing his or

her asylum claim, so long as the individual establishes his or her identity and presents

neither a flight risk nor danger to the community.  Parole Directive ¶ 6.2.  In considering

parole applications, the Directive requires that "[e]ach alien's eligibility for parole should

be considered and analyzed on its own merits and based on the facts of the individual

alien's case." *Id.*

The Parole Directive also sets out a number of procedural requirements for DHS's

adjudication of parole applications.  These include that the agency must:

- Provide arriving noncitizens with notice of their right to seek parole, which "shall

  be explained . . . in a language they understand," *id.* ¶ 6.1;

- Conduct a parole interview within "seven days following a finding that an

  arriving [noncitizen] has a credible fear," *id.* ¶ 8.2;

- Provide written notification of the parole decision that contains "a brief

  explanation of the reasons for any decision to deny parole" within seven days of

  the interview, *id.* ¶ 6.5-6.6;

---

[1] ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, ¶ 4.4  (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

- Notify applicants whose applications are denied that they may request a redetermination, *id.* § 8.2;

- "Review all relevant documentation offered" by the asylum seeker, as well as "any other information available," in determining identity, *id*. ¶ 8.3.1.b;

- "[C]onsider whether setting a reasonable bond and/or" an alternative to detention program would mitigate any flight risk concerns, *id*. ¶ 8.3.2.c; and

- Engage in supervisory review of individual officers' decisions, *id.* ¶ 8.5-8.6.

Until recently, the ICE Field Offices relied on the Parole Directive to grant parole to thousands of asylum seekers with credible fears of persecution, based on individualized findings that their detention was unnecessary. For example, between 2011 and 2013, the ICE Field Offices paroled 92% of arriving asylum seekers pursuant to the Directive. Ex. 8, Daher Decl. ¶ 9.[2] This is not surprising: the overwhelming majority of asylum seekers who establish a credible fear lack any criminal history; pose no threat to public safety; and do not need to be detained to ensure their appearance for court proceedings.[3]

DHS has not revoked or amended the Parole Directive. Indeed, in February 2017, then-DHS Secretary John Kelly stated that the Parole Directive "remain[s] in full force

---

[2] Plaintiffs do not have access to parole data for 2010, the first year the Parole Directive was in effect. Ex. 8, Daher Decl. ¶ 6.

[3] *See, e.g.*, Mark Noferi, *A Humane Approach Can Work: The Effectiveness of Alternatives to Detention for Asylum Seekers* at 1, 3 (July 2015), https://www.americanimmigrationcouncil.org/sites/default/files/research/a_humane_appr oach_can_work_the_effectiveness_of_alternatives_to_detention_for_asylum_seekers.pdf (summarizing research showing that asylum seekers are predisposed to comply with legal processes).

and effect," pending the DHS Secretary's "further review and evaluation."[4]  DHS has not

withdrawn or amended the Parole Directive since that time.

The Government also represented to the U.S. Supreme Court last year that the

Parole Directive remains "in full force and effect."[5]  The Government emphasized that

the Parole Directive generally requires DHS "to release the alien if he establishes his

identity [and] demonstrates that he is not a flight risk or danger," and requires an

individualized analysis that "calls for far more than 'checking a box on a form.'"[6]

**B.    Unlawful Detention of Virtually All Asylum Seekers at the Five ICE Field Offices**

Notwithstanding the requirements of the Parole Directive, DHS has, since the

Trump Administration took office last year, implemented the Deterrence Policy at five

ICE Field Offices: its Field Offices in Detroit, El Paso, Los Angeles, Newark, and

Philadelphia ("the ICE Field Offices").  The Deterrence Policy is a *de facto* policy of

denying parole in virtually all cases in the regions under the jurisdiction of those five

Field Offices in order to deter others from coming to the United States.[7]

---

[4] *See* Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies ("Kelly Memorandum"), at 9-10 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_ Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.
[5] Pet. Suppl. Reply Br., *Jennings v. Rodriguez*, No. 15-1204, 2017 WL 727754, at *6 n.2 (U.S. filed Feb. 21, 2017) (quoting Kelly Memorandum at 10).
[6] *Id.* at 6-7.
[7] These ICE Field Offices detain approximately 24% of ICE's total average daily detention population.  *See* ICE ERO Custody Management Division Authorized DMCP Facility List, https://www.detentionwatchnetwork.org/sites/default/files/Confidential %20ICE%20ERO%20Facility%20List%2007-10-2017-1-1.xlsx (percentage calculated by dividing total average daily detention population in detention centers located in the five ICE Field Offices (8,575) by total average daily detention population in all detention centers (35,929) in July 2017).

According to ICE data, from February to September 2017 alone, the ICE Field Offices collectively denied nearly 800 requests for parole by asylum seekers who passed their credible fear interviews, at a denial rate of more than 96%.  Ex. 8, Daher Decl. ¶ 10.[8]  More specifically, the ICE Field Offices denied parole at the following rates: Detroit officers denied 63 of 64 parole requests, or 98% of cases; El Paso officers denied 349 of 349 parole requests, or 100% of cases; Los Angeles officers denied 326 of 354 parole requests, or 92% of cases; Newark officers denied 10 of 10 parole requests, or 100% of cases; and Philadelphia officers denied 43 of 43 cases, or 100% of cases.  *Id.* ¶ 11.  This is a dramatic departure from the 92% *grant* rate at those Field Offices pursuant to the Parole Directive between 2011 and 2013.  *See id.* ¶ 9.

Legal services providers in the jurisdictions of each of the ICE Field Offices confirm that the Field Offices have effectively stopped granting parole.  *See* Ex. 9, Bellis Decl. ¶ 12; Ex. 2, Spector Decl. ¶ 5; Ex. 3, Ford Decl. ¶¶ 6-8, 13; Ex. 4, Miles Decl. ¶¶ 5-7; Ex. 10, Del Valle Decl. ¶¶ 5-8; Ex. 5, Knowles Decl. ¶¶ 6, 10; Ex. 1, Stambaugh Decl. ¶¶ 4-6; Ex. 11, Maze Decl. ¶¶ 4-11; Ex. 6, Major Decl. ¶¶ 4-5.  These practitioners observed a marked departure from earlier treatment of parole requests, finding that individuals like the named Plaintiffs—who established their identity and pose no flight risk or danger—are now routinely denied parole, while similarly situated clients were routinely granted parole in earlier years.  *See* Ex. 9, Bellis Decl. ¶¶ 9-10, 14-15; Ex. 2 Spector Decl. ¶ 5; Ex. 3, Ford Decl. ¶¶ 6-8; Ex. 4, Miles Decl. ¶¶ 5-7; Ex. 10, Del Valle Decl. ¶¶ 5-8; Ex. 5, Knowles Decl. ¶ 10; Ex. 1, Stambaugh Decl. ¶¶ 4-6; Ex. 11, Maze Decl. ¶¶ 7, 11; Ex. 6, Major Decl. ¶ 5.  ICE officers in the Field Offices told some

---

[8] Plaintiffs do not have access to parole data after Fall 2017.  Ex. 8, Daher Decl. ¶ 6.

practitioners that "there is no more parole" for arriving asylum seekers and that such individuals "should not even bother to submit a parole request because ICE ha[s] to deny all parole requests."  Ex. 10, Del Valle Decl. ¶ 8; *accord, e.g.*, Ex. 4, Miles Decl. ¶ 6; Ex. 1, Stambaugh Decl. ¶ 6.

Testimony from Plaintiffs and legal services providers also demonstrates that the ICE Field Offices are no longer making individualized parole determinations.  Instead, the ICE Field Offices issue denials that give no indication that they are considering the evidence submitted in support of the parole requests.  The denials typically come as short form letters containing boilerplate language and/or checkboxes indicating that the asylum seeker poses a "flight risk" or has not sufficiently demonstrated her identity—even when these reasons are facially inconsistent with the evidence submitted.  *See, e.g.*, Ex. 12, N.J.J.R. Decl. ¶ 13; Ex. 13, Callol Decl. ¶¶ 10, 15; Ex. 14, Castro Decl. ¶¶ 15-17, Ex. C; Ex. 15, H.A.Y. Decl. ¶¶ 23-24, Ex. C; Ex. 18, A.M.M. Decl. ¶¶ 26-27; Ex. 17, E.E.C.S. Decl. ¶ 10; Ex. 2, Spector Decl. ¶ 8; Ex. 3, Ford Decl. ¶ 7; Ex. 4, Miles Decl. ¶ 8; Ex. 10, Del Valle Decl. ¶ 13; Ex. 5, Knowles Decl. ¶¶ 7, 11; Ex. 11, Maze Decl. ¶ 9; Ex. 6, Major Decl. ¶ 10.  In the denial letters, ICE provides no individualized explanation of why parole was denied.  *See* Ex. 13, Callol Decl. ¶ 17; Ex. 14, Castro Decl. ¶ 15, Ex. C; Ex. 15, H.A.Y. Decl. ¶ 33; Ex. 18, A.M.M. Decl. ¶ 27; Ex. 16, A.M.M. Supplemental Decl. ¶ 3, Ex. C; Ex. 17, E.E.C.S. Decl. ¶ 10; Ex. 2, Spector Decl. ¶ 8; Ex. 3, Ford Decl. ¶¶ 11, 14; Ex. 4, Miles Decl. ¶ 8; Ex. 10, Del Valle Decl. ¶ 13; Ex. 5, Knowles Decl. ¶¶ 8, 11; Ex. 1, Stambaugh Decl. ¶¶ 9-12; Ex. 11, Maze Decl. ¶ 9; Ex. 6, Major Decl. ¶¶ 10-12.  In some cases, ICE never provides *any* reasons for the denial or even any written decision at all.  Ex. 7, Damus Decl. ¶ 15; Ex. 19, L.H.A. Decl. ¶ 16; Ex. 20, L.I.L.M. Decl. ¶ 11.

