UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ansly DAMUS, *et al.*, on behalf of themselves and others similarly situated, )<br>)<br>)<br>)<br>*Plaintiffs*, )<br>)<br>v. )<br>)<br>Kirstjen NIELSEN, Secretary of the Department of Homeland Security, in her official capacity, *et al.*, )<br>)<br>)<br>)<br>*Defendants*. ) | Civil Action No. 1:18-cv-0578 |

## DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

### MOTION TO DISMISS

Defendants Kirstjen Nielsen, Secretary of the U.S. Department of Homeland Security ("DHS"); Thomas Homan, Acting Director of U.S. Immigration and Customs Enforcement ("ICE"); Rebecca Adducci, Director of ICE's Detroit Field Office; William Joyce, Acting Director of ICE's El Paso Field Office; David Marin, Director of ICE's Los Angeles Field Office; John Tsoukaris, Director of ICE's Newark Field Office; Greg Brawley, Director of ICE's Philadelphia Field Office; Jefferson B. Sessions, III, Attorney General of the United States; and James McHenry, Director of the U.S. Department of Justice's Executive Office for Immigration Review ("EOIR"); in their official capacities (collectively, "Defendants"), respectfully move to dismiss Plaintiffs' Complaint (ECF No. 3) .

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION................................................................................................................1

LEGAL BACKGROUND....................................................................................................2

DEFENDANTS' MOTON TO DISMISS.............................................................................6

    I.      FACTS ALLEGED.............................................................................................6

    II.     ARGUMENT....................................................................................................10

         A.  The Court Lacks Jurisdiction to Grant Plaintiffs'
             Request for Injunctive Relief.............................................................10

         B.  Even if the Court had Jurisdiction to Grant Plaintiffs Relief, the Court
             Should Dismiss the Complaint under Federal Rule of Civil Procedure
             12(b)(6)..............................................................................................12

             1.  Plaintiffs Have Failed to Allege Sufficient Facts to Support a Claim
                 that Defendants Have Adopted a "Deterrence Policy.".............13

             2.  Neither Have Plaintiffs Adequately Pleaded a Constitutional Claim........13

         C.  Even if the Court Does Not Dismiss the Complaint in its Entirety, it
             Should Dismiss Defendants Sessions and McHenry......................................17

    III.    CONCLUSION.................................................................................................18

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION....................................................................................................................18

    I.      FACTS IN SUPPORT OF DEFENDANTS' OPPOSITION...............................18

    II.     ARGUMENT....................................................................................................20

         A.  Plaintiffs Have Not Shown that They Are Substantially Likely to
             Succeed on the Merits.......................................................................21

          B.  Plaintiffs Have Not Shown that a Substantial Threat of Irreparable Harm
             is Likely Absent Injunctive Relief...................................................24

    III.    CONCLUSION.................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009) ........................................................................................ 12, 15, 18

*Bell Atlantic Corp. v. Twombly*,
　　550 U.S. 544 (2007) ............................................................................................... 12, 15

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
　　58 F.3d 738 (D.C. Cir. 1995) ....................................................................................... 21

*Clark v. Martinez*,
　　543 U.S. 371 (2005) ...................................................................................................... 2

*Davis v. Pension Benefit Guar. Corp.*,
　　571 F.3d 1288 (D.C. Cir. 2009) ................................................................................... 20

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
　　117 F.3d 621 (D.C. Cir. 1997) ..................................................................................... 12

*Gilardi v. U.S. Dep't of Health & Human Servs.*,
　　733 F.3d 1208 (D.C. Cir. 2013) ................................................................................... 21

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Housing and Urban Dev.*,
　　639 F.3d 1078 (D.C. Cir. 2011) ................................................................................... 21

*Jennings v. Rodriguez*,
　　583 U.S. — (2018) ................................................................................... 2, 10, 16, 24

*Latif v. Obama*,
　　677 F.3d 1175 (D.C. Cir. 2011) ................................................................................... 21

*Nat'l Min. Ass'n v. Jackson*,
　　768 F. Supp. 2d 34 (D.D.C. 2011) ............................................................................... 24

*Papasan v. Allain*,
　　478 U.S. 265 (1986) ..................................................................................................... 15

*R.I.L-R. v. Johnson*,
　　80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................................... 10

*Sai v. Transportation Sec. Admin.*,
　　54 F. Supp. 3d 5 (D.D.C. 2014) ............................................................................. 21, 24

*Sussman v. U.S. Marshals Serv.*,
　　494 F.3d 1106 (D.C. Cir. 2007) ................................................................................... 14

*Tele-Commc'ns of Key W., Inc. v. United States*,
    757 F.2d 1330 (D.C. Cir. 1985) ................................................................ 21

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... 26

## Federal Statutes

28 U.S.C. § 1391(e) ........................................................................................ 16

6 U.S.C. § 202(3) .............................................................................................. 2

6 U.S.C. § 557 .................................................................................................. 2

8 U.S.C. § 1182(d)(5)(A) ............................................................................. 2, 3

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................. 2

8 U.S.C. § 1225(b)(2)(A) .................................................................................. 2

8 U.S.C. § 1252(a)(2)(B)(ii) .............................................................................. 3

8 U.S.C. § 1252(f) ............................................................................................. 1

8 U.S.C. § 1252(f)(1) ................................................................................ 18, 19

## Statutes

Immigration and Nationality Act,
    Pub. L. 82-414, 66 Stat. 163 (1952) .......................................................... 1

## Federal Rules

Federal Rule of Civil Procedure 12(b)(6) ............................................ 2, 11, 20

Federal Rule of Civil Procedure 8 .................................................................. 10

## Federal Regulations

8 C.F.R. § 1001.1(*l*) ......................................................................................... 2

8 C.F.R. § 212.5(a) ........................................................................................... 3

8 C.F.R. § 212.5(b) ........................................................................... 3, 4, 16, 17

## Other Authorities

ICE Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of
    Persecution or Torture" (Dec. 8, 2009) .............................................. passim

