## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANSLY DAMUS,** *et al.*,

    **Plaintiffs,**

       v.

**KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security,** *et al.*,

    **Defendants.**

Civil Action No. 18-578 (JEB)

## MEMORANDUM OPINION

As the events of recent months make clear, the question of how this nation will treat those who come to our shores seeking refuge generates enormous debate. While arriving foreigners may have myriad reasons for wanting to settle in the United States, a subset claims a fear of persecution in their native lands. They seek asylum here. Since 2009, the detention of those asylum-seekers has, in part, been governed by a set of principles and procedures set forth in a "Parole Directive" issued by Immigration and Customs Enforcement, a component of the Department of Homeland Security. This document establishes the process by which ICE must determine whether an individual who has passed a credible-fear interview – the first step toward gaining asylum status – will be released from detention on parole pending a full hearing.

Plaintiffs (and other members of the class they seek to represent) are noncitizens being held at five ICE Field Offices who have received a credible-fear determination but have been denied parole. Although, in the past, individuals deemed to have a "credible fear" of persecution and thus a significant possibility of being granted asylum were overwhelmingly released, Plaintiffs contend that there is a new reality in place. Pointing to the fact that parole rates have

plummeted from over 90% to nearly zero, as well as to testimony from detained asylum-seekers and their counsel, they assert that the Government is no longer following its own Parole Directive. Plaintiffs allege that, rather than providing individualized determinations and procedural safeguards, DHS is now engaging in systematic detention.

Seeking the protections spelled out in the Directive, Plaintiffs have now turned to the courts. They filed suit in March of this year against DHS Secretary Kirstjen Nielsen, as well as Thomas Homan, the Acting Director of ICE, U.S. Attorney General Jefferson B. Sessions, and the directors of the five ICE Field Offices. Their Complaint alleges that Plaintiffs have been denied parole in violation of the ICE Directive, and that the Government has thereby violated the Administrative Procedure Act, the Immigration and Nationality Act, and the Due Process Clause of the Fifth Amendment. Defendants have now moved to dismiss, contending that this Court lacks subject-matter jurisdiction over the various counts and that Plaintiffs have failed to state a viable claim for relief. The asylum-seekers both oppose dismissal and request a preliminary injunction requiring DHS to comply with the Parole Directive and to provide individualized parole determinations while this suit is pending.

Finding that the circumstances here merit that extraordinary form of relief, the Court will grant Plaintiffs' Motion. In so doing, this Opinion does no more than hold the Government accountable to its own policy, which recently has been honored more in the breach than the observance. Having extended the safeguards of the Parole Directive to asylum-seekers, ICE must now ensure that such protections are realized.

## I.    Background

###    A.  Statutory and Regulatory Framework

Plaintiffs in this case are detained pursuant to the Immigration and Nationality Act, 8

U.S.C. § 1225(b).  This statute provides that if a noncitizen "who is arriving in the United States"

demonstrates an intention to apply for asylum or expresses a fear of persecution or torture, he is

referred for an interview to determine whether the fear is credible.  See 8 U.S.C. §

1225(b)(1)(A)(ii).  If the interviewing officer determines this to be the case, the INA provides

that the individual "shall be detained for further consideration of the application for asylum,"

which includes a full asylum hearing before an immigration court and, if unsuccessful, an

administrative appeal with the Board of Immigration Appeals (BIA).  See 8 C.F.R. § 208.30(f); 8

U.S.C. § 1225(b)(1)(B)(ii).  This detention requirement is not, however, entirely inflexible.

Instead, an individual detained under § 1225(b) can be paroled "into the United States

temporarily" pursuant to the discretion of the Attorney General.  See 8 U.S.C. § 1182(d)(5)(A).

According to agency regulations, the Secretary of Homeland Security "may invoke" this parole

authority for individuals who are "neither a security risk nor a risk of absconding," and who meet

one or more of a series of conditions – namely, "for urgent humanitarian reasons or significant

public benefit."  Id.; 8 C.F.R. § 212.5(b).

It is this last factor – "public benefit" – that is the focus of the 2009 Directive, "Parole of

Arriving Aliens Found to Have a Credible Fear of Persecution or Torture," issued by

Immigration and Customs Enforcement ("ICE Directive" or "Parole Directive").  See ECF No.

22-1 (ICE Directive 11002.1).  The Directive explains the agency's interpretation of "public

benefit" for the purposes of determining parole and sets out a number of procedural requirements

for assessing asylum-seekers' eligibility for release.  On a broad level, the Directive states that

"[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case," and that if an asylum-seeker establishes his identity and that he presents neither a flight risk nor a danger to the public, "[ICE] should, absent additional factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." Id., ¶ 6.2 (emphasis added). More specifically, the Directive sets out a series of procedures ICE must undertake to determine whether a given asylum-seeker should be granted parole, including, *inter alia*, that the individual shall be provided written notice of the parole process explained in a language he understands, id., ¶¶ 6.1, 8.1, shall be granted a parole interview within seven days of a credible-fear finding, id., ¶ 8.2, shall be provided written notification of a parole determination, id., ¶ 6.5, and shall be given a "brief explanation of the reasons for any decision to deny parole." Id., ¶ 6.5. As a result, although the Directive affirms that parole decisions are discretionary, it also establishes certain minimum procedures and processes that are to be utilized in making these determinations. Id., ¶ 4.4 (Directive "explains how the term [public interest] is to be interpreted by [ICE] when it decides whether to parole arriving aliens determined to have a credible fear" and "mandates uniform recordkeeping and review requirements for such decisions").

B. Plaintiffs' Detention

The nine named Plaintiffs and other members of the class they seek to represent are "asylum seekers who traveled to the United States, were found to have a credible fear of persecution, and were referred for immigration proceedings to decide their asylum claims." Compl., ¶ 2. During the pendency of their asylum determinations, however, each has remained detained, allegedly "with no individualized review of whether their detention is necessary." Id.

The lead plaintiff, Ansly Damus, is a former ethics teacher who is seeking asylum in the United States after fleeing political persecution in Haiti. Id., ¶ 11. Damus entered the United States in October 2016 and was referred for immigration proceedings after an asylum officer determined that he had a credible fear of persecution. He was subsequently granted asylum twice, but the Government appealed both determinations; meanwhile, the Detroit ICE Field Office denied his requests for parole in January 2017 and February 2018. Id. He has therefore remained detained – at this point – for over a year and a half. Id.

Plaintiff L.H.A. (the Court has permitted certain named Plaintiffs to proceed under pseudonyms) has been detained for even longer – over two years. Id., ¶ 16. He entered the United States in May 2016, upon fleeing threats in El Salvador. After receiving a credible-fear determination, L.H.A. applied for parole on June 14, 2017, but his request was denied by the El Paso Field Office and he remains detained. Id.

Plaintiffs Alexi Castro, H.A.Y., A.M.M., E.E.C.S., and L.I.L.M. have been detained for shorter periods (so far), but their experiences mirror those of Damus and L.H.A. Each was found to have a credible fear of persecution, each requested parole, and each was subsequently denied release and remains detained. Id., ¶¶ 14, 15, 17, 18. For two of the Plaintiffs, however, the story takes a slightly different twist. Abelardo Callol, who presented himself to immigration officers in December 2017 after fleeing persecution in Cuba, was denied parole and had been detained for over three months at the time the Complaint was filed. Id., ¶ 13. N.J.J.R., who presented himself to immigration in October 2017 after fleeing Venezuela, had been detained for over four. Id., ¶ 12. In the time since the Complaint was filed, however, both men have been granted asylum and released from detention. See ECF No. 32 (Pl. Class Cert. Reply) at 15 n.6.

