IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANSLY DAMUS, *et al.*, on behalf of themselves and others similarly situated, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security, in her official capacity, *et al.*, <br><br> *Defendants.* | Civil Action No. 1:18-cv-00578 (JEB) |

**PLAINTIFFS' MOTION FOR LIMITED DISCOVERY REGARDING COMPLIANCE WITH THE PRELIMINARY INJUNCTION, OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**

In past years, the five U.S. Immigration and Customs Enforcement ("ICE") Field Offices in this case released 92% of asylum seekers pursuant to the Parole Directive's requirement that, absent exceptional circumstances, ICE release asylum seekers who are not flight risks or dangers to the community. During the first eight months of the Trump Administration, the release rate had dropped to zero in three of the Field Offices and less than 4% in the five Field Offices collectively. In July, this Court held that the dramatic drop in the parole-grant rate and other evidence reflected that Defendants were violating the Parole Directive, and granted a preliminary injunction enjoining those violations.

Despite the Court's preliminary injunction, it appears that Defendants continue to violate the Parole Directive. Data provided by Defendants to the Court on August 24 reflects that, during the first six weeks after the preliminary injunction issued, the ICE Field Offices have

granted parole to only 25% of asylum seekers — dramatically less than the 92% grant rate in prior years.  Testimony of legal practitioners handling parole cases in the jurisdictions covered by the Field Offices confirms that the situation has not fundamentally changed since the Court entered the preliminary injunction:  Defendants still are denying parole to individuals who are not flight risks or dangers to the community, and who would have been granted parole in earlier years.  Defendants also are continuing to violate procedural requirements of the Parole Directive, including, for example, the requirement that a parole interview be conducted no later than seven days following a finding that an asylum seeker has a credible fear.

Defendants, meanwhile, have offered no explanation that could account for the fact that more than 90% of asylum seekers were granted parole under the Parole Directive in prior years, while only 25% are now being granted parole pursuant to the very same Directive.  The Parole Directive does not mandate that any particular percentage of parole requests be granted, but the seismic shift in parole-grant rates from just a few years ago demands explanation and Defendants have offered none.

The evidence before the Court is sufficient to support a finding that Defendants are in contempt of the preliminary injunction.  At this stage, however, Plaintiffs seek only limited discovery relevant to that determination.  The discovery Plaintiffs seek pertains solely to whether Defendants are complying with the preliminary injunction and is thus appropriate at this stage of the proceedings.  Courts regularly grant such compliance discovery to monitor compliance with their orders and the Court should do so here given the substantial evidence that Defendants are in contempt.

## BACKGROUND

### A.     The Preliminary Injunction

On July 2, 2018, this Court granted a class-wide preliminary injunction, enjoining Defendants to follow the requirements of ICE Directive No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009) (the "Parole Directive"). *Damus v. Nielsen*, 313 F. Supp. 3d 317, 343 (D.D.C. 2018); Order, *Damus v. Nielsen*, 1:18-cv-00578-JEB (D.D.C. July 2, 2018) (ECF No. 33) ("PI Order").  The Court concluded that Plaintiffs were likely to succeed on their claim that Defendants were no longer following the Parole Directive in five ICE field offices (the "ICE Field Offices"); that Plaintiffs were suffering irreparable harm through their detention; and that Plaintiffs had satisfied the remaining requirements for a preliminary injunction.  *See Damus*, 313 F. Supp. 3d at 339-42.

The Court's preliminary injunction order provided that:

- Defendants may not deny "parole to any provisional class members absent an individualized determination, through the parole process, that such provisional class member presents a flight risk or a danger to the community";
- "The individualized determinations . . . shall be based on the specific facts of each provisional class member's case" and not "categorical criteria applicable to all provisional class members"; and
- "Defendants shall provide provisional class members with parole determinations that conform to all of the substantive and procedural requirements of [the Parole Directive]."

PI Order, ¶¶ 3-5.

