UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Ansly DAMUS, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-00578 |
| | ) | |
| Kirstjen NIELSEN, Secretary, U.S. | ) | |
| Department of Homeland Security, in her | ) | |
| official capacity, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY, OPPOSITION TO PLAINTIFFS' ALTERNATIVE REQUEST FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT, AND CONDITIONAL REQUEST FOR LEAVE TO PROPOUND THEIR OWN LIMITED DISCOVERY

Without providing specific written discovery requests, without having submitted their own underlying data to the Court or counsel, without exploring less burdensome ways of obtaining the information they seek, and without first providing Defendants the opportunity to investigate and potentially rectify specific allegations of noncompliance with the preliminary injunction before initiating burdensome motions practice, Plaintiffs ask the Court for permission to engage in "limited" expedited discovery of *each and every* document relating to the 1,004 provisional class members identified so far, *all* ICE communications related the Parole Directive since July 2, 2018, and oral testimony from the five Field Offices regarding their implementation of the Parole Directive *for the past seven years*—effectively beginning the "piecemeal litigation" the Court already said it would not conduct. Putting aside that the Court does not have jurisdiction to "inquire into the specific strengths or weaknesses of the parole decisions under dispute" and that "the specific facts of each denial matter not," Plaintiffs' "targeted" discovery requests are premature, facially overbroad, or not at all relevant to the only class claim the Court

has determined is potentially viable: "whether, as a general matter, the five Field Offices are

following the Directive or are instead systematically denying parole" in violation of the

Administrative Procedure Act. ECF No. 34 at 9, 20. The Court should deny Plaintiffs' motion

outright, or at the very least, put an end to their attempted fishing expedition and require them to

propose specific discovery requests that are narrowly tailored to the classwide compliance issue

at hand. Otherwise, if Plaintiffs insist on seeking individualized evidence of ICE's discretionary

parole determinations, the provisional class should be decertified so that the individual Plaintiffs

can propound their discovery requests in separate actions, where the individualized evidence

they seek would be "apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011).

The Court should similarly deny Plaintiffs' alternative request for an order to show cause

why Defendants should not be held in contempt of the preliminary injunction. Defendants have

already shown they are substantially complying with the Court's order. As the September 24

status report makes clear, the Field Offices are conducting the overwhelming majority of parole

determinations on the Parole Directive's timeline. And the overall parole rate has increased more

than six times over since the outset of this lawsuit. Even if one were to accept Plaintiffs' premise,

for argument's sake, that the parole rate is positively correlated with systematic compliance with

the Directive—which is an illustrative but fundamentally inaccurate way of examining the

issue—a sixfold increase in the rate of parole surely does not support the conclusion that "ICE is,

*as a general matter*, not complying with the policies and procedures of the Parole Directive"

after the Court ordered it to. ECF No. 34 at 9 (emphasis added). Plaintiffs' alternative contempt

request is simply a different way of asking the Court to order Defendants to produce troves of

individualized evidence relevant only to one-off provisional class members. Plaintiffs must do

more than identify only a handful of individuals they believe were improperly denied parole—out of an ever-growing provisional class of more than a thousand—to plausibly suggest that ICE is in contempt of the Court's order.

Finally, although Defendants firmly believe that no party should be engaging in discovery before the Court rules on Defendants' pending motion to dismiss, or before Defendants answer the complaint, or before the parties have a Rule 26(f) conference, or before the Court enters a Rule 16(b) scheduling order, "discovery must be a two-way street." *Wardius v. Oregon*, 412 U.S. 470, 475 (1973). "It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed" to the other party. *Id.* at 476. Thus, if Plaintiffs are permitted to begin discovery early, Defendants will similarly seek the Court's leave to propound their own targeted discovery on some or all of the several dozen declarants whose testimony provides the basis for Plaintiffs' allegations.

## **BACKGROUND**

### I.   **Procedural History**

Plaintiffs filed their Complaint on March 15, 2018, alleging that ICE's Detroit, El Paso, Los Angeles, Newark, and Philadelphia Field Offices are engaged in a *de facto* policy or practice of failing to conduct individualized parole reviews for individuals mandatorily detained under 8 U.S.C. § 1225(b), for the purpose of deterring others from seeking asylum in the United States. *E.g.* ECF No. 3 ¶¶ 1, 4, 37. Plaintiffs argue that this alleged conduct is contrary to ICE Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture" (Dec. 8, 2009) ("Parole Directive"), in violation of the Administrative Procedure Act

("APA"), and that it violates the Immigration and Nationality Act ("INA") at 8 U.S.C.

§ 1182(d)(5)(A) and the Fifth Amendment's Due Process Clause. ECF No. 3 ¶¶ 66–80.

Plaintiffs' claims rest largely on the assertions of one declarant who has reviewed data

showing the rate of parole at each of the five Field Offices. *See* ECF No. 11-12 ¶ 6. This data,

Plaintiffs say, shows that between January 2011 and December 2013, the Field Offices together

paroled approximately 92% of section 1225(b) detainees. ECF No. 11-12 ¶ 9. There was then

allegedly a "seismic shift," where, between February 2017 and September 2017, the Field

Offices suddenly began paroling only 4% of section 1225(b) detainees. ECF No. 41 at 2.

Plaintiffs have not submitted any data showing the rate at which parole declined between

December 2013 and January 2017. And although Plaintiffs have submitted anecdotal evidence

relating to the Field Offices' substantive and procedural compliance with the Directive, they

have not submitted any quantitative evidence relating to Defendants' procedural compliance.

On July 2, 2018, the Court provisionally certified a class of all individuals mandatorily

detained under section 1225(b) who have been or will be denied parole by one of the five Field

Offices. *See* ECF Nos. 33, 34. Defendants argued that class certification is not proper because

Plaintiffs' claims can only be resolved by combing through each piece of individualized

evidence related to every Plaintiff's and provisional class member's parole determination

process, ECF No. 31 at 32–40, but the Court took a different view. "Contrary to the

Government's assertion," the Court explained, "the resolution of this case would require no such

piecemeal litigation. Rather, Plaintiffs ask this Court to determine only whether, as a general

matter, the five Field Offices are following the Directive or are instead systematically denying

parole. Analyzing this issue thus requires only a common, programmatic analysis, as the specific

facts of each denial matter not if Plaintiffs are correct in their claim that the Directive is no longer in force overall." ECF No. 34 at 20 (internal citation omitted).

The Court also preliminarily determined based on Plaintiffs' statistics and, to a lesser degree, the testimony of immigration practitioners that the five Field Offices were not following the Parole Directive in violation of the APA at 5 U.S.C. § 706(2). The Court entered a preliminary injunction on Plaintiffs' APA claim requiring the Field Offices to comply with the Directive's substantive and procedural requirements and prohibiting the Field Offices from denying parole based on categorical criteria applicable to all provisional class members. ECF No. 33; ECF No. 34 at 30–36.

The Court specifically explained that "[t]o the extent Plaintiffs are challenging the determinations themselves—*i.e.*, the actual balancing of the merits of each application for parole—this Court agrees that it lacks jurisdiction. It will, therefore, not inquire into the specific strengths or weaknesses of the parole decisions under dispute." ECF No. 34 at 9. Consistent with its provisional class certification decision, the Court also noted that it understood Plaintiffs' allegations to be "that ICE is, as a matter of general course, not complying with the policies and procedures of the Parole Directive. In other words, they are not challenging the *outcome* of ICE's decisionmaking, but the *method* by which parole is currently being granted (or denied)." ECF No. 34 at 9–10. The "specific facts of each denial matter not" to this classwide issue. ECF No. 34 at 20.

Defendants filed a motion to dismiss the case in its entirety on April 24, 2018. *See* ECF No. 22. That motion remains pending. *See* ECF No. 34 at 6.

## II.   ICE's Response to the Court's Order

As shown in Defendants' September 24 status report, the five Field Offices have substantially complied with the preliminary injunction. *See* ECF No. 44; ECF Nos. 44-1–44-5.

(Defendants cite to these documents throughout this section unless otherwise noted.) As of September 17, 2018, the parole rate at the five Field Offices stands at approximately 25.15%, more than six times higher than what Plaintiffs alleged at the outset of this action.[1] *Compare* ECF No. 11-12 (alleging a 4% parole rate) *with* ECF Nos. 44–44-5. Defendants have identified 1,004 potential, known, or former provisional class members, 154 of whom have dropped out of the class because they were removed from the United States or had a final order of removal entered[2] (78 individuals), were granted asylum (52 individuals), were granted bond by an immigration judge,[3] or otherwise had their removal proceedings terminated (24 individuals). As of September 17, ICE has completed 823 of the remaining 850 class members' parole determinations, or about 96.82%.

The Field Offices have also demonstrated their substantial compliance with the Parole Directive's specific procedural requirements. Of the 1,004 total provisional class members, 816 received a parole interview within seven days of being served with a Parole Advisal (81.27%). Some individuals likely dropped out of the provisional class within that seven-day period, which would make the compliance rate as to the remaining eligible class members even higher. Of the

---

[1] Defendants have not answered the Complaint, and so any reference, comparative or otherwise, to Plaintiffs' allegations or data that has not been submitted to the Court should not be construed as Defendants' admission or denial of Plaintiffs' claims.

[2] Detention authority shifts to 8 U.S.C. § 1231(a) after a removal order becomes final. Section 1231(a) detainees are not covered by the Parole Directive.

[3] Although the INA does not authorize immigration judges to release section 1225(b) detainees on bond, *see* 8 U.S.C. § 1182(d)(5)(A), and federal regulations expressly prohibit immigration judges from doing so, *see* 8 C.F.R. § 1003.19(h)(2)(i), certain court orders allow for the possibility of such a scenario. *See generally, e.g.*, *Rodriguez v. Marin*, Nos. 13-56706 & 13-56755 (9th Cir.).

823 parole determinations completed as of September 17, 653 determinations were made within seven days of a parole interview (79.34%).

Each individual Field Office is substantially complying with the Directive. ICE's Detroit Field Office identified forty-two (42) provisional class members, ten (10) of whom have dropped out of the class because they were removed from United States or had a final removal order entered against them (8 individuals) or were granted asylum (2 individuals). ICE Detroit has completed all parole determinations for the remaining thirty-two (32) provisional class members as of September 17, 2018 (100%). Eight (8) of those parole determinations were identified as grants of parole (25%), twenty-four (24) were identified as denials of parole based on flight risk (75%), and none were identified as denials based on danger to the community (0%). Of the forty-two (42) total provisional class members, forty (40) received a parole interview within seven days of being served with a Parole Advisal (95.24%). Of the thirty-two (32) parole determinations completed as of September 17, twenty-nine (29) determinations were made within seven days of a parole interview (90.63%). ECF No. 44 at 2; ECF No. 44-1.

ICE's El Paso Field Office identified 489 provisional class members, fifty-nine (59) of whom have dropped out of the class because they were removed from United States or had a final removal order entered against them (44 individuals), or were granted asylum (12 individuals), or were released on bond by an immigration judge (1 individual), or had their removal proceedings terminated (2 individuals). ICE El Paso has completed parole determinations for 410 of the remaining 430 provisional class members as of September 17, 2018 (95.35%). One hundred twenty-three (123) of those 410 parole determinations were identified as grants of parole (30%), 278 were identified as denials of parole based on flight risk (67.8%), and nine (9) were identified as denials based on danger to the community (2.2%). Of

the 489 total provisional class members, 333 received a parole interview within seven days of being served with a Parole Advisal (68.1%). Of the 410 parole determinations completed as of September 17, 312 determinations were made within seven days of a parole interview (76.1%). ECF No. 44 at 2–3; ECF No. 44-2.

ICE's Los Angeles Field Office identified 306 provisional class members, fifty-eight (58) of whom have dropped out of the class because they were removed from United States or had a final removal order entered against them (13 individuals), or were granted asylum (24 individuals), or were released on bond by an immigration judge (21 individuals). ICE Los Angeles has completed parole determinations for 233 of the remaining 248 provisional class members as of September 17, 2018 (93.95%). Thirty-five (35) of those 233 parole determinations were identified as grants of parole (15.02%), 198 were identified as denials of parole based on flight risk (84.98%), and none were identified as denials based on danger to the community (0%). Of the 306 total provisional class members, 290 received a parole interview within seven days of being served with a Parole Advisal (94.77%). Of the 233 parole determinations completed as of September 17, 224 determinations were made within seven days of a parole interview (96.14%). ECF No. 44 at 3; ECF No. 44-3.

ICE's Newark Field Office identified 107 provisional class members, eighteen (18) of whom have dropped out of the class because they were removed from United States or had a final removal order entered against them (9 individuals) or were granted asylum (9 individuals). ICE Newark has completed parole determinations for ninety-three (93) of the remaining class members as of September 17, 2018, including for eight (8) individuals who dropped out of the class after their determinations were made (effectively 100%). Thirty-one (31) of those ninety-three (93) parole determinations were identified as grants of parole (33.33%), sixty-two (62)

were identified as denials of parole based on flight risk (66.67%), and none were identified as denials based on danger to the community (0%). Of the 107 total provisional class members, ninety-four (94) received a parole interview within seven days of being served with a Parole Advisal (87.85%). Of the ninety-three (93) parole determinations completed as of September 17, thirty-seven (37) determinations were made within seven days of a parole interview (39.78%). Another thirty (30) determinations were completed within fourteen days of a parole interview (32.26%). Another twenty-two (22) determinations were completed within twenty-one days of a parole interview (23.66%). ECF No. 44 at 3; ECF No. 44-3.

ICE's Philadelphia Field Office identified sixty (60) provisional class members, nine (9) of whom have dropped out of the class because they were removed from United States or had a final removal order entered against them (4 individuals) or were granted asylum (5 individuals). ICE Philadelphia has completed parole redeterminations for fifty-five (55) of the remaining provisional class members as of September 17, 2018, including for eight (8) individuals who dropped out of the class after their redeterminations were made (effectively 100%). Ten (10) of those fifty-five (55) parole redeterminations were identified as grants of parole (18.18%), forty-four (44) were identified as denials of parole based on flight risk (80%), and one was identified as a denial based on danger to the community (1.82%). Of the sixty (60) total provisional class members, fifty-nine (59) received a parole interview within seven days of being served with a Parole Advisal (98.33%). Of the fifty-five (55) parole determinations completed as of September 17, fifty-one (51) determinations were made within seven days of a parole interview (92.73%). ECF No. 44; ECF No. 44-5.

## **ARGUMENT**

### I.   **Plaintiffs' Motion for Premature, Overbroad, and Highly Individualized Merits Discovery is Patently Unreasonable and Must be Denied.**

Generally, the Federal Rules prohibit litigants from engaging in discovery in this procedural posture, where Defendants' motion to dismiss remains pending, where Defendants have not answered the complaint, where the parties have not had a Rule 26(f) conference, and where there is no Rule 16(b) scheduling order on the docket. Fed. R. Civ. P. 26(d)(1); *Guttenberg v. Emery*, 26 F.Supp.3d 88, 97 (D.D.C. 2014) ("[U]nless this Court orders otherwise, plaintiffs may not seek discovery from defendants (or any other source) until the parties have had their Rule 26(f) conference."). Plaintiffs ask the Court—based almost exclusively on out-of-circuit case law—to take this class action off of the standard track and to allow them to propound facially overbroad discovery unrelated to any common, classwide issue, after presenting surprisingly little evidence (much of it hearsay, none of it subject to cross-examination) in support of their accusation that Defendants are categorically failing to comply with the preliminary injunction. The Court should deny their request.

At the outset, the test for expedited discovery in this District is not whether there are "'significant questions'" whether Defendants have implemented the Parole Directive to Plaintiffs' satisfaction, as they claim. *See* ECF No. 41 at 9 (citing the Ninth Circuit's decision in *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025 (9th Cir. 2008), the Northern District of California's decision in *Blackberry Ltd. v. Typo Prod. LLC*, 2014 WL 4136586 (N.D. Cal. Aug. 21, 2014), and the Southern District of New York's decision in *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 896 F.Supp.2d 320 (S.D.N.Y. 2012)). When a litigant seeks to propound discovery before a Rule 26(f) conference, as Plaintiffs do here, courts in this District typically apply the

"reasonableness" test.[4] *Guttenberg*, 26 F.Supp.3d at 97; *Attkisson v. Holder*, 113 F.Supp.3d 156,

161–62 (D.D.C. 2015); *Landwehr v. Fed. Deposit Ins. Corp.*, 282 F.R.D. 1, 3 (D.DC. 2010);

*Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit*

*Authority*, 234 F.R.D. 4, 6 (D.D.C. 2006); *In re Fannie Mae Litigation*, 227 F.R.D. 142, 142–43

(D.D.C. 2005); *Arista Records LLC v. Does 1–19*, 552 F.Supp.2d 1, 6–7 (D.D.C. 2008)

(referring to the "overwhelming number of cases where courts have routinely applied the 'good

cause' standard). That test weighs overwhelmingly in favor of denying Plaintiffs' motion.

Under the "reasonableness" standard, the Court "considers the 'reasonableness of the

request in light of all the surrounding circumstances.'" *Guttenberg*, 26 F.Supp.3d at 98 (citing *In*

*re Fannie Mae*, 227 F.R.D. at 142–43). Courts have developed a non-exhaustive list of factors to

consider, including "(1) whether a preliminary injunction is pending; (2) the breadth of the

discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the

defendants to comply with the requests; and (5) how far in advance of the typical discovery

process the request was made," which includes whether a motion to dismiss is pending. *Id.*

("Indeed, most important for the Court's reasonableness analysis is the pendency of Defendants'

motion to dismiss."); *Landwehr*, 282 F.R.D. at 4 (denying expedited discovery motion where it

---

[4] Courts in this District have less commonly applied the *Notaro* test to an expedited discovery motion. *See Guttenberg*, 26 F.Supp.3d at 97 (citing *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982). However, if Plaintiffs "cannot prevail under the reasonableness approach," as they cannot here, "the Court need not decide whether they could meet the *Notaro* approach, because the reasonable approach is a more liberal standard." *Id.* at 98. Plaintiffs also do not even attempt to show they have satisfied any of the *Notaro* factors, including whether they will suffer irreparable harm by not obtaining discovery immediately. They necessarily cannot succeed under that approach. *In re Fannie Mae*, 227 F.R.D. at 142 ("[T]he Court finds that [the plaintiff] is unable to satisfy the stringent [*Notaro*] standard because he has failed to demonstrate that any irreparable injury will result if the expedited discovery is not provided.").

"comes well in advance of typical discovery, having been filed shortly after briefing concluded on the FDIC's pending motion to dismiss").

Each of these five factors weighs in favor of denying Plaintiffs' motion. *First*, no preliminary injunction motion is pending, which takes away one of the primary reasons courts grant expedited discovery in the first place. As courts in this and other Districts have explained, the reason a pending or forthcoming preliminary injunction motion weighs in favor of expedited discovery is because of a plaintiff's purported need to preserve the status quo. *See Dimension Data North America, Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005) ("In the Fourth Circuit, where the circumstances permit, courts have allowed parties to engage in expedited discovery in preparation for a *hearing* on preliminary injunction. Here, as no such hearing or determination is pending, expedited discovery is premature." (internal citations omitted)); *Landwehr*, 282 F.R.D. at 4 (denying expedited discovery request under the reasonableness test where "[t]he plaintiffs are not seeking a preliminary injunction"); *Legal Tech. Group, Inc. v. Mukerji*, No. 17-cv-631, 2017 WL 7279398, at *3 (D.D.C. June 5, 2017). But where there is no preliminary injunction motion at issue, an expedited discovery request is generally not necessary, and is better understood as an improper attempt to engage in early merits discovery. As another judge in this District has explained:

> A preliminary injunction is just that—preliminary. It does not substitute for a trial, and its usual office is to hold the parties in place until a trial can take place. Surely, plaintiffs are not seeking expedited discovery to gain evidence to get the court to preserve the status quo. They want to gather all the evidence they would need to radically transform the status quo, on an expedited basis. But that is not the purpose of a preliminary injunction, nor of the limited discovery that the courts traditionally permit a plaintiff to have to secure it.

*Disability Rights Council*, 234 F.R.D. at 7 (quoting *Cobell v. Norton*, 391 F.3d 251, 261 (D.D.C. 2004); *Attkisson*, 113 F.Supp.3d at 163 ("[W]hen a plaintiff's discovery requests would go to the

heart of the case, such that they become discovery that seeks to prove an element of the plaintiff's case, a request for expedited discovery is inappropriate." (internal citation omitted)). Here, Plaintiffs have already obtained a preliminary injunction, and so they have no immediate need for documents or oral testimony to aid them in arguing for preservation of the status quo. *Id.*; *Landwehr*, 282 F.R.D. at 4; *Dimension Data*, 226 F.R.D. at 532.

Plaintiffs argue that they seek expedited discovery to gauge "Defendants' compliance with the preliminary injunction." ECF No. 41 at 10. But the Court has already ordered Defendants to produce certain information from which that compliance can be gauged. *See* Minute Order of July 24, 2018. And notably, neither the July 24 minute order nor the preliminary injunction itself contain any monitoring requirements. Further, the preliminary injunction requires Defendants to follow the Parole Directive, and Defendants' compliance with the Parole Directive is one of the ultimate merits questions of this case. *See* ECF No. 3 ¶¶ 66–70. Plaintiffs cannot bootstrap their merits discovery into an expedited discovery request merely by reframing it as an attempt to measure compliance. *In re Fannie Mae*, 227 F.R.D. at 143 ("[T]he discovery requests . . . appear to be a thinly veiled attempt to circumvent the normal litigation process" and therefore "are unreasonable."); *Disability Rights Council*, 234 F.R.D. at 7; *Attkisson*, 113 F.Supp.3d at 163. The first factor weighs in favor of denying Plaintiffs' motion.

*Second* and *third*, Plaintiffs' discovery requests are facially overbroad as compared to their purported need to evaluate Defendants' compliance with the preliminary injunction. *See Guttenberg*, 26 F.Supp.3d at 98 ("[P]laintiffs seek relatively broad discovery on issues going to the merits of their case—their discovery requests are not narrowly tailored to reveal information related to the preliminary injunction as opposed to the case as a whole."). Plaintiffs claim to be seeking information relating to Defendants' "general procedures and standards" implementing

the Parole Directive, yet they seek *all* documents relating to the parole determinations of the

1,004 provisional class members identified so far, *all* ICE communications related to parole

determinations since July 2, 2018, and five full-scale depositions—within thirty days—of

officials from the five Field Offices regarding their implementation of the Parole Directive for

effectively the *past seven years*. ECF No. 41 at 8, 10 n.3. These requests are not "targeted."

It should be noted at the outset that, although allowing discovery for the purpose of

assessing compliance with a final order may not be uncommon, courts do not typically allow

expedited discovery to assess compliance with a *preliminary* injunction. Perhaps this is because a

preliminary injunction's "usual office is to hold the parties in place until a trial can take place,"

rather than to force one party to "radically transform the status quo, on an expedited basis," as is

Plaintiffs' apparent goal here. *Disability Rights Council*, 234 F.R.D. at 7; *see, e.g.*, ECF No. 41 at

5 (arguing that the difference in parole rates between December 2013 and August 2018 indicates

that ICE is not complying with the Parole Directive). Indeed, almost all of the cases Plaintiffs

cite relate to *post*-Rule 26(f) discovery, which does not particularly show why Plaintiffs should

be allowed to conduct *pre*-Rule 26(f) discovery. *See Leavitt*, 523 F.3d at 1027 (on remand from

the Court of Appeals); *Palmer v. Rice*, 231 F.R.D. 21, 24 (D.D.C. 2005) (referring to "this late

stage in the litigation"); *Cardell Fin. Corp.*, 2012 WL 12932049, at *1 (discussing discovery

relating to "alleged violations of an amended judgment"). Moreover, none of those cases address

the pendency of a motion to dismiss, and most of them are not class actions.

Even the two cases Plaintiffs cite related to preliminary injunction compliance

discovery—which are also not class actions—are highly distinguishable from this case. In both

*Blackberry Ltd.* and *MACOM*, the courts allowed expedited discovery to assess compliance with

their preliminary injunctions where there was specific evidence from the defendants themselves

that that they had *affirmatively* violated the order through a discrete and specific action. *See*

*Blackberry Ltd.*, 2014 WL 4136586, at *1; *MACOM Tech. Solutions Holdings, Inc. v. Infineon*

*Techs. AG*, No. 2:16-cv-2859, ECF No. 283 at 5–6 (C.D. Cal. Mar. 17, 2017). In both situations,

the courts' decisions to allow expedited discovery were limited to whether the defendants'

specific actions affirmatively violated the courts' orders. *Blackberry Ltd.*, 2014 WL 4136586, at

*3–4; *MACOM*, No. 2:17-cv-2859, ECF No. 283 at 8.

Those scenarios are a far cry from this case, where Plaintiffs are essentially arguing that

Defendants have *negatively* violated the preliminary injunction by *not doing enough* to

implement the Parole Directive in the way Plaintiffs want it implemented. *See* ECF No. 41 at 5–

8. They ask for broad discovery into the ultimate merits question "whether, as a general matter,

the five Field Offices are following the Directive or are instead *systematically* denying parole."

ECF No. 34 at 20 (emphasis added); s*ee, e.g.*, ECF No. 41 at 5 (emphasizing the difference in

parole rates between December 2013 and August 2018). This is certainly not like the situations

in *Blackberry Ltd.* or *MACOM*, where the parties and the courts identified affirmative, discrete

actions that arguably violated a specific provision of the courts' orders—provisions which were

themselves not part of the ultimate merits determinations. *See Blackberry Ltd.*, 2014 WL

41369586; *MACOM*, No. 2:17-cv-2859, ECF No. 283. Defendants have no qualm with the

Court's "inherent power to enforce compliance with [its] lawful orders." *Leavitt*, 525 F.3d at

1033. But it would not be appropriate to exercise that authority here. A preliminary injunction's

"usual office is to hold the parties in place" until after dispositive motions practice, full merits

discovery, and a trial are finished, *Disability Rights Council*, 234 F.R.D. at 7, not to allow

Plaintiffs to conduct full merits discovery even before the Court rules on Defendants' pending

motion to dismiss. Thus, Plaintiffs' purported justification for their expedited discovery request is not particularly compelling.

Even assuming that Plaintiffs present a compelling justification, their requests are far broader than what is necessary to measure compliance with the preliminary injunction. *Guttenberg*, 26 F.Supp.3d at 98. Plaintiffs first request all documents "reflecting the process and/or bases" for the 1,004 (and counting) provisional class members, including each class member's parole determination worksheet. ECF No. 41 at 8. This is neither "targeted" nor "narrowly tailored" to the question of whether Defendants have complied with the preliminary injunction on a classwide basis. Plaintiffs seek to discover a large number of documents going to the heart of the merits of their case, which is itself enough to tip the scale against granting their request for expedited discovery. *See Attkisson*, 113 F.Supp.3d at 163, 164. But the critical problem is that Plaintiffs' request for all documents relating to all provisional class members' parole determinations does not seek evidence germane to the "common, programmatic analysis" that will show whether there is a systemic, classwide violation or not. ECF No. 34 at 20. The individual parole determination worksheets Plaintiffs seek catalogue only "the specific strengths and weaknesses of the parole decision[]" at issue. ECF No. 34 at 9; *see also* Parole Directive ¶¶ 6.2, 8.2–8.7. There would necessarily be no evidence of a "systematic," classwide failure to follow the Directive contained in those worksheets.

Plaintiffs, of course, offer the bare statements that their "discovery requests are narrowly tailored to the issue of Defendants' compliance with the preliminary injunction," and that they "seek only information relevant to Defendants' general procedures and standards." ECF No. 41 at 10, 10 n.3. But they make no attempt whatsoever to explain *how* or *why* the evidence they seek is actually limited to their attempt to show such alleged categorical noncompliance. Put another

way, Plaintiffs' first request for parole determination worksheets seeks *nothing but* individualized evidence of ICE's discretionary determinations, and they offer no explanation to the contrary. There is simply no discernible use for individual parole determination worksheets except to "inquire into the specific strengths and weaknesses of the parole decisions" themselves, which is explicitly outside the scope of this case. ECF No. 34 at 9.

Plaintiffs cannot comb through thousands of individualized parole documents reflecting the individual determinations of individual adjudicators in five separate Field Offices.[5] As the Court has already explained, "the resolution of this case would require no such piecemeal litigation. Rather, Plaintiffs ask this Court to determine only whether, as a general matter, the five Field Offices are following the Directive or are instead *systematically* denying parole. Analyzing this issue thus requires only a common, programmatic analysis, *as the specific facts of each denial matter not* if Plaintiffs are correct in their claim that the Directive is no longer in force overall." ECF No. 34 at 20 (emphasis added). Plaintiffs' request for individualized evidence simply does not square with the Court's ruling, nor with their purported justification of assessing classwide compliance with the preliminary injunction. If Plaintiffs wish to obtain evidence that necessarily bears exclusively on individual parole determinations, the provisional class should be decertified so that the individualized evidence Plaintiffs seek correlates to the individualized issues Plaintiffs are seemingly attempting to litigate. *See* ECF No. 34 at 9, 20; ECF No. 34 at 23 (finding Rule 23(b)(2) satisfied because "the asylum-seekers are not asking for

---

[5] This is precisely why a "statistically valid sample" of the worksheets would not suddenly make Plaintiffs' request acceptable. A "statistically valid sample" of individualized evidence is still individualized evidence. It also would not likely show a classwide or systemic violation. *Cf. Wal-Mart Stores*, 564 U.S. at 356 ("In *Falcon*, we held that one named plaintiff's experience of discrimination was insufficient to infer that 'discriminatory treatment is typical of [the employer's employment] practices.' *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158 (1982). A similar failure of inference arises here.").

this Court to remedy discrete errors in their parole determinations or to interfere with ICE's discretionary decisionmaking"). Otherwise, Plaintiffs' request for permission to obtain individualized evidence should be rejected. *See Wal-Mart Stores*, 564 U.S. at 352 ("[I]t will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."); *Cierco v. Mnuchin*, 857 F.3d 407 (D.C. Cir. 2017) ("We are particularly disinclined to endorse standing theories that rest on speculation about the decisions of independent actors. It is well understood that standing is 'substantially more difficult to establish' when it 'depends on the unfettered choices made by independent actors . . . whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." (internal citations omitted)).

This first request for all documents related to each provisional class member's parole determination is also so broad that it is virtually certain to encompass information exempted from disclosure under the deliberative process privilege or as law enforcement sensitive. *See, e.g.*, *Abtew v. U.S. Dep't of Homeland Security*, 808 F.3d 895, 898–99 (D.C. Cir. 2015) (The deliberative process privilege "protects 'documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)); *Ameziane v. Obama*, 620 F.3d 1, 6 (D.C. Cir. 2010) (discussing the Government's withholding of documents on law enforcement grounds). Defendants cannot presently say which documents and information might fall under either or both of these exemptions, but that illustrates the very overbreadth of Plaintiffs' request: to determine which portions of more than a thousand documents are exempt from disclosure is to shoulder the very burden the reasonableness test seeks to avoid. *See Guttenberg*, 26 F.Supp.3d at 98. Defendants should not

be required to compile, review, analyze, and potentially assert a privilege over all documents relating to the 1,004 provisional class members' parole determinations simply because Plaintiffs have proposed an overly broad discovery request outside the normal litigation process.

Plaintiffs' second request for internal ICE communications regarding "the procedures that ICE officers are expected to follow and the standards they are expected to apply in making parole determinations," and their third request for oral testimony "from an official at each of the five Field Offices" regarding the same, are similarly overbroad.[6] ECF No. 41 at 8. Putting aside that Plaintiffs have already received copies of the non-attorney-client privileged communications related to the Field Offices' implementation of the preliminary injunction, *see* ECF No. 41-12 at 5, 6, Plaintiffs' requests encompass ICE's standards and procedures related to "making parole determinations" *generally* (which, again, is a merits determination in this case). *See* ECF No. 3 ¶¶ 66–80. They are not narrowly tailored to the Field Offices' implementation of the preliminary injunction *specifically*. *See Guttenberg*, 26 F.Supp.3d at 98; *Attkisson*, 113 F.Supp.3d at 163 ("[W]hen a plaintiff's discovery requests would go to the heart of the case, such that they become discovery that seeks to prove an element of the plaintiff's case, a request for expedited discovery is inappropriate." (internal citation omitted)).

The request for oral testimony also covers the Field Offices' implementation of the Parole Directive since January 2011—more than seven years ago. ECF No. 41 at 8; ECF No. 11-12 at 2–3. This is obviously not "targeted" or "narrowly tailored" to how ICE has conducted

---

[6] These requests also present the same risk (albeit to a slightly lesser degree) of delving into exclusively individualized evidence as Plaintiffs' first request. Thus, if the Court is inclined to allow Plaintiffs to proceed on their second or third requests in any way, it should order Plaintiffs to propound reasonably particular discovery requests and deposition topics so that Defendants can properly object on any available grounds or otherwise move for a protective order. *See* Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 30(b)(6); Fed. R. Civ. P. 34(B)(1)(A). Defendants cannot properly meet their burden of objecting or seeking a protective order otherwise.

parole determinations since July 2018. And again, by pursuing testimony related to events before the preliminary injunction, Plaintiffs reveal that their expedited discovery requests are simply a "thinly veiled attempt to circumvent the normal litigation process." *In re Fannie Mae*, 227 F.R.D. at 143. Moreover, Plaintiffs' refusal to even discuss written testimony in lieu of full-scale depositions in five cities across the country further demonstrates the unreasonable nature of their requests. *See* ECF No. 41 at 8 n.2; ECF No. 41-12 at 4–6. If Plaintiffs were truly seeking "targeted," "narrowly tailored" discovery, written responses would be more appropriate precisely *because* they do not allow for the possibility of delving into unrelated topics. *See, e.g.*, *English v. Washington Metropolitan Transit Authority*, 323 F.R.D. 1, 26 (D.D.C. 2017) (noting that depositions can be used "to further probe the facts elicited through interrogatories and requests for production"). Plaintiffs' purported justification for seeking expedited discovery is weak, and even if it were not, Plaintiffs' discovery requests are patently overbroad when measured against that justification. The second and third factors weigh strongly in favor of denying Plaintiffs' motion.

*Fourth*, the burden on Defendants and their counsel in complying with Plaintiffs' discovery requests is substantial. *See Guttenberg*, 26 F.Supp.3d at 98. Defendants and their counsel have already developed an ad hoc method, specifically for this litigation, of compiling the information Plaintiffs requested in the parties' July 17 status report. *See* ECF No. 36 at 3 (showing Plaintiffs' "Parole Reporting" requests); ECF Nos. 40-1–40-5; ECF Nos. 44-1–44-5. Two months and more than a thousand provisional class members later, it would be manifestly unfair to require Defendants to go back and begin tracking, copying, and producing *each and every* document that Plaintiffs could have requested back in July.

Further, as noted, all of Plaintiffs' requests are broad enough that they almost certainly encompass information exempted from disclosure as law enforcement sensitive or by the attorney-client privilege, the attorney work-product doctrine, or the deliberative process privilege, among others. *See supra*. Based on the scope of the requests, it would be extremely burdensome for Defendants to compile, review, and analyze each individual document for privilege before producing them to Plaintiffs. *See* ECF No. 41 at 8.

The burden associated with Plaintiffs' request for oral testimony is also substantial. Defendants and their counsel would be required to spend as many as ten of the next thirty days out of the office preparing for and defending depositions in Michigan, Texas, California, New Jersey, and Philadelphia. *See* ECF No. 41-1. This is clearly disruptive to everyone involved. It is also costly. A rough calculation shows that the cost of preparing for and defending five depositions in five metropolitan areas across ten business days is at least $1,700 per attorney, even before the cost of airfare.[7] Plaintiffs could have chosen to continue discussing the option of having ICE officials provide sworn, written responses to targeted interrogatories, but instead, they waited until the eve of their filing deadline—a week after Defendants' counsel broached the topic—to inform Defendants that they viewed the possibility of obtaining sworn statements as "[un]productive." ECF No. 41-12 at 4–9. Plaintiffs seek the same information they could have asked for in July, and they have rejected the possibility of avoiding burdensome motions practice and oral depositions when specifically presented with the opportunity to do so. The fourth factor weighs heavily in favor of denying Plaintiffs' motion.

---

[7] *See* Gen. Servs. Admin., "Per Diem Rates," available at https://www.gsa.gov/travel/plan-book/per-diem-rates (last accessed Sept. 23, 2018), and select the "Michigan," "Texas," "California," "New Jersey," and "Pennsylvania" links.

*Fifth*, Plaintiffs have made this request well in advance of the typical discovery process, which weighs in favor of denying their motion. *See Guttenberg*, 26 F.Supp.3d at 98; *Mukerji*, 2017 WL 7279398, at *5 ("Both defendants argue in response that this factor weighs in their favor because [the movant] made its request for expedited discovery well before typical discovery should begin. The Court agrees with the defendants."). As noted, the Court has not yet ruled on Defendants' pending motion to dismiss; Defendants have not answered the complaint; the parties have not had a Rule 26(f) conference; and the Court has not entered a Rule 16(b) scheduling order. Plaintiffs' request thus comes very early and for the improper purpose of seeking evidence "that would go to the heart of this case." *Guttenberg*, 26 F.Supp.3d at 98.

The pendency of Defendants' motion to dismiss is critically important to this analysis. *Id.* at 99. As another judge in this District has explained:

> Indeed, most important for the Court's reasonableness analysis is the pendency of defendants' motion to dismiss. This means that plaintiffs' request for expedited discovery comes "well in advance of typical discovery." *Landwehr,* 282 F.R.D. at 4 (finding motion for expedited discovery filed just after motion-to-dismiss briefing concluded to be premature). It also means that requiring defendants (who have raised several arguments as to why plaintiffs' complaint should be dismissed) to expend significant resources in responding to plaintiffs' discovery requests would be unjust—even more so because plaintiffs' discovery requests go to the merits of the dispute. For example, if the Court were to grant plaintiffs' discovery motion, and then grant defendants' motion to dismiss for failure to state a claim, defendants would have been forced to expend significant resources responding to discovery requests in a case where plaintiffs did not have a viable cause of action. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558 (2007) ("So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" (citing 5 C. Wright & A. Miller, Fed. Prac. & Proc. § 1216, 233–34 (3d ed. 2004)) (internal quotations omitted). And in this case, defendants have already been forced to expend resources responding to the numerous motions filed by plaintiffs. At the very least, reasonableness dictates that the Court consider defendants' motion to dismiss before requiring extensive and expensive discovery.

*Id.* The Court should rule the same way for the same reasons here. The fifth factor, and each of the other four established factors, weighs in favor of denying Plaintiffs' motion. It is not reasonable for Plaintiffs to engage in expedited discovery, and the Court should deny their motion.

**II.    Defendants are Substantially Complying with the Preliminary Injunction, Making a Show-Cause Order Unnecessary.**

The Court should also deny Plaintiffs' alternative request for a show-cause order—which is better understood as another attempt to obtain merits-related evidence outside the normal litigation process. As discussed, Defendants have already shown they are substantially complying with the preliminary injunction. *See supra* pp. 5–9. Moreover, Plaintiffs have not otherwise shown that a show-cause order is necessary because the preliminary injunction does not "clear[ly]" and "specific[ally]" prohibit the actions Plaintiffs complain of. *Stewart v. O'Neill*, 225 F.Supp.2d 6, 10 (D.D.C. 2002); *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993).

Plaintiffs claim that the "most significant" evidence of Defendants' purported failure to comply with the Court's order is that the rate of parole has increased only six times over, to 25%, instead of twenty-three times over, to 92%. ECF No. 41 at 11; ECF No. 41 at 7 (alleging that "ICE continues to ignore class members' evidence that they satisfy the parole criteria"). But they do not point to any "clear and reasonably specific command" in the preliminary injunction or the Parole Directive requiring a 92% parole rate. *Stewart*, 225 F.Supp.2d at 10. Nor could they. The Parole Directive does not require, nor does it even contemplate, that any given percentage of mandatory detainees will be granted parole. The Directive is an agency policy that "provides guidance" to ICE officers "for exercising their discretion to consider the parole of arriving aliens" and establishes record-keeping and quality assurance processes. Parole Directive ¶ 1. It

quite simply does not set a minimum threshold of parole amongst any or all ICE Field Offices,[8] and neither Plaintiffs nor the Court have the authority to establish such a benchmark.

The decision whether to parole a section 1225(b) detainee is committed to the Executive's discretion by law, 8 U.S.C. § 1182(d)(5)(A), *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892), and the Parole Directive serves to guide that discretion in individual parole determinations. Parole Directive ¶¶ 1, 4.4. It does not place that discretion with the Judiciary, and thus, it is not within the Court's purview to examine the exercise of that discretion, whether in one or one thousand different cases. Plaintiffs' complaint that Defendants are not paroling a certain number of detainees does not show that Defendants have done something they are clearly and specifically prohibited from doing. *See Stewart*, 225 F.Supp.2d at 10; *Armstrong*, 1 F.3d at 1289.

Plaintiffs also point to several declarations from immigration practitioners which purportedly show Defendants' noncompliance. *See* ECF No. 41 at 12, 5–8. But those declarations do not show that Defendants have violated a "clear and reasonably specific" command either. Plaintiffs claim that "ICE is apparently continuing to ignore the substantive standard for parole." ECF No. 41 at 5. But the Court's order does not establish a substantive

---

[8] Plaintiffs claim that the court in *Aracely R.* "f[ound] non-compliance with the Parole Directive, *based in significant part* on change in parole rate" among two ICE Field Offices not part of this litigation. ECF No. 41 at 12 (emphasis added) (citing *Aracely R. v. Nielsen*, 319 F.Supp.3d 110, 2018 WL 3243977, at **23, **28 (D.D.C. 2018)). They misrepresent the extent of that court's reliance on the parole rates. Judge Contreras took note of the change in parole rates, certainly, but there is nothing in the court's opinion which elevates that data as a "significant part" of the decision. *See id.* at **23, **28. Indeed, the rate of parole was only one of six other factors that supported the plaintiffs' claim that the Government had "developed and implemented an unwritten policy directing ICE officials to consider immigration deterrence as a factor in evaluating individual" parole requests. *Id.* at **22–24. The Court here, in contrast, explicitly did not base its preliminary injunction order on the "unwritten policy" allegation. *See* ECF No. 34 at 30–31. *Aracely R.* thus does not establish Defendants' purported noncompliance as concretely as Plaintiffs want it to.

standard for parole, and again, nor could it: "[t]o the extent Plaintiffs are challenging . . . the actual balancing of the merits of each application for parole, this Court agrees that it lacks jurisdiction." ECF No. 34 at 9. Thus, that certain immigration practitioners would have evaluated several parole requests differently than the agency does not plausibly suggest Defendants are in contempt.

Plaintiffs claim that Defendants are not sufficiently explaining the Parole Advisal in a language the provisional class members can understand. ECF No. 41 at 6. But only two declarants can attest to that, and only in generalized, conclusory ways. Even if one accepts their testimony as true, *but see infra* at III, Plaintiffs still have not shown a systemic, classwide violation. For example, Elizabeth Hercules-Paez, an attorney who conducts a Legal Orientation Program ("LOP") at one detention center under the purview of one Field Office, offers the conclusory statement that ICE does not provide a written or oral translation of the Parole Advisal. ECF No. 41-4 ¶ 6. But Ms. Hercules-Paez does not explain how she knows that— possibly because, as an LOP provider, she does not engage in direct representation of the detainees she is speaking to and likely does not have firsthand knowledge of their statements to her. Putting even that aside, Ms. Hercules-Paez presents evidence related to at most forty detainees at a single detention center within the Los Angeles Field Office. ECF No. 41-4 ¶¶ 3, 4. The Los Angeles Field Office has multiple detention centers and, as of September 17, 306 identifiable class members. ECF No. 44; ECF No. 44-3. Evidence related to only 13% of that group does not establish a classwide violation.

Plaintiffs claim that Defendants have failed to "explain[] that detainees are entitled to request a reasonable extension of time" before their parole interview, "as the Directive requires." ECF No. 41 at 6 (citing Parole Directive ¶ 8.2). The Parole Directive does not contain such a

"clear and reasonably specific" requirement. *Stewart*, 225 F.Supp.2d at 10; *see* Parole Directive ¶ 8.2. (Even if the Directive could be interpreted that way, the thoroughness with which each individual ICE officer explains a single document to a single detainee is exactly the kind of individualized evidence not apt to resolve this litigation. ECF No. 34 at 9, 20.)

Plaintiffs claim that Defendants, "in many cases," are not providing parole interviews within seven days of a credible fear determination. ECF No. 41 at 6. But Defendants are overwhelmingly providing parole interviews within seven days of serving a Parole Advisal, which must come only "[a]s soon as practicable" following a credible fear determination. Parole Directive ¶ 8.1; ECF No. 44 at 1–4. Indeed, more than 81% of the class has received a parole interview on this timetable, and many of the later-issued decisions were not made within seven days because of increased operational demands. Moreover, Plaintiffs do not even allege that all or any of the "many cases" of noncompliance pertain to *new* class members. *See* ECF No. 41 at 6. Indeed, the vast majority of provisional class members—approximately two-thirds—had already been detained for much longer than seven days on the day the Court entered its order. *See* ECF Nos. 44-1–44-5. They of course would not have received an interview within seven days of a credible fear determination—indeed, that alleged violation is part of what Plaintiffs cited in order to obtain a preliminary injunction in the first place. Plaintiffs' allegation that Defendants are dilatory in conducting parole interviews does not establish noncompliance, especially where the Field Offices are known to be providing interviews within a week of serving a Parole Advisal more than 81% of the time.

Plaintiffs lastly take issue with the format of ICE's denial letters. ECF No. 41 at 7. Neither the preliminary injunction nor the Parole Directive "clear[ly]" and "specific[ally]" set forth the format of the agency's denial letters. *See Stewart*, 225 F.Supp.2d at 10. ICE's use of a

specific type of denial letter does not show the agency is violating the APA, and even if it arguably did, that is completely within the agency's discretion. Given Plaintiffs' failure to point to clear and specific violations of the Court's order, and the Field Offices' significant steps in attaining substantive and procedural compliance with the Parole Directive, there is no need for the Court to issue a show-cause order.

### III.   If Plaintiffs are Permitted to Engage in Expedited Discovery, the Court Should Similarly Allow Defendants to Engage in Discovery.

Defendants firmly believe that no party should be engaging in expedited discovery at this early stage. However, if the Court permits Plaintiffs to serve their discovery requests, fundamental fairness dictates that it allow Defendants to subpoena and depose, or serve discovery requests on, some or all of Plaintiffs' witnesses to expose the weaknesses in their testimony.[9] *Wardius*, 412 U.S. at 476. "[D]iscovery must be a two-way street." *Id.* at 475.

Potential topics of inquiry include:

- the extent of the declarants' experience with parole determinations prior to February 2017, *see, e.g.*, ECF No. 41-5 ¶ 2; ECF No. 41-8 ¶ 2;

- the specific facts underlying the declarants' multiple factual and legal conclusions, *see, e.g.*, ECF No. 41-4 ¶ 6; ECF No. 41-7 ¶ 9; ECF No. 41-11 ¶ 8;

- the strength and credibility of the evidence the declarants believe establishes a detainee's identity, lack of flight risk, or lack of dangerousness, *see, e.g.*, ECF No. 41-6 ¶ 4;

- the declarants' basis for believing that certain detainees did not receive parole interviews, *compare, e.g.*, ECF No. 41-9 ¶ 10 *with* ECF No. 44-4 at 1;

- any other topics the declarants have attested to in their declarations; and

- any matter that forms the basis of Plaintiffs' allegations thus far, including allegations specifically made by or in reference to a named Plaintiff.

---

[9] Undersigned counsel's authority to subpoena and depose the attorneys who have appeared as declarants may be subject to the approval of the Assistant Attorney General.

Defendants should have the opportunity to test Plaintiffs' assertions, especially if the Court intends to rely on their evidence in its ruling.

## **CONCLUSION**

Plaintiffs' request for expedited discovery is an unreasonable attempt to engage in merits discovery before the Court rules on Defendants' pending motion to dismiss and before the parties have had a Rule 26(f) conference. Defendants have already shown they are substantially complying with the preliminary injunction, and Plaintiffs' allegations do not plausibly suggest otherwise. The Court should therefore deny Plaintiffs' motion in its entirety. If it does not, fundamental fairness dictates that Defendants be afforded the same opportunity to engage in discovery as Plaintiffs.


Dated: September 25, 2018                  Respectfully submitted,


                                           JOSEPH H. HUNT
                                           Assistant Attorney General
                                           Civil Division

                                           WILLIAM C. PEACHEY
                                           Director
                                           Office of Immigration Litigation, District Court Section

                                           SARAH B. FABIAN
                                           Senior Litigation Counsel

                                           */s/ Alexander J. Halaska*
                                           ALEXANDER J. HALASKA
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division
                                           Office of Immigration Litigation, District Court Section
                                           P.O. Box 868, Ben Franklin Station
                                           Washington, D.C. 20044
                                           Tel: (202) 307-8704 | Fax: (202) 305-7000

                                           *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

Case No. 1:18-cv-00578-JEB (D.D.C.)

I hereby certify that on September 25, 2018, I served a copy of the foregoing document on all parties of record by causing this document to be filed with the Clerk of the Court through the CM/ECF system, which will provide electronic notification of and a link to this document to all attorneys of record.

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation, District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000

*Attorneys for Defendants*