UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ansly DAMUS, Abelardo Asensio CALLOL, Alexi Ismael Montes CASTRO, H.A.Y., A.M.M., L.H.A., E.E.C.S., and L.I.L.M., on behalf of themselves and others similarly situated,<br><br>              Plaintiffs,<br><br>      v.<br><br>Kirstjen NIELSEN, Secretary of Homeland Security; Ronald D. VITIELLO, Acting Director for U.S. Immigration and Customs Enforcement; Rebecca ADDUCCI, Director of the ICE Detroit Field Office; Corey PRICE, Acting Director of the ICE El Paso Field Office; Thomas GILES, Acting Director of the ICE Los Angeles Field Office; John TSOUKARIS, Director of the ICE Newark Field Office; and Simona FLORES, Director of the ICE Philadelphia Field Office, in their official capacities,<br><br>              Defendants.[1] | Civil Action No. 1:18-cv-00578 |

## DEFENDANTS' ANSWER TO PLAINTIFFS' COMPLAINT

Noting that they deny all allegations that they do not specifically admit, Defendants answer Plaintiffs' Class Complaint for Injunctive and Declaratory Relief (ECF No. 3) according to its numbered paragraphs as follows:

---

[1] The following individuals are automatically substituted as defendants in this action pursuant to Federal Rule of Civil Procedure 25(d): Acting ICE Director Ronald D. Vitiello is substituted for former Acting Director Thomas Homan; Acting El Paso Field Office Director Corey Price is substituted for former Acting El Paso Field Office Director William Joyce; Acting Los Angeles Field Office Director Thomas Giles is substituted for former Los Angeles Field Office Director David Marin; and Philadelphia Field Office Director Simona Flores is substituted for former Philadelphia Field Office Director Greg Brawley. The Court dismissed the Attorney General and the Director of the Executive Office for Immigration Review from this action on February 28, 2019. *See* ECF No. 67.

**INTRODUCTION**

1.      Plaintiffs bring this class action to enjoin a Department of Homeland Security ("DHS") policy and practice of categorically detaining asylum seekers in order to deter others from seeking refuge in the United States.

**Answer:** This paragraph consists of Plaintiffs' characterization of this lawsuit. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

2.      Plaintiffs are all asylum seekers who traveled to the United States, were found to have a credible fear of persecution, and were referred for immigration proceedings to decide their asylum claims. All of them have sponsors in the United States who are prepared to provide them with housing and ensure they attend their court hearings, and none of them have criminal records or history of violence. Yet DHS has imprisoned them during the pendency of their asylum cases, with no individualized review of whether their detention is necessary.

**Answer:** Defendants admit that Plaintiffs are arriving aliens who presented themselves to immigration authorities at a U.S. port of entry, were determined to have a credible fear of persecution or torture in their home countries by a U.S. Citizenship and Immigration Services ("USCIS") asylum officer, and have been referred for proceedings inside the United States to decide their asylum claims. The remaining allegations in this paragraph consist of Plaintiffs' characterization of this lawsuit. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the remaining allegations in this paragraph.

3.      In *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015), this Court preliminarily enjoined a DHS policy of detaining families seeking asylum that was designed to "send[] a message of deterrence" to other migrants. *Id.* at 188–89. Applying established Supreme Court

precedent, the Court held in its preliminary-injunction ruling that immigration detention could

not lawfully be founded on general deterrence—which may inform criminal, but not civil,

detention. The Court, moreover, found that the government's conclusory incantations of

"national security" could not support a deterrence-based detention policy. *Id*. at 189–90.

**Answer:** This paragraph consists of Plaintiffs' characterization of this Court's opinion in

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015). Accordingly, no response is required. To

the extent the Court requires a response, Defendants deny the allegations in this paragraph and

aver that the cited legal authority speaks for itself.

4.      Notwithstanding *R.I.L-R.*, DHS has now unlawfully embarked on an even *broader*

policy of detaining asylum seekers on deterrence grounds at five U.S. Immigration and Customs

Enforcement ("ICE") Field Offices across the country (the "Deterrence Policy"). With the

approval of ICE Headquarters, and in violation of a longstanding DHS directive precluding

detention of asylum seekers except in unusual cases ("Parole Directive"), these five Field Offices

have detained virtually all adults who request asylum at a port of entry to the United States. The

five Field Offices have detained these asylum seekers based not on individualized determinations

that they pose a flight risk or a danger to the community, but rather to deter other migrants from

seeking refuge here.

**Answer:** This paragraph consists of Plaintiffs' characterizations of this lawsuit.

Accordingly, no response is required. To the extent the Court requires a response, Defendants

deny the allegations in this paragraph.

5.      Detaining asylum seekers to deter others, without even considering whether

individuals are flight risks or dangers to the community, violates the Parole Directive (which

generally bars the detention of asylum seekers who pose neither a flight risk nor a danger to the

community), the Immigration and Naturalization Act ("INA"), regulations promulgated thereunder, and the Due Process Clause of the Fifth Amendment. Indeed, even if DHS's current parole policy were not based on deterrence, it would be unlawful for DHS to engage in virtually blanket detention of asylum seekers without individualized determinations of flight risk or danger to the community. The fact that the Policy *is* based on general deterrence—which cannot be a basis for civil detention—makes it even clearer that the Policy is unlawful. *See R.I.L-R.*, 80 F. Supp. at 189.

**Answer:** This paragraph consists of Plaintiffs' characterizations of this lawsuit and U.S. Immigration and Customs Enforcement ("ICE") Directive No. 11002.1, "Parole of Arriving Aliens Determined to Have a Credible Fear of Persecution or Torture" (Dec. 8, 2009) ("Parole Directive"), the Immigration and Nationality Act ("INA"), federal regulations, the Due Process Clause of the Fifth Amendment, and *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015), which speak for themselves. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

**6.**     Ensuring that asylum seekers have access to a meaningful parole process has become even more critical in light of the Supreme Court's recent decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). The Court in *Jennings* held that parole is the only exception to detention under the INA for asylum seekers who presented themselves at ports of entry to the United States, and that this "express exception to detention implies that there are no other circumstances under which [such] aliens . . . may be released." *Id*. at 844 (emphasis omitted). The Deterrence Policy, however, effectively and unlawfully eliminates this opportunity for release at the five ICE Field Offices, leaving asylum seekers within these Field Offices with no meaningful way to avoid detention during the pendency of their asylum cases.

**Answer:** This paragraph consists of Plaintiffs' characterizations of this lawsuit and the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph and aver that the cited legal authority speaks for itself.

**7.**      ICE data suggests that, as a result of the Deterrence Policy, more than a thousand individuals in the last year have been unlawfully deprived of their liberty for nothing more than seeking refuge in a nation that has provided it to countless others since its founding. Each additional day of detention exacerbates the grave risk to the mental and physical health of these individuals. Absent intervention by this Court, thousands more asylum seekers will suffer the same fate. The Court should enjoin the Deterrence Policy and require Defendants to provide Plaintiffs and other proposed class members with individualized determinations of flight risk and danger to the community before subjecting them to detention.

**Answer:** This paragraph consists of Plaintiffs' characterization of this lawsuit. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

## JURISDICTION AND VENUE

**8.**      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity pursuant to 5 U.S.C. § 702.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because multiple defendants reside in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

**Answer:** Defendants admit that venue is not improper in this judicial district because a defendant, the Secretary of Homeland Security, "resides" here. Defendants deny that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

10.     Plaintiffs are asylum seekers who presented themselves to immigration authorities at a U.S. port of entry, were found to have a credible fear of persecution or torture in their home countries, and have been referred for proceedings inside the United States to decide their asylum claims. They are all detained pursuant to the Deterrence Policy.

**Answer:** Defendants admit that Plaintiffs are arriving aliens who presented themselves to immigration authorities at a U.S. port of entry, were determined to have a credible fear of persecution or torture in their home countries by a USCIS asylum officer, and have been referred for proceedings inside the United States to decide their asylum claims. Defendants deny that a "Deterrence Policy" exists and that Plaintiffs are detained pursuant to a "Deterrence Policy."

11.     Ansly Damus, a former ethics teacher, is seeking asylum in the United States after fleeing political persecution—including beating and death threats—in his home country, Haiti. Fearing for his life, Mr. Damus came to the United States in October 2016. An asylum officer found that he had a credible fear of persecution and referred him for removal proceedings. Although an immigration judge has granted him asylum—twice—the government appealed both determinations, and Mr. Damus has remained in detention pending the government's repeated appeals. In late January 2017 and February 2018, the Detroit ICE Field Office denied Mr.

Damus' requests for release on parole pursuant to the Deterrence Policy, even though he established his identity, identified a sponsor with whom he could live, and showed that he poses no flight risk or danger to the community. As a result, Mr. Damus has been detained in ICE custody for the last 16 months—with no end in sight. Mr. Damus is currently detained at the Geauga County Safety Center in Chardon, Ohio.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether Ansly Damus is a former ethics teacher, whether Ansly Damus was fleeing political persecution when he arrived in the United States, and whether Ansly Damus faced beating and death threats in Haiti. Defendants admit that Ansly Damus came to the United States in October 2016, but aver that, at that time, he informed the inspecting immigration officer that he came to the United States to find work and to help his family in Haiti. Defendants aver that Ansly Damus did not claim a fear of return to Haiti until approximately November 22, 2016, at which time he was referred to USCIS for a credible fear interview. Defendants admit that Ansly Damus was found to have a credible fear of persecution and referred for removal proceedings. Defendants admit that Ansly Damus was granted asylum twice by an immigration judge, that the government appealed both decisions to the BIA, and that Ansly Damus remained in detention during those appeals. Defendants aver that the BIA sustained both of the government's appeals and that the immigration judge denied all applications for relief on September 26, 2018. Defendants aver that Ansly Damus appealed the immigration judge's September 26, 2018 decision, and that his appeal remains pending before the BIA as of March 8, 2019. Defendants admit that Ansly Damus was denied parole in January 2017 and February 2018. Defendants admit that Ansly Damus established that he was not a danger to the community, but deny that Ansly Damus demonstrated that he was not a flight risk. Defendants deny that Ansly Damus's parole requests were denied

pursuant to a "Deterrence Policy." Defendants deny that a "Deterrence Policy" exists at either the national level or at ICE's Detroit Field Office. Defendants deny that Ansly Damus is currently detained and aver that Ansly Damus was paroled from ICE custody on November 30, 2018, subject to conditions of parole. Defendants deny any allegations in this paragraph that they do not expressly admit.

**12.**     N.J.J.R. is seeking asylum in the United States after fleeing beating and threats from armed groups that seek to eliminate opposition to the Venezuelan government. Fearing for his life, N.J.J.R. presented himself to immigration officers in October 2017. An asylum officer found that N.J.J.R. had a credible fear of persecution and referred him for removal proceedings. The Newark ICE Field Office denied N.J.J.R's requests for release on parole pursuant to its Deterrence Policy, even though he has established his identity, identified a sponsor with whom he could live, and shown he poses no flight risk or danger to the community. N.J.J.R. has been detained for over four months. He is currently detained at the Essex County Correctional Facility in Newark, New Jersey.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether N.J.J.R. was subjected to beating and threats from armed groups that seek to eliminate opposition to the Venezuelan government. Defendants admit that N.J.J.R. presented himself to immigration officers in October 2017. Defendants admit that an asylum officer found that N.J.J.R. had a credible fear of persecution and referred him for removal proceedings. Defendants admit that N.J.J.R.'s requests for release on parole were denied. Defendants admit that N.J.J.R. established his identity and that he was not a danger to the community, but deny that he established that he was not a flight risk. Defendants deny that N.J.J.R.'s parole requests were denied pursuant to a "Deterrence Policy." Defendants deny that a "Deterrence Policy" exists at

either the national level or at ICE's Newark Field Office. Defendants deny that N.J.J.R. is currently detained and aver that he was paroled from ICE's custody on April 24, 2018. Defendants deny any allegations in this paragraph that they do not expressly admit.

13.     Abelardo Asensio Callol is seeking asylum in the United States after fleeing persecution at the hands of the Cuban government due to his refusal to be a part of the Cuban Communist Party and attend a rally held in memory of Fidel Castro. Fearing for his life, Mr. Callol presented himself to immigration officers in December 2017. An asylum officer found that Mr. Callol had a credible fear of persecution and referred him for removal proceedings. ICE denied Mr. Callol parole without ever interviewing him on his eligibility for parole. Mr. Callol submitted several requests to ICE asking how to submit additional documentation that would establish his identity and demonstrate that he is not a flight risk and that he has sponsors with whom he can live. ICE has not responded to any of his requests. Mr. Callol has been detained for over three months. Currently he is detained at the York County Prison in York, Pennsylvania.

**Answer:** Defendants lack knowledge or information sufficient to form a belief whether Abelardo Asensio Callol was subjected to persecution at the hands of the Cuban government due to his refusal to be part of the Cuban Communist Party and attend a rally held in memory of Fidel Castro. Defendants admit that Abelardo Asensio Callol arrived in the United States in December 2017 but lack knowledge or information sufficient to form a belief as to whether Abelardo Asensio Callol feared for his life. Defendants admit that an asylum officer determined that Abelardo Asensio Callol had a credible fear of persecution and referred him for removal proceedings. Defendants admit that Abelardo Asensio Callol was not granted parole. Defendants deny that Abelardo Asensio Callol was never interviewed regarding his eligibility for parole. Defendants aver instead that ICE served Abelardo Asensio Callol with a Parole

Advisal/Scheduling Notification on or about January 11, 2018, and that ICE conducted a parole interview with Abelardo Asensio Callol on or about January 12, 2018. Defendants deny that they did not respond to Abelardo Asensio Callol's parole request. Defendants aver instead that on or about January 18, 2018, ICE notified Abelardo Asensio Callol that his parole request was denied. Defendants aver that Abelardo Asensio Callol's parole request was denied because he did not establish that he was not a flight risk. Defendants deny that Abelardo Asensio Callol was not granted parole pursuant to a "Deterrence Policy." Defendants deny that a "Deterrence Policy" exists at either the national level or at ICE's Philadelphia Field Office. Defendants deny that Abelardo Asensio Callol is currently detained and aver instead that he was released from ICE's custody on July 26, 2018. Defendants deny any allegations in this paragraph that they do not expressly admit.

14.     Alexi Ismael Montes Castro is seeking asylum in the United States after fleeing harassment, assault, and threats at gunpoint in Honduras because he is gay. Fearing for his life, Mr. Montes Castro presented himself to immigration officers and sought asylum in November 2017. An asylum officer found that Mr. Montes Castro had a credible fear of persecution and referred him for removal proceedings. Mr. Montes Castro was not even aware that he could request release on parole until he received a boilerplate letter from ICE in January 2018, denying him parole pursuant to the Deterrence Policy. ICE never interviewed him to determine his eligibility for parole. ICE denied Mr. Montes Castro parole even though he provided the government with his birth certificate and explained that he had a relative in Virginia willing to provide him housing and support in the course of requesting asylum. Mr. Montes Castro has been detained for about four months. Currently he is detained at the York County Prison in York, Pennsylvania.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether Alexi Ismael Montes Castro was subjected to harassment, assault, and threats at gunpoint in Honduras because he is gay. Defendants admit that Alexi Ismael Montes Castro arrived in the United States in November 2017, but lack knowledge or information sufficient to form a belief as to whether Alexi Ismael Montes Castro feared for his life. Defendants admit that an asylum officer determined that Alexi Ismael Montes Castro had a credible fear of persecution and referred him for removal proceedings. Defendants deny that Alexi Ismael Montes Castro was not advised that he could seek parole and deny that Alexi Ismael Montes Castro was never interviewed regarding his eligibility. Defendants aver instead that on or about January 11, 2018, ICE served Alexi Ismael Montes Castro with a Parole Advisal/Scheduling Notification, and that ICE conducted a parole interview with Alexi Ismael Montes Castro on or about January 12, 2018. Defendants deny that Alexi Ismael Montes Castro was not granted parole pursuant to a "Deterrence Policy." Defendants deny that a "Deterrence Policy" exists at either the national level or at ICE's Philadelphia Field Office. Defendants deny that Alexi Ismael Montes Castro is currently detained and aver instead that Alexi Ismael Montes Castro was released from ICE's custody on May 23, 2018. Defendants deny any allegations in this paragraph that they do not expressly admit.

15.    H.A.Y. and A.M.M. are a wife and husband seeking asylum in the United States after fleeing a criminal cartel in Mexico that sought to take control of their home, cattle, and farm. Fearing for their lives, the couple came to the United States in December 2017. Asylum officers found that they each had a credible fear of persecution and referred them both for removal proceedings. In February 2018, the El Paso ICE Field Office denied both H.A.Y.'s and A.M.M.'s requests for parole pursuant to the Deterrence Policy, even though they had

established their identities, identified a sponsor with whom they could live, and shown that they

pose no flight risk or danger to the community. H.A.Y. and A.M.M. have been detained for over

two months. H.A.Y. is currently detained at the El Paso Processing Center in El Paso, Texas.

A.M.M. was separated from his wife and is currently detained at the Otero County Processing

Center in Chaparral, New Mexico.

 **Answer:** Defendants admit that H.A.Y and A.M.M. are husband and wife, but lack

knowledge or information sufficient to form a belief as to whether H.A.Y. and A.M.M. are

fleeing a criminal cartel in Mexico that sought to take control of their home, cattle, and farm.

Defendants admit that H.A.Y. and A.M.M. arrived in the United States in December 2017, but

lack knowledge or information sufficient to form a belief as to whether H.A.Y. and A.M.M.

feared for their lives. Defendants admit that USCIS asylum officers determined that H.A.Y and

A.M.M. had a credible fear of return and that H.A.Y. and A.M.M. were referred for removal

proceedings. Defendants admit that H.A.Y.'s and A.M.M.'s parole requests were denied, but

deny that H.A.Y. and A.M.M. were not granted parole pursuant to a "Deterrence Policy."

Defendants aver instead that H.A.Y. and A.M.M. were not granted parole because they failed to

establish that they were not flight risks. Defendants deny that a "Deterrence Policy" exists at

either the national level or at ICE's El Paso Field Office. Defendants admit that H.A.Y. and

A.M.M. were not detained in the same facility. Defendants deny that H.A.Y. and A.M.M. are

currently detained and aver instead that both H.A.Y. and A.M.M. were paroled from ICE's

custody on July 26, 2018. Defendants deny any allegations in this paragraph that they do not

expressly admit.

 **16.** L.H.A. is seeking asylum in the United States after fleeing a dangerous gang in El

Salvador, which attempted to recruit and extort money from him, and threatened to kill him and

his family. Fearing for his life, L.H.A. came to the United States in May 2016. An asylum officer found that L.H.A. had a credible fear of persecution and referred him for removal proceedings. On June 14, 2017, L.H.A. applied for parole, but the El Paso ICE Field Office denied L.H.A.'s request for parole pursuant to the Deterrence Policy, even though he had established his identity, identified a sponsor with whom he could live, and shown he poses no flight risk or danger to the community. L.H.A. has been detained for more than twenty-one months. He is currently detained at the El Paso Processing Center in Texas.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to whether L.H.A. is fleeing a dangerous gang in El Salvador that attempted to recruit and extort money from him and threatened to kill him and his family. Defendants admit that L.H.A. arrived in the United States in May 2017, but lack knowledge or information sufficient to form a belief as to whether L.H.A. feared for his life. Defendants admit that a USCIS asylum officer determined had a credible fear of return and that L.H.A. was referred for removal proceedings. Defendants admit that L.H.A. applied for parole on June 14, 2017. Defendants admit that L.H.A.'s parole request was denied, but deny that L.H.A. was not granted parole pursuant to a "Deterrence Policy." Defendants aver instead that L.H.A. was denied parole because he failed to establish that he was not a flight risk. Defendants deny that a "Deterrence Policy" exists at either the national level or at ICE's El Paso Field Office. Defendants deny that L.H.A. is currently detained and aver instead that L.H.A. was removed from the United States to El Salvador pursuant to a final order of removal on October 24, 2018. Defendants deny any allegations in this paragraph that they do not expressly admit.

17.    E.E.C.S. is seeking asylum in the United States after the dangerous MS-13 gang in El Salvador beat him and threatened to kill him, and Salvadoran police targeted him. Fearing

for his life, E.E.C.S. presented himself to U.S. immigration officers in December 2017. An

asylum officer found that E.E.C.S. had a credible fear of persecution and referred him for

removal proceedings. The Los Angeles ICE Field Office denied E.E.C.S.'s request for parole

pursuant to the Deterrence Policy, even though he has established his identity, identified a

sponsor with whom he could live, and shown that he poses no flight risk or danger to the

community. E.E.C.S. has been detained for over three months. E.E.C.S. is currently detained at

the James A. Musick detention facility in Irvine, California.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to

whether MS-13 beat and threatened to kill E.E.C.S. in El Salvador and whether the Salvadoran

police targeted E.E.C.S. Defendants admit that E.E.C.S. arrived in the United States in December

2017, but lack knowledge or information sufficient to form a belief as to whether E.E.C.S. feared

for his life. Defendants admit that a USCIS asylum officer determined that E.E.C.S. had a

credible fear of persecution and referred him for removal proceedings. Defendants admit that

E.E.C.S.'s parole request was denied, but deny that E.E.C.S. was not granted parole pursuant to a

"Deterrence Policy." Defendants aver that E.E.C.S. was denied parole because he failed to

establish that he was not a flight risk. Defendants deny that a "Deterrence Policy" exists at either

the national level or at ICE's Los Angeles Field Office. Defendants deny that E.E.C.S. is

currently detained and aver instead that E.E.C.S. was released from ICE's custody on or about

June 18, 2018. Defendants deny any allegations in this paragraph that they do not expressly

admit.

18.     L.I.L.M. is seeking asylum in the United States after fleeing a dangerous criminal

cartel in Mexico. Fearing for his life, L.I.L.M. presented himself to U.S. immigration officers in

October 2017. An asylum officer found that L.I.L.M. had a credible fear of persecution and

referred him for removal proceedings. L.I.L.M. submitted two requests for parole, submitting

evidence of his identity and letters of support from a family member who can serve as his

sponsor. The Los Angeles ICE Field Office orally denied both his parole requests without

providing him any explanation or written decision. L.I.L.M. has been detained for over four

months. L.I.L.M. is currently detained at the James A. Musick detention facility in Irvine,

California.

**Answer:** Defendants lack knowledge or information sufficient to form a belief as to

whether L.I.L.M. fled a cartel in Mexico. Defendants admit that L.I.L.M. arrived in the United

States in October 2017, but lack knowledge or information sufficient to determine whether

L.I.L.M. feared for his life. Defendants admit that a USCIS asylum officer determined that

L.I.L.M. had a credible fear of persecution and referred L.I.L.M. for removal proceedings.

Defendants aver that L.I.L.M. was served with a Parole Advisal/Scheduling Notification and that

ICE interviewed L.I.L.M. on or about November 13, 2017, to determine his eligibility for parole.

Defendants admit that L.I.L.M.'s parole request was denied, but deny that L.I.L.M. was not

granted parole pursuant to a "Deterrence Policy." Defendants aver that L.I.L.M.'s parole request

was denied because he failed to establish that he was not a flight risk. Defendants deny that a

"Deterrence Policy" exists at either the national level or at ICE's Los Angeles Field Office.

Defendants deny that L.I.L.M. was not provided with an explanation or written decision

regarding the denial of his parole request. Defendants aver instead that L.I.L.M. was provided

with written notice on or about November 15, 2017, that his parole request was denied, and aver

that the written notice included the basis for L.I.L.M.'s denial. Defendants deny that L.I.L.M. is

currently detained, and aver instead that L.I.L.M. was released from ICE's custody on or about

April 20, 2018. Defendants deny any allegations in this paragraph that they do not expressly admit.

19.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of Department of Homeland Security ("DHS"). In this capacity, she directs each of the component agencies within DHS, including U.S. Immigration and Customs Enforcement ("ICE"). Defendant Nielsen is responsible for the administration of immigration laws and policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the detention of arriving asylum seekers.

**Answer:** Defendants admit the allegations in this paragraph.

20.     Defendant Thomas D. Homan is sued in his official capacity as the Deputy Director and Senior Official Performing the Duties of the Director of ICE, the sub-agency that operates the government's immigration detention system. In this capacity, Defendant Homan directs the administration of ICE's detention policies and operations, including those policies and operations regarding the detention of arriving asylum seekers.

**Answer:** Defendants admit the allegations in this paragraph, but aver that Ronald D. Vitiello, not Thomas D. Homan, is the Deputy Director and Senior Official Performing the Duties of Director of ICE.

21.     Defendant Rebecca Adducci is sued in her official capacity as Director of the Detroit ICE Field Office. In this capacity, Defendant Adducci is responsible for ICE detention policies and operations in the Detroit District, which covers detention facilities in Michigan and Ohio, including those policies and operations regarding the detention of arriving asylum seekers.

**Answer:** Defendants admit the allegations in this paragraph.

22.    Defendant William P. Joyce is sued in his official capacity as Acting Director of the El Paso ICE Field Office. In this capacity, Defendant Joyce is responsible for ICE detention policies and operations in the El Paso District, which covers detention facilities in New Mexico and West Texas, including those policies and operations regarding the detention of arriving asylum seekers.

**Answer:** Defendants admit the allegations in this paragraph, but aver that Corey Price, not William P. Joyce, is the Acting Director of ICE's El Paso Field Office.

23.    Defendant David Marin is sued in his official capacity as Director of the Los Angeles ICE Field Office. In this capacity, Defendant Marin is responsible for ICE detention policies and operations in the Los Angeles District, which covers detention facilities in the Los Angeles area, including those policies and operations regarding the detention of arriving asylum seekers.

**Answer:** Defendants admit the allegations in this paragraph, but aver that Thomas Giles, not David Marin, is the Acting Director of ICE's Los Angeles Field Office.

24.    Defendant John Tsoukaris is sued in his official capacity as Director of the Newark ICE Field Office. In this capacity, Defendant Tsoukaris is responsible for ICE detention policies and operations in the Newark District, which covers detention facilities in the New Jersey area, including those policies and operations regarding the detention of arriving asylum seekers.

**Answer:** Defendants admit the allegations in this paragraph.

25.    Defendant Greg Brawley is sued in his official capacity as Director of the Philadelphia ICE Field Office. In this capacity, Defendant Brawley is responsible for ICE

detention policies and operations in the Philadelphia District, which covers detention facilities in
Pennsylvania, including those policies and operations regarding the detention of arriving asylum
seekers.

**Answer:** Defendants admit the allegations in this paragraph, but aver that Simona Flores,
not Greg Brawley, is the Director of ICE's Philadelphia Field Office.

26.     Defendant Jefferson Sessions is the Attorney General of the United States and the
most senior official in the U.S. Department of Justice ("DOJ"). He has the authority to interpret
the immigration laws and adjudicate custody hearings for detained immigrants. The Attorney
General delegates this responsibility to the Executive Office for Immigration Review ("EOIR"),
which administers the immigration courts and the Board of Immigration Appeals ("BIA"). He is
named in his official capacity.

**Answer:** The Court granted Defendants' Motion to Dismiss the U.S. Attorney General
from this action. *See* ECF No. 67. Accordingly, no response is required.

27.     Defendant James McHenry is the Director of EOIR, the agency within DOJ
responsible for the immigration courts and the BIA. He is named in his official capacity.

**Answer:** The Court granted Defendants' Motion to Dismiss the Director of the Executive
Office for Immigration Review from this action. *See* ECF No. 67. Accordingly, no response is
required.

## FACTUAL BACKGROUND

**A.     Legal Framework Governing Parole of Asylum Seekers.**

28.     Under the INA, a person who is subjected to expedited removal who requests
asylum at a port of entry to the United States must first demonstrate a credible fear of
persecution in his or her home country during an interview with an immigration officer—

meaning there is a "significant possibility" that the individual is eligible for asylum. 8 U.S.C.

§ 1225(b)(1)(B)(v). If an individual establishes a credible fear of persecution, he or she is then

entitled to a hearing before an immigration judge to adjudicate the asylum claim. *See id.*

§ 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

**Answer:** This paragraph consists of Plaintiffs' characterizations of federal statutes and

regulations. Accordingly, no response is required. To the extent the Court requires a response,

Defendants aver that the cited authorities speak for themselves.

29.     There typically is an interval of several months between an asylum seeker's

credible-fear interview with an immigration officer and a decision on his or her asylum claim by

an immigration judge. During that period, DHS must determine whether the individual should be

detained or released pending resolution of the asylum claim. That resolution can take more than a

year or even several years if it involves appeals to the Board of Immigration Appeals ("BIA") or

a federal court of appeals.

**Answer:** This paragraph consists of Plaintiffs' general characterizations of immigration

court proceedings rather than specific factual allegations. Accordingly, no response is required.

To the extent the Court requires a response, Defendants admit that a credible fear interview must

precede the adjudication of any potential asylum claim, but lack knowledge or information

sufficient to form a belief as to the length of a "typical" interval between a credible fear

interview and the adjudication of any subsequent asylum claim. Defendants admit that aliens

found to have a credible fear are considered for release on parole, but deny the remaining

allegations in the second sentence of this paragraph. Defendants cannot respond to the

allegations in the third sentence of this paragraph because it is unclear what "that determination"

refers to. To that extent, Defendants deny the allegations in the third sentence of this paragraph.

**30.** Pursuant to the INA and implementing regulations, asylum seekers who do not pose a flight risk or a danger to the community may be paroled by DHS during the pendency of their immigration cases on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A), 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

**Answer:** This paragraph consists of Plaintiffs' characterizations of federal statutes and regulations. Accordingly, no response is required. To the extent the Court requires a response, Defendants aver that the cited authorities speak for themselves.

**31.** DHS issued the Parole Directive in 2009.[2] The Parole Directive defines the circumstances under which there is a "significant public benefit" to granting parole pursuant to the INA and implementing regulations. The Parole Directive provides that, absent exceptional overriding factors, an asylum seeker who has established a credible fear of persecution should be granted parole in the "public interest" and released from detention while pursuing his or her asylum claims if the individual (a) establishes his or her identity to the satisfaction of DHS; and (b) presents neither a flight risk nor danger to the community. Parole Directive ¶ 6.2.

**Answer:** Defendants admit that the Parole Directive was issued on December 8, 2009. Defendants deny that the Parole Directive defines the circumstances under which there is a "significant public benefit," and aver instead that the Parole Directive explains how ICE is to interpret the term "public interest" at 8 C.F.R. § 212.5(b)(5) when it decides whether to parole arriving aliens determined to have a credible fear. Defendants admit the remaining allegations in this paragraph.

---

[2] ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hdparole_of_arriving_aliens_found_credible_fear.pdf.

**32.**      DHS's policy, reflected in the Parole Directive, against the detention of asylum

seekers who have credible claims to asylum ensures that the government adheres to

constitutional prohibitions against arbitrary detention. Asylum seekers, including those detained

at ports of entry into the United States, are "persons" who may not be deprived of liberty without

due process of law under the Due Process Clause. Accordingly, the Due Process Clause, as well

as the INA and its implementing regulations, preclude DHS from subjecting a *bona fide* asylum

seeker to long-term civil immigration detention absent an individualized determination that the

individual poses a flight risk or is a danger to the community.

**Answer:** This paragraph consists of Plaintiffs' general characterizations of DHS policy

and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Accordingly, no

response is required. To the extent the Court requires a response, Defendants deny the allegations

in this paragraph.

**33.**      Until recently, DHS relied on the Parole Directive to grant parole to thousands of

asylum seekers with a credible fear, based on individualized findings that their detention was

unnecessary. This is not surprising: the overwhelming majority of asylum seekers who establish

a credible fear lack any criminal history, pose no threat to public safety, and do not need to be

detained to ensure their appearance for court proceedings.[3]

**Answer:** This paragraph consists of Plaintiffs' general characterizations of the Parole

Directive and general characterizations of aliens seeking asylum in the United States.

---

[3] *See, e.g.*, Mark Noferi, *A Humane Approach Can Work: The Effectiveness of Alternatives to Detention for Asylum Seekers*, at 1, 3 (July 2015), https://www.americanimmigrationcouncil.org/ sites/default/files/research/a_humane_approach_can_work_the_effectiveness_of_alternatives_ to_detention_for_asylum_seekers.pdf (summarizing research showing that asylum seekers are predisposed to comply with legal processes).

Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

**34.**     DHS has not revoked or amended the Parole Directive. Indeed, in February 2017, then-DHS Secretary John Kelly stated that the Parole Directive "remain[s] in full force and effect" pending the DHS Secretary's "further review and evaluation."[4] DHS has not withdrawn or amended the Parole Directive since that time.

**Answer:** Defendants admit the allegations in this paragraph.

**35.**     The government also represented to the Supreme Court of the United States last year that the Parole Directive remains "in 'full force and effect.'"[5] The government emphasized that the Parole Directive generally requires DHS "to release the alien if he establishes his identity [and] demonstrates that he is not a flight risk or danger," and requires an individualized analysis that "calls for far more than checking a box on a form."[6]

**Answer:** Defendants admit that the government represented to the Supreme Court of the United States that the Parole Directive remains in full force and effect and that the policy requires more than checking a box. Defendants deny the remaining allegations in this paragraph, as Plaintiffs' quotations do not fairly represent the government's position, which states:

> The government's policy is to automatically consider parole for arriving aliens found to have a credible fear, and to release the alien if he establishes his identity, demonstrates that he is not a flight risk or danger, *and there are no countervailing considerations*. J.A. 48–50.

---

[4] *See* Memorandum from John Kelly, *Implementing the President's Border Security and Immigration Enforcement Improvements Policies*, at 9-10 (Feb. 20, 2017) ("Kelly Memorandum"), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

[5] Pet. Suppl. Reply Br., *Jennings v. Rodriguez*, No. 15-1204, at 6 n.2 (U.S. filed Feb. 21, 2017) (quoting the Kelly Memorandum at 10).

[6] *Id.* at 6–7 (internal quotations and citation omitted).

Pet. Suppl. Reply Br., *Jennings v. Rodriguez*, No. 15-1204, at 6–7 (U.S. filed Feb. 21, 2017)

(footnote omitted) (emphasis added).

**36.**     So long as the Parole Directive remains in effect, it is binding on ICE, and its

provisions must be applied to asylum seekers who establish a credible fear of persecution. *See*

*Abdi v. Duke*, 280 F. Supp. 3d 373, 2017 WL 5599521, at *28 (W.D.N.Y. Nov. 17, 2017),

*injunction clarified*, 2018 WL 798747 (W.D.N.Y. Feb. 9, 2018), *appeal pending*, No. 18-94 (2d

Cir. filed Jan. 12, 2018).

**Answer:** This paragraph consists of Plaintiffs' characterizations of the Parole Directive

and the opinion in *Abdi v. Duke*, 280 F. Supp. 3d 373 (W.D.N.Y. Nov. 17, 2017). Accordingly,

no response is required. To the extent a response is required, Defendants aver that the cited

authorities speak for themselves, and that the U.S. Court of Appeals for the Second Circuit

remanded the *Abdi* case to the U.S. District Court for the Western District of New York on

September 5, 2018, for further consideration in light of the Supreme Court's decision in *Jennings*

*v. Rodriguez*, 138 S. Ct. 830 (2018). *Abdi v. Brophy*, No. 18-94, 2018 WL 7021866 (2d Cir. Sept.

5, 2018).

**B.     The Unlawful Detention of Virtually All Asylum Seekers at Five ICE Field
        Offices.**

**37.**     DHS has, since the Trump Administration took office last year, implemented a *de*

*facto* policy of denying parole in virtually all cases at its Detroit, El Paso, Los Angeles, Newark,

and Philadelphia Field Offices ("the ICE Field Offices"). Altogether, these ICE Field Offices

detain approximately 24 percent of ICE's total average daily detention population.

**Answer:** Defendants deny the allegations in this paragraph.

38.     ICE data suggests that the ICE Field Offices likely denied at least 1,000 requests

for parole by arriving asylum seekers during 2017. Between February and September 2017,[7] the

ICE Field Offices denied parole at the following rates: Detroit officers denied 63 of 64 parole

requests, or 98 percent of cases; El Paso officers denied 349 of 349 parole requests, or 100

percent of cases; Los Angeles officers denied 326 of 354 parole requests, or 92 percent of cases;

Newark officers denied 10 of 10 parole requests, or 100 percent of cases; and Philadelphia

officers denied 43 of 43 cases, or 100 percent of cases.

**Answer:** Defendants deny the allegations in this paragraph.

39.     This is a dramatic change from ICE's past practice pursuant to the Parole

Directive. Between 2011 and 2013, the ICE Field Offices paroled 92 percent of arriving asylum

seekers pursuant to the Directive. More recently, the parole rate began to fall, dropping to less

than 4 percent on average across the ICE Field Offices during the period from February through

September 2017.

**Answer:** Defendants deny the allegations in this paragraph.

40.     Since the Trump Administration came into office, officers in the ICE Field

Offices repeatedly have told detainees and their attorneys that parole will no longer be granted.

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph. To that extent, Defendants deny the allegations in this

paragraph.

41.     The ICE Field Offices are no longer following the requirements of the Parole

Directive. Asylum seekers routinely are not notified of the availability of parole, in violation of

---

[7] September 2017 data is the most recent data available to Plaintiffs.

the Parole Directive. *See* Parole Directive, §§ 6.1, 8.1 (requiring DHS officers to provide asylum

seeker with parole advisal "[a]s soon as practicable following a credible fear determination").

When notification is provided, the ICE officer does not "explain the contents of the notification

to the [asylum seeker] in a language he or she understands," also in violation of the Parole

Directive. *Id.* § 8.1. Some asylum seekers are denied parole even before they are notified of their

ability to seek it, again in violation of the Parole Directive. Others are not given interviews

before their parole requests are denied, likewise in violation of the Parole Directive. *See id.* § 8.2

(requiring parole interview generally "no later than seven days" after asylum seeker passes

credible fear screening). Indeed, sometimes the ICE Field Offices simply do not respond to

asylum seekers' parole requests at all.

     **Answer:** Defendants deny the allegations in this paragraph.

     **42.**    Even where the ICE Field Offices ostensibly consider parole requests, they no

longer provide individualized determinations of flight risk and danger, in violation of the Parole

Directive. *See id.* § 6.2. Instead, the ICE Field Offices issue denials that give no indication that

the evidence in support of the parole request has been considered. The denials typically come in

the form of very short form letters that contain boilerplate language and/or checkboxes indicating

that the asylum seeker poses a "flight risk" or has not sufficiently demonstrated her identity.

These form denials provide no explanation of why the asylum seeker has been denied parole or

any indication that the request was given any individualized consideration at all, again in

violation of the Parole Directive. *See id.* § 8.2 ("The letter must include a brief explanation of the

reasons for denying parole."). The form denials also typically come in English, including for

asylum seekers who do not understand English—another violation of the Parole Directive. *See*

*id.* The denials also often do not inform the asylum seeker of her right to seek redetermination of the denial, which is yet another violation. *See id.*

**Answer:** Defendants deny the allegations in this paragraph.

43.     As a result, many asylum seekers who clearly satisfy the Parole Directive's criteria for release are denied parole. The ICE Field Offices grant release only in extremely narrow circumstances—such as medical emergencies or a shortage in detention bed space. The result is that numerous individuals for whom detention serves no permissible purpose are being deprived of their liberty—for months or even years—as they wait for their asylum claims to be adjudicated.

**Answer:** Defendants deny the allegations in this paragraph.

44.     Officials at ICE Headquarters are fully aware of and have permitted the ICE Field Offices to implement this policy. The Parole Directive specifically requires ICE Headquarters to analyze periodic reporting on parole decisions and take corrective action as needed. *See* Parole Directive ¶¶ 8.11, 8.12. Although ICE Headquarters has been aware of detention practices across the ICE Field Offices for more than a year, it has taken no action to require the ICE Field Offices to follow the Parole Directive.

**Answer:** Defendants deny the allegations in this paragraph.

45.     Another federal court recently held that ICE officers at ICE's Buffalo, New York Field Office violated the Parole Directive through their blanket detention of asylum seekers. In November 2017, the U.S. District Court for the Western District of New York found that the government had engaged in a class-wide practice of issuing "blanket denials" to parole requests that failed to analyze each case "'on its own merits and based on the facts of the individual

alien's case,'" in violation of the Parole Directive. *Abdi*, 2017 WL 5599521, at *23. The court

granted a preliminary injunction requiring, among other things, that the Buffalo ICE Field Office

"immediately adjudicate" the parole requests of a class of detained asylum seekers "in

conformance with [its] legal obligations, including [its] obligations under the [Parole] Directive."

*Id*. at *28.

      **Answer:** This paragraph consists of Plaintiffs' characterizations of the opinion in *Abdi v.*

*Duke*, 280 F. Supp. 3d 373 (W.D.N.Y. Nov. 17, 2017). Accordingly, no response is required. To

the extent a response is required, Defendants aver that the cited authority speaks for itself, and

that the U.S. Court of Appeals for the Second Circuit remanded the *Abdi* case to the U.S. District

Court for the Western District of New York on September 5, 2018, for further consideration in

light of the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). *Abdi v.*

*Brophy*, No. 18-94, 2018 WL 7021866 (2d Cir. Sept. 5, 2018).

      **C.**     **The Deterrence Motive Behind the Virtually Blanket Detention at the ICE**
            **Field Offices.**

      **46.**     DHS's *de facto* policy of denying parole in virtually all cases at the ICE Field

Offices, without individualized determinations of flight risk or danger to the community, would

be unlawful regardless of the motive behind that policy. But here, that illegality is exacerbated

by the policy's unlawful motive. The Deterrence Policy is plainly motivated by the Trump

Administration's goal of deterring *other* asylum seekers from seeking refuge in the United

States. As this Court found in its preliminary injunction ruling in *R.I.L-R.*, deterrence of others—

which is a function of criminal law—is not a permissible basis for civil immigration detention.

*See R.I.L-R.*, 80 F. Supp. 3d at 189–90.

**Answer:** This paragraph consists of Plaintiffs' legal conclusions. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

47.     The Trump Administration's own words establish that the Deterrence Policy is indeed deterrence-based. Executive Order No. 13767, *Border Security and Immigration Enforcement Improvements*, 82 Fed. Reg. 8793 (Jan. 30, 2017), makes detention central to the Administration's efforts to deter what it considers unauthorized migration. The Order makes it the policy of the Executive Branch to "detain individuals apprehended on suspicion of violating . . . Federal immigration law, pending further proceedings regarding those violations." *Id*. at 8793. This new detention policy aims, in part, "to secure the Nation's southern border" and "prevent further illegal immigration into the United States." *Id*. at 8793.

**Answer:** Defendants deny the allegations in this paragraph.

48.     On February 20, 2017, then-DHS Secretary John Kelly issued the Kelly Memorandum, which implemented the Executive Order through "new policies designed to stem illegal immigration and facilitate the . . . detention and removal of aliens who have no lawful basis to enter or remain in the United States."[8] The Kelly Memorandum did not rescind the Parole Directive, and, indeed, stated that the Directive "remain[s] in full force and effect" pending the DHS Secretary's "further review and evaluation."[9] Nonetheless, the Kelly Memorandum articulated that DHS would broadly detain migrants as a means of deterring other migrants from coming to the United States. This in turn has resulted in Defendants violating the Parole Directive at the ICE Field Offices by effectuating the Deterrence Policy.

---

[8] Kelly Memorandum at 1.
[9] *Id*. at 9–10.

**Answer:** Defendants admit that former Secretary of Homeland Security issued a memorandum on February 20, 2017, and that this memorandum did not rescind the Parole Directive. Defendants deny the remaining allegations in this paragraph.

49.     With respect to detention, the Kelly Memorandum states that "[t]he President has determined that the lawful detention of aliens arriving in the United States . . . pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders."[10] To that end, "[p]olicies that facilitate the release of removable aliens apprehended at and between the ports of entry . . . collectively referred to as 'catch-and-release,' shall end."[11]

**Answer:** This paragraph consists of Plaintiffs' characterizations of certain excerpts of the Kelly Memorandum. Accordingly, no response is required. To the extent the Court requires a response, Defendants aver that the Kelly Memorandum, in its entirety, speaks for itself.

50.     An earlier draft of the Kelly Memorandum states the Administration's deterrence goals in even clearer terms. The draft expressly states that DHS's new enforcement policies—including its expanded use of detention to end "catch-and-release"—were "designed to *deter* illegal immigration," and that "[t]he President has determined that the lawful detention of arriving aliens pending a determination of their inadmissibility and eligibility for immigration relief has a significant *deterrent* effect on illegal immigration."[12] The final version of the memorandum merely replaces "deter illegal immigration" with "stem illegal immigration," and

---

[10] *Id.* at 2.

[11] *Id.*

[12] Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies, at 1 (Jan. 25, 2017) (draft) (emphases added), http://www.aila.org/infonet/leaked-dhs-memo-on-implementation-of-presidents.

"significant deterrent effect" with "most efficient means by which to enforce the immigration laws." Despite these cosmetic revisions, which were presumably made to create the appearance that the memo does not violate *R.I.L-R.* and the authorities on which it is based, the purpose of DHS's new detention policies remains clear: the *deterrence* of migration to the United States.

**Answer:** Defendants can neither admit nor deny the allegations in this paragraph, as to do so would implicate information protected by legal privileges, including, but not necessarily limited to, the attorney-client communications privilege and the deliberative process privilege.

51.    Since the Kelly Memorandum was issued, the Trump Administration has continued to emphasize its goal of deterring migration through detention. A recent White House Framework on Immigration Reform & Border Security provides that "[t]he Department of Homeland Security must have tools to deter illegal immigration." Specifically, the Administration pledges to "[d]eter illegal entry" by ending "catch-and-release and by closing legal loopholes that have eroded our ability to secure the immigration system and protect public safety."[13]

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. To the extent Plaintiffs cite to selected portions of memoranda and policy documents not authored by Defendants, Defendants aver that those documents, in their entireties, speak for themselves.

---

[13] White House Framework on Immigration Reform & Border Security (Jan. 25, 2018), https://www.whitehouse.gov/briefings-statements/white-house-framework-immigrationreform- border-security/.

52.     The ICE Field Offices' detention practices for asylum seekers directly reflect the Trump Administration's commitment to arbitrary detention as a strategy of immigration enforcement and deterrence.

**Answer:** Defendants deny the allegations in this paragraph.

53.     Notwithstanding the Trump Administration's deterrence goals, detaining current asylum seekers will not deter future asylum seekers. Individuals who flee violence and persecution and come to the United States in fear of their lives and safety will not be deterred by the threat of detention.[14]

**Answer:** Defendants deny the allegations in this paragraph.

> **D.     The Deterrence Policy Causes Plaintiffs and Proposed Class Members Irreparable Harm.**

54.     Defendants' categorical detention of Plaintiffs and those similarly situated, without any individualized review of flight risk and danger to the community, has caused Plaintiffs and those similarly situated irreparable harm.

**Answer:** Defendants deny the allegations in this paragraph.

55.     Detention facilities for asylum seekers are punitive and abusive.[15] ICE uses secure facilities to detain asylum seekers, including jails designed to hold individuals charged with or convicted of crimes. Asylum seekers detained in secure facilities are often subjected to physical

---

[14] *See* Jonathan Hiskey, et al., *Understanding the Central American Refugee Crisis: Why They Are Fleeing and How U.S. Policies Are Failing to Deter Them* (American Immigration Council 2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/understanding_the_central_american_refugee_crisis.pdf.

[15] *See, e.g*., USCIRF, *Report on Asylum Seekers in Expedited Removal, Volume I: Findings and Recommendations*, at 60-61, 68-69 (2005), http://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf.

and verbal abuse at the hands of security personnel. Medical and mental healthcare at ICE

detention facilities is typically inadequate.

      **Answer:** Defendants deny the allegations in this paragraph.

      56.     The detention of asylum seekers causes them psychological and physical trauma.

Confined detainees have little information or control over their environments and often

experience circumstances similar to "sensory deprivation."[16] They develop feelings of

"helplessness and hopelessness that lead to debilitating depressive symptoms, chronic anxiety,

despair, dread," Post-Traumatic Stress Disorder ("PTSD"), and suicidal ideation.[17] Some attempt

suicide.

      **Answer:** Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph. To that extent, Defendants deny the allegations in this

paragraph.

      57.     Asylum seekers are particularly vulnerable to trauma because detention may

exacerbate traumas they have experienced in the past.[18] The court in the *Abdi* case found that

class members' "physical and psychological impairments" resulting from their "prolonged

confinement" established that detainees were irreparably harmed. 2017 WL 5599521, at \*23.

These deleterious impacts of detention begin immediately and worsen over time.

---

[16] Physicians for Human Rights, *Punishment Before Justice: Indefinite Detention in the U.S.*, at
7-11 (2011), https://s3.amazonaws.com/PHR_Reports/indefinite-detentionjune2011.pdf.
[17] *Id.* at 11.
[18] *Id.* at 26–27; *see also* Physicians for Human Rights and Bellevue/NYU Program for Survivors
of Torture, *From Persecution to Prison: The Health Consequences of Detention for Asylum
Seekers* at 2 (2003) (study of 70 detained asylum seekers finding that 86 percent experienced
symptoms of depression, 77 percent anxiety, and 50 percent PTSD).

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of this paragraph. To that extent, Defendants deny the allegations in the first sentence of this paragraph. Defendants deny the remaining allegations in this paragraph and aver that that the cited legal authority speaks for itself.

58.     Detention also impairs asylum seekers' ability to adequately prepare for and litigate their asylum hearings. *See id*. Representation is crucial to prevailing on an asylum claim,[19] yet detention makes it much less likely that asylum seekers can secure lawyers, gather evidence, and prepare their asylum cases. Detention centers under the jurisdiction of several of the ICE Field Offices are located in remote locations, far from *pro bono* immigration lawyers, making it very difficult for individuals to obtain legal advice. Detention further curtails access to counsel by imposing strict limitations on attorney access and attorney communications. For those asylum seekers able to secure representation, the conditions of detention impair their ability to develop trusting relationships with attorneys, which are necessary to prepare their claims for protection.

**Answer:** Defendants deny the allegations in this paragraph.

## CLASS ACTION ALLEGATIONS

59.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as follows:

> (1) All arriving asylum seekers; (2) who are found to have a credible fear of persecution or torture; and (3) who are or will be detained by U.S. Immigration and

---

[19] *See, e.g*., TRAC Immigration, *Asylum Representation Rates Have Fallen Amid Rising Denial Rates* (Nov. 28, 2017), http://trac.syr.edu/immigration/reports/491/ (reporting government data showing represented asylum seekers are five times more likely to win asylum than *pro se* litigants).

Customs Enforcement; (4) after having been denied parole under the authority of
ICE's Detroit, El Paso, Los Angeles, Newark, or Philadelphia Field Office.

**Answer:** Defendants admit that Plaintiffs seek to certify a class, but deny that Plaintiffs'

proposed class satisfies the requirements of Federal Rule of Civil Procedure 23.

60.     The class is so numerous that joinder of all members is impracticable. According

to ICE data, from February to September 2017 alone, the ICE Field Offices denied nearly 800

requests for parole by asylum seekers who passed their credible fear interviews. This data

suggests that, since late January 2017, more than 1,000 asylum seekers likely have been detained

and denied parole pursuant to Defendants' Deterrence Policy, and therefore have satisfied the

class definition. Many more individuals will become class members in the future.

**Answer:** Defendants admit that Plaintiffs' proposed class is so numerous that joinder of

all members is impracticable, but deny that the proposed class satisfies the requirements of

Federal Rule of Civil Procedure 23.

61.     Whether the Deterrence Policy is lawful presents common questions of fact and

law. All class members have been subjected to a common Deterrence Policy. The facts and

circumstances surrounding that policy thus concern all class members. The issues regarding the

legality of the Deterrence Policy also apply to the class as a whole.

**Answer:** Defendants deny the allegations in this paragraph.

62.     The claims of the representative parties are typical of the claims of the class.

Plaintiffs and the class of individuals they seek to represent have all been detained pursuant to

the policies and practices described above. The legal claims raised by Plaintiffs are identical to

the class claims.

**Answer:** Defendants deny the allegations in this paragraph.

63.     Plaintiffs are adequate representatives because they seek the same relief as the other members of the class: that Defendants be enjoined from applying the Deterrence Policy and required to determine custody based on an individualized determination of each migrant's flight risk and danger to the community through the parole process and at a custody hearing before an immigration judge. Plaintiffs do not have any interests adverse to those of the class as a whole.

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. To that extent, Defendants deny the allegations in this paragraph.

64.     The proposed class would be represented by counsel from the ACLU, Covington & Burling LLP, the Center for Gender and Refugee Studies, and Human Rights First. Counsel have extensive experience litigating class action lawsuits, including lawsuits on behalf of immigration detainees. Counsel also have significant legal and factual expertise on the detention of asylum seekers.

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. To that extent, Defendants deny the allegations in this paragraph.

65.     Defendants have acted on grounds generally applicable to the class by applying the Deterrence Policy to all class members. Thus, injunctive and declaratory relief is appropriate with respect to the class as a whole.

**Answer:** Defendants deny the allegations in this paragraph.

## CAUSES OF ACTION

### First Claim
### (Administrative Procedure Act)

**Unlawful Failure to Follow and/or Effective Rescission the ICE Parole Directive**

**66.**     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

**Answer:** Defendants repeat and reassert all of their foregoing answers as though fully set forth herein.

**67.**     Pursuant to the Deterrence Policy, Defendants have detained Plaintiffs and similarly-situated persons without parole reviews that conform to the requirements of the Parole Directive.

**Answer:** Defendants deny the allegations in this paragraph.

**68.**     Through the Deterrence Policy, DHS has violated and/or *de facto* rescinded the Parole Directive without providing any reasoned justification for its change in policy.

**Answer:** Defendants deny the allegations in this paragraph.

**69.**     DHS's violation and/or effective rescission of its own Parole Directive while representing that the Directive remains in full force and effect is unlawful.

**Answer:** Defendants deny the allegations in this paragraph.

**70.**     Defendants' actions are arbitrary and capricious and contrary to law, in violation of the APA. *See* 5 U.S.C. § 706(2).

**Answer:** Defendants deny the allegations in this paragraph.

**Second Claim**
**(Administrative Procedure Act – Violation of the Immigration and Nationality Act and Implementing Regulations)**
**Failure to Provide an Individualized Determination of Flight Risk and Danger**

**71.**    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

**Answer:** Defendants repeat and reassert all of their foregoing answers as though fully set forth herein.

**72.**    Pursuant to the Deterrence Policy, Defendants have detained Plaintiffs and persons similarly situated, without having made individualized determinations through the parole-review process that such detention is necessary based on flight risk or danger to the community. Defendants have done so to deter other asylum seekers from seeking refuge in the United States.

**Answer:** Defendants deny the allegations in this paragraph.

**73.**    Defendants' Deterrence Policy constitutes final agency action for which there is no other adequate remedy. This action governs parole decisions made by ICE agents at the ICE Field Offices pursuant to INA § 212(d)(5), 8 U.S.C. § 1182(d)(5), 8 C.F.R. § 212.5(b), and will govern parole decisions made at those field offices in the future. Because of the Deterrence Policy, Plaintiffs and those similarly situated have been or will be detained without individualized parole review on flight risk or danger.

**Answer:** Defendants deny the allegations in this paragraph.

**74.**    Under the INA and implementing regulations, immigration detention of an asylum seeker must be based on an individualized determination that the asylum seeker constitutes a flight risk or a danger to the community. Detention based on general deterrence of others is not permissible. Accordingly, the Deterrence Policy violates the INA and its implementing regulations.

**Answer:** This paragraph consists of Plaintiffs' general legal conclusions. Accordingly, no response is required. To the extent the Court requires a response, Defendants deny the allegations in this paragraph.

### Third Claim
**(Due Process Clause of the Fifth Amendment to the United States Constitution)**
**Failure to Provide an Individualized Determination of Flight Risk and Danger**

75.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

**Answer:** Defendants repeat and reassert all of their foregoing answers as if fully set forth herein.

76.     The Due Process Clause provides that "no person . . . shall be deprived of . . . liberty . . . without due process of law." U.S. Const., amend. V.

**Answer:** Defendants admit the allegations in this paragraph.

77.     Asylum seekers who present themselves at a port of entry to the United States are "persons" who may not be deprived of liberty without due process of law under the Due Process Clause.

**Answer:** This paragraph consists of Plaintiffs' general legal conclusions. Accordingly, no response is required. To the extent the Court requires a response, Defendants admit that arriving aliens are "persons" under the Due Process Clause, but that due process for such aliens is "[w]hatever the procedure authorized by Congress is." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).

78.     The Due Process Clause permits civil immigration detention of an asylum seeker only where such detention is reasonably related to the government's interests in preventing flight

or protecting the community from danger. Thus, due process requires an individualized

assessment of flight risk or danger to the community to determine whether detention is justified.

**Answer:** This paragraph consists of Plaintiffs' general legal conclusions. Accordingly, no

response is required. To the extent the Court requires a response, Defendants deny the allegations

in this paragraph.

**79.**       In addition, particularly where detention is prolonged, due process requires a

custody hearing before a neutral decision-maker to determine if detention is necessary.

**Answer:** This paragraph consists of Plaintiffs' general legal conclusions. Accordingly, no

response is required. To the extent the Court requires a response, Defendants deny the allegations

in this paragraph.

**80.**       Pursuant to the Deterrence Policy, Defendants have detained Plaintiffs and

similarly situated persons without individualized determinations of flight risk or danger to the

community through the parole process or at a custody hearing before a neutral decision-maker.

Thus, the Deterrence Policy violates the Due Process Clause.

**Answer:** Defendants deny the allegations in this paragraph.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.   Certify this case as a class action lawsuit, as proposed herein, appoint Plaintiffs as

class representatives, and appoint the undersigned counsel as class counsel;

b.   Declare that the Deterrence Policy is arbitrary and capricious and contrary to law;

c.   Enter an order enjoining Defendants from detaining Plaintiffs and proposed class

members absent parole reviews that result in individualized determinations that

detention is necessary to prevent flight or danger to the community and that

conform to the other requirements of the Parole Directive;

    d.   Enter an order enjoining Defendants from subjecting Plaintiffs and proposed class

members to prolonged detention absent a custody hearing before an immigration

judge to determine if detention is necessary to prevent flight or danger to the

community;

    e.   Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to

Justice Act and any other applicable statute or regulation; and

    f.   Grant such further relief as the Court deems just, equitable, and appropriate.

**Answer:** This paragraph consists of Plaintiffs' requested relief. Accordingly, no response

is required. To the extent the Court requires a response, Defendants deny that Plaintiffs are

entitled to the relief requested.

Dated: March 14, 2019                    Respectfully submitted,

                                         JOSEPH H. HUNT
                                         Assistant Attorney General
                                         Civil Division

                                         WILLIAM C. PEACHEY
                                         Director

                                         KATHLEEN A. CONNOLLY
                                         Senior Litigation Counsel

                                         VICTORIA BRAGA
                                         Trial Attorney

                                         */s/ Alexander J. Halaska*
                                         ALEXANDER J. HALASKA
                                         Trial Attorney
                                         United States Department of Justice
                                         Office of Immigration Litigation
                                         District Court Section
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, D.C. 20044
                                         Tel: (202) 307-8704 | Fax: (202) 305-7000
                                         alexander.j.halaska@usdoj.gov

                                         *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

Case No. 1:18-cv-00578-JEB (D.D.C.)

I certify that on March 14, 2019, I served a copy of the foregoing document on all parties

of record by causing it to be filed with the Clerk of the Court through the CM/ECF system,

which will provide electronic notice and a link to this document to all attorneys of record.


*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
Trial Attorney
United States Department of Justice
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000

*Attorney for Defendants*