The evidence also shows that the ICE Field Offices are failing to follow other requirements of the Parole Directive.  For instance, asylum seekers routinely are not notified of the availability of parole.  *See* Ex. 7, Damus Decl. ¶¶ 10-11; Ex. 12 N.J.J.R. Decl. ¶ 9; Ex. 6, Major Decl. ¶ 6.  When notification is provided, the ICE officer may not "explain the contents of the notification to the [asylum seeker] in a language he or she understands."  Parole Directive § 8.1; *see* Ex. 15, H.A.Y. Decl. ¶ 22; Ex. 16, A.M.M. ¶ 23; Ex. 19, L.H.A. Decl. ¶ 13; Ex. 17, E.E.C.S. Decl. ¶ 8; Ex. 20, L.I.L.M. Decl. ¶ 9; Ex. 9, Bellis Decl. ¶ 13; Ex. 10, Del Valle Decl. ¶ 9; Ex. 6, Major Decl. ¶ 6.  Some asylum seekers are denied parole even before they are notified of their ability to seek it.  *See, e.g.*, Ex. 14, Castro Decl. ¶¶ 13-15.

Many asylum seekers are not given parole interviews within seven days of passing a credible fear screening, or even before their parole requests are denied.  *See* Ex. 7, Damus Decl. ¶ 10; Ex. 12, N.J.J.R. Decl. ¶ 13; Ex. 13, Callol Decl. ¶ 9; Ex. 14, Castro Decl. ¶ 13; Ex. 17, E.E.C.S. Decl. ¶ 8; Ex. 9, Bellis Decl. ¶ 14; Ex. 2, Spector Decl. ¶ 6; Ex. 3, Ford Decl. ¶ 14; Ex. 10, Del Valle Decl. ¶ 10; Ex. 1, Stambaugh Decl. ¶ 7.  Sometimes the ICE Field Offices simply do not respond to parole requests.  Ex. 4, Miles Decl. ¶ 8; Ex. 6, Major Decl. ¶ 8.

When parole interviews and formal denials are provided, the denials frequently are not within seven days of the interview.  *See* Ex. 7, Damus Decl. ¶¶ 11, 15; Ex. 12, N.J.J.R. Decl. ¶¶ 10, 13; Ex. 18, A.M.M. Decl. ¶¶ 25, 27; Ex. 1, Stambaugh Decl. ¶ 7; Ex. 10, Del Valle Decl. ¶ 11; Ex. 9, Bellis Decl. ¶ 15; Ex. 2, Spector Decl. ¶ 7; Ex. 11, Maze Decl. ¶ 8; Ex. 6, Major Decl. ¶ 8.  The form denials also typically come in English, regardless of whether the asylum seeker understands English.  *See* Ex. 12, N.J.J.R. Decl.

¶ 13; Ex. 14, Castro Decl. ¶ 14; Ex. 15, H.A.Y. Decl. ¶ 33; Ex. 18, A.M.M. ¶ 27; Ex. 17, E.E.C.S. Decl. ¶ 10; Ex. 9, Bellis Decl. ¶ 16; Ex. 3, Ford Decl. ¶ 14; Ex. 10, Del Valle Decl. ¶ 12; Ex. 5, Knowles Decl. ¶ 11; Ex. 1, Stambaugh Decl. ¶ 8; Ex. 6, Major Decl. ¶ 9.  Finally, the denials may fail to inform asylum seekers of their right to seek redetermination of the denial.  *See* Ex. 5, Knowles Decl. ¶ 12.  All of this conduct violates the Parole Directive.

Officials at ICE and DHS Headquarters are fully aware of the ICE Field Offices' implementation of the Deterrence Policy and failure to follow the Parole Directive.  The Parole Directive specifically requires ICE Headquarters to analyze periodic reporting on parole decisions and take corrective action as needed.  *See* Parole Directive ¶¶ 8.11, 8.12.  Although ICE Headquarters has been aware of detention practices across the ICE Field Offices for more than a year, neither ICE Headquarters, nor the DHS Secretary, who supervises ICE Headquarters, has taken any action to require the ICE Field Offices to follow the Parole Directive.

### C.    Deterrence Motive Behind the Virtually Blanket Detention at the ICE Field Offices

Since the Trump Administration took office, it has repeatedly stated its intent to deploy detention as a strategy for deterring immigration to the United States.

On January 25, 2017, only days after his inauguration, President Trump issued Executive Order No. 13767, "Border Security and Immigration Enforcement Improvements," 82 Fed. Reg. 8793 (Jan. 30, 2017).  The Order makes it the policy of the Executive Branch to "detain individuals apprehended on suspicion of violating . . . Federal immigration law, pending further proceedings regarding those violations." *Id.* at

8793.  This new detention policy aims, in part, "to secure the Nation's southern border" and "prevent further illegal immigration into the United States." *Id.*

On February 20, 2017, then-DHS Secretary John Kelly issued a memorandum implementing the Executive Order through "new policies designed to stem illegal immigration and facilitate the . . . . detention and removal of aliens who have no lawful basis to enter or remain in the United States" (the "Kelly Memorandum").[9]  Although the Kelly Memorandum states that the Parole Directive "remain[s] in full force and effect" pending DHS's "further review and evaluation," the Memorandum also states that "[t]he President has determined that the lawful detention of aliens arriving in the United States . . . pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders."[10]  To that end, "[p]olicies that facilitate the release of removable aliens apprehended at and between the ports of entry . . . collectively referred to as 'catch-and-release,' shall end."[11]

An earlier leaked draft of the Kelly Memorandum states the Administration's deterrence goals in even clearer terms.  The draft expressly states that DHS's new enforcement policies—including its expanded use of detention to end "catch-and-release"—were "designed to *deter* illegal immigration," and that "[t]he President has determined that the lawful detention of arriving aliens pending a determination of their inadmissibility and eligibility for immigration relief has a significant *deterrent* effect on

---

[9] Kelly Memorandum at 1.
[10] *Id.* at 2, 9-10.
[11] *Id.*

illegal immigration."[12]  The final version of the memorandum makes only cosmetic revisions to this language, replacing "deter illegal immigration" with "stem illegal immigration," and "significant deterrent effect" with "most efficient means by which to enforce the immigration laws."

Since the Kelly Memorandum was issued, the Trump Administration has continued to emphasize its goal of deterring migration through detention.  A recent White House Framework on Immigration Reform & Border Security provides that "[t]he Department of Homeland Security must have tools to deter illegal immigration."[13] Specifically, the Administration pledges to "[d]eter illegal entry" by ending "catch-and-release and by closing legal loopholes that have eroded our ability to secure the immigration system and protect public safety."[14]

### D.   Application of the Deterrence Policy to Plaintiffs

Plaintiffs are asylum seekers who came to the United States fleeing grave persecution or the threat of death and were found to have a credible fear of persecution. *See* Ex. 7, Damus Decl. ¶ 5; Ex. 12, N.J.J.R. Decl. ¶ 6; Ex. 13, Callol Decl. ¶ 7; Castro Decl. ¶ 11; Ex. 15, H.A.Y. Decl. ¶ 21; Ex. 16, A.M.M. Decl. ¶ 22; Ex. 19, L.H.A. Decl. ¶ 11; Ex. 17, E.E.C.S. Decl. ¶ 6; Ex. 20, L.I.L.M. Decl. ¶ 8.  None is a flight risk and none has a criminal record or history of violence.  *See* Ex. 7, Damus Decl. ¶¶ 13-16; Ex. 12, N.J.J.R. Decl. ¶¶ 11-13; Ex. 13, Callol Decl. ¶¶ 15-17; Ex. 14, Castro Decl. ¶¶ 17-19, 21;

---

[12] Draft Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies, at 1 (Jan. 25, 2017), http://www.aila.org/infonet/leaked-dhs-memo-on-implementation-of-presidents (emphasis added).

[13] White House Framework on Immigration Reform & Border Security (Jan. 25, 2018), https://www.whitehouse.gov/briefings-statements/white-house-framework-immigration-reform-border-security/.

[14] *Id.*

Ex. 15, H.A.Y. Decl. ¶¶ 20, 23-25; Ex. 16, A.M.M. Decl. ¶¶ 21, 26-27; Ex. 19, L.H.A.

Decl. ¶¶ 16-17, 19; Ex. 17, E.E.C.S. Decl. ¶¶ 9-10; Ex. 20, L.I.L.M. Decl. ¶¶ 10-11.  Yet

DHS has imprisoned all Plaintiffs and many others like them, continuing to hold them

during the pendency of their asylum cases, with no individualized reviews of whether

such detention is necessary.  *See* Ex. 7, Damus Decl. ¶ 16; Ex. 12, N.J.J.R. Decl. ¶ 13;

Ex. 13, Callol Decl. ¶ 17; Ex. 14, Castro Decl. ¶ 21; Ex. 15, H.A.Y. Decl. ¶ 25; Ex. 16,

A.M.M. Decl. ¶ 27; Ex. 19, L.H.A. Decl. ¶ 16; Ex. 17, E.E.C.S. Decl. ¶ 10; Ex. 20,

L.I.L.M. Decl. ¶ 11.

For example, Ansly Damus came to the United States seeking asylum from

political persecution in Haiti.  Ex. 7, Damus Decl. ¶ 3.  After Mr. Damus spoke in a

seminar about a local government official who used armed gangs to intimidate the

population, members of one of these armed gangs attacked him, accused him of telling

his students to vote against the government official, and threatened to kill him.  *Id.*  Mr.

Damus came to the United States in October 2016, and an asylum officer found he had a

credible fear of persecution.  *Id.* ¶¶ 1, 5.  Mr. Damus has been granted asylum twice by an

immigration judge, and the Government has appealed both times.  *Id.* ¶¶ 6-8.  His case is

currently pending at the Board of Immigration Appeals.  *Id.* ¶ 8.

Mr. Damus has remained detained during this entire period and has now been in

detention for well over a year.  *Id.* ¶ 9.  He submitted two parole requests, which included

ample evidence of his identity, his lack of flight risk, and lack of danger.  *Id.* ¶¶ 11-16.

To establish his identity, Mr. Damus submitted copies of his birth certificate, marriage

certificate, Haitian identification card, a valid and unexpired passport, his school

diplomas and school certification, and a letter of support from his sponsor attesting to his

identity.  *Id.* ¶ 12, Exs. B & C.  His parole requests stated that he had sponsors who he could live with and who would support him if he were released, confirming that he is not a flight risk.  *Id.* ¶ 13, Exs. B & C; *see also id.* ¶ 16, Ex. C.  And the requests explained that Mr. Damus is a former ethics teacher with no criminal record.  *Id.* ¶ 14, Exs. B & C.  Yet the Detroit ICE Field Office denied his requests without any written decision or explanation for why he should be denied.  *Id.* ¶¶ 15-16.

The other named Plaintiffs also have experienced grave persecution before coming to the United States.  Abelardo Asensio Callol left Cuba due to oppression at the hands of the Cuban government, after he refused to join the Communist Party and attend a rally held in memory of Fidel Castro.  Ex. 13, Callol Decl. ¶ 3.  Alexi Ismael Montes Castro is seeking asylum in the United States after fleeing assault and threats at gunpoint in Honduras because he is gay.  Ex. 14, Castro Decl. ¶¶ 4-8.  N.J.J.R. came to the United States after beatings and threats from armed groups that seek to eliminate opposition to the Venezuelan government.  Ex. 12, N.J.J.R. Decl. ¶ 3.  L.H.A. and E.E.C.S. fled persecution from notoriously violent Salvadoran gangs, which the government cannot or will not control.  Ex. 19, L.H.A. Decl. ¶¶ 6-9; Ex. 17, E.E.C.S. Decl. ¶ 4.  H.A.Y., A.M.M., and L.I.L.M. are fleeing dangerous criminal cartels in Mexico.  Ex, 15, H.A.Y. Decl. ¶¶ 7-16; Ex. 16, A.M.M. Decl. ¶¶ 7-19; Ex. 20, L.I.L.M. Decl. ¶ 4.  Like Mr. Damus, the other Plaintiffs submitted parole requests with evidence demonstrating that they satisfied the Parole Directive's criteria.  All were denied, with no meaningful explanation.  *See* Ex. 13, Callol Decl. ¶¶ 12-17, Ex. A; Ex. 14, Castro Decl. ¶ 15; Ex. 16, A.M.M. Decl. ¶ 27; Ex. 12, N.J.J.R. Decl. ¶ 13; Ex. 17, E.E.C.S. Decl. ¶ 10; Ex. 15, H.A.Y. Decl. ¶¶ 25, 33, Ex. C; Ex. 20, L.I.L.M. Decl. ¶ 11; Ex. 19, L.H.A. Decl. ¶ 16.

All Plaintiffs are currently detained as they await final adjudications of their asylum claims. Plaintiffs already experienced trauma before fleeing their home countries and are thus particularly sensitive to the harm inflicted by continued detention. *See* Ex. 21, Keller Decl. ¶¶ 12-23 ("Detention substantially contributes to psychological distress in asylum seekers, both exacerbating pre-existing symptoms and fostering development of new symptoms."). With each additional day of incarceration, these harms grow worse. *See id.*; Ex. 7, Damus Decl. ¶¶ 17-20; Ex. 12, N.J.J.R. Decl. ¶¶ 15-16; Ex. 13, Callol Decl. ¶ 18; Ex. 14, Castro Decl. ¶ 20; Ex. 15, H.A.Y. Decl. ¶¶ 27-30; Ex. 16, A.M.M. Decl. ¶¶ 30-33; Ex. 19, L.H.A. Decl. ¶¶ 19-24; Ex. 17, E.E.C.S. Decl. ¶ 11; Ex. 20, L.I.L.M. Decl. ¶ 12.

## LEGAL STANDARD

In deciding whether to issue a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted). Plaintiffs meet these requirements.

## ARGUMENT

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     The Deterrence Policy Violates the APA.

The APA requires that courts "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As set forth below, the Deterrence Policy should be preliminarily enjoined

because DHS is failing to follow its own binding Parole Directive, and has offered no reasoned explanation for departing from it.  Accordingly, the Policy is arbitrary, capricious, and contrary to law.  The Deterrence Policy also contravenes the INA and its implementing regulations (and is thus contrary to law under the APA) because it does not afford each Plaintiff individualized consideration of whether his or her detention is justified.

       1.      *DHS's Departure from the Parole Directive Is Arbitrary,*
                *Capricious, and Contrary to Law.*

      a)      <u>The Deterrence Policy Violates the Parole Directive.</u>

Pursuant to the so-called "*Accardi* doctrine," "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions."  *Jefferson v. Harris*, 2018 WL 324209, at *6 (D.D.C. Jan. 5, 2018) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)); *accord Abdi*, 280 F. Supp. 3d at 386.  In particular, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Jefferson*, 2018 WL 324209, at *6 ("interference with regulations that seek to safeguard plaintiff's individual rights implicates the *Accardi* doctrine and its requirement that agencies abide by their own procedures"); *Abdi*, 280 F. Supp. 3d at 389 (violation of "internal policy" implicates *Accardi* doctrine if it "pertains to individual rights").

The requirement that an agency follow its own directives is not "limited to rules attaining the status of formal regulations."  *Mass. Fair Share v. Law Enforcement Assistance Admin*., 758 F.2d 708, 711 (D.C. Cir. 1985); *accord Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977).  Rather, even an unpublished manual or policy binds the

agency if "an examination of the provision's language, its context, and any available

extrinsic evidence" supports the conclusion that it is "mandatory rather than merely

precatory." *Doe*, 566 F.2d at 281; *see also Mass. Fair Share*, 758 F.2d at 711-12

(invalidating agency action that violated the "highly-refined procedures for treatment of

applications for grants" found in internal program documents); *Jefferson*, 2018 WL

324209, at *6 (plaintiff pleaded valid *Accardi* claim based on agency violations of its

"policies," "regulations[,] and guidelines").  Again, this is particularly so "[w]here the

rights of individuals are affected," *Morton*, 415 U.S. at 235, and where the guidance

provides one of "the only safeguard[s]  . . . against unlimited agency discretion," *Lopez v.

Fed. Aviation Admin.*, 318 F.3d 242, 247 (D.C. Cir. 2003).

   The Parole Directive is binding on DHS under this standard.  DHS itself refers to

it as a "directive."  *See, e.g.*, Parole Directive at 1 ("The purpose of this ICE policy

*directive* is to ensure transparent, consistent, and considered ICE parole determinations

for arriving aliens seeking asylum in the United States" (emphasis added)).  Consistent

with its status as a "directive," the Parole Directive imposes numerous substantive and

procedural obligations on DHS and ICE, many of which affect the "rights of individuals."

*Morton*, 415 U.S. at 235.  Most importantly, the Parole Directive "explain[s] how the

term ['public interest' in 8 C.F.R. § 212.5(b)] is to be interpreted by [DHS] when it

decides whether to parole arriving aliens."  Parole Directive ¶ 4.4.  In doing so, the

Directive instructs that "[e]ach alien's eligibility for parole should be considered and

analyzed on its own merits and based on the facts of the individual alien's case."  *Id*. §

6.2.  Moreover, if a noncitizen "establishes to the satisfaction of [DHS] his or her identity

and that he or she presents neither a flight risk nor danger to the community, [DHS]

should, absent additional factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." *Id.*

As noted, the Parole Directive also mandates that DHS "shall" follow a number of procedures in making parole decisions, such as the requirement that its officers inform asylum seekers of the availability of parole in a language they understand. *Id.* ¶ 6.1; *see also supra* pp. 5-6. All of the referenced substantive and procedural provisions impose obligations on the agency that it is bound to follow, and that affect whether or not individuals will continue to be deprived of their liberty.

The Government itself has confirmed that the Parole Directive imposes meaningful constraints on how DHS adjudicates parole requests. The Government represented to the Supreme Court last year that the Parole Directive requires DHS to "automatically consider parole for arriving aliens found to have a credible fear, and to release the alien if he establishes his identity, demonstrates that he is not a flight risk or danger, and there are no countervailing considerations." Pet. Suppl. Reply Br., *Jennings*, 2017 WL 727754, at *6 (Feb. 21, 2017). The Government also represented that the Directive requires a parole review that "calls for far more than 'checking a box on a form,'" and specifically "provides for notice to the alien, an interview, the opportunity to respond and present evidence," and other procedural requirements. *Id.* The Government further told the Supreme Court that the Parole Directive provides critical safeguards against the arbitrary detention of arriving asylum seekers and that it remains "in full force and effect." *See id.* at *6 n.2; *see also Abdi*, 280 F. Supp. 3d at 379 (recognizing that the Government "recently embraced" the Parole Directive before the Supreme Court, "telling the Justices that it remained in full force and effect").

Notwithstanding the Government's representations, the ICE Field Offices have stopped following the Parole Directive.  As DHS's own parole data indicates, between 2011 and 2013, the Field Offices paroled 92% of arriving asylum seekers pursuant to the Parole Directive.  Ex. 8, Daher Decl. ¶ 9.  More recently, the parole rate began to fall, dropping to *less than 4%* across the Field Offices during the period between February and September 2017.  *Id.* ¶ 10.  Indeed, in three of the field offices, not a *single* individual was granted parole between February and September 2017.  *See id.* ¶ 11.[15]

The testimony of legal services providers in each of the ICE Field Office jurisdictions confirms that the Field Offices have abandoned the Parole Directive.[16]  These practitioners have observed a dramatic break from prior treatment of parole requests, finding that clients who established their identity and pose no flight risk or danger are now routinely denied parole, while similarly situated clients were routinely

---

[15] There is no doubt that the ICE Field Offices' overwhelming denial rates demonstrate a departure from the Parole Directive's requirement of individualized determinations.  *See, e.g.*, *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) (four departures out of approximately 100 decisions was insufficient to show willingness to depart from model on individualized basis); *U.S. Tel. Ass'n v. F.C.C.*, 28 F.3d 1232, 1235 (D.C. Cir. 1994) (where agency "exercised discretion in only one out of over 300 cases," it would show "little support for the [agency's] assertion that it intended not to be bound"); *Bellarno Int'l Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410, 415 (E.D.N.Y. 1988) ("two . . . instances of deviation" out of 386 decisions "can hardly form the basis for a finding of agency discretion").  The handful of parole grants in 2017 likely are explained by separate ICE policies, unrelated to the Parole Directive, of releasing certain limited categories of individuals.  For instance, ICE had presumptively released all pregnant women from detention, until a change of policy in approximately December 2017 "to better align with the President's Executive Order."  *See* ICE Directive 11032.3, *Identification and Monitoring of Pregnant Detainees* (Dec. 14, 2017), https://www.ice.gov/sites/default/files/documents/Document/2018/11032_3_PregnantDet aines.pdf; Rafael Bernal, *ICE Will Detain Pregnant Women, Ending Previous Policy*, The Hill (Mar. 29, 2018), http://thehill.com/latino/380827-ice-will-detain-pregnant-women-ending-previous-policy.

[16] *See* Ex. 9, Bellis Decl. ¶¶ 14-15; Ex. 2, Spector Decl. ¶ 5; Ex. 3, Ford Decl. ¶¶ 6-8; Ex. 4, Miles Decl. ¶¶ 5-7; Ex. 10, Del Valle Decl. ¶¶ 5-8; Ex. 5, Knowles Decl. ¶ 10; Ex. 1, Stambaugh Decl. ¶¶ 4-6.

granted parole in earlier years.[17]   The practitioners also have heard directly from ICE

officers in the Field Offices that parole is no longer being granted.[18]   The ICE Field

Officers have likewise ceased to follow the procedures set forth in the Parole Directive.

*See supra* pp. 9-11.

      Defendants' violations of the Parole Directive are arbitrary, capricious, and

contrary to law.   The court in *Abdi* so held in its preliminary injunction ruling concerning

similar violations of the Parole Directive at the Buffalo, New York ICE Field Office.   280

F. Supp. 3d at 412.   In its decision, the *Abdi* court explained that the Parole Directive is

binding on DHS: it "does not simply guide the discretion of immigration officials in

making parole determinations.   Rather, it sets forth specific procedural rights for asylum-

seekers in connection with the parole process, such as being informed in writing as to the

reason parole was denied."   *Id.* at 389.   The *Abdi* court further emphasized that the Parole

Directive "affects the rights of individuals," and that the government "cannot now

contend . . . that the ICE Directive does not affect the rights of individuals" in light of its

representations to the Supreme Court in *Jennings* that it does.   *Id.*[19]   Accordingly, the

court held that DHS's violations of the Directive's provisions are unlawful under

*Accardi*.   *Id*. at 386-89, 409-10.   This Court should reach the same conclusion here.

---

[17] *See* Ex. 9, Bellis Decl. ¶¶ 9-10, 14-15; Ex. 2, Spector Decl. ¶ 5; Ex. 3, Ford Decl. ¶¶ 6-8; Ex. 4, Miles Decl. ¶¶ 5-7; Ex. 10, Del Valle Decl. ¶¶ 5-8; Ex. 5, Knowles Decl. ¶ 10; Ex. 1, Stambaugh Decl. ¶¶ 4-6.
[18] *See, e.g.*, Ex. 10, Del Valle Decl. ¶ 8; Ex. 4, Miles Decl. ¶ 6; Ex. 1, Stambaugh Decl. ¶ 6.
[19] As the *Abdi* court also noted, boilerplate language in the Directive cannot eviscerate its binding effect.   *See* 280 F. Supp. 3d at 389 (rejecting argument that "agencies can avoid application of *Accardi* by simply disclaiming any binding effect in the directive itself," because "[t]o find otherwise would render the teachings of *Accardi* and its progeny meaningless").

b)     DHS's Sub Silentio Implementation of the Deterrence
       Policy Also Is Arbitrary and Capricious.

Defendants' failure to follow the Parole Directive is arbitrary and capricious for

an additional reason: DHS cannot lawfully change its position on an established policy

like the Parole Directive without "display[ing] awareness that it is changing position" and

"show[ing] that there are good reasons for the new policy."  *Fed. Commc'ns Comm'n v.*

*Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) [*Fox TV*]; *accord Encino*

*Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).  Where, as here, an agency

effectively abandons a prior policy, it must provide a more detailed explanation than if it

were writing on a blank slate—particularly in light of the "serious reliance interests that

must be taken into account."  *Fox TV*, 556 U.S. at 515-16.

Here, DHS has not acknowledged that it has changed its policy.  In fact, it has

done precisely the opposite by representing to the Supreme Court last year that the Parole

Directive remains "in full force and effect."  Pet. Suppl. Reply Br., *Jennings*, 2017 WL

727754, at *6 n.2.  Nor has DHS provided *any* explanation, much less a reasoned

explanation, for departing from the Parole Directive.  Accordingly, its actions are

arbitrary and capricious under *Fox TV*.

DHS may argue that there is no written policy demonstrating that the Field

Offices have departed from the Parole Directive.  The requirement that an agency provide

a reasoned explanation for a policy change, however, applies equally to explicit and *sub*

*silentio* departures from prior policy and practice.  *See, e.g.*, *Fox TV*, 556 U.S. at 515

(agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are

still on the books"); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C.

22

Cir. 2017) (agency cannot depart from "established pattern of agency conduct" without reasoned explanation).

The Court may enjoin an unexplained departure from a prior agency rule when the record makes clear that a new, albeit unwritten, policy exists. *See, e.g.*, *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929, 934-95 (D.C. Cir. 2008); *see also Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 372-75 (1998) (agency must follow its announced standard in adjudications, and cannot adopt different standard in practice). The overwhelming statistical and testimonial evidence clearly demonstrates that DHS has departed from the policy set forth in the Parole Directive at the ICE Field Offices. *See supra* pp. 8-11.

DHS has failed to provide even a "minimal level of analysis" to justify its drastic change of parole policy at the ICE Field Offices. *Encino Motorcars*, 136 S. Ct. at 2126. "The [agency's] failure even to acknowledge its past practice and formal policies . . . let alone to explain its reversal of course," is arbitrary and capricious. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 927.

> 2.   *DHS's Refusal to Provide Individualized Parole Determinations Violates the INA and Its Implementing Regulations.*
>
>> a)   <u>The Language of the INA and Its Regulations Mandate Individualized Parole Reviews.</u>

The failure of the ICE Field Offices to provide individualized parole reviews not only violates the Parole Directive; it also violates the INA. Accordingly, even if DHS were to revoke the Parole Directive and to provide reasoned grounds for doing so, the failure of the ICE Field Offices to consider release on parole based on the facts of each case still would be unlawful.

The INA provides that an arriving asylum seeker initially "shall be detained" (8 U.S.C. § 1225(b)(1)(B)(ii)), but that the Attorney General (now the DHS Secretary) then "may . . . in his discretion parole" such individuals into the United States on a "case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A); *accord Nat'l Venture Capital Ass'n v. Duke*, 2017 WL 5990122, at *1 (D.D.C. Dec. 1, 2017) ("The [INA] . . . grants the Secretary of Homeland Security the discretionary authority to parole individuals into the United States on a case-by-case basis.").  Release on parole is an "express exception" to detention and is a "specific provision authorizing release."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).

Under established Supreme Court precedent, the INA provision that the Attorney General "may, in his discretion" release individuals on parole mandates that Defendants in fact make individualized parole decisions.  In *Jean v. Nelson*, the Supreme Court considered a predecessor version of the parole statute.  *See* 472 U.S. at 848.  Like the current version, it provided that the Attorney General "may in his discretion" release individuals applying for admission into the United States on parole.  *See id.* at 859 (internal quotation marks omitted).  Specifically, the version of the parole statute at issue in *Jean* provided that the Attorney General (or his designee) "may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States."  *Id*. (quoting predecessor version of 8 U.S.C. § 1182(d)(5)(A)) (internal quotation marks omitted).  Based on this language, the Supreme Court remanded the case before it with instructions that the lower court determine

"whether INS officials exercised their discretion under § 1182(d)(5)(A) *to make individualized determinations of parole*." *Id*. at 857 (emphasis added).

The Supreme Court thus determined in *Jean* that the words "may in his discretion parole" require immigration authorities to consider a putative parolee's individual circumstances in determining whether release on parole is appropriate. *See, e.g.*, *Marczak v. Greene*, 971 F.2d 510, 515 (10th Cir. 1992) (*Jean* requires that immigration authorities "'make individualized determinations of parole'" (quoting *Jean*, 472 U.S. at 857)); *accord Diaz v. Schiltgen*, 946 F. Supp. 762, 764-65 (N.D. Cal. 1996) (under predecessor version of parole statute, "[t]he District Director is required to 'make individualized determinations of parole'" (quoting *Jean*, 472 U.S. at 857)). "[I]n *each case* a district director must determine whether a *particular person* is likely to flee, and whether that person's continued detention would be in the public interest." *Marczak*, 971 F.2d at 515 (emphasis added).

Relatedly, immigration authorities may *not* "decide[] parole applications based on broad, non-individualized policies." *Id.*; *accord Diaz*, 946 F. Supp. at 765. As the Tenth Circuit construing *Jean* explained, "as a logical matter, we do not see how an immigration official *could* base his decision on a general rule, given the Supreme Court's requirement that the district director 'make *individualized determinations* of parole.'" *Marczak*, 971 F.2d at 515 (quoting *Jean*, emphasis in original).

As noted, like the predecessor version of the parole statute at issue in *Jean*, the current statute provides that the Attorney General "may, in his discretion" release asylum seekers on parole. *Jean* thus mandates individualized parole reviews in this case and precludes parole determinations "on the basis of broad, non-individualized policies."

25

Indeed, unlike the predecessor version of the parole statute, the current version of the statute expressly states that parole should be considered on a "case-by-case basis," 8 U.S.C. § 1182(d)(5)), making it all the more clear that individualized review is required.

Pursuant to the Deterrence Policy, the ICE Field Offices are not making "individualized determinations of parole."  Rather, in denying parole in 100% or nearly 100% of cases, Ex. 8, Daher Decl. ¶ 11, they are implementing a "broad, non-individualized policy" of general deterrence—without regard to whether an individual asylum seeker is a flight risk or a danger to the community, or whether detention of the asylum seeker is otherwise in the public interest.[20]  The Deterrence Policy thus violates the INA and is contrary to law under the APA.

The Deterrence Policy also violates regulations promulgated pursuant to the parole statute.  The regulations define when DHS may permissibly exercise its parole discretion "on a case-by-case basis."  They provide that arriving asylum seekers are eligible for parole if they "present neither a security risk nor a risk of absconding" and if their "continued detention" is determined not to be in "the public interest."  8 C.F.R. § 212.5(b)(5).  Read in conjunction with the statute, the regulations require an individualized parole review in which an immigration official considers whether an individual asylum seeker presents a flight risk or a danger to the community and if his or her release is in the public interest.  *See id.*  The ICE Field Offices are not engaging in the required individualized consideration.  *See supra* p. 9.  Their failure to do so violates INA regulations and is contrary to law under the APA.

---

[20] Just as the statistical evidence demonstrates that the Field Offices have impermissibly departed from the Parole Directive, *see supra* p. 8, the evidence also confirms that the Field Offices have stopped exercising the discretion required by statute.  *See, e.g.*, *McLouth Steel Prod. Corp.*, 838 F.2d at 1321; *U.S. Tel. Ass'n v. F.C.C.*, 28 F.3d at 1235.

b)    The Doctrine of Constitutional Avoidance Further Mandates That the INA and Its Regulations Be Construed to Require Individualized Parole Determinations.

(1)    *The Deterrence Policy Raises Serious Constitutional Problems.*

The Court need not invoke the principle of constitutional avoidance to find that the Deterrence Policy violates the INA and regulations.  However, application of that canon makes it even clearer that the statute and regulations require individualized parole determinations based on flight risk and danger to the community, and preclude virtually blanket detention based on deterrence.

Courts must read a statute to avoid serious constitutional problems when it is "fairly possible" to do so.  *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (the avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"); *Jennings*, 138 S. Ct. at 843 (canon "permits a court to choose between competing plausible interpretations of a statutory text" (internal quotation marks and emphasis omitted)).  In particular, courts have consistently "read significant limitations" into the "immigration statutes in order to avoid their constitutional invalidation." *Zadvydas*, 533 U.S. at 689.

Here, the Court must construe the parole statute against the backdrop of the Due Process Clause.[21]  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690.  "[G]overnment detention violates th[e] [Due Process] Clause

---

[21]  For the reasons explained in Part I.C.1, *infra*, the Due Process Clause applies to arriving asylum seekers who are subject to the Deterrence Policy.

unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (internal citations omitted) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)); *see Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)).

The Supreme Court has recognized two legitimate "special justifications" for immigration detention: "preventing flight" and "protecting the community" from danger. *Zadvydas*, 533 U.S. at 690-91. "[S]trong procedural protections" are necessary to ensure that civil detention is justified on one of these two permissible grounds. *Id.* Consistent with such "strong procedural protections," immigration detention generally must be based on an *individualized* determination of flight risk and danger to the community. *Id.*

General deterrence decidedly is *not* a valid basis for immigration detention. To the contrary, the Supreme Court has repeatedly warned that civil detention may not "become a 'mechanism for retribution or *general deterrence*'—functions properly those of criminal law, not civil commitment." *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (emphasis added) (quoting *Hendricks*, 521 U.S. at 372-74  (Kennedy, J., concurring)); *accord R.I.L-R.*, 80 F. Supp. 3d at 188-89.[22]

---

[22] *See also*, *e.g.*, *Hendricks*, 521 U.S. at 361-62 (upholding civil commitment statutes because it "does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence"); *Foucha*, 504 U.S. at 78, 80 (although Louisiana could "imprison convicted criminals for the purposes of deterrence and retribution," it had "no such punitive interest" in detention of individuals acquitted due to insanity; continued detention of such individuals required "determination in civil commitment proceedings of [their] current mental illness and dangerousness"); *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) ("Retribution and deterrence are not legitimate nonpunitive governmental objectives" for pretrial detention (citing, *inter alia*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963))).

In *R.I.L-R.*, this Court recognized the "essential distinction" between the nature of the government's interests in preventing flight and danger to the public on the one hand, and a purported interest in general deterrence on the other.  While the former "relate wholly to characteristics inherent in the alien himself," the latter would subject an individual to civil detention "for the sake of sending a message of deterrence [to others] who may be considering immigration." *Id.* at 188-89.  Accordingly, reliance on general deterrence to justify immigration detention is "out of line" with Supreme Court case law requiring that civil detention be based on individual characteristics, and is thus "impermissible." *Id.* at 189.

The Deterrence Policy is flatly inconsistent with the principles of civil immigration detention rooted in the Due Process Clause and reflected in *Zadvydas*, *R.I.L-R.*, and other cases.  Pursuant to the Deterrence Policy, asylum seekers are detained based not on individualized determinations that they are flight risks or dangers to the community, or based on other "characteristics inherent in the alien himself." *See supra* p. 9.  Rather, they are detained in order to deter *other* migrants from seeking refuge in the United States. *See supra* pp. 12-13.  Such detention is inconsistent with due process. *See R.I.L-R.*, 80 F. Supp. 3d at 190.

> (2)   It Is "Fairly Possible" to Construe the Parole Statute and Regulations to Mandate Individualized Reviews of Flight Risk and Danger to the Community.

In light of this due process issue and pursuant to the constitutional avoidance doctrine, the parole statute and regulations must be construed to preclude detention based on deterrence and to require individualized parole determinations founded on whether an individual is a flight risk or a danger to the community.  As discussed above, the Supreme

Court's decision in *Jean* mandates that construction and, in all events, such construction is "fairly possible."

*R.I.L-R.* is again on point.  There, this Court addressed a section of the INA providing that the Attorney General "may continue to detain" or may instead release a non-citizen on bond or conditional parole pending a decision on whether he or she should be removed from the United States.  The Government argued that "the statute contains no limitation on the Executive's discretion to detain, nor does it enumerate the factors that may be considered."  80 F. Supp. 3d at 186.  Applying the doctrine of constitutional avoidance, the Court held that the provision did not afford DHS unfettered discretion to detain individuals absent individualized assessments of flight risk or danger to the community.  The Court determined that the phrase "may continue to detain" must instead be construed to mean that immigration authorities only "may continue to detain" individuals when continued detention is consistent with due process principles—*i.e.*, when detention is justified by circumstances specific to the individual's case, like flight risk or danger to the community.  *Id.* at 190.

Similarly in *Zadvydas*, the Supreme Court addressed whether the words "may detain" in the INA authorized the Government to effect indefinite detention of migrants.  Applying the constitutional avoidance doctrine, the Court determined that "may detain" must be construed in the context of the Due Process Clause and held that "while 'may' suggests discretion, it does not necessarily suggest unlimited discretion."  533 U.S. at 697; *accord Jennings*, 138 S. Ct. at 844 (discussing avoidance analysis in *Zadvydas*).

Similarly here, the words "may, in his discretion, parole . . . on a case-by-case basis" cannot appropriately be construed to give the Government unfettered discretion

simply to deny parole in virtually all cases, without considering whether continued detention of asylum seekers is necessary based on flight risk or danger to the community. Nor can the words appropriately be construed to authorize the Government to deprive asylum seekers of their liberty for months or years on end in order to send a message to others.  To so construe the statute would improperly render this sole "exception to detention" for arriving asylum seekers (*Jennings*, 138 S. Ct. at 844) a meaningless nullity.  *See, e.g.*, *Diaz*, 946 F. Supp. at 766.

Consistent with due process, the words "may, in his discretion, parole . . . on a case-by-case basis" rather require that the Government in fact *exercise* discretion in evaluating parole requests on a "case-by-case basis."  Moreover, pursuant to the regulations, the Government must exercise such case-by-case discretion based on flight risk, danger to the community, and the public interest.

> c)   The Parole Statute Must Also Be Construed to Require Individualized Parole Determinations to Avoid Conflict with International Law Obligations.

This construction of the parole statute is further mandated by another venerable canon of statutory construction: that courts must avoid interpreting a statute to conflict with the United States' international law and treaty obligations "if any other possible construction remains."  *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *see also United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013).

International law prohibits the detention of asylum seekers based on general deterrence and without an individualized determination that detention is justified by danger or flight risk.  *See* UNHCR, *Guideline on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, Guideline No. 4.1.4 (2012), http://www.refworld.org/docid/503489533b8.html ("Detention that is

31

imposed in order to deter future asylum-seekers, or to dissuade those who have

commenced their claims from pursuing them, is inconsistent with international norms.").

This international law requirement is reflected in specific treaty commitments binding on

the United States. *See* United Nations Convention Relating to the Status of Refugees,

July 28, 1951, 19 U.S.T. 6259, arts. 26 & 31 (protecting "freedom of movement" for

asylum seekers); *see also* International Covenant on Civil and Political Rights, Dec. 19,

1966, 1916 U.S.T. 521, art. 9 (prohibiting arbitrary deprivations of liberty).

     For this further reason, the Deterrence Policy violates the INA and its regulations,

and is "contrary to law" under the APA.

     *3.    All the Other Requirements for APA Relief Are Satisfied.*

     Under the APA, this Court may set aside and enjoin unlawful agency action that

is (1) "final agency action," and (2) "for which there is no other adequate remedy in a

court," so long as (3) there are no "statutes [that] preclude judicial review" or "agency

action is committed to agency discretion by law."  5 U.S.C. §§ 701(a), 704.  None of

these criteria poses an obstacle to enjoining the Deterrence Policy.

     a)    <u>The Deterrence Policy Constitutes Final Agency Action.</u>

     An agency action is final if two conditions are satisfied: (1) "the action must mark

the consummation of the agency's decisionmaking process," and (2) "the action must be

one by which rights or obligations have been determined, or from which legal

consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal

quotation marks and citations omitted); *Holistic Candlers & Consumers Ass'n v. FDA*,

664 F.3d 940, 943 (D.C. Cir. 2012).  The Deterrence Policy meets this standard.

     *First*, while the Deterrence Policy does not constitute *considered* agency action

supported by adequate reasons as required by *Fox TV*, it *does* mark *final* agency action

for APA purposes.  An agency action is "final" if it "mark[s] the 'consummation' of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 178.  An agency's "settled position" applied by "officials in the field" constitutes final agency action.  *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022 (D.C. Cir. 2000).

As the evidence demonstrates, ICE officers in the field are applying a settled Deterrence Policy every day by denying parole to all or virtually all asylum seekers, including those who plainly meet the Parole Directive's criteria for release.[23]  The Deterrence Policy has immediate and binding effect by directing ICE officers to apply a specific approach and to reach a specific result in making custody determinations: that is, to deny parole in virtually all cases without an individualized analysis of each application.  This, particularly combined with the repeated statements of high-level agency officials concerning their intent to end "catch and release" of immigrants, reveals the existence of a "definitive agency position" that is ripe for review.  *Washington Legal Found. v. Kessler*, 880 F. Supp. 26, 35 (D.D.C. 1995) (examining existence of final agency action by analyzing "aggregate effect of [individual] acts" of enforcement, as well as "general remarks" by "high-ranking officers" of agency).

*Second*, the Deterrence Policy both determines "rights or obligations," and is an action from which "legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks and citation omitted).  Only one of these standards need be met in order to demonstrate the existence of a final agency action.  *See id.*  Both are satisfied here. The Deterrence Policy determines rights and obligations by giving ICE officers

---

[23] *See* Ex. 8, Daher Decl. ¶¶ 10-11; Ex. 9, Bellis Decl. ¶ 12; Ex. 2, Spector Decl. ¶ 5; Ex. 3, Ford Decl. ¶ 7; Ex. 10, Del Valle Decl. ¶ 7; Ex. 5, Knowles Decl. ¶ 6; Ex. 6, Major Decl. ¶ 5.

"marching orders" to generally deny release on the basis of deterrence, instead of making individualized determinations based on danger to the community and flight risk. *Appalachian Power Co.*, 208 F.3d at 1023 (final agency action present where those responsible for enforcement are given "marching orders" that they are expected to follow, even if those orders may not be followed with complete uniformity).

Additionally, the Deterrence Policy has profound and immediate consequences for asylum seekers, who, but for DHS's action, would have received individualized parole assessments based on danger to the community and flight risk, and in most cases would have been released. Due to the Deterrence Policy, Plaintiffs and those similarly situated will suffer lengthy unlawful detention, which has detrimental impacts, particularly on asylum seekers who are already traumatized. Ex. 21, Keller Decl. ¶¶ 12-23; *see CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (finding that agency action was final where it imposed "immediate and significant burden" on regulated party); *Pharm. Research & Manufacturers of Am. v. United States Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 46 (D.D.C. 2015) (infliction of "acute burden" and "real consequences" supported existence of final agency action).

b)      Plaintiffs Have No Adequate Remedy.

The Supreme Court has long interpreted the "other adequate remedy" limitation on APA review narrowly, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("The Supreme Court has long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of

34

'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967))). Instead, "Congress intended by [the 'other adequate remedy'] provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993); *see also R.I.L-R.*, 80 F. Supp. 3d at 185.

Here, there is no adequate relief available through the immigration system. Under current agency practice, asylum seekers who are denied parole have no recourse to further hearings or review by neutral decision-makers and parole constitutes the only "exception" to detention for arriving asylum seekers under the INA. *Jennings*, 138 S. Ct. at 844. Although the Parole Directive purportedly affords the right to reconsideration by an ICE officer, that process merely permits the asylum seeker to beg relief from the same agency—and likely the same officers—who are following the Deterrence Policy. Moreover, legal services providers practicing in the Field Office jurisdictions and Plaintiffs themselves have found that, pursuant to the Deterrence Policy, asylum seekers' reconsideration requests have been denied on a blanket basis, just as their initial requests have been.[24]

      c)     There Is No Statutory Bar to Review or a Commitment to Agency Discretion.

Congress has done nothing here to override "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy*

---

[24] *See, e.g.*, Ex. 1, Stambaugh Decl. ¶¶ 10-12; Ex. 6, Major Decl. ¶ 12; Ex. 5, Knowles Decl. ¶ 12; Ex. 7, Damus Decl. ¶¶ 11-16; Ex. 20, L.I.L.M Decl. ¶¶ 10-11. Defendants may argue that Plaintiffs' only remedy is through a habeas petition. But "APA and habeas review may coexist," particularly where, as here, Plaintiffs are "challenging an unlawful . . . policy," not their own detention per se. *R.I.L-R.*, 80 F. Supp. 3d at 185-86.

*of Family Physicians*, 476 U.S. 667, 670, 671 (1986) ("clear and convincing" evidence

required to "restrict access to judicial review" (internal quotation marks and citation

omitted)); *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001).

This is especially true because Plaintiffs do not dispute the outcome of any

specific parole determination, but rather challenge the agency's unlawful *policy* of

denying parole without individualized consideration and failing to follow its own Parole

Directive.  *See Abdi*, 280 F. Supp. 3d at 385 (no statutory bar to "[a] claim . . . seek[ing] a

ruling that Respondents' failure to follow their own policy directive is unlawful," but

"not seek[ing] to have this Court interfere with the ultimate parole decision"); *see also*

*Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (action is not committed to agency

discretion "unless the statutory scheme, taken together with other relevant materials,

provides absolutely no guidance as to how that discretion is to be exercised").

### B.      The Deterrence Policy Violates the Due Process Clause.

Separate from the APA, the Deterrence Policy also violates the Due Process

Clause.  *See Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (independent cause of

action exists to remedy constitution violations); *Hubbard v. EPA*, 809 F.2d 1, 11 n.15

(D.C. Cir. 1986) ("[T]he court's power to enjoin unconstitutional acts by the government

. . . is inherent in the Constitution itself . . . .").[25]

### 1.      Arriving Asylum Seekers Are Protected by the Due Process Clause.

While the Supreme Court in *Jennings* did not reach the issue, numerous courts

have found that the Due Process Clause protects against the arbitrary detention of

"arriving" (or "excludable") noncitizens like Plaintiffs.  *See, e.g.*, *Rosales-Garcia v.*

---

[25] The Deterrence Policy's violation of the Due Process Clause also is contrary to law and therefore in violation of the APA.  *See* 5 U.S.C. § 706(2)(A).

*Holland*, 322 F.3d 386, 408 (6th Cir. 2003) (en banc) (finding serious constitutional problems with indefinite detention of excludable noncitizens); *Ngo v. INS*, 192 F.3d 390, 396 (3d Cir. 1999) (same); *Ahad v. Lowe*, 235 F. Supp. 3d 676, 687-88 (M.D. Pa. 2017) ("rising sea of case law" "has consistently determined that detained aliens," including arriving noncitizens, "are entitled to some essential measure of due process"); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 800 (W.D. Tex. 2015) ("[I]t is clear that aliens—even inadmissible aliens—are entitled to some constitutional protections, including some amount of due process."); *see also Rosales-Garcia*, 322 F.3d at 410 n.29 ("[N]o circuit has concluded that the Due Process Clauses of the Fifth and Fourteenth Amendments do not apply to excludable aliens.").

*Zadvydas* reinforces this conclusion.  Seven of nine Justices in *Zadvydas* agreed that even noncitizens who had lost all legal right to reside in the United States had the right to "freedom from [unjustified] physical restraint," 533 U.S. at 690; *see also id.* at 721 (Kennedy, J., dissenting) (acknowledging "serious" and "obvious" constitutional problems arising from arbitrary detention of noncitizens with removal orders, and stating that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious").  If noncitizens who have *no* legal right to be in the United States have such due process protections, it follows that those who—like Plaintiffs—*do* have a right to pursue legitimate asylum claims must have at least the same rights.  *See, e.g.*, *Ahad*, 235 F. Supp. 3d at 688 ("Given the scope of the due process protections provided to detained aliens, and acknowledged by the courts in the past, it would be anomalous to completely deny this modest measure of due process to detainees held pursuant to § 1225(b).").

Defendants may rely on the Supreme Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), to argue that Plaintiffs lack due process rights because they presented themselves at ports of entry.  Such reliance on *Mezei* would be unfounded.  *Mezei* may be read to suggest that certain arriving noncitizens do not have due process rights with respect to their *admission* to the United States where national security is at issue.  *See id.* at 215 ("we do not think that respondent's *continued exclusion* deprives him of any statutory or constitutional right" (emphasis added)); *id*. at 216 ("respondent's *right to enter* the United States depends on the Congressional will ").  But *Mezei* does not mean that such individuals lack due process rights with respect to arbitrary *detention*.

As the en banc Sixth Circuit emphasized in *Rosales-Garcia*, any such broad reading of *Mezei* was "eclipsed" by later Supreme Court cases that "rigorously delineated" "the contours of constitutionally permissible civil detention."  *Rosales-Garcia*, 322 F.3d at 413-14.  *Rosales-Garcia* further explained that the *Mezei* court "explicitly grounded its decision in the special circumstances of a national emergency and the determination . . . that Mezei presented a threat to national security"— circumstances not present here.  *Id.*

Other Supreme Court authority since *Mezei* also precludes a sweeping reading of that case.  For example, the Supreme Court has adopted a functional approach to the applicability of constitutional rights even for those *outside* the United States.  In *Boumediene v. Bush*, 553 U.S. 723, 764 (2008), the Supreme Court held that the Suspension Clause applies to noncitizens detained at Guantanamo Bay as alleged "enemy combatants."  The Court explained that whether the Constitution applies outside the

United States does not depend on a formalistic determination of *de jure* sovereignty, but rather on whether there are "practical barriers" to affording constitutional protections to individuals subject to U.S. control.  *Id*. at 770.  Absent such "practical barriers," the Government's conduct is subject to constitutional constraint.  *See id.*  If the Constitution constrains the power to detain noncitizens outside the United States in the midst of an armed conflict, surely it also constrains the power to detain Plaintiffs, all of whom are in the territorial United States, after demonstrating credible fears of persecution that permit them to pursue legitimate asylum claims here.

> 2.     *DHS's Refusal to Provide Individualized Parole Determinations Violates the Due Process Clause.*

Pursuant to the Due Process Clause, the Government may not detain asylum seekers on grounds not reasonably related to the legitimate purposes of preventing flight or protecting the community.  *Zadvydas*, 533 U.S. at 690.  The Deterrence Policy violates the Due Process Clause on that basis alone:  it would be unconstitutional even if the virtually blanket detention of asylum seekers were not based on deterrence.  The fact that the Policy *is* based on deterrence exacerbates the due process violation.

As this Court has acknowledged, *Zadvydas* "grounds its analysis of immigration detention in principles derived from the wider civil-commitment context."  *R.I.L-R.*, 80 F. Supp. 3d at 189.  Those principles establish that deterrence is *not* a permissible basis for civil detention.  *See Crane*, 534 U.S. at 412; *Hendricks*, 521 U.S. at 361-62; *Foucha*, 504 U.S. at 80; *Bell*, 441 U.S. at 539 n.20; *see also supra* Part I.A.2.b.  By detaining Plaintiffs on the basis of general deterrence rather than an individualized determination that detention is warranted due to flight risk or danger to the community, the Deterrence Policy deprives Plaintiffs and those similarly situated of their due process rights.

Even assuming that general deterrence were a permissible purpose for detention in some circumstances, the Deterrence Policy still would violate the Due Process Clause. As this Court held in *R.I.L-R.*, a government interest in detaining migrants to send a message to others "is particularly insubstantial." 80 F. Supp. 3d at 189. It "seeks to deter future mass immigration but to what end?" *Id*. Unlike the violent offenders whose detention was at issue in *Hendricks* or *Crane*, "neither those being detained nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate claims to asylum in this country." *Id*.

Moreover, at a minimum, due process would require that detention be reasonably related to Defendants' goals of deterring an influx of future migrants. *See Zadvydas*, 533 U.S. at 690; *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("Due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."). However, the detention of *bona fide* asylum seekers who have passed their credible fear interviews, such as Plaintiffs, is not reasonably related to that objective. Defendants can show no rational connection between the selective detention of class members and general deterrence aims, as the use of detention against asylum seekers in order to deter future migration is "not empirically supported." Ex. 22, Hiskey Decl. ¶ 11.

To the contrary, social science research reveals that "individuals' views of the U.S. immigration climate had no significant impact on their decision to emigrate," even when that climate is perceived as worsening. *Id*. ¶ 10. In Honduras, El Salvador, and Guatemala—consistently among the top five countries from which individuals seek asylum in the United States—representative survey data reflects instead that "the decisive

determinant of emigration intentions was whether or not an individual had been a victim

of a crime in the previous twelve months." *Id.*  In short, individuals' decisions to flee

their home countries and seek asylum in the U.S. are typically driven by violence and

other factors they confront at home.  There is no evidentiary basis to conclude that

detention effectively deters asylum seekers from seeking refuge here.  *See also R.I.L-R.*,

80 F. Supp. 3d at 189 (noting that Government "presented little empirical evidence . . .

that their detention policy . . .  actually deters potential immigrants" and citing evidence

that crime victimization motivated migration to the United States).  For this additional

reason, the Deterrence Policy is unconstitutional.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

To demonstrate irreparable harm, the moving party must show that the injury is

"of such imminence that there is a 'clear and present' need for equitable relief to prevent

irreparable harm."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758

F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  The injury must also be "both certain and

great; it must be actual and not theoretical."  *Id.* (quoting *Wisconsin Gas*, 758 F.2d at

674).  Finally, the injury must be "beyond remediation."  *Id.*

Plaintiffs and those similarly situated will suffer irreparable harm without

injunctive relief.  First, their injury is imminent and certain.  They are currently being

detained at ICE facilities pursuant to the Deterrence Policy.  Detention irreparably harms

Plaintiffs and other putative class members "in myriad ways."  *R.I.L-R.*, 80 F. Supp. 3d at

191; *Abdi*, 280 F. Supp. 3d at 404 (detained asylum seekers suffered irreparable harm in

"negative physical and mental health effects of prolonged detention and the fact that their

continued detention has prevented putative class members from adequately preparing for their asylum hearings before an immigration judge").

Moreover, Plaintiffs already experienced trauma before fleeing their home countries, and are thus particularly vulnerable to the harm inflicted by continued detention, which "worsen[s] symptoms of trauma and severely impede[s] the ability of asylum seekers to recover from their physical and mental conditions." Ex. 21, Keller Decl. ¶ 20; *see also id.* ¶¶ 12-23. These harms only grow worse with each additional day of incarceration. *Id.* As such, the injuries caused by the Deterrence Policy are "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (internal quotation marks and citation omitted).

Plaintiffs' injuries also are "beyond remediation." Plaintiffs do not seek monetary compensation for their injuries. Rather, they seek injunctive and declaratory relief invalidating and setting aside the unlawful Deterrence Policy. The "unnecessary deprivation of liberty clearly constitutes irreparable harm." *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (citation omitted). And "[u]nlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact." *R.I.L-R.*, 80 F. Supp. 3d at 191.

## III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF.

Plaintiffs ask this Court to enjoin an unlawful and unconstitutional policy to prevent irreparable harm to numerous vulnerable asylum seekers. Each Plaintiff seeks nothing more than an individualized review to determine whether there is a need for him or her to be detained. Neither the Government nor the public has any legitimate interest

42

in denying Plaintiffs this modest relief.  Indeed, the Government itself has expressly

determined that the "continued detention" of asylum seekers who have passed credible

fear, established their identity, and are not flight risks "is not in the public interest."

Parole Directive § 6.2.

Numerous courts have recognized that likelihood that individuals "will . . . be

deprived of their physical liberty . . . in the absence of the injunction" weighs heavily in

favor of granting preliminary relief.  *E.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 995-96

(9th Cir. 2017) (describing numerous harms suffered by noncitizens in immigration

detention); *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) ("[T]he

harm to petitioner if he is not released is immeasurably significant.").  These grave harms

far outweigh any countervailing governmental interest.

In addition, "issuance of a preliminary injunction would serve the public's interest

in maintaining a system of laws" where the Government must comply with its

constitutional and legal obligations.  *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 429

(D.C. Cir. 1992); *see also R.I.L-R.*, 80 F. Supp. 3d at 191 (explaining that public interest

is served by injunction that "ends an unlawful practice" and ensures compliance with

APA (citation and quotation marks omitted)); *Seretse-Khama*, 215 F. Supp. 2d at 54 ("the

public interest is served by petitioner's release" because continued unlawful detention

"poses serious constitutional risks"); *Abdi*, 280 F. Supp. 3d at 410 ("Granting preliminary

injunctive relief will simply require Respondents to comply with their legal obligations

and afford Petitioners procedural protections in connection with Respondents' exercise of

discretion.").

Far from undermining the public interest, treating asylum-seekers with basic fairness and dignity is among our nation's best traditions. *See*, *e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

In short, the balance of harms and the public interest decisively favor requiring DHS to follow the law and to afford asylum seekers the process required by DHS's own binding Parole Directive, as well as by the INA and the Due Process Clause.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a class-wide preliminary injunction should be GRANTED.

Dated: March 30, 2018

Respectfully submitted,

/s/ Philip J. Levitz

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS
PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Hardy Vieux (D.C. Bar No. 474762)
Laura Gault[*]
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692

Eleni Bakst
Josie Cardoso-Rojo
HUMAN RIGHTS FIRST
75 Broad Street, 31st floor
New York, NY 10004
(212) 845-5200

Dennis B. Auerbach (D.C. Bar No.
418982)
Philip J. Levitz (D.C. Bar No. 1018430)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

Eunice Lee
Blaine Bookey
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF
THE DISTRICT OF COLUMBIA
915 15th Street, NW, 2nd floor
Washington, D.C. 20005-2302
(202) 457-0800

Farrin R. Anello
Edward Barocas
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
P.O. Box 32159
Newark, NJ 07102
(973) 642-2084

---

[*]Although LCvR 83.2(c) and (d) do not apply to Ms. Gault, she appears before the Court pursuant to LCvR 83.2(g), which states, "ATTORNEYS REPRESENTING INDIGENTS. Notwithstanding (c) and (d) above, an attorney who is a member in good standing of the District of Columbia Bar or who is a member in good standing of the bar of any United States Court or of the highest court of any State may appear, file papers and practice in any case handled without a fee on behalf of indigents upon filing a certificate that the attorney is providing representation without compensation." Ms. Gault is not receiving compensation for her services.

Michael J. Steinberg
Abril Valdes
AMERICAN CIVIL LIBERTIES UNION FUND
OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814

Leon Howard
Kristin Greer Love
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87104
(505) 266-5915, x1007

Witold J. Walczak
Golnaz Fakhimi
ACLU OF PENNSYLVANIA
247 Ft. Pitt Blvd., 2nd floor
Pittsburgh, PA  15222
(412) 681-7864

Freda J. Levenson
ACLU OF OHIO
4506 Chester Ave.
Cleveland, OH 44103
(216) 472-2220

Ahilan T. Arulanantham
Sameer Ahmed
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA  90017
(213) 977-5232

Edgar Saldivar
Andre Segura
ACLU FOUNDATION OF TEXAS, INC.
1500 McGowen, Suite 250
Houston, TX 77004
(713) 942-8146 x111