## INTRODUCTION

Plaintiffs, classified under the Immigration and Nationality Act ("INA"), Pub. L. 82-414, 66 Stat. 163 (1952), as statutorily inadmissible "applicants for admission," came to various United States ports of entry to be processed without the necessary entry documentation and expressed a fear of returning to their home countries. They have all have been placed into removal proceedings to determine whether they might be eligible for relief from removal. Plaintiffs brought suit against the U.S. Department of Homeland Security ("DHS"); U.S. Immigration and Customs Enforcement ("ICE"); five of ICE's twenty-five Field Offices (the Detroit, El Paso, Los Angeles, Newark, and Philadelphia Field Offices (collectively, the "five Field Offices"); the U.S. Department of Justice ("DOJ"); and DOJ's Executive Office for Immigration Review ("EOIR"). They allege that DHS, ICE, and the five Field Offices have adopted a "*de facto* policy of denying [them] parole [pending the adjudication of their asylum claims] in virtually all cases" with the "goal of deterring *other* asylum seekers from seeking refuge in the United States." Compl. (ECF No. 3) ¶ 46. For relief, Plaintiffs ask the Court to (1) "[d]eclare that the Deterrence Policy is arbitrary and capricious and contrary to law;" (2) "[e]nter an order enjoining Defendants from detaining Plaintiffs and proposed class members absent parole reviews that result in individualized determinations that detention is necessary to prevent flight or danger to the community and that conform to the other requirements of the Parole Directive;" and (3) "[e]nter an order enjoining Defendants from subjecting Plaintiffs and proposed class members to prolonged detention absent a custody hearing before an immigration judge to determine if detention is necessary to prevent flight or danger to the community." Compl. at 26–27.

The Court should dismiss Plaintiffs' Complaint in its entirety because it lacks jurisdiction under 8 U.S.C. § 1252(f) to grant the constitutional, injunctive relief Plaintiffs request. The Court should also dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6)

because it fails to allege facts that, taken as true, could plausibly demonstrate that the alleged un-lawful "Deterrence Policy" exists.

## LEGAL BACKGROUND

This case concerns aliens who arrived at a port of entry without valid documentation, passed the credible-fear screening process, and are in removal proceedings before an immigration judge—an administrative judge within EOIR, 8 C.F.R. § 1001.1(*l*)—to determine whether they should remain in the country. *See* 8 U.S.C. § 1225(b)(1)(A)(ii)). Congress has made clear that this category of aliens "shall be detained" during proceedings to determine whether they will be admitted or removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(ii)). The Supreme Court has recently re-affirmed that reading. *Jennings v. Rodriguez*, 583 U.S. — , 138 S. Ct. 830, 842 (2018) (emphasis added) ("Read most naturally, [section 1225](b)(2) *thus mandate[s] deten-tion* of applicants for admission until certain proceedings have concluded.").

Qualifying section 1225(b)'s detention mandate, however, the INA allows the Secretary,[1] "in h[er] discretion," to parole an alien detained under section 1225(b) "into the United States temporarily under such conditions as [s]he may prescribe." 8 U.S.C. § 1182(d)(5)(A). The exer-cise of this discretion is permitted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* The Secretary has delegated her discretionary authority "to con-tinue an alien in custody or grant parole" under section 1182 to ICE's Assistant Commissioner for the Office of Field Operations; the Director of Detention and Removal; the Directors of Field Operations; the Field Office Directors; the Deputy Field Office Directors; and a number of other ICE officials, including any "other officials as may be designated in writing, subject to the parole

---

[1] In these circumstances, the INA's references to the Attorney General are generally understood to refer to the Secretary of the Department of Homeland Security. 6 U.S.C. §§ 202(3), 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

and detention authority of the Secretary or h[er] designees." 8 C.F.R. § 212.5(a). The Secretary's discretionary decision to grant or deny parole is completely insulated from judicial review. 8 U.S.C. § 1182(d)(5)(A); 8 U.S.C. § 1252(a)(2)(B)(ii).

Agency regulations lay out certain categories of section 1225(b) detainees who *may* be eligible for parole within the Secretary's discretion under section 1182(d)(5)(A). *See* 8 C.F.R. § 212.5(b). DHS, through ICE, "would *generally be justified only on a case-by-case basis*" in granting parole *if* a detainee "present[s] neither a security risk nor a risk of absconding" *and* (1) has a serious medical condition; (2) is pregnant; (3) falls within certain categories of juveniles; (4) is or will be a witness in judicial, administrative, or legislative proceedings; or (5) if continued detention is otherwise "not in the public interest as determined by those officials" noted above. *Id.* (emphasis added). The regulations do not otherwise direct the manner in which ICE "may invoke, in the exercise of discretion, the authority" to grant parole under section 1182(d)(5)(A). 8 C.F.R. § 212.5(a).

ICE's goal, nonetheless, is "to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States." ICE Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture" ¶ 1 (Dec. 8, 2009) ("Parole Directive," attached as Exhibit A). To that end, in 2009, the agency issued a Parole Directive entitled "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture." *Id.* The Directive states that "while the first four of [the categories listed in 8 C.F.R. § 212.5(b)] are largely self-explanatory, the term "public interest" is open to consid-

erable interpretation." *Id.* at ¶ 4.4. The Parole Directive "explains how the term is to be interpreted by [ICE's Enforcement and Removal Operations[2] when it decides whether to parole arriving aliens determined to have a credible fear" and "mandates uniform recordkeeping and review requirements for such decisions." *Id.* It also states that "[p]arole remains an inherently discretionary determination entrusted to the agency" and that the Parole Directive "serves to guide the exercise of that discretion." *Id.*

The Parole Directive states that Enforcement and Removal Operations personnel "must conduct an interview with the alien to assess his or her eligibility for parole" within seven (7) days "following a finding that [the] arriving alien has a credible fear" where practicable. Parole Directive ¶ 8.2. Enforcement and Removal Operations personnel "shall" provide each detainee with a completed copy of a "Parole Advisal and Scheduling Notification" prior to the parole determination and "explain the contents of the notification to the alien in a language he or she understands, through an interpreter if necessary." *Id.* ¶ 8.1. It states that an arriving alien found to have a credible fear of persecution "should be paroled under this directive *if* [Enforcement and Removal Operations] determines . . . that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien." *Id.* ¶ 8.3 (emphasis added).

In evaluating whether a detainee can sufficiently establish his or her identity, the Directive emphasizes that "asylum-related fraud is of genuine concern to ICE, and [Enforcement and Removal Operations] *must* be satisfied that an alien is who he or she claims to be before releasing the alien from custody." *Id.* ¶ 8.3(1)(a) (emphasis added). It also instructs that "[i]n order

---

[2] The Directive refers to "Detention and Removal Operations," which is presently referred to as "Enforcement and Removal Operations."

to be considered for release, an alien determined to have a credible fear of persecution or torture *must* present sufficient evidence demonstrating his or her likelihood of appearing when required" and "*must"* first undergo a determination of whether he or she is a danger to the community or a threat to national security. *Id.* ¶¶ 8.3(2)(a), (3)(a) (emphases added).

The Directive provides a list of "appropriate" factors for Enforcement and Removal Operations to consider in evaluating the detainee's flight risk, but it does not elevate any factor or group of factors as categorically "sufficient" to demonstrate that the alien will appear when required. *Id.* ¶ 8.3(2)(b). "Additional factors" are also relevant to the parole determination. *Id.* ¶ 8.3(4). Recognizing that "parole remains an inherently discretionary decision," the Parole Directive expressly permits Field Office personnel to consider "exceptional, overriding factors that should be considered" that weigh against release, that "include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests." *Id.* ¶¶ 8.3, 8.3(4)(a), (b).

Enforcement and Removal Operations personnel must then complete a "Record of Determination/Parole Determination Worksheet" memorializing his or her decisions or conclusions and submit it for supervisory review and concurrence. *Id.* ¶¶ 8.2, 8.5. If the officer concludes that parole should be denied, he or she "should" draft a letter to the alien or his representative and forward the letter for the Field Office Director, Deputy Field Office Director, or Assistant Field Office Director's concurrence and review along with the completed Parole Determination Worksheet. *Id.* ¶ 8.2. The letter must include a "brief explanation" of the reasons parole was denied and notify the alien that he or she may request a parole redetermination "based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding." *Id.* ¶¶ 8.2, 8.5–8.7. To deter the risk of asylum-related fraud, the Parole Directive

does not require the completed Parole Determination Worksheet to be provided to the alien. *See id.*

On February 20, 2017, DHS issued a memorandum signed by then-Secretary John Kelly entitled "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (attached as Exhibit B). Among other things, the memorandum clarifies that the 2009 Parole Directive "establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or torture shall remain in full force and effect" and "shall be implemented in a manner consistent with its plain language." Ex. B at 9–10. It reiterates that, under the Parole Directive, "[i]n every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case." *Id.* at 3. It also specifically reiterates, under the Parole Directive, the eligibility for parole of arriving aliens who have "been found to have established a 'credible fear' of persecution or torture by an asylum officer or an immigration judge." *Id.* Consistent with the Parole Directive, it states that such aliens are among the only groups of individuals who should be released from section 1225 detention, provided that such an alien "affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings." *Id.*

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

### I.    FACTS ALLEGED

Plaintiffs assert that they bring this suit to enjoin a DHS "policy and practice of categorically detaining asylum seekers in order to deter others from seeking refuge in the United States." Compl., ECF No. 3, ¶ 1. They allege that, in violation of the 2009 Parole Directive, "DHS has

imprisoned them during the pendency of their asylum cases, with no individualized review of whether their detention is necessary." *Id.* ¶ 2. Plaintiffs allege that the Parole Directive "preclude[s] detention of asylum seekers except in unusual cases." *Id.* ¶ 4. They allege that "[t]he five Field Offices have detained [Plaintiffs] based not on individualized determinations that they pose a flight risk or a danger to the community, but rather to deter other migrants from seeking refuge here." *Id.*

Plaintiffs assert that "ICE data suggests that, as a result of the Deterrence Policy, more than a thousand individuals in the last year have been unlawfully deprived of their liberty for nothing more than seeking refuge in a nation that has provided it to countless others since its founding." *Id.* ¶ 7. The named Plaintiffs allege that they were denied parole "pursuant to the Deterrence Policy, even though [they] established [their] identit[ies], identified a sponsor with whom [they] could live, and showed that [they] pose[ ] no flight risk or danger to the community." *Id.* ¶¶ 11–18. Mr. Castro also alleges that he was never interviewed for parole and L.I.L.M. also alleges that he received no explanation of the decision denying him parole. *Id.* ¶¶ 14, 18. Mr. Callol alleges only that he was never interviewed for parole and received no response from ICE after submitting additional documentation in support of his application. *Id.* ¶ 13.

Plaintiffs assert that DHS has neither "revoked," "amended," nor "withdrawn" the Parole Directive. *Id.* ¶ 34. They allege instead that, "[s]ince the Trump Administration came into office, officers in the ICE Field Offices repeatedly have told detainees and their attorneys that parole will no longer be granted." *Id.* ¶ 40. They allege that "[b]etween February and September 2017 the ICE Field Offices denied parole at the following rates: Detroit officers denied 63 of 64 parole requests, or 98 percent of cases; El Paso officers denied 349 of 349 parole requests, or 100 percent of cases; Los Angeles officers denied 326 of 354 parole requests, or 92 percent of cases;

7

Newark officers denied 10 of 10 parole requests, or 100 percent of cases; and Philadelphia offic-
ers denied 43 of 43 cases, or 100 percent of cases." *Id.* ¶ 38. They allege that "this is a dramatic
change from ICE's past practice pursuant to the Parole Directive" and that "between 2011 and
2013, the ICE Field Offices paroled 92 percent of arriving asylum seekers pursuant to the Di-
rective," but that, "[m]ore recently, the parole rate began to fall, dropping to less than 4 percent
on average across the ICE Field Offices during the period from February through September
2017." *Id.* ¶ 39.

They also allege that "[t]he ICE Field Offices are no longer following the requirements of
the Parole Directive," and allege that "some asylum seekers" have been deprived of certain pro-
cedures required of ICE offices under the Directive. *Id.* ¶¶ 41–42. They allege that the five Field
Offices "no longer provide individualized determinations of flight risk and danger, in violation of
the Parole Directive." *Id.* ¶ 42. They allege that "[a]s a result, many asylum seekers who clearly
satisfy the Parole Directive's criteria for release are denied parole." They state that ICE Head-
quarters must be aware of the "Deterrence Policy" because it should know about the alleged
lower parole rates at the five Field Offices. *Id.* ¶ 44. They allege that although ICE Headquarters
must know about the Deterrence Policy, "it has taken no action to require the ICE Field Offices
to follow the Parole Directive." *Id.* ¶ 44. They state that "[i]n November 2017, the U.S. District
Court for the Western District of New York found that the government had engaged in a class-
wide practice of issuing 'blanket denials' to parole requests that failed to analyze each case 'on
its own merits and based on the facts of the individual alien's case,' in violation of the Parole Di-
rective." *Id.*

To support their claim that a "Deterrence Policy" exists, the Plaintiffs cite a February 20,
2017, Memorandum signed by then-DHS Secretary John Kelly, which states that "[t]he President

has determined that the lawful detention of aliens arriving in the United States . . . pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders." *Id.* ¶ 49. They also cite what they allege is an earlier draft of that memo, stating that "the lawful detention of arriving aliens" has a "*deterrent* effect on illegal immigration." *Id.* ¶ 50. Finally, they cite a recent White House statement that "[t]he Department of Homeland Security must have tools to deter illegal immigration" and that illegal entry should be deterred by ending "catch-and-release and by closing legal loopholes that have eroded our ability to secure the immigration system and protect public safety." *Id* ¶ 51.

Plaintiffs present three claims in their Complaint: (1) that "DHS's violation and/or effective rescission of its own Parole Directive while representing that the Directive remains in full force and effect is unlawful;" (2) that, pursuant to the "Deterrence Policy," "Defendants have [unlawfully] detained Plaintiffs and persons similarly situated, without having made individualized determinations through the parole-review process that such detention is necessary based on flight risk or danger to the community;" and (3) that, "particularly where detention is prolonged, due process requires a custody hearing before a neutral decision-maker to determine if detention is necessary." *Id.* ¶ 79. Their prayer for relief asks the Court to (1) "[d]eclare that the Deterrence Policy is arbitrary and capricious and contrary to law;" (2) "[e]nter an order enjoining Defendants from detaining Plaintiffs and proposed class members absent parole reviews that result in individualized determinations that detention is necessary to prevent flight or danger to the community and that conform to the other requirements of the Parole Directive;" and (3) "[e]nter an order enjoining Defendants from subjecting Plaintiffs and proposed class members to prolonged

detention absent a custody hearing before an immigration judge to determine if detention is necessary to prevent flight or danger to the community." Compl. at 26–27.

## II.   ARGUMENT

### A.  The Court Lacks Jurisdiction to Grant Plaintiffs' Request for Injunctive Relief.

Title 8 U.S.C. § 1252(f)(1) strips the Court of jurisdiction over Plaintiffs' two prayers for injunctive relief: an injunction barring Defendants "from detaining Plaintiffs and proposed class members absent parole reviews that result in individualized determinations that detention is necessary to prevent flight or danger to the community and that conform to the other requirements of the Parole Directive;" and an injunction preventing "Defendants from subjecting Plaintiffs and proposed class members to prolonged detention absent a custody hearing before an immigration judge to determine if detention is necessary to prevent flight or danger to the community." *See* Compl. at 26, ¶ c.

Section 1252(f)(1) strips the Court of jurisdiction over all class claims seeking to enjoin the operation of 8 U.S.C. §§ 1221–1232. *Jennings*, 138 S. Ct. at 851. Under that provision, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§ 1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). While the Ninth Circuit and this Court in *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015), have held that section 1252(f)(1) does not affect the lower courts' jurisdiction over statutory claims that seek only to enjoin unlawful conduct (as opposed to the lawful operation of the immigration detention statutes), the Supreme Court has stated that such reasoning "does not seem to apply to an order granting relief on constitutional grounds." *Jennings*, 138 S. Ct. at 851.

Plaintiffs' last two prayers seek relief that neither the statute, its regulations, nor the Parole Directive can provide. The second prayer requests an injunction barring Defendants from detaining Plaintiffs "absent parole reviews that result in individualized determinations that detention is necessary to prevent flight or danger to the community." Compl. at 26. Section 1225 cannot provide Plaintiffs that relief, even as that section is qualified by section 1182, its implementing regulations, and the Parole Directive. The Parole Directive does not require immigration officers to find that a parole applicant's continued detention is "necessary to prevent flight or danger to the community" to justify detention. *See generally* Parole Directive. Rather, it instructs that absent any other "exceptional, overriding factors" that weigh against release, arriving aliens determined to have a credible fear should be paroled *if*, to the satisfaction of the immigration officer and reviewing supervisors, *they* have established their identity and demonstrated that they are neither a flight risk nor a danger to the community. Parole Directive ¶ 8.3. Therefore, Plaintiffs' second prayer for relief is not for an injunction requiring the "lawful operation of the immigration detention statutes"; it is for an injunction *compelling* discretionary determinations to be made a certain way. The Court cannot grant that relief. *See* 8 U.S.C. § 1252(f)(1). To the extent that the second prayer for relief also asks for an injunction requiring Defendants to "conform to the other requirements of the Parole Directive," assuming that this refers to the procedural requirements that the Parole directive places on the ICE Field Offices, the Court still lacks jurisdiction to grant that relief because the Parole Directive does not establish a cause of action based on ICE's alleged failure to follow those procedures alone. Parole Directive ¶ 10 ("This directive is an internal policy statement of ICE. It is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its

11

officers or employees, or any other person."). Accordingly, the Court lacks jurisdiction to provide that relief class-wide.

The Court also lacks jurisdiction to grant Plaintiffs an injunction preventing Defendants "from subjecting Plaintiffs and proposed class members to prolonged detention absent a custody hearing before an immigration judge to determine if detention is necessary to prevent flight or danger to the community." Compl. at 26-27. As already discussed below, *see infra* of Defendants' Motion to Dismiss, that relief has no basis in the INA. Thus, Plaintiffs' requested relief does not seek to require the "lawful operation of the immigration detention statutes." Accordingly, the Court also lacks jurisdiction to grant Plaintiffs, as a class, hearings before an immigration judge.

**B.  Even if the Court had Jurisdiction to Grant Plaintiffs Relief, the Court Should Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).**

"In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice. *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A complaint must contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The pleading standard of Federal Rule of Civil Procedure 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Plaintiffs must offer "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* A complaint "that offers 'labels and conclusions . . . will not do.'" *Id.* When a complaint's well-pleaded facts do not enable a court, "draw[ing] on its judicial experience and common sense," "to infer more than the

mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Ahuja v. Detica Inc.*, 742 F. Supp. 2d 96, 102 (D.D.C. 2010).

> **1.** **Plaintiffs Have Failed to Allege Sufficient Facts to Support a Claim that Defendants Have Adopted a "Deterrence Policy."**

The Court should dismiss Plaintiffs' claim that DHS or ICE has adopted a "Deterrence Policy" under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' allegations, taken as true, do not allow the Court to plausibly infer that Defendants have unofficially rescinded the 2009 Parole Directive in the five Field Offices, in direct contravention of the DHS Secretary's recent mandate that the Directive remains in "full force and effect." The 2017 Kelly Memorandum not only states that the 2009 Parole Directive remains in "full force and effect" and "shall be implemented in a manner consistent with its plain language," but also specifically reiterates that arriving aliens found to have a credible fear are among some of the only aliens detained under section 1225 who should be released, provided—consistent with the Parole Directive—that the alien can establish his or her identity and that he or she presents neither a security risk nor a flight risk. Ex. B.

Even if taken as true, Plaintiffs' allegation that an earlier draft of the Kelly Memorandum referenced a deterrence aspect of immigration enforcement fails to support their claim that after Secretary Kelly issued the February 20 Memorandum, DHS and ICE changed course and adopted a different, secret, or unofficial policy conforming to a prior draft of the Memorandum that DHS had already considered and rejected.

Plaintiffs also proffer alleged statistics regarding the parole rates at the five Field Offices between February and September 2017, which they allege are starkly lower than the average national parole rates between 2011 and 2013. Compl. ¶¶ 37–39. But even taken as true, these statistics do not constitute sufficient factual matter upon which they can state a facially plausible

claim. Plaintiffs have cherry-picked a small sampling of statistics—choosing to target the five Field Offices that happen to have the lowest parole rates over a single eight-month span—and have compared them to parole rates between 2011 and 2013. *Id.* They have omitted statistics from 2014 to 2016 and have omitted current statistics from the twenty unnamed Field Offices. *Id.* Plaintiffs' proffered statistics cannot support their allegation of a "Deterrence Policy," especially when the very Parole Directive Defendants have allegedly rescinded places the burden on the parole applicants to demonstrate that they have established their identities and that they are not a flight risk or a danger to the community. *See generally* Parole Directive. Given the fact that the Parole Directive (1) places the burden on the parole applicants and (2) leaves parole "an inherently discretionary determination," *Id.* ¶ 4.4, an allegation that the five Field Offices with the lowest national parole rates had a combined 4% parole rate over one eight-month span is not sufficient to state a claim that Defendants have adopted a secret "Deterrence Policy" in direct contravention of the DHS Secretary's express order to follow the 2009 Parole Directive. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").[3]

---

[3] Plaintiffs' view that a 4% percent parole rate in a small group of selected Field Offices over an eight-month span can sustain a claim of a blanket "Deterrence Policy" is likely rooted in their apparent misunderstanding of the requirements of the Parole Directive. Plaintiffs believe that the Directive requires "individualized determinations that detention is *necessary* to prevent flight or danger to the community" in order to justify denying release. Compl. at 26, ¶ c. That characterization wrongly implies that the Parole Directive places the burden on ICE to demonstrate that Plaintiffs' continued detention is necessary. The Directive instructs instead that absent any other "exceptional, overriding factors" that weigh against release, arriving aliens determined to have a credible fear should be paroled *if*, to the satisfaction of the parole officer and reviewing supervisors, *they* have established their identity and demonstrated that they are neither a flight risk nor a danger to the community. Ex. A ¶ 8.3 (emphases added).

Finally, Plaintiffs offer generalized individual allegations that they were denied parole "pursuant to the Deterrence Policy, even though [they] established [their] identit[ies], identified a sponsor with whom [they] could live, and showed that [they] pose[ ] no flight risk or danger to the community." Compl. ¶¶ 11–18. But these allegations are merely legal conclusions *disguised* as factual allegations. Whether Plaintiffs have "established [their] identit[ies]" or "showed that [they] pose[ ] no flight risk or danger to the community" are discretionary determinations that the Parole Directive delegates to DHS, and whether those discretionary determinations were made pursuant to some ethereal "Deterrence Policy" is a legal question for the Court. Legal conclusions couched as factual allegations are not sufficient to give rise to a plausible claim. *See also Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating that on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Mere "labels and conclusions . . . will not do." *Iqbal*, 556 at 678.

The individual Plaintiffs' remaining allegations, that Mr. Castro was never interviewed and received no explanation for his parole denial and that Mr. Callol received no interview and no response after submitting additional documents, Compl. ¶¶ 13, 14, 18, are also insufficient to support Plaintiffs' claim that ICE, DHS, and the five Field Offices have collectively, but unofficially, rescinded then-Secretary Kelly's orders to follow an agency directive that DHS has never "revoked," "amended," or "withdrawn" them. *Id.* ¶ 34.

### 2. Neither Have Plaintiffs Adequately Pleaded a Constitutional Claim.

Plaintiffs' constitutional due process claim should also be dismissed under Rule 12(b)(6). Plaintiffs claim that "particularly where detention is prolonged, due process requires a custody hearing before a neutral decision-maker to determine if detention is necessary." Compl. ¶ 79. This is not the law.

Under the Fifth Amendment, Plaintiffs, as arriving aliens, receive only the process guaranteed to them by statute. "[A]n alien on the threshold of initial entry stands on a different footing: Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (internal quotation marks omitted). The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982). The Court's "general reaffirmations of this principle have been legion." *Kleindienst* v. *Mandel*, 408 U.S. 753, 765-766 (1972); *see Zadvydas* v. *Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."); *Mandel*, 408 U.S. at 767 ("[T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government.") (quoting *Galvan* v. *Press*, 347 U.S. 522, 531 (1954)). By definition, an alien seeking initial entry lacks any constitutionally cognizable interest in being released into the United States while doubts about his status are resolved. In contemplation of law, that alien is outside the United States. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.").

The Supreme Court recently made clear in *Jennings v. Rodriguez* that the plain language of 8 U.S.C. § 1225(b)(1) and (2) mandate detention of arriving aliens, like Plaintiffs, throughout the completion of applicable proceedings and not just until the moment those proceedings begin.

138 S. Ct. at 845. And Congress did not confer any protected liberty interest supporting an arriving alien's release. *See Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("[A]n individual claiming a protected interest must have a legitimate claim of entitlement to it."). To the contrary, Congress provided that an arriving alien found to have a credible fear "shall be detained for further consideration" of his asylum claim, 8 U.S.C. 1225(b)(1)(B)(ii) (emphasis added), and may be released only through the Secretary of Homeland Security's discretionary parole authority under 8 U.S.C. 1182(d)(5). This Court cannot apply the canon of constitutional avoidance to read an implicit reasonableness standard or any other limitation into the plain language of the statutory provision. *Id.* at 843-44. This includes the relief that Plaintiffs claim they are owed under the Fifth Amendment: "a custody hearing before a neutral decision-maker to determine if detention is necessary." Compl. ¶ 79.

Accordingly, because Plaintiffs can only receive under the Fifth Amendment what is guaranteed to them by statute, and because neither section 1225, 1182, nor any implementing or interpretive regulations provide Plaintiffs a custody hearing before a neutral decision-maker to determine if detention is necessary, Plaintiffs' constitutional claim fails to state a claim for which relief can be granted. Because Plaintiffs have failed to state either a statutory or a constitutional claim, the Court should dismiss the Complaint in its entirety under Rule 12(b)(6).

### C.   Even if the Court Does Not Dismiss the Complaint in its Entirety, it Should Dismiss Defendants Sessions and McHenry.

Finally, even if the Court determines that it has jurisdiction to provide Plaintiffs the relief they seek in their Complaint, the Court should still dismiss Attorney General Sessions and EOIR Director McHenry. This Complaint alleges that ICE has established a blanket Deterrence Policy in contravention of the INA and Fifth Amendment. Neither the U.S. Department of Jus-

tice nor the EOIR, one of DOJ's component agencies, has any responsibility whatsoever for implementing the Parole Directive, and Plaintiffs have neither alleged that they do nor alleged those agencies have acted unlawfully in any way. Plaintiffs have thus failed to state a claim upon which relief may be granted as to Defendants Sessions and McHenry, and they must be dismissed from this action under Federal Rule of Civil Procedure 12(b)(6). *See Iqbal*, 556 U.S. at 678.

III.   **CONCLUSION**

Because the Court lacks jurisdiction to provide Plaintiffs the injunctive relief they seek and because Plaintiffs have failed to state a claim under Rule 12(b)(6), the Court should dismiss the Complaint in its entirety.

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I.   **FACTS IN SUPPORT OF DEFENDANTS' OPPOSITION**

The facts as alleged in Plaintiffs' Complaint differ significantly from the facts contained in records Defendants reviewed in preparation for their opposition to Plaintiffs' request for a preliminary injunction.[4] First, none of the five Field Offices uses deterrence of future migration as a factor when making parole determinations. *See* Ex. C ¶ 5, Ex. D ¶ 4, Ex. E ¶ 6, Ex. F ¶ 5, Ex. G ¶ 8. Much less have any of the Field Offices adopted a blanket "Deterrence Policy" depriving Plaintiffs of the opportunity of an individualized parole determination. *Id.* Second, each named Plaintiff received an individualized parole determination, after which ICE officers completed a

---

[4] Defendants recite these facts exclusively to oppose Plaintiffs' Motion for a Preliminary Injunction and not to support their Motion to Dismiss.  Accordingly, the Court should not convert Defendants' Motion to Dismiss into a Motion for Summary Judgment. *See Tele-Commc'ns of Key W., Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985) (requiring the Court, before it converts a motion to dismiss into a motion for summary judgment to ensure that such treatment is fair to both parties).

"Record of Determination/Parole Determination Worksheets" memorializing each ICE officer's parole determination and the concurrence and approval of his supervisors. Ex. C ¶¶ 10-12, 16-18; Ex. D ¶ 4; Ex. E ¶ 13, Ex. F ¶¶ 7-8, Ex. G ¶ 20.

ICE records also indicate that each named Plaintiff was provided a letter giving him or her a brief explanation for his or her denial.  Ex. C ¶¶ 12, 18; Ex. D-3, D-6, D-8, D-10; Ex. E ¶ 13; Ex. F ¶¶ 7-8, Ex. G ¶ 21. Contrary to what Plaintiffs allege in their Complaint, none of them was denied parole based on an interest in deterring other asylum seekers from coming to the United States. Mr. Damus was denied parole because he failed to demonstrate to the satisfaction of the parole officer that he is not a flight risk, due to his lack of ties to the community. Ex. E ¶ 13. N.J.J.R. was denied parole after failing to present evidence demonstrating that his proposed sponsor was his niece, as he had claimed. Ex. G ¶ 20. Mr. Callol was denied parole because, although he was able to identify a sponsor in lawful immigration status, he did not provide evidence of an ongoing relationship with the sponsor and was not able to provide evidence of sufficient ties to the United States or to a stable residence to illustrate that he was not a flight risk. Ex. F ¶ 8. Mr. Montes-Castro was denied parole after failing to show that his proposed sponsor lacked lawful immigration status or that he himself had sufficient ties to the community. Ex. F ¶ 7. H.A.Y. was denied parole after failing to present sufficient evidence that she wasn't a flight risk. Ex. D ¶ 24. A.M.M. was denied parole for failing to present sufficient evidence to establish his relationship with his sponsor. Ex. D ¶ 20. L.H.A. was denied parole after failing to present sufficient evidence that his proposed sponsor could financially support him and that he wasn't a flight risk. Ex. D ¶¶ 10, 12, 14, 16. E.E.C.S. was denied parole having previously used counter-

feit documents to attempt to gain entry into the United States. Ex. C ¶¶ 16-18. L.I.L.M. was de-

nied parole having previously lived and worked in Canada and having provided conflicting evi-

dence about his relationship to his proposed sponsor. Ex. C ¶¶ 10-12.

In addition, while Mr. Castro alleges in the Complaint that he was never interviewed,

Compl. ¶ 14, ICE records indicate that he was interviewed with an interpreter on January 12,

2018. Ex. F ¶ 7. While L.I.L.M. alleges that he received no explanation of the decision denying

him parole, Compl. ¶ 18, a copy of the denial letter, dated February 8, 2018, and indicating that

he was denied parole because he was a flight risk, is contained in his file. Ex. C-4. And while

Mr. Callol alleges that he was never interviewed for parole and received no response from ICE

after submitting additional documentation in support of his application, Compl. ¶ 13, ICE rec-

ords indicate that he was interviewed by an officer with the assistance of an interpreter. Ex. F ¶

8.

ICE supervisory officials at the five Field Offices also assert that their Field Offices fol-

low procedures outlined in the Parole Directive when adjudicating parole applications. This in-

cludes notifying arriving aliens determined to have a credible fear of their rights to apply for pa-

role, considering the documents the applicant provides in support of his or her application, utiliz-

ing the "Record of Determination/Parole Determination Worksheet" to make a determination,

and informing the applicant of any denial in writing. *See* Ex. C ¶ 5, Ex. D ¶ 4, Ex. E ¶ 6, Ex. F

¶ 5, Ex. G ¶ 8.

## II.    ARGUMENT

In determining whether to grant a preliminary injunction, the Court must balance four

factors: (1) the movant's showing of a substantial likelihood of success on the merits, (2) irrepa-

rable harm to the movant, (3) substantial harm to the non-movant, and (4) public interest. *Davis*

*v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291 (D.C. Cir. 2009). "[T]he movant has the

burden to show that all four factors, taken together, weigh in favor of the injunction." *Id.* at 1292. But if the movant fails to demonstrate a likelihood of success on the merits, the court "need not consider the other factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Housing and Urban Dev.,* 639 F.3d 1078, 1089 (D.C. Cir. 2011); *accord Gilardi v. U.S. Dep't of Health & Human Servs.,* 733 F.3d 1208, 1211 (D.C. Cir. 2013). "Likewise, since the basis of injunctive relief in the federal courts has always been irreparable harm, a court need not balance the other factors if the movant makes no showing of irreparable harm." *Sai v. Transportation Sec. Admin.*, 54 F. Supp. 3d 5, 8 (D.D.C. 2014) (internal quotation marks omitted) (quoting *City-Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

### A. Plaintiffs Have Not Shown that They Are Substantially Likely to Succeed on the Merits.

As discussed above in Defendants' Motion to Dismiss, the Complaint should be dismissed for lack of jurisdiction and for failure to state a claim. Accordingly, Plaintiffs have not shown a likelihood of success on the merits.

Plaintiffs also cannot show that they are likely to succeed on their claim of a blanket deterrence policy because, as ICE records demonstrate, no such policy exists. *See Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2011) ("The presumption [of regularity] applies to government-produced documents no less than to other official acts."). Neither do any of the five Field Offices use deterrence as a factor in making parole determinations for arriving aliens determined to have a credible fear. *See* Ex. C ¶ 5, Ex. D ¶ 4, Ex. E ¶ 6, Ex. F ¶ 5, Ex. G ¶ 8.

Contrary to Plaintiffs' assertions, ICE records contain a completed "Record of Determination/Parole Determination Worksheet" for each named Plaintiff, indicating that each was denied parole after receiving an individualized assessment and after having failed to show to the satisfaction of the parole officer that he or she warranted parole under the Parole Directive. Ex. C

¶¶ 10-12, 16-18; Ex. D ¶ 4; Ex. E ¶ 13, Ex. F ¶¶ 7-8, Ex. G ¶ 20. Mr. Damus was denied parole because he failed to demonstrate to the satisfaction of the parole officer that he is not a flight risk, due to his lack of ties to the community.  Ex. E ¶ 13. N.J.J.R. was denied parole after failing to present evidence demonstrating that his proposed sponsor was his niece, as he had claimed. Ex. G ¶ 20. Mr. Callol was denied parole because, although he was able to identify a sponsor in lawful immigration status, he did not provide evidence of an ongoing relationship with the sponsor and was not able to provide evidence of sufficient ties to the United States or to a stable residence to illustrate that he was not a flight risk. Ex. F ¶ 8. Mr. Montes-Castro was denied parole after failing to show that his proposed sponsor lacked lawful immigration status or that he himself had sufficient ties to the community. Ex. F ¶ 7. H.A.Y. was denied parole after failing to present sufficient evidence that she wasn't a flight risk. Ex. D ¶ 24. A.M.M. was denied parole for failing to present sufficient evidence to establish his relationship with his sponsor. Ex. D ¶ 20. L.H.A. was denied parole after failing to present sufficient evidence that his proposed sponsor could financially support him and that he wasn't a flight risk. Ex. D ¶¶ 10, 12, 14, 16. E.E.C.S. was denied parole having previously used counterfeit documents to attempt to gain entry into the United States. Ex. C ¶¶ 16-18. L.I.L.M. was denied parole having previously lived and worked in Canada and having provided conflicting evidence about his relationship to his proposed sponsor. Ex. C ¶¶ 10-12. Each Plaintiff was determined to have failed to demonstrate that he or she is not a flight risk based on "appropriate" factors for consideration listed in the Parole Directive. Ex. A at 7 ("Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to, community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United

States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available to the alien."). Accordingly, Plaintiffs are unlikely to succeed on the merits of their blanket "Deterrency Policy" claim.

In addition, while Mr. Castro alleges in the Complaint that he was never interviewed, Compl. ¶ 14, ICE records indicate that he was interviewed with an interpreter on January 12, 2018.  Ex. F ¶ 7. While L.I.L.M. alleges that he received no explanation of the decision denying him parole, Compl. ¶ 18, a copy of the denial letter, dated February 8, 2018, and indicating that he was denied parole because he was a flight risk, is contained in his file. Ex. C-4. And while Mr. Callol alleges that he was never interviewed for parole and received no response from ICE after submitting additional documentation in support of his application, Compl. ¶ 13, ICE records indicate that he was interviewed by an officer with the assistance of an interpreter. Ex. F ¶ 8. ICE supervisory officials at the five Field Offices also assert that their Field Offices follow procedures outlined in the Parole Directive when adjudicating parole applications. This includes notifying arriving aliens determined to have a credible fear of their rights to apply for parole, considering the documents the applicant provides in support of his or her application, utilizing the "Record of Determination/Parole Determination Worksheet" to make a determination, and informing the applicant of any denial in writing. Therefore, Plaintiffs are not likely to succeed on the merits of any claim that ICE has unlawfully rescinded the Parole Directive.

None of the named Plaintiffs' factual allegations about a "Deterrence Policy" finds support in ICE records. Accordingly, Plaintiffs have failed to show a likelihood of success on the merits and the Court should deny their request for a Preliminary Injunction.

### B.  Plaintiffs Have Not Shown that a Substantial Threat of Irreparable Harm is Likely Absent Injunctive Relief.

Neither can Plaintiffs show that a substantial threat of irreparable harm is likely absent injunctive relief. To do this, "[t]he movant must show that the threat of irreparable harm is likely, as opposed to just a possibility." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 48 (D.D.C. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

Because Plaintiffs were never subjected to a "Deterrence Policy" and have already received individualized parole determinations under the Parole Directive, there is no threat that Plaintiffs will be subjected to a "Deterrence Policy" in the near future. Moreover, pursuant to the Parole Directive, each of the Plaintiffs can, and indeed a few did, seek a redetermination. *See* Ex. A ¶ 8.2; Ex. C ¶ 5; Ex. D ¶¶ 11, 13, 15; Ex. E ¶ 7. Under those circumstances, Plaintiffs cannot show that irreparable harm is likely to occur absent the Court ordering an injunction. *Nat'l Min. Ass'n*, 768 F. Supp. at 53 (denying a preliminary injunction where plaintiffs failed to show the certainness or the imminence of their alleged harm).

### C.  The Government Maintains an Interest in Enforcement of the Immigration Laws.

The Supreme Court has recognized that "[t]here is always a public interest" in efficient enforcement of United States law. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, detention under section 1225(b) furthers the efficient enforcement of the immigration of the immigration laws by "giv[ing] immigration officials the time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision [on the alien's immigration status] can be made." *Jennings*, 138 S. Ct. at 836.

## III.   CONCLUSION

Failure to show either a likelihood of success on the merits or a substantial threat of irreparable harm is fatal to a motion for a preliminary injunction. *Sai*, 54 F. Supp. 3d at 8. Here,

Plaintiffs have shown neither. Therefore their Motion for a Preliminary Injunction must be denied.

Dated:  April 24, 2018                    Respectfully submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General
                                          Civil Division

                                          WILLIAM C. PEACHEY
                                          Director
                                          Office of Immigration Litigation
                                          District Court Section

                                          SARAH B. FABIAN
                                          Senior Litigation Counsel
                                          Office of Immigration Litigation
                                          District Court Section

                                          ALEXANDER J. HALASKA
                                          Trial Attorney
                                          Office of Immigration Litigation
                                          District Court Section


                                          */s/ Genevieve M. Kelly*

                                          GENEVIEVE M. KELLY
                                          Trial Attorney, Office of Immigration Litigation
                                          U.S. Department of Justice
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, DC 20044
                                          (202) 532-4705
                                          Va. Bar No. 86183
                                          genevieve.m.kelly@usdoj.gov

                                          *Attorneys for the Defendants*