According to Plaintiffs, this shared experience of being found to have a credible fear of

persecution but then being denied parole is indicative of the issue at the crux of this case – namely, the allegation that certain ICE Field Offices are no longer providing individualized parole determinations pursuant to the 2009 Directive.  In support of this claim, Plaintiffs point to the steep descent of parole-grant rates in the initial months of the current administration.  Citing figures showing that nearly 100% of parole requests processed by the five Field Offices at issue have been denied, Plaintiffs allege that the Government is no longer following its own parole policies.

This past spring, the asylum-seekers looked elsewhere to vindicate their claims.  On March 15, 2018, they brought a class-action suit in this Court, challenging the parole regime currently in place at the Detroit, El Paso, Los Angeles, Newark, and Philadelphia ICE Field Offices.  See Compl., ¶¶ 21-25.  They claim that these Field Offices are categorically denying parole, an approach that Plaintiffs contend is contrary to law and arbitrary and capricious in contravention of the APA and the INA.  Id., ¶¶ 66-74.  They additionally bring a freestanding allegation that the current state of the parole system violates the Due Process Clause of the Fifth Amendment.  Id., ¶¶ 75-80.  Presently before the Court are Plaintiffs' Motions for a preliminary injunction requiring that Defendants follow the Parole Directive during the pendency of this suit, as well as for provisional class certification for purposes of the requested injunction.  Defendants oppose both Motions and separately seek dismissal of the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  In keeping with the expedited nature of a preliminary-injunction proceeding, the Court held a hearing on May 17, 2018, after which it ordered further briefing on the issue of class certification.  See ECF Order of May 29, 2018.  That briefing complete, this Opinion regarding injunctive relief now follows.  Given the result, the Court does not now tackle Defendants' Motion to Dismiss.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. NRDC, 555 U.S. 7, 24 (2008).  A party seeking preliminary relief must make a "clear 'showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'"  League of Women Voters of United States v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting Pursuing America's Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016)).  "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  Hospitality Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (citing Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in Winter, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another.  Davis v. PBGC, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit has hinted, though not held, that Winter – which overturned the Ninth Circuit's "possibility of irreparable harm" standard – establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'"  Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)); see League of Women Voters, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after Winter).  Unresolved, too, is the related question of "whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (citation

omitted).  Regardless of the extent to which showings of irreparable harm and success on the merits can be diminished, however, it is clear that where the plaintiff can show <u>neither</u> harm nor success, no relief is warranted.  <u>See</u> <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u>, 205 F. Supp. 3d 4, 26 (D.D.C. 2016).

## III.    Analysis

At the heart of Plaintiffs' suit is their assertion that, under the current administration, the parole practices at the five Field Offices have drastically departed from the policies and protections enshrined in the 2009 ICE Directive.  Offering comparative statistics as well as declarations from detained asylum-seekers and their counsel, Plaintiffs contend that parole has been effectively eliminated as an option and detention has instead become the status quo.  They attribute this shift in part to the Trump administration's emphasis on "deterrence" and "zero-tolerance" when it comes to the treatment of undocumented individuals.  Defendants contest this characterization, claiming instead that there is no "deterrence policy" in place, that they continue to implement the ICE Directive, and that parole remains available to asylum-seekers at the five Field Offices.

Before turning to its analysis of these issues, however, the Court must first address two threshold complications: justiciability and class certification.  According to Defendants, the asylum-seekers' case cannot proceed because this Court lacks jurisdiction over their claims and because they do not present a proper class.  Disagreeing on both fronts, the Court will discuss these points separately before tackling the merits of injunctive relief.

A.  Preliminary Issues

1. *Jurisdiction*

Defendants raise a bevy of jurisdictional objections.  Specifically, the Government

alleges that Plaintiffs' claims challenging the parole process are barred by 8 U.S.C. §

1252(a)(2)(B)(ii) and their request for classwide injunctive relief by 8 U.S.C. § 1252(f)(1).

Ultimately, the Court concludes that these alleged jurisdictional hurdles are easily cleared by the

asylum-seekers, and that their claims may therefore proceed.

One arrow Defendants pluck from their justiciability quiver relies on on 8 U.S.C. §

1252(a)(2)(B)(ii), which provides:

> [N]o court shall have jurisdiction to review . . . any other
> decision or action of the Attorney General or the Secretary of
> Homeland Security the authority for which is specified under
> this subchapter to be in the discretion of the Attorney General
> or the Secretary of Homeland Security.

According to the Government, Plaintiffs are improperly attempting to challenge "ICE officers'

discretionary weighing of the evidence."  ECF No. 26 (Def. PI Reply) at 4.

To the extent Plaintiffs are challenging the determinations themselves – *i.e.*, the actual

balancing of the merits of each application for parole – this Court agrees that it lacks jurisdiction.

It will, therefore, not inquire into the specific strengths or weaknesses of the parole decisions

under dispute, including Plaintiffs' allegation that certain of the proffered rationales for denial

were "pretextual."  ECF No. 24 at 8-10.  Yet the asylum-seekers do not rest their case on a

challenge to discrete parole determinations.  Rather, they allege that ICE is, as a matter of

general course, not complying with the policies and procedures of the Parole Directive.  In other

words, they are not challenging the outcome of ICE's decisionmaking, but the method by which

parole is currently being granted (or denied). The question, therefore, is whether such a claim falls within the scope of § 1252(a).

As the Supreme Court held in Zadvydas v. Davis, 533 U.S. 678 (2001), § 1252(a)(2)(B)(ii) does not entirely strip federal courts of jurisdiction over claims relating to the parole process. In that case, the petitioners challenged the Attorney General's authority to detain them indefinitely beyond the removal period. Id. at 682. The Court held that, although §1252(a) precludes judicial review of the discretionary determination to detain a noncitizen, the petitioners were not in fact challenging such decisionmaking. Instead, "they challenge[d] the extent of the Attorney General's authority," a claim that the Supreme Court held fell outside the scope of § 1252(a)(2)(B)(ii). Id. at 688.

This Court reached a similar conclusion when interpreting a parallel jurisdictional bar, 8 U.S.C. § 1226(e), in its decision in R.I.L-R. v. Johnson, 80 F. Supp. 3d 164 (D.D.C. 2015). As here, the provision at issue in that case precluded judicial review over any decision by the Attorney General regarding the "grant, revocation, or denial of bond or parole." Id. at 176. Yet, because Plaintiffs in R.I.L-R. were contesting the policies underlying their detention, and not "th[e] discretionary determinations granting or denying bond or parole in an individual case," the Court found that it had subject-matter jurisdiction. Id. at 177. Here, too, Plaintiffs are "challeng[ing] an overarching agency" action as unlawful – in this case, Defendants' systematic failure to follow the Parole Directive and to instead impose detention without its safeguards and individualized determinations. Id. at 176. As a district court held last year when presented with nearly identical claims by a putative class of asylum-seekers detained at the Buffalo Federal Detention Facility, Plaintiffs are not asking for this Court to review the propriety of any given parole decision, but, instead, "simply seek compliance with certain minimum procedural

safeguards when parole decisions are made" by requiring that Defendants follow the Directive. Abdi v. Duke, 280 F. Supp. 3d 373, 385 (W.D.N.Y. 2017). This Court agrees that such claims do not fall within the jurisdictional bar of 1252(a). Id. at 384 ("Petitioners are asking that this Court ensure that Respondents comply with certain policies and procedures in making th[e] parole decision – issues that are beyond the jurisdictional bar of § 1252(a)(2)(B)(ii).").

Defendants additionally assert that the classwide injunctive relief sought by Plaintiffs is jurisdictionally barred by a separate provision of the INA. See ECF No. 22 (Def. Opp. to PI) at 10-12. Specifically, they point to 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-1232], other than with respect to . . . an individual alien against whom proceedings under such part have been initiated." According to Defendants, to grant relief in this case, the Court would need to enjoin the operations of ICE in carrying out its delegated powers on a classwide basis – relief that they allege is prohibited under 8 U.S.C. § 1252(f)(1). See Def. PI Opp. at 10-12.

Even assuming that Plaintiffs' claims fall within the provisions addressed by § 1252(f)(1) – a premise that is disputed by the parties – Defendants' jurisdictional argument is easily defeated. As this Court noted in R.I.L.-R., Section 1252(f)(1) "prohibits only injunction of 'the operation of' the detention statutes." 80 F. Supp. 3d at 184 (citing Rodriguez v. Hayes, 591 F.3d 1105, 1120 (9th Cir. 2010)). Put another way, "[w]here . . . a petitioner seeks to enjoin conduct that allegedly is not even authorized[,] . . . the court is not enjoining the operation of [the statute], and § 1252(f)(1) therefore is not implicated." Id. (citing Rodriguez, 591 F.3d at 1120) (internal quotations and citations omitted). Here, Plaintiffs do not seek to "enjoin or restrain the operation" of any provision of the INA. Instead, they ask that this Court mandate

compliance with the Parole Directive, which addresses the discretionary authority of the Attorney General to grant temporary parole. As a classwide injunction in this case would not obstruct the "operation of" any statute, but merely require conduct that complies with ICE's own Directive, 8 U.S.C. § 1252(f)(1) does not stand in the way.

### 2. *Class Certification*

To achieve meaningful relief with respect to DHS's allegedly unlawful actions, Plaintiffs sensibly ask this Court to provisionally certify a class. To obtain certification, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the three Rule 23(b) requirements. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345-50 (2011). Rule 23(a) states that a class may be certified only if: (1) it is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative are typical of those of the class ("typicality"), and (4) the class representative will fairly and adequately protect the interests of the class ("adequacy of representation"). Plaintiffs must show, in addition, that: (1) the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent adjudications, (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, or (3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members. See Fed. R. Civ. P. 23(b)(1)-(3).

In deciding whether class certification is appropriate, a district court must ordinarily undertake a "rigorous analysis" to see that the requirements of the Rule have been satisfied. See Gen. Tel. Co. of SW v. Falcon, 457 U.S. 147, 161 (1982). "Rule 23 does not set forth a mere

pleading standard." <u>Wal-Mart</u>, 564 U.S. at 350. Rather, the party seeking class certification bears the burden of "affirmatively demonstrat[ing] his compliance with the Rule – that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, etc." <u>Id.</u> (emphasis in original).

Plaintiffs here, however, need only <u>provisional</u> class certification in order for the Court to grant their preliminary injunction. <u>See</u> Tr. of PI Hearing (May 17, 2018) at 6:6-8. In granting such provisional certification, the Court must still satisfy itself that the requirements of Rule 23 have been met. <u>See</u> <u>Berge v. United States</u>, 949 F. Supp. 2d 36, 49 (D.D.C. 2013) (citing Fed. R. Civ. P. 23 Advisory Committee Notes 2003 Amendments). Its analysis is tempered, however, by the understanding that such certifications "may be altered or amended before the decision on the merits." <u>Bame v. Dillard</u>, No. 05-1833, 2008 WL 2168393, at *5 (D.D.C. May 22, 2008) (internal quotation marks omitted).

Plaintiffs' proposed class consists of all arriving asylum-seekers who "are found to have a credible fear of persecution or torture" and "who are or will be detained by ICE . . . after having been denied parole under the authority of the [five] ICE Field Offices." Mot. for Class Cert. at 5-6. The Court must therefore consider whether this class, as defined, meets the requirements under Rule 23. It will begin by addressing Defendants' threshold contention that the class cannot be certified because certain members lack standing, and then briefly analyze the first and fourth prongs of Rule 23(a), neither of which Defendants contest. It then assesses the second and third specifications together, both of which are disputed. Finally, it considers whether Plaintiffs have satisfied their burden under Rule 23(b).

a.   Standing

Defendants first attack Plaintiffs' standing to bring a classwide suit.  According to the

Government, Plaintiffs' request that this Court "certify a class that includes all arriving asylum

seekers who are found to have a credible fear . . .  who are or will be detained by ICE after

having been denied parole under the authority of [the five] Field Offices"  cannot proceed

because the class definition "includes persons who have not experienced the harm Plaintiffs

allege."  Opp. to Class Cert. at 28.  The asylum-seekers reply that "[t]o the contrary, all class

members have been denied parole pursuant to Defendants' *de facto* parole denial policy and thus

have suffered the injury alleged in Plaintiffs' Complaint."  Pl. Class Cert. Reply at 14.

 To establish standing, a plaintiff "must, generally speaking, demonstrate that he has

suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and

that the injury will likely be redressed by a favorable decision."  Bennett v. Spear, 520 U.S. 154,

162 (1997) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992); Valley Forge

Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464,

471-472 (1982)).  Standing is assessed "upon the facts as they exist at the time the complaint is

filed,"  Natural Law Party of U.S. v. Fed. Elec. Comm'n, 111 F. Supp. 2d 33, 41 (D.D.C. 2000),

and "Rule 23's requirements must be interpreted in keeping with Article III constraints."

Amchem Products, Inc. v. Windsor, 521 U.S. 591, 592 (1997).

Here, the Court concludes that Plaintiffs have adequately established the standing of their

class members.  As defined, the putative class includes only arriving asylum-seekers who have

been or will be detained by the five ICE Field Offices after having been denied parole.  Each of

these individuals has suffered a concrete injury – detention imposed without the protections of

the Parole Directive – from the Government's refusal to grant them the Directive's requisite

processes and protections. Although the Government asserts that "not all putative class members have been injured by Defendants' purported policy . . . [as] not all persons detained at the Field Offices were denied parole," Opp. to Class Cert. at 28, this line of argument entirely ignores Plaintiffs' definition of the class as including only those asylum-seekers who are or will be detained "<u>after</u> having been <u>denied</u> parole." Pl. Class Cert. Reply at 15 (emphasis altered). The (albeit negligible) percentage of asylum-seekers released by the Field Offices does not, therefore, undermine Plaintiffs' classwide standing, as they are explicitly excluded from the definition of the class.

For those individuals who <u>are</u> (or will be) detained after being denied release on parole, Plaintiffs adequately allege that the Government is engaging in injurious conduct, the resolution of which would likely be redressed by a favorable decision by this Court. According to Plaintiffs, their detention is the direct result of the Field Offices' current departure from the protections of the Parole Directive in favor of *de facto* detention – an allegation that, as discussed in more depth below, is robustly supported by statistics and other record evidence. In light of the prior substantial grant rates under the Directive and the near-uniform detention of asylum-seekers under the current administration, it is in no sense "speculative" that enjoining the Field Offices to implement the Directive would render Plaintiffs' release far more likely. As this Circuit has emphasized, "A significant increase in the likelihood that [a litigant] would obtain relief that directly redresses the injury suffered will suffice for standing." <u>Nat'l Parks Conservation Ass'n v. Manson</u>, 414 F.3d 1, 7 (D.C. Cir. 2005) (internal quotation marks omitted); <u>accord</u> <u>Lichoulas v. FERC</u>, 606 F.3d 769, 775 (D.C. Cir. 2010). Granting the injunctive relief in this case would mandate compliance with the procedures and policies of the Directive and would therefore result in a greater opportunity for class members' release on

parole.  The Court is, consequently, satisfied that the requirements of Article III are met by the proposed class.

b.   Numerosity

The numerosity requirement is determined case by case and "'imposes no absolute limitations.'"  Bynum v. D.C., 214 F.R.D. 27, 32 (D.D.C. 2003) (quoting Gen. Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)).  Plaintiffs need not prove exactly how many people fall within the class to merit certification.  See, e.g., Kifafi v. Hilton Hotels Retirement Plan, 189 F.R.D. 174, 176 (D.D.C. 1999) ("So long as there is a reasonable basis for the estimate provided, the numerosity requirement can be satisfied without precise numbers.").  As a general benchmark, "courts have found that a proposed class consisting of at least forty members" satisfies this requirement.  Johnson v. D.C., 248 F.R.D. 46, 52 (D.D.C. 2008) (internal quotation marks and citation omitted); accord Taylor v. District of Columbia Water & Sewer Auth., 241 F.R.D. 33, 37 (D.D.C. 2007); Bynum, 214 F.R.D. at 32.

Defendants do not challenge the numerosity of the proposed class, and rightly so. Plaintiffs have provided ample evidence that a large number of asylum-seekers – well over 40 – have been denied parole at the five Field Offices, see ECF No. 17-10 (Decl. of Anne Daher), ¶ 10, and state that the "Government itself has identified nearly 800 class members."  Mot. for Class Cert. at 1.  As discussed below, they have further demonstrated that the detention of class members is sufficiently tethered to ICE's compliance, or lack thereof, with the protections and procedures enshrined in the Parole Directive.  Nothing more is needed to satisfy the numerosity requirement under Rule 23.

c.   Adequacy of Representation

In order to satisfy this prerequisite, Plaintiffs must show both that (1) there is no conflict

of interest between the named members and the rest of the class, and that (2) counsel is competent to represent the class. See Twelve John Does v. D.C., 117 F.3d 571, 575 (D.C. Cir. 1997); Johnson, 248 F.R.D. at 53-54; Taylor, 241 F.R.D. at 45; Bynum, 214 F.R.D. at 35. No trace of a conflict exists here, and Plaintiffs are represented by very capable counsel from the American Civil Liberties Union and Covington & Burling LLP. Defendants, appropriately, do not dispute that these requirements have been met either.

### d. Commonality and Typicality

The Government, conversely, finds greater traction in citing two other prongs of the certification test. Rule 23(a)(2) – commonality – requires that Plaintiffs establish that "there are questions of law or fact common to the class." Class members' claims must depend on "a common contention [that] is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, 131 S. Ct. at 2551. In other words, the representative plaintiffs must show that the class members have "suffered the same injury." Id. (citation omitted). As the D.C. Circuit explained, commonality is satisfied where there is "a uniform policy or practice that affects all class members." D.L. v. District of Columbia, 713 F.3d 120, 128 (D.C. Cir. 2013).

To demonstrate typicality, as required by Rule 23(a)(3), Plaintiffs must show that their claims are "typical of the claims . . . of the class." Typicality means that the representative plaintiffs must "possess the same interest and suffer the same injury" as the other class members. See Falcon, 457 U.S. at 156 (citations omitted). The commonality and typicality requirements often overlap because both "serve as 'guideposts'" to determine whether a class action is practical and whether the representative plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class members. See Taylor, 241 F.R.D. at 44-45 (quoting Falcon,

457 U.S. at 157 n.13). Here, as Defendants' principal challenge to class certification goes to both, the Court considers them together.

Contending that Plaintiffs have been unable to establish a categorical practice affecting parole at the five Field Offices, Defendants argue that a class action is an improper vehicle to challenge their alleged failure to conform with the Parole Directive. According to the Government, Plaintiffs "allege a variety of procedural and substantive violations of the Parole Directive facially unconnected to any coordinated agency action." Def. Opp. to Cert at 1. They contend, therefore, that class certification is not available here because the asylum-seekers "cannot credibly identify any single policy or practice that bridges all their claims." Id. (internal quotation marks and citation omitted). Put another way, under the Government's view of the case, Plaintiffs are not challenging any uniform agency policy, but instead contest "the manner in which ICE has exercised its discretionary parole authority in more than a thousand different cases." Id. at 26 (internal quotation marks and citation omitted). DHS goes on to argue that the "fundamental flaw in Plaintiff's Motion for Class Certification is that it does not provide any evidence linking each Plaintiff's denied parole applications to a single or 'indivisible' government action capable of being enjoined 'in one stroke.'" Id. at 27 (citing Wal-Mart, 564 U.S. at 350) (emphasis added).

This argument bears a striking resemblance to Defendants' objection that Plaintiffs have not established a common injury for the purposes of standing, and, for similar reasons, the Court rejects it here as well. While it is true that the reasons for any given discretionary detention cannot necessarily be proven on an individualized basis, the Government has nonetheless conceded that ICE is required to follow the Directive when determining parole for asylum-seekers who have established a credible fear of persecution. See Def. Reply at 5. Plaintiffs here

have provided ample evidence that, in the initial months of the current administration, nearly every application for parole from such individuals has been denied.  This is in sharp contrast to the prior parole-grant rates, and, as discussed in depth below, indicates a likely departure from the policies and processes mandated by the Parole Directive.

The Court can, therefore, conclude that a "common question[] of law and fact" unites the class members' claims – namely, the allegation that the five ICE Field Officers are no longer providing the "individualized determinations" of parole eligibility and procedural protections required by the Parole Directive.  See D.L. v. D.C. (D.L. II), 860 F.3d 713, 724-26 (D.C. Cir. 2017) (evidence suggesting failure to follow statutory provisions satisfies commonality); R.I.L-R., 80 F. Supp. 3d at 182 (holding that "ample evidence that nearly every Central American family apprehended since June 2014 has been detained" supports conclusion that "common questions of law and fact united the class members' claims").  Such a showing provides the "glue holding" the alleged basis for the putative class's detention "together."  Wal-Mart, 564 U.S. at 352.  The asylum-seekers acknowledge that the circumstances of their detention may vary, but they have sufficiently identified a common cause and injury as a result of the current parole regime and ICE's departure from the mandates of the Parole Directive.  See Pl. Class Cert. Reply at 5-6.

The fact that the precise role this alleged failure to follow the Directive played in any specific determination may differ among the Plaintiffs does not destroy the fact that all (or nearly all) class members were subjected to the same system of *de facto* parole denial.  Indeed, as this Circuit has held, if there is a "single" common question, "factual variations among the class members will not defeat the commonality requirement."  Hardy v. D.C., 283 F.R.D. 20, 24 (D.D.C. 2012) (quoting Bynum v. D.C., 214 F.R.D. 27, 33 (D.D.C. 2003)).  As the court held in

Abdi when faced with the question of certifying the class of detained asylum-seekers at the Buffalo ICE Field Office, the question of whether Defendants were providing "certain procedural safeguards when adjudicating parole . . . determinations" is a common question that will "generate common <u>answers</u> apt to drive resolution of the litigation."  323 F.R.D. at 141 (citation omitted).  The court therefore rejected the Government's contention, repeated here, that the request to certify the class could not proceed "because the claims require individualized factual determinations."  <u>Id.</u>; <u>see also</u> <u>Borum v. Brentwood Vill., LLC</u>, 324 F.R.D. 1, 15-16 (D.D.C. 2018) (no requirement under Rule 23 that "all members of the putative class will be affected by the policy in the same way"); <u>Nio v. Dep't of Homeland Sec.</u>, 323 F.R.D. 28, 32 (D.D.C. 2017) ("factual variations among class members" do not trump "the overarching questions common to the class" addressing the "legal authority to implement [the challenged] policies and practices").

This Court agrees with the sound reasoning of Judge Wolford of the Western District of New York.  Contrary to the Government's assertion that "[i]f the class is certified, the Court will be forced to hear individualized evidence of ICE's compliance or alleged non-compliance with the Parole Directive for potentially every putative class member," the resolution of this case would require no such piecemeal litigation.  <u>See</u> Def. Opp. to Cert. at 32.  Rather, Plaintiffs ask this Court to determine only whether, as a general matter, the five Field Offices are following the Directive or are instead systematically denying parole.  Analyzing this issue thus requires only a common, programmatic analysis, as the specific facts of each denial matter not if Plaintiffs are correct in their claim that the Directive is no longer in force overall.

Nor is commonality defeated by the fact that a small percentage of asylum-seekers were, in fact, released from two of the five Field Offices.  As Plaintiffs correctly note, "A policy or

practice may satisfy Rule 23(a)(2), even when it is substantially less uniform than the near-100%

parole-denial rates at issue here." Pl. Class Cert. Reply at 5. See, e.g., Hoyte v. D.C., 2017 WL

3208456, at *10 (D.D.C. July 27, 2017) (commonality found when 43% of claims conformed to

alleged D.C. practice of failing to provide interim hearings).

Finally, the Court can also dispose of Defendants' contention that Plaintiffs are unable to

establish commonality because they do not allege a common motive underlying the Field

Offices' departure from the Parole Directive. See Opp. to Class Cert at 30-32, 39. As this

Circuit held in D.L. II, a common motive is not required under Rule 23 when "liability does not

depend on the reason for a defendant's failure" to follow the law. See 860 F.3d at 725

(distinguishing Wal-Mart on ground that "crux of the inquiry" under Title VII "is the reason for a

particular employment decision"). Here, although Plaintiffs identify "deterrence" as the

motivating factor behind the lack of individualized parole determinations and compliance with

the Directive, the Court need not find any such common intention in order to certify the class.

The asylum-seekers' claims rest not on the impetus behind the Field Offices' practices, but,

instead, on the very fact that they are no longer following the binding guidance of the Parole

Directive. See Pl. PI Brief at 17-19, 23-26, 28-31; see also Garnett, 2018 WL 1524748, at *5

("The question the Court confronts is simply whether the applications are being . . . processed"

lawfully, "not why they are . . . not.") (emphasis added).

The same reasoning applies to Defendants' challenge to typicality. The Government

alleges that Plaintiffs "point to no evidence that the five ICE Field Offices have engaged in the

'unitary course of conduct' they allege . . . and so no named Plaintiff can say that his claim is

'typical' of anyone else's." Opp. to Class Cert. at 40 (citation omitted). Again, the typicality

requirement is satisfied when the claims of the class representatives "arise from the same course

of conduct, series or events, or legal theories of other class members." <u>Hoyte</u>, 2017 WL 3208456, at *4 (citation omitted). Here, it is clear from Plaintiffs' filings and affidavits that the nine named class members have each alleged a personal deprivation of the protections of the Parole Directive, contending that they have instead been denied the opportunity for release under the Field Offices' current practice of nearly uniform detention. Although the specific details of each named Plaintiff's parole adjudication may vary, the crux of their allegations is typical of the claims of the putative class that the Government is no longer providing asylum-seekers with the individualized determinations and opportunities for release required under the Directive. In light of the record evidence of a current no-parole regime in place at the five Field Offices, <u>see</u> Section III. B, <em>infra</em>, such allegations are sufficiently tethered to a uniform course of governmental conduct. Defendants' various objections thus parried, the Court finds that commonality and typicality have been established.

> e. Rule 23(b)(2)

To obtain certification, a proposed class must also satisfy just one of the three Rule 23(b) specifications. Plaintiffs here invoke Rule 23(b)(2), which sets forth two basic requirements: (1) the party opposing the class must have "acted or refused to act on grounds that apply generally to the class," and (2) "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, must be appropriate." Put otherwise, Rule 23(b)(2) codifies the "presumption that the interests of the class members are cohesive." <u>Lightfoot v. D.C.</u>, 273 F.R.D. 314, 329 (D.D.C. 2011).

In disputing that this cohesion requirement has been satisfied, Defendants regurgitate a variant of the same challenge they raised to standing, typicality, and commonality – to wit, that Plaintiffs have not shown that "all putative class members warrant the same relief for the same

reasons." Opp. to Class Cert. at 41. Once again, the Court cannot concur. Plaintiffs allege that the five Field Offices no longer follow the policies and procedures outlined in the 2009 Parole Directive. They seek declaratory and injunctive relief requiring compliance with the Directive and mandating that the Field Offices provide the individualized parole determinations and protections required by such agency guidance. Contrary to the Government's argument that "it is difficult to see how each individual alleged violation of the Parole Directive would be amenable to resolution on a classwide basis," id. at 42, the asylum-seekers are not asking for this Court to remedy discrete errors in their parole determinations or to interfere with ICE's discretionary decisionmaking. Rather, Plaintiffs ask only that the Court address an alleged systematic harm – the failure of the Field Offices to comply with the Directive. This departure from the Directive is an agency action "generally applicable" to all class members, and a determination of whether that practice is unlawful would therefore resolve all members' claims "in one stroke." Wal-Mart Stores, 564 U.S. at 350; see R.I.L-R., 80 F. Supp. 3d at 182 (Rule 23(b)(2) satisfied when class challenges agency action "generally applicable to all class members"). Rule 23(b)(2) thus poses no obstacle to class certification.

B. The Merits

The undercard bouts now concluded, the Court turns to the main event: the merits of Plaintiffs' request for a preliminary injunction. The Complaint provides three distinct grounds for such relief. Specifically, Plaintiffs allege that DHS's actions: (1) are contrary to law under the APA by failing to follow the Parole Directive; (2) violate the APA by failing to conform with the INA; and (3) abridge Plaintiffs' due-process rights under the Fifth Amendment. See Mot. for PI at 1-3. Because the Court concludes that Plaintiffs' first theory warrants relief, it will focus its

attention accordingly.  In doing so, it addresses each of the four prongs of the preliminary-injunction analysis.

### 1. *Likelihood of Success*

To remind any reader whose attention may understandably have flagged: in Count I of their Amended Complaint, Plaintiffs allege that DHS is no longer complying with the ICE Directive, a practice they assert is "contrary to law" under the APA.  See 5 U.S.C. § 706(2)(A). Likelihood of success, consequently, turns on the strength of their argument that Defendants are failing to follow the Directive, and that such a departure is unlawful.  This is where the rubber meets the road.

Defendants contest both the premise and the substance of Plaintiffs' APA claims. DHS contends that the asylum-seekers do not have a cause of action under the statute, that the Parole Directive does not provide a sound basis for the relief they seek, and that they do not demonstrate that the agency is in fact failing to follow the necessary procedures. Because Plaintiffs' argument in support of this count rests in large part on a somewhat obscure area of law – the so-called Accardi doctrine – the Court will first lay out the fundamentals of this concept, next look at the question of whether Plaintiffs may raise such claims under the APA, and conclude with the alleged violations themselves.

### a. The Accardi Doctrine

Plaintiffs' first APA count is based, in large part, on the "Accardi doctrine," which they allege requires Defendants to follow the ICE Directive in adjudicating parole determinations. This doctrine arises from a 1954 Supreme Court decision, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954), in which the Court vacated a deportation order because it was issued without procedures that conformed to the relevant agency regulations.  The Court

stated that "[r]egulations with the force and effect of law supplement the bare bones" of federal statutes, and that, even in areas of expansive discretion, agencies must follow their own "existing valid regulations." Id. at 266, 268. Two decades later, in Morton v. Ruiz, 415 U.S. 199, 232 (1974), the Supreme Court returned to the doctrine – this time striking down a Bureau of Indian Affairs benefits determination because it did not comply with the procedures set forth in the agency's internal manual. In doing so, the Court noted that Accardi's teachings apply with particular force in those cases in which "the rights of individuals are affected," stating that "it is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required." Id. at 235.

This Circuit and district courts here have subsequently invoked the doctrine, noting that "Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." Battle v. FAA, 393 F.3d 1330, 1336 (D.C. Cir. 2005); see also Steenholdt v. FAA, 314 F.3d 633, 639 (D.C. Cir. 2003) ("The Accardi doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions."); Wilkinson v. Legal Servs. Corp., 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998) (citing Accardi and stating that "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions"); Vanover v. Hantman, 77 F. Supp. 2d 91, 103 (D.D.C. 1999), aff'd, 38 F. App'x 4 (D.C. Cir. 2002) (judicial review under Accardi available for "claims that an agency has acted in violation of its own binding procedures where those procedures are promulgated for the protection of individuals, even where the procedures were not issued as formal regulations"); Jefferson v. Harris, 285 F. Supp. 3d 173, 185 (D.D.C. 2018). And, in the immigration context, the Second Circuit has explained that the Accardi doctrine's "ambit is not limited to rules attaining the status of formal

regulation," and that it can be applied to internal agency guidance. See Montilla v. INS, 926 F.2d 162, 167 (2d Cir. 1991); see also Zhang v. Slattery, 840 F. Supp. 292, 296 (S.D.N.Y. 1994) (requiring that INS adhere to internal procedures in parole memorandum).

The doctrine is not without its limits, however. Courts have distinguished between those internal agency regulations that are enforceable and those that remain unreviewable – drawing a line "between procedural rules benefitting the agency . . . and procedural rules benefitting the party otherwise left unprotected . . . [or] cases in which the agency has failed to exercise discretion required by its regulations." Lopez v. FAA, 318 F.3d 242, 247 (D.C. Cir. 2003), as amended (Feb. 11, 2003). This Circuit has articulated this distinction as meaning that "agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion." Id. Similarly, the Supreme Court has held that the enforceability of agency policies depends upon whether they impose binding norms on the agency. Vitarelli, 359 U.S. at 539–40; Dulles, 354 U.S. at 372. Following that guidance, this Circuit has synthesized these considerations to conclude that "an agency pronouncement is transformed into a binding norm if so intended by the agency," a determination that takes into account the substance and intent of the agency action, as well as whether it confers individual protections or privileges. See Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987) (citations omitted).

b.    Accardi and Parole Directive

The next set of questions for the Court is therefore whether Plaintiffs can bring their Accardi claim pursuant to their first APA count, and whether the Parole Directive falls within the realm of agency rules, regulations, and guidance to which the doctrine can attach.

On the initial issue, Defendants contend that the asylum-seekers' Accardi allegations present a claim without a cause of action. According to the Government, Plaintiffs' assertion

that the Field Offices are failing to follow the Parole Directive is "not cognizable under Section 706(2) of the APA." Opp. to Class Cert at 26. Plaintiffs respond that the APA empowers them to challenge agency action that is arbitrary, capricious, and contrary to law, see 5 U.S.C. §§ 702, 706(2), and that their allegation that ICE's systematic departure from the Parole Directive is unlawful is thus actionable under that Act.

They are correct. "It has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated." Mass. Fair Share v. Law Enf't Assistance Admin., 758 F.2d 708, 711 (D.C. Cir. 1985). As numerous courts have held, the Accardi doctrine therefore provides plaintiffs with a means by which they can hold agencies accountable to their own policies. See, e.g., Burdue v. FAA, 774 F.3d 1076, 1082 n.2 (6th Cir. 2014) ("Under the doctrine outlined in Accardi, a party may always challenge an agency's failure to abide by its own regulations.") (internal citation omitted). It is clear, moreover, that such claims may arise under the APA. See Schaefer v. Geren, 607 F. Supp. 2d 61, 68-70 (D.D.C. 2009), aff'd sub nom. Schaefer v. McHugh, 608 F.3d 851 (D.C. Cir. 2010) (addressing Accardi claim pursuant to allegation that Army Board for Correction of Military Records "acted arbitrarily, capriciously, and contrary to law" in violation of APA § 706(2)(A)); Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841, 852 (9th Cir. 2003) (upholding Accardi challenge under APA § 706 and finding that "[h]aving chosen to promulgate the [] policy, the [Fish and Wildlife Service] must follow that policy"); Alamo Exp., Inc. v. United States, 613 F.2d 96, 98 (5th Cir. 1980) (finding APA violation by Interstate Commerce Commission because it failed to comply with internal procedure).

This connection between § 706(2) and Accardi was carefully explained in a recent opinion from the Southern District of California addressing a different form of internal agency

guidance on immigration, the "Operating Procedures" governing Deferred Action for Childhood Arrivals.  See Torres v. U.S. Dep't of Homeland Sec., 2017 WL 4340385, at *5-6 (S.D. Cal. Sept. 29, 2017).  As the court spelled out in Torres, the plaintiffs' allegation that Defendants had "fail[ed] to follow their own procedures in terminating Plaintiff's DACA status" was properly framed as a claim that the agency's actions were "arbitrary, capricious, and an abuse of discretion."  Id. at *5-6.  Such allegations, Torres concluded, fell well within the scope of the Accardi doctrine: "While Defendants are granted broad discretion to commence, adjudicate, and execute removal orders, a fundamental principle of federal law is that a federal agency must follow its own procedures."  Id. (citing Morton, 415 U.S. at 233-35).  For an agency to violate this governing maxim, the court found, would amount to an "unlawful" action under the APA. Id. (quoting 5 U.S.C. § 706(2)).  Agreeing with the analysis in Torres, and with the congeries of other cases addressing Accardi claims under the framework of administrative law, the Court rejects Defendants' assertion that Plaintiffs have failed to identify a cause of action under the APA.

The Court finds the Government's contention that Plaintiffs may not rely on the Parole Directive for their Accardi claim because it is not "binding" on the agency similarly unavailing. As discussed above, the premise underlying the Accardi doctrine is that agencies can be held accountable to their own codifications of procedures and policies – and particularly those that affect individual rights.  Here, the policies and procedures contained within the Directive establish a set of minimum protections for those seeking asylum, including an opportunity to submit documentation, the availability of an individualized parole interview, and an explanation of the reasons for a parole denial.  The Directive therefore falls squarely within the ambit of those agency actions to which the doctrine may attach.  See Pacific Molasses Co. v. FTC, 356

F.2d 386, 389-90 (5th Cir. 1966) ("[O]nce an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules."); Pasquini v. Morris, 700 F.2d 658, 663 n.1 (11th Cir. 1983) ("Although the [INS] internal operating instruction confers no substantive rights on the alien-applicant, it does confer the procedural right to be considered for such status upon application.").

Defendants' reliance on language in the Directive disclaiming that the document confers any substantive rights does not prove otherwise. The ICE Directive provides that it "is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States." Parole Directive, ¶ 10. The Government points to this language in refuting Plaintiffs' Accardi claims, stating in its briefing that "the Parole Directive's statement that it places requirements on ICE and its officers without creating a private cause of action should be viewed by the Court as determinative evidence of the extent to which DHS intended to be bound by the Directive." Reply at 2-3. Yet the Government's subsequent statement at oral argument that the Directive is, in fact, binding compels the Court to find otherwise. See Tr. at 19:12-13. It would seem that this representation is in fact the "determinative evidence" of the extent to which the agency "intended to be bound." The Court will therefore take Defendants at their word that the Directive is binding agency policy and thus concludes that it can be challenged via an Accardi claim.

The Court additionally notes that, even absent such concession, the Accardi doctrine could well apply to the ICE Directive. This case is distinguishable from a prior Opinion in this Circuit addressing the effects of disclaimer language in agency guidance, In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141 (D.C. Cir. 2006). In Miller, this Circuit held that DOJ

guidelines for issuing subpoenas to the media – which contained language similar to that in the ICE directive – did not create legally enforceable procedural rights. Yet although <u>Miller</u> relied in part on the express reservation at issue in that case, it does not stand for the proposition that such a disclaimer would necessarily defeat Plaintiffs' claim that the Directive is binding upon and enforceable against DHS. Instead, <u>Miller</u> explicitly distinguished <u>Morton</u> on the ground that the procedures contained in the BIA manual at issue in that case were "intended to benefit" individuals, whereas the DOJ guidelines provided no such protections and instead "exist[ed] to guide the Department's exercise" of its internal decisionmaking to seek subpoenas. <u>See Miller</u>, 438 F.3d at 1152. As discussed above, the ICE Directive falls clearly on the side of <u>Morton</u> rather than <u>Miller</u>, as "given the nature of the guidelines themselves, and the function they govern," the Directive was intended – at least in part – to benefit asylum-seekers navigating the parole process. <u>Id.</u> at 1153. The Court finds, therefore, that the disclaimer language contained within the Directive does not bar the application of the <u>Accardi</u> doctrine. <u>See Abdi</u>, 280 F. Supp. 3d at 389 (holding that agency cannot "avoid application of <u>Accardi</u> by simply disclaiming any binding effect in the [D]irective itself" and that "[t]o find otherwise would render the teachings of <u>Accardi</u> and its progeny meaningless").

c.    Merits of <u>Accardi</u> Claim

Having determined that Plaintiffs may invoke the <u>Accardi</u> doctrine, the Court must now assess whether they are likely correct with respect to the substantive claim at the heart of this case – <i>viz.</i>, the allegation that ICE is no longer following the Directive. As an initial matter, the Court briefly addresses Plaintiffs' assertion that the current practice at the five Field Offices of "denying parole in virtually all cases" is motivated by deterrence. <u>See</u> Pl. PI Reply at 2. This line of argument may well be true, <u>see</u> Pl. Class Cert. Reply at 6 n.2 (contending that "evidence

of the Trump Administration's deterrence goals continues to accumulate"), but, as Plaintiffs acknowledge, it is not necessary for the Court to delve into the basis for the agency's alleged departure from the Directive. See Pl. PI Reply at 14-15 ("Plaintiffs are entitled to a preliminary injunction, regardless of whether Defendants have been motivated by deterrence."); Tr. at 5:17-19; 26:20-22. Because it need not resolve this issue of impetus, the Court turns instead to the record regarding the current parole regime at the various Field Offices.

It begins with the most compelling evidence in support of Plaintiffs' case: the raw numbers. Although Benjamin Disraeli decried "lies, damn lies, and statistics," the numbers here are irrefutable. According to records obtained by the asylum-seekers, "[D]uring the eight months from February to September 2017," ICE's El Paso, Philadelphia, and Newark Field Offices denied 100% of parole applications. See Pl. Reply at 1. During that same period, the Los Angeles and Detroit Offices denied 92% and 98% of applications, respectively. See Daher Decl., ¶¶ 5-1; Compl., ¶ 38. These figures, Plaintiffs assert, "constitute[] a marked departure from just a few years ago," when ICE was also implementing the Parole Directive and granted parole to more than 90% of asylum-seekers. See id.; Compl., ¶ 39.

The Government's response to these figures is underwhelming at best. Indeed, as counsel conceded at the hearing, in light of the numbers for the first months of the administration, "there are questions" as to whether the five Field Offices are following the Parole Directive. See Tr. at 19:19-25; Tr. at 20:17-25 ("[T]hose statistics certainly look like outliers" from the Parole Directive.); Tr. at 21:7-11 (Government is "trying to get more information" as to whether "these five offices are following the" Directive). Although Defendants now state that they are "trying to get th[e] numbers" for intervening years, see Tr. at 20:7-8, and are "in the process of retrieving more information on the parole data," ECF No. 31-1 (Decl. of David W.

Jennings), ¶ 10, the fact remains that the only statistics submitted in this case are those cited by Plaintiffs. While DHS may believe that such figures overcount the actual parole-denial rate, their speculation is not sufficient to rebut Plaintiffs' assertion that the current release rate at the five ICE Field Offices is approaching zero.

Defendants' assertion that the statistics were "cherry picked" is similarly unavailing. See PI Opp. at 14. The Government attempts to cast doubt on Plaintiffs' figures by arguing that they strategically selected the numbers from only five ICE Offices across the nations. Yet, as Plaintiffs very reasonably note, "[I]t is those five Field Offices, and only those five, whose practices are at issue in this case." PI Reply at 4. It therefore seems to make perfect sense for them to present numbers from those specific locales. Nor can Defendants allege that the asylum-seekers have manipulated the figures from the five Field Offices at issue. The statistics presented by Plaintiffs include every parole request – more than 800 cases – recorded by ICE at those offices during the first eight months of the current administration. See Daher Decl., ¶¶ 5-11. The Court therefore finds that Plaintiffs' analysis adequately supports their claims.

The Court notes, moreover, that the dramatic departure in parole-grant rates from years past has not been explained in any way by Defendants. The Government does not dispute Plaintiffs' assertion that "there has been no significant change in the types of asylum seekers traveling to the United States," Pl. Reply at 1, nor does it indicate any other change in circumstances that would lead to a shift in how the Parole Directive is being applied. See Pl. Reply at 3 (noting that "Defendants do not suggest that asylum seekers detained in 2017 suddenly became more apt to flee or more apt to commit crimes than those detained earlier, and they make no other effort to explain the numbers"). Instead, in February 2017, then-DHS Secretary John Kelly stated that the Parole Directive "remain[s] in full force and effect," and the

Government represented the same to the Supreme Court just last year.  See Def. MTD, Exh. B at 9-10 (Kelly Memorandum); Pet. Suppl. Reply. Br., <u>Jennings v. Rodriguez</u>, No. 15-1204, at 6 n.2 (filed Feb. 21, 2017).  Declarations submitted by Defendants in this case, moreover, also state that the Parole Directive remains in force.  See ECF Nos. 22-3 (Decl. of Diane L. Witte), ¶ 3; 22-4-5 (Declaration of Rebecca Adducci), ¶¶ 3-4.  Such representations – and the dearth of data supporting the allegation that Plaintiffs' numbers are off – place the Government in an untenable position.  Defendants cannot claim that the ICE Directive remains fully in effect, and yet, at the same time, provide no explanation for the sudden shift in the day-to-day treatment of asylum-seekers under the current administration.  Indeed, as the Government stated at argument, "The policy . . . certainly envisions case by case determinations that will result in parole."  Tr. at 20:23-24.  Defendants concede that such an aim is "clear from reading the Parole Directive."  <u>Id.</u> Faced with the current record, the reasonable conclusion is that the five ICE Field Offices are not in fact putting this language into effect on the ground.

In addition to providing the Court with these troubling statistics, Plaintiffs support their claims with a number of declarations from asylum-seekers and their advocates.  The record includes affidavits from each of the named Plaintiffs, all of whom assert various violations of the Parole Directive with respect to ICE's adjudication of their release requests.  <u>See, e.g.</u>, Pl. PI Mot., Exhs. 12 (N.J.J.R. Decl.), ¶ 13; 13 (Callol Decl.), ¶¶ 10, 15; 16 (A.M.M. Suppl. Decl.) at 3, Exh. C.  Plaintiffs' evidence also includes the statements of attorneys such as Joan Del Valle, an experienced immigration lawyer, who asserts that she has been told by multiple ICE officials that "there is no more parole."  Pl. Exh. 10 (Decl. of Joan Del Valle), ¶ 8; <u>see also</u> Pl. Exh. 4 (Declaration of Jessica Miles), ¶ 6 (stating that as an immigration attorney she has been told by ICE officers that agency is "not granting parole").  Finally, there are also declarations from

various immigration practitioners stating that ICE is now denying parole to individuals who, in years past, would have been granted release under the Parole Directive. See Pl. Mot. at 8 (collecting statements from nine declarations). In sum, Plaintiffs argue that "the evidence demonstrates that similarly situated individuals who routinely were <u>granted</u> parole in prior years are being <u>denied</u> parole under the current regime," and that the Parole Directive is thus no longer being implemented at these five locations. See Pl. Reply at 1.

DHS marshals its own declarations, asserting that the named Plaintiffs were in fact given individualized parole determinations and that the Directive remains in place. Yet, as Plaintiffs aptly note, Defendants' declarations rely on records that have not been submitted to the Court and are written by individuals who largely did not have direct involvement with the specific adjudications. See Pl. Reply at 5-6; <u>Ramirez v. ICE</u>, 2018 WL 1882861, at *14 (D.D.C. Apr. 18, 2018) (refusing to credit declarations from ICE officials when officials were not decisionmakers and instead based assertions on "purported review" of documents). And, even if given full weight by this Court, the statements by various ICE officials do little to rebut the overwhelming evidence presented by Plaintiffs. See <u>Huynh v. Harasz</u>, 2016 WL 2757219, at *18-19 (N.D. Cal. May 12, 2016) (denial of 215 out of 215 applications could support conclusion that agency had blanket policy of denying applications, even in light of evidence suggesting individualized review). Although Defendants have submitted copies of certain letters and forms sent to the named Plaintiffs regarding their parole determinations, these summary and often boilerplate records do little to shine light on whether the Field Offices did, in fact, provide individualized determinations and comply in full with the Directive.

Indeed, in certain cases, Defendants' evidences cuts against DHS's contention that it continues to follow the Parole Directive. In the case of Plaintiff H.A.Y., the Government has

provided a declaration from Diane Witte of the El Paso Field Office, stating that the office denied H.A.Y.'s parole request because she was "a recent entrant and thus presented a flight risk." Witte Decl., ¶ 23. This reasoning is contrary to the very concept of giving each applicant an "individualized determination," as "recent entry" is a categorical characteristic of most, if not all, asylum-seekers. For the El Paso Field Office to conclude that such entry is, itself, sufficient to demonstrate flight risk strongly suggests that it is not conducting the particularized assessments required by the Directive. Certain of Defendants' records similarly undermine their assertion that the processes mandated by the Directive remain in place, as they evince a lack of compliance with its enumerated procedures. See, e.g., ECF No. 22-6 (Declaration of Jennifer Ritchey), Exh. 2-5 (providing records showing that Plaintiffs Castro and Callol received letters advising them of the right to apply for parole only one day prior to receiving nearly identical boilerplate letters informing them of parole denial); compare ECF No. 23 (Decl. of Andre Quinones), ¶ 4 (stating that "parole interviews are not conducted in every case if the interview would be superfluous") with Parole Directive, ¶ 8.2 ("Unless an additional reasonable period of time is necessary . . . no later than seven days following a finding that an arriving alien has a credible fear, a [Detention and Removal Operations] officer . . . must conduct an interview with the alien to assess his or her eligibility for parole") (emphasis added); id., Witte Decl., ¶ 9 (discussing denial of parole for L.H.A. without interview).

In light of the drastic decline in parole-grant rates at the five ICE Field Offices, and the affidavits by the named Plaintiffs and their counsel regarding the processing of their parole applications, this Court finds that the asylum-seekers are able to demonstrate that individualized parole determinations are likely no longer par for the course. The Court therefore finds that Plaintiffs have demonstrated a likelihood of success on the merits of their Accardi claim that

Defendants are not abiding by their own policies and procedures. Having decided this critical issue, the Court moves on to the remaining three preliminary-injunction factors.

### 2. *Irreparable Harm*

To establish the existence of the second factor, a party must demonstrate that its injury is "of such <u>imminence</u> that there is a 'clear and present' need for equitable relief to prevent irreparable harm." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)). The injury must also be "both certain and great; it must be actual and not theoretical." <u>Id.</u> (quoting <u>Wisconsin Gas</u>, 758 F.2d at 674). Finally, the injury must be "beyond remediation." <u>Id.</u>

Plaintiffs have satisfied this inquiry here. As discussed above, the evidence they present suggests that asylum-seekers are being denied parole without the protections of the ICE Directive. The record indicates that, instead, they are subject to a *de facto* "no-parole" reality, under which detention has become the default option. It is evident, moreover, that being deprived of the safeguards of the Parole Directive harms putative class members in myriad ways. <u>See</u> ECF No. 17-23 (Declaration of Allen S. Keller), ¶¶ 11-24 (discussing "harmful effects of immigration detention on the health and well-being of asylum-seekers"); <u>Abdi</u>, 280 F. Supp. 3d at 407-08 (finding irreparable harm when asylum-seekers detained at facility failing to follow Parole Directive). Although Defendants contend that Plaintiffs can seek parole redeterminations, and thus are not subject to irreparable harm, they make no showing that such requests are any more likely to be granted than the initial applications. <u>See</u> Def. Opp. at 24. Given that this Court has already agreed with Plaintiffs' contention that parole requests are being nearly uniformly denied at the five Field Offices, it makes little sense to seek redetermination under the same

regime as a route to meaningful relief.  See ECF No. 25-3 (Stambaugh Suppl. Decl.), ¶¶ 6, 10

(redetermination denial consisted solely of "original boilerplate parole denial letter").

The injuries at stake, furthermore, are "beyond remediation."  Chaplaincy, 454 F.3d at

297.  Members of the proposed class do not seek monetary compensation for their injuries.

Instead, they seek injunctive and declaratory relief requiring that Defendants follow their own

parole policies.  Unlike economic harm, the harm from detention pursuant to an unlawful

departure from agency procedure cannot be remediated after the fact.  Cf. Davis v. Pension

Benefit Guar. Corp., 571 F.3d 1288, 1295 (D.C. Cir. 2009) (economic losses are typically not

irreparable because compensation can be awarded after a merits determination).

3.    *Balance of Harms and Public Interest*

Under the circumstances of this case, factors three and four do not require in-depth

analysis.  As courts in this district have recognized, "The public interest is served when

administrative agencies comply with their obligations under the APA."  N. Mariana Islands v.

United States, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).  The Parole Directive itself, moreover, states

that the detention of asylum-seekers who are neither a flight risk nor dangerous is "not in the

public interest" and therefore requires an individualized parole determination as to whether they

should be released.  See Parole Directive, ¶ 6.2 (emphasis added).  In light of the Court's

conclusion that DHS's current failure to follow the ICE Directive is likely unlawful, and that the

parole practices in place at the five Field Offices cause irreparable harm to those seeking asylum,

the Court finds that these last two factors favor Plaintiffs as well.

*       *       *

To be clear, in finding that injunctive relief is warranted in this case, this Court is simply

ordering that Defendants do what they already admit is required – follow the ICE Directive when

adjudicating asylum-seekers' detention.  The Directive provides a framework of minimum protections for those claiming refugee status, and, as Defendants acknowledge, it is binding on the Government.  To mandate that ICE provide these baseline procedures to those entering our country – individuals who have often fled violence and persecution to seek safety on our shores – is no great judicial leap.  Rather, the issuance of injunctive relief in this case serves only to hold Defendants accountable to their own governing policies and to ensure that Plaintiffs receive the protections they are due under the Parole Directive.

**IV.     Conclusion**

For the aforementioned reasons, the Court will grant Plaintiffs' Motions for a Preliminary Injunction and will grant provisional class certification.  A separate Order consistent with this Opinion shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  July 2, 2018