In implementing the preliminary injunction, this Court ordered that Defendants provide new parole advisals, parole interviews, and parole determinations to all class members by August 24, 2018.  The Court also ordered Defendants to submit a report on that date providing data on

the outcome of the new parole determinations.  *See* Minute Order, *Damus v. Nielsen*, 1:18-cv-00578-JEB (D.D.C. July 24, 2018).

### B. The Evidence Suggests That Defendants Are Not Complying with the Preliminary Injunction.

Defendants' data reports on parole determinations conducted after the preliminary injunction was issued strongly suggest that Defendants still are not following the Parole Directive.  *See* Sealed Document, *Damus v. Nielsen*, 1:18-cv-00578-JEB (D.D.C. Aug. 24, 2018) (ECF No. 40).  Across the five ICE Field Offices, Defendants granted only approximately 25% of parole determinations — as compared to roughly 92% in earlier years.  *See id.*; Daher Decl. ¶ 9 (ECF No. 17-10).  Nearly all of the parole denials since the preliminary injunction was entered have been based on purported "flight risk," with no further explanation — suggesting that Defendants continue to invoke "flight risk" as a pretext for denying parole in cases where no bona fide individualized parole reviews have been conducted.  *See* Sealed Document (ECF No. 40).  More specifically:

- In the Detroit Field Office, only 19% of parole determinations were granted, and every denial was based on purported "flight risk."
- In the El Paso Field Office, only 27% of parole determinations were granted, and all but 5 of 208 determinations were based on purported "flight risk."
- In the Los Angeles Field Office, only 17% of parole determinations were granted, and every denial was based on purported "flight risk."
- In the Newark Field Office, 42% of parole determinations were granted (in a relatively small sample), and every denial was based on purported "flight risk."
- In the Philadelphia Field Office, only 18% of parole determinations were granted, and all denials but one were based on purported "flight risk."

*See id.*

These parole grant rates are all vastly lower than the approximately 92% parole-grant rate in the same ICE Field Offices just a few years ago, when the same Parole Directive was in effect. Defendants have provided no explanation for the much lower parole grant rates today. They have never, for example, suggested that asylum seekers today are more likely to flee than they were a few years ago, nor have they suggested some other material change in the population of individuals seeking asylum.

Testimony of legal practitioners in the Field Office jurisdictions supports the conclusion that Defendants still are not complying with the Parole Directive. First, ICE is apparently continuing to ignore the substantive standard for parole. That standard provides that, absent exceptional circumstances, ICE should parole an asylum seeker in the public interest where she establishes her identity to the satisfaction of ICE and proves that she is neither a flight risk nor a danger to the community. *See* Parole Directive ¶ 6.2; PI Order ¶ 3. Yet many asylum seekers who have done so continue to be denied parole as purported "flight risks." *See* Ex. 1, Declaration of Elizabeth Ford ("Ford Decl.") ¶ 4; Ex. 2, Supplemental Declaration of Carlos Spector ("Suppl. Spector Decl.") ¶ 7; Ex. 3, Declaration of Elizabeth Hercules-Paez ("Hercules-Paez Decl.") ¶ 5; Ex. 4, Declaration of Rafael Reyneri ("Reyneri Decl.") ¶ 8; Ex. 5, Declaration of Troy E. Elder ("Elder Decl.") ¶ 9; Ex. 6, Declaration of Andres Alonso ("Alonso Decl.") ¶ 7; Ex. 7, Declaration of Brennan Gian-Grasso ("Gian-Grasso Decl.") ¶ 9; Ex. 8, Declaration of Brayan Antonio Guzman Orellana ("Guzman Orellana Decl.") ¶ 11; Ex. 9, Declaration of Yosiel Casado Milanes ("Casado Milanes Decl.") ¶ 9. In fact, many of those denied parole as "flight risks" since the preliminary injunction issued continue to have *stronger* relationships with sponsors in the United States than others who were granted parole before the Trump

Administration took office. *See* Ex. 1, Ford Decl. ¶ 5; Ex. 2, Suppl. Spector Decl. ¶¶ 8-9; Ex. 10, Declaration of Linda Corchado ("Corchado Decl.") ¶¶ 8.

In addition, Defendants still are not complying with numerous procedural requirements of the Parole Directive. For example, the Parole Directive requires that ICE explain the parole advisal in a language that asylum seekers understand. *See* Parole Directive ¶¶ 6.1, 8.1. However, ICE has frequently failed to do so, despite the fact that the large majority of the plaintiff class is not proficient in English. *See* Ex. 3, Hercules-Paez Decl. ¶ 6; Ex. 10, Corchado Decl. ¶¶ 3-5. Nor has ICE explained that detainees are entitled to request a reasonable extension of time in order to collect evidence in support of their parole application, as the Directive requires. *Compare* Parole Directive ¶ 8.2, *and* Minute Order, *Damus v. Nielsen*, 1:18-cv-00578-JEB (D.D.C. July 24, 2018), *with* Ex. 3, Hercules-Paez Decl. ¶ 6; Ex. 10, Corchado Decl. ¶ 6. As a result, many asylum seekers are unable to adequately prepare for their parole reviews. *See* Ex. 3, Hercules-Paez Decl. ¶ 6.

The Parole Directive also requires a parole interview no later than seven days following a finding that an asylum seeker has a credible fear (unless an additional reasonable period of time is necessary). *See* Parole Directive ¶ 8.2; *see also* Minute Order, *Damus v. Nielsen*, 1:18-cv-00578-JEB (D.D.C. July 24, 2018) (setting deadlines for parole interviews). However, ICE has failed to provide an interview in many cases, and the Los Angeles Field Office appears to have ignored this requirement altogether. *See* Ex. 8, Guzman Orellana Decl. ¶ 10; Ex. 3, Hercules-Paez Decl. ¶ 7; Ex. 4, Reyneri Decl. ¶ 6; Ex. 5, Elder Decl. ¶¶ 7-8 (describing statement by officer of Los Angeles Field Office that declarant's client would not receive a parole interview, as "that's not how it's done here"). In other cases, ICE provided cursory interviews that lasted only five-minutes. *See* Ex. 7, Gian-Grasso Decl. ¶ 7.

The Parole Directive further requires that each asylum seeker's "eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." Parole Directive ¶ 6.2. However, ICE continues to ignore class members' evidence that they satisfy the parole criteria, including evidence of their sponsors, community ties, and other facts demonstrating that they do not pose a flight risk. *See* Ex. 1, Ford Decl. ¶¶ 3-5; Ex. 2, Suppl. Spector Decl. ¶¶ 6-8; Ex. 4, Reyneri Decl. ¶¶ 5, 8; Ex. 5, Elder Decl. ¶¶ 4, 9; Ex. 6, Alonso Decl. ¶¶ 6-7, 9; Ex. 7, Gian-Grasso Decl. ¶¶ 6, 9-13; Ex. 8, Guzman Orellana Decl. ¶ 9, 11; Ex. 9, Casado Milanes Decl. ¶¶ 8-9.

Likewise, the Parole Directive requires that ICE provide a "brief explanation of the reasons for denying parole" when a denial occurs. Parole Directive ¶ 8.2. However, the ICE Field Offices continue to rely on the same form denial letters they used before the preliminary injunction issued. *See, e.g.*, Ex. 1, Ford Decl. ¶¶ 4-5, Ex. B; Ex. 2, Suppl. Spector Decl., ¶ 7, Ex. B; Ex. 3, Hercules-Paez Decl. ¶ 8; Ex. 4, Reyneri Decl. ¶ 8; Ex. 5, Elder Decl. ¶ 9; Ex. 6, Alonso Decl. ¶ 7; Ex. 7, Gian-Grasso Decl. ¶ 9; Ex. 8, Guzman Orellana Decl. ¶ 11; Ex. 9, Casado Milanes ¶ 9; Ex. 10, Corchado Decl. ¶ 8. As the Court found in its preliminary injunction decision, "these summary and often boilerplate records do little to shine light on whether the Field Offices did, in fact, provide individualized determinations and comply in full with the Directive." *Damus*, 313 F. Supp. 3d at 341. The Directive further requires that ICE provide "reasonable access to translation or interpreter services" for the parole decision and service of the parole decision on the asylum seeker's attorney. Parole Directive ¶ 6.5. Again, ICE is still failing to satisfy these requirements. *See* Ex. 3, Hercules-Paez Decl. ¶ 9; Ex. 4, Reyneri Decl. ¶

7; Ex. 5, Elder Decl. ¶ 9; Ex. 6, Alonso Decl. ¶ 8; Ex. 7, Gian-Grasso Decl. ¶ 8; Ex. 8, Guzman Orellana Decl. ¶ 11; Ex. 9, Casado Milanes Decl. ¶ 9.[1]

### C. Defendants Have Refused to Provide Information Necessary to Assess Their Purported Compliance With the Preliminary Injunction.

Notwithstanding this evidence, Defendants have asserted that they are complying with the preliminary injunction. To test that assertion, Plaintiffs requested that Defendants provide limited information concerning their purported compliance. *See* Ex. 11, Declaration of Philip Levitz ("Levitz Decl.") ¶ 3 & Ex. 1. Specifically, Plaintiffs requested:

- Parole determination worksheets, case summaries, parole denials themselves, and/or other documents reflecting the process and/or bases for parole determinations since the preliminary injunction issued, or a statistically valid sample of these documents;

- Internal ICE communications, such as emails, memoranda, and training material, reflecting the procedures that ICE officers are expected to follow and the standards they are expected to apply in making parole determinations; and

- Testimony from an official at each of the five ICE Field Offices regarding such procedures and standards, and why the parole grants rates after the preliminary injunction was entered are so much lower than they were just a few years ago, when the very same Parole Directive was in effect.

*See id.* Defendants have refused to provide this information, leaving Plaintiffs no choice but to file this motion. *See id.*[2]

---

[1] The Parole Directive also requires that ICE provide written decisions to requests for reconsideration within seven days, absent reasonable justification for delay. *See* Parole Directive ¶ 6.6. ICE has failed to do so in several cases. *See* Ex. 7, Gian-Grasso Decl. ¶ 14; Ex. 10, Corchado Decl. ¶ 9.

[2] While Defendants' counsel offered to "discuss" written questions from Plaintiffs regarding preliminary injunction compliance with their clients, responses to written questions would likely

## ARGUMENT

I. **Targeted Discovery Is Necessary to Assess Whether Defendants Are Complying with the Preliminary Injunction.**

Courts have inherent power to grant "limited discovery to aid the court in determining whether [a defendant] had complied with a judgment," including a preliminary injunction order. *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008) (collecting cases); *see also Palmer v. Rice*, 231 F.R.D. 21, 25-26 (D.D.C. 2005) (granting discovery where, "without further discovery, plaintiffs will not be able to determine whether the government has complied with the court's injunctions"); *Blackberry Ltd. v. Typo Prod. LLC*, 2014 WL 4136586, at *5 (N.D. Cal. Aug. 21, 2014) (granting discovery regarding preliminary injunction compliance); *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 2012 WL 12932049, at *57-58 (S.D.N.Y. July 17, 2012) (collecting additional cases), *report and recommendation adopted sub nom. Cardell Fin. Corp. v. Suchodolksi Assocs., Inc.*, 896 F. Supp. 2d 320, 329 (S.D.N.Y. 2012).

The evidence needed to justify discovery for the limited purpose of assessing compliance is "considerably less than that needed to show actual noncompliance." *Leavitt*, 523 F.3d at 1034. So long as "significant questions regarding noncompliance have been raised, appropriate discovery should be granted." *Id.*; *Blackberry Ltd.*, 2014 WL 4136586, at *2 (discovery appropriate where movants provided evidence "rais[ing] [a] significant question of whether [the defendant] has violated the preliminary injunction"); *see also Cardell Fin. Corp.*, 2012 WL

---

just mirror the conclusory declarations filed by Defendants in connection with earlier preliminary injunction briefing that this Court declined to credit. *See* Ex. 11, Levitz Decl. ¶ 3 & Ex. 1; *Damus*, 313 F. Supp. 3d at 341. Written responses would be no substitute for contemporaneous documentation, or live testimony permitting follow-up. *See, e.g.*, *D.A. v. Nielsen*, 2018 WL 3158819, at *6 (D.N.J. June 28, 2018) (ordering defendants to produce parole determination worksheets, even where defendants had previously submitted declaration that ICE conducts individualized review of parole requests, as "Plaintiffs have a legitimate interest in supplementing DFOD Perez's representation with the only available documentary evidence of ICE's decision making process that preceded the denial of parole to these Plaintiffs").

12932049, at *58 (discovery should be granted upon "prima facie showing that a violation has occurred").

The evidence described above easily meets this standard. At a bare minimum, the dramatic and unexplained drop in the parole grant rate from more than 90% in earlier years to approximately 25% in the months since the preliminary injunction issued raises "significant questions" regarding Defendants' compliance. The sworn testimony cited above by legal practitioners who have represented clients seeking parole in the jurisdictions covered by the five ICE Field Offices only magnifies those questions. Accordingly, compliance discovery is warranted.

Plaintiffs' discovery requests are narrowly tailored to the issue of Defendants' compliance with the preliminary injunction. Plaintiffs seek parole determination documentation only from the brief period since the preliminary injunction issued in July; documents reflecting the procedures and standards that the five ICE Field Offices have applied in making parole determinations since the preliminary injunction issued; and testimony regarding those procedures and standards and the reasons parole grants rates at the Field Offices have dropped from over 90% in prior years to just 25% today, notwithstanding that the same Parole Directive remains in effect.[3] Because Plaintiffs' requested discovery is focused narrowly on Defendants' compliance with the preliminary injunction, it is irrelevant that a Rule 26(f) discovery conference has not yet occurred. *See, e.g.*, *MACOM Tech. Sols. Holdings, Inc. v. Infineon Tech. AG*, No. 2:16-cv-02859-CAS(PLAx), ECF No. 283 (C.D. Cal. Mar. 17, 2017) (holding that, even prior to Rule

---

[3] Plaintiffs seek only information relevant to Defendants' general procedures and standards; Plaintiffs are not seeking information to challenge the exercise of discretion in any particular parole determination.

26(f) conference, "good cause exists for expedited discovery . . . [because] plaintiffs have demonstrated that defendants may have violated the Court's injunctions").

Accordingly, Plaintiffs' request for targeted compliance discovery should be granted.

## II. Alternatively, Defendants Should Be Ordered to Show Cause Why They Should Not Be Held in Contempt.

In the alternative, based on the evidence that ICE is not complying with the preliminary injunction, the Court should order Defendants to show cause why they should not be held in contempt.

An order to show-cause should issue if "sufficient evidence exists that the Court *might* find evidence sufficient to hold defendant in contempt." *Stewart v. O'Neill*, 225 F. Supp. 2d 6, 10 (D.D.C. 2002). "Two elements must be established before a party may be held in civil contempt." *Id.* "First, the Court must have issued an order that is clear and reasonably specific." *Id.* (citing *Armstrong v. Exec. Off. of Pres.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993)). "Second, the putative contemnor must have violated the Court's Order." *Id.* (citing *Armstrong*, 1 F.3d at 1289). There is sufficient evidence of both here.

*First*, this Court's preliminary injunction order is "clear and unambiguous." The order requires Defendants to provide class members with parole determinations that comply with the substantive and procedural mandates of the Parole Directive. *See* PI Order ¶¶ 2-5.

*Second*, Plaintiffs have presented ample evidence of Defendants' failure to comply with the preliminary injunction. Most significantly, there has been a dramatic drop in parole-grant rates at the ICE Field Offices — from 92% a few years ago to 25% now — and Defendants have offered no explanation for the precipitous decline. *See* Daher Decl. ¶ 9 (ECF No. 17-10); Sealed Document (ECF No. 40). This Court already held that a "dramatic departure in parole-grant rates from years past" that is "not . . . explained in any way by Defendants" leads to the

"reasonable conclusion" that the ICE Field Offices are not following the Parole Directive. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 340 (D.D.C. 2018). Indeed, another court in this District recently held that *less dramatic* changes in parole grant rates than those at issue here reflect non-compliance with the Parole Directive. *See Aracely R. v. Nielsen*, 2018 WL 3243977, at *23, *28 (D.D.C. July 3, 2018) (finding non-compliance with the Parole Directive, based in significant part on change in parole rate from approximately 35% in 2016 to approximately 9% in 2017 in one detention center, and from approximately 50% in 2016 to approximately 26% in 2017 in another detention center). Moreover, here, the statistical evidence of non-compliance is supported by declarations from practitioners reflecting that ICE is not conducting bona fide individualized parole reviews; that individuals with similar profiles were granted parole a few years ago but are being denied parole now; and that ICE is violating a number of the Parole Directive's procedural requirements. *See supra* pp. 5-8. This evidence is more than sufficient to meet the *Stewart* standard.

## CONCLUSION

For the foregoing reasons, the Court should grant the limited discovery outlined in this motion and the attached proposed order, or, alternatively, order that Defendants show cause why they should not be held in contempt of the preliminary injunction order.

Dated: September 7, 2018

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Hardy Vieux (D.C. Bar No. 474762)
Laura Gault[*]
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692

Josie Cardoso-Rojo
HUMAN RIGHTS FIRST
75 Broad Street, 31st floor
New York, NY 10004
(212) 845-5200

Respectfully submitted,

/s/ Philip J. Levitz

Dennis B. Auerbach (D.C. Bar No. 418982)
Philip J. Levitz (D.C. Bar No. 1018430)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

Eunice Lee
Blaine Bookey
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA
915 15th Street, NW, 2nd floor
Washington, D.C. 20005-2302
(202) 457-0800

Farrin R. Anello
Edward Barocas
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
P.O. Box 32159
Newark, NJ 07102
(973) 642-2084

---

[*] Although LCvR 83.2(c) and (d) do not apply to Ms. Gault, she appears before the Court pursuant to LCvR 83.2(g), which states, "ATTORNEYS REPRESENTING INDIGENTS. Notwithstanding (c) and (d) above, an attorney who is a member in good standing of the District of Columbia Bar or who is a member in good standing of the bar of any United States Court or of the highest court of any State may appear, file papers and practice in any case handled without a fee on behalf of indigents upon filing a certificate that the attorney is providing representation without compensation." Ms. Gault is not receiving compensation for her services.

Leon Howard  
Kristin Greer Love  
ACLU OF NEW MEXICO  
1410 Coal Ave. SW  
Albuquerque, NM 87104  
(505) 266-5915, x1007  

Witold J. Walczak  
Golnaz Fakhimi  
ACLU OF PENNSYLVANIA  
247 Ft. Pitt Blvd., 2nd floor  
Pittsburgh, PA 15222  
(412) 681-7864  

Freda J. Levenson  
ACLU OF OHIO  
4506 Chester Ave.  
Cleveland, OH 44103  
(216) 472-2220  

Ahilan T. Arulanantham  
Sameer Ahmed  
ACLU FOUNDATION OF SOUTHERN CALIFORNIA  
1313 West 8th Street  
Los Angeles, CA 90017  
(213) 977-5232  

Edgar Saldivar  
Andre Segura  
ACLU FOUNDATION OF TEXAS, INC.  
1500 McGowen, Suite 250  
Houston, TX 77004  
(713) 942-8146 x111

## CERTIFICATE OF SERVICE

    I certify that, on September 7, 2018, I electronically transmitted the attached motion and accompanying exhibits using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants for this case.

Date: September 7, 2018          Signed:   <u>/s/ Philip J. Levitz</u>
                                                                                         Philip J. Levitz
                                                                                       COVINGTON & BURLING LLP
                                                                                       One CityCenter
                                                                                       850 Tenth St., N.W.
                                                                                       Washington, D.C. 20001–4956
                                                                                       (202) 662-6000