# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANSLY DAMUS, *et al.*, on behalf of themselves and others similarly situated, )<br><br>*Plaintiffs,* )<br><br>*v.* )<br><br>KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security, in her official capacity, *et al.*, )<br><br>*Defendants.* ) | Civil Action No.  1:18-cv-00578 (JEB) |

## PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM
## FOR A FINDING OF CIVIL CONTEMPT

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Dennis B. Auerbach (D.C. Bar No. 418982)
Philip J. Levitz (D.C. Bar No. 1018430)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

*Additional counsel listed at end of memorandum*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL AND PROCEDURAL HISTORY ....................................................................... 2

    1.  The Preliminary Injunction Order ............................................................................. 2

    2.  Compliance Discovery Reveals Ongoing Violations of the Preliminary Injunction .... 3

    3.  Defendants Refuse to Take Any Steps to Ensure Compliance with the Preliminary Injunction ................................................................................................................... 5

LEGAL STANDARD ............................................................................................................. 6

ARGUMENT .......................................................................................................................... 7

I.   THE LOS ANGELES FIELD OFFICE IS IN CONTEMPT OF THE PRELIMINARY INJUNCTION .......................................................................................................................... 7

  A.  The Preliminary Injunction Imposes Clear and Unambiguous Requirements ................... 7

  B.  The Los Angeles Field Office Is Not Complying with the Clear Requirements of the Preliminary Injunction Order. ........................................................................................ 7

    1.  The Los Angeles Field Office Has Not Changed Its Parole Practices Since the Preliminary Injunction Issued; Nor Has Its Grant Rate Materially Changed. .............. 7

    2.  The Los Angeles Field Office Continues to Violate Specific Requirements of the Parole Directive. ..................................................................................................... 9

II.  THE COURT SHOULD ORDER TARGETED REMEDIAL MEASURES TO ADDRESS THE LOS ANGELES FIELD OFFICE'S CONTEMPT. ...................................................... 11

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blackman v. D.C.*,
   185 F.R.D. 4 (D.D.C. 1999)................................................................14

*Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*,
   692 F.2d 790 (1st Cir. 1982)................................................................9

*Huang v. I.N.S.*,
   436 F.3d 89 (2d Cir. 2006)................................................................10

*Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal &
   Glass LLC*,
   736 F. Supp. 2d 35 (D.D.C. 2010)........................................................6

*Mamouzian v. Ashcroft*,
   390 F.3d 1129 (9th Cir. 2004)............................................................10

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949)........................................................................6

*Melendres v. Arpaio*,
   2016 WL 2783715 (D. Ariz. May 13, 2016)........................................7, 8

*Melendres v. Arpaio*,
   2016 WL 3996453 (D. Ariz. July 26, 2016)........................................12

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*,
   828 F.2d 536 (9th Cir. 1987)............................................................14

*National Labor Relations Board v. Blevins Popcorn Co.*,
   659 F.2d 1173 (D.C. Cir. 1981)..........................................................6

*Oil Chemical and Atomic Workers Int'l Union AFL-CII v. NLRB*,
   547 F.2d 575 (D.C. Cir. 1976)..........................................................12

*In re Peterson*,
   253 U.S. 300 (1920)........................................................................13

*Powell v. Ward*,
   487 F. Supp. 917 (S.D.N.Y. 1980)....................................................14

*Powell v. Ward*,
   643 F.2d 924 (2d Cir. 1981)..........................................................8, 14

*Shillitani v. United States*,
 384 U.S. 364 (1966).............................................................................................................6

*United States v. Latney's Funeral Home, Inc.*,
 41 F. Supp. 3d 24, 29 (D.D.C. 2014)..................................................................................11

## INTRODUCTION

Plaintiffs seek a finding of civil contempt against the Los Angeles Field Office of Immigration and Customs Enforcement ("ICE"), for ongoing violations of the preliminary injunction in this case.  In its July 2, 2018 preliminary injunction order, the Court held that five ICE field offices — among them the Los Angeles Field Office — were likely violating the Parole Directive and ordered them to comply with the Directive in adjudicating parole requests.  Yet the Los Angeles Field Office admits it has changed **nothing** in the way it conducts parole determinations for asylum seekers since the preliminary injunction issued.

Nor has its parole grant rate materially changed.  In the months before the preliminary injunction, the Los Angeles Field Office granted just 8% of parole requests.  In the nine months since this Court's preliminary injunction has been in effect, the Field Office has granted a mere 14% of 242 parole requests.  Indeed, the effective grant rate is even lower — around 11% — because Defendants admit that 73 class members have not received parole determinations at all. This grant rate remains far below the 85% parole grant rate that prevailed between 2011 and 2013. The Los Angeles Field Office can provide no explanation or justification for this dramatic drop. Moreover, the Field Office admits that it continues to engage in the very parole-review practices — including denying parole on categorical grounds — that this Court identified as likely violations of the Parole Directive.

In the face of these facts, the Court should find that the Los Angeles Field Office is in contempt of the preliminary injunction order.  Plaintiffs do not move for contempt lightly. Plaintiffs have asked Defendants to take specific steps at the Los Angeles Field Office (and the other ICE field offices at issue in this case) to bring them into compliance with the preliminary injunction.  Defendants have refused.  Plaintiffs have deposed a Los Angeles Field Office

representative to determine whether the office has done anything since last July in an effort to comply with the preliminary injunction. No such measures have been taken. And Plaintiffs have waited nine months since the preliminary injunction issued to see if the parole grant rate in Los Angeles would materially improve. It has not. Accordingly, Plaintiffs are left with no choice but to file this contempt motion.[1]

## FACTUAL AND PROCEDURAL HISTORY

The Parole Directive[2] provides that, absent exceptional circumstances, ICE should release asylum seekers who establish their identity and show that they are neither a flight risk nor a danger to the community. Between 2011 and 2013, the Los Angeles Field Office released 85% of asylum seekers pursuant to this requirement. Ex. B, Declaration of Brooke Watson ("Watson Decl."), ¶ 18. Between February and September 2017, however, the grant rate at the Los Angeles Field Office fell to just 8%. Declaration of Anne Daher, ECF No. 11-12, ¶ 11.

### 1.   *The Preliminary Injunction Order*

The Court entered a class-wide preliminary injunction on July 2, 2018 based on this dramatic drop in the parole grant rate in Los Angeles, comparable drops at the other four ICE field offices in the case, and additional evidence reflecting violations of the Parole Directive. Specifically, the Court enjoined Defendants from denying parole to a class member without an individualized determination regarding the necessity of detention "based on the specific facts of each provisional class member's case." PI Order, ECF No. 33, ¶ 4. The Court further required Defendants to "conform to all of the substantive and procedural requirements of" the Parole

---

[1] This motion focuses exclusively on the Los Angeles Field Office because the evidence of its non-compliance with the preliminary injunction is most stark. Plaintiffs have concerns with the other ICE field offices at issue in the litigation as well, which may need to be addressed at a later time.

[2] ICE Directive No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009) (Ex. A).

Directive.  *Id.* ¶ 5.  In so ruling, the Court found that Defendants were likely violating the Parole

Directive and that Plaintiffs faced irreparable harm from their continued unlawful detention.  *See*

PI Mem. Op., ECF No. 34, at 24-37.

As required by the Court, Defendants have filed monthly data reports reflecting the parole

grant rate for each of the five ICE field offices subject to the preliminary injunction.  *See* Minute

Order, Aug. 28, 2018.  Defendants' most recent report dated March 24, 2019 reflects that, since

the preliminary injunction issued in July 2018, the Los Angeles Field Office has granted parole in

just 34 of 242 parole determinations (14%).  *See* Defs.' Status Report, Mar. 2019, ECF No. 72, at

2; Ex. B, Watson Decl., ¶ 10.  Moreover, the Field Office has failed to conduct any parole

determination in 73 additional cases, meaning the effective grant rate is approximately 11%.  *See*

*id.*  This number is largely unchanged from the 8% grant rate during the first eight months of the

Trump Administration, but it differs dramatically from the 85% grant rate in prior years.

> **2.**     *Compliance Discovery Reveals Ongoing Violations of the Preliminary*
> *Injunction*

Given the evidence that Defendants were continuing to violate the Parole Directive,

Plaintiffs moved for limited discovery on the issue of preliminary-injunction compliance.  On

October 22, 2018, the Court granted Plaintiffs' request, finding that Plaintiffs "raised significant

questions of noncompliance."  Mem. Op., ECF No. 52, at 5.  The Court ordered, *inter alia*, that

the Los Angeles Field Office and the other field offices each produce a witness able to testify about

steps taken by the relevant field office to comply with the preliminary injunction and the Parole

Directive.  *See* Order, ECF No. 51.

The Los Angeles Field Office designated Assistant Field Office Director Gabriel Anthony

Valdez as its witness.  At his deposition on December 7, 2018, Valdez testified that the Los

Angeles Field Office had made **no** changes to its parole-review process since the preliminary

injunction issued.  When asked whether there has been "any change in the way the Los Angeles Field Office has conducted parole determinations since the preliminary injunction," Valdez said "**No**."  *See* Ex. C at 133:8–11 (emphasis added).  When asked whether there were "any changes to the factors to be considered in parole determinations after the preliminary injunction," Valdez again said "**No**."  *See id.* at 159:17–160:18 (emphasis added).  Valdez also admitted that he and his field office had provided no training to staff on the requirements of the preliminary injunction. *See id.* at 66:2–10.  Remarkably, far from implementing any changes to comply with the preliminary injunction, Valdez testified that, after the preliminary injunction issued, he told his staff handling parole determinations to "**[d]o what you always do.**" *Id.* at 66:11–67:16 (emphasis added).[3]

In addition to testifying that the Los Angeles Field Office has made no changes to its practices, Valdez confirmed the Office's continuing application of parole-review practices that clearly violate the Parole Directive and the Court's preliminary injunction.  Valdez admitted that the Field Office categorically denies parole to asylum seekers who elude immigration controls when entering the United States or use falsified documents, even though asylum seekers must often do this to escape persecution at home.  *See id.* at 195:17–196:22.  Valdez also acknowledged that the Los Angeles Field Office categorically denies parole requests from asylum seekers who do not present original identity documents.  *See id.* at 177:1-4.

---

[3] Valdez also confirmed that the Los Angeles Field Office has made no changes in a host of other areas since the preliminary injunction issued.  It has not changed its practices concerning when alternatives to detention or bond are considered or used, *see id.* at 160:19–161:2.  It has not changed its practices regarding how supervisors review parole determinations by line officers.  *See id.* at 162:12–16.  And it has not changed its practices concerning how the Field Office notifies parole applicants of their parole determinations.  *See id.* at 293:13–15.

Valdez likewise testified that he was not aware of any steps taken by the Los Angeles Field Officer Director to monitor and oversee the parole decision-making process and the Office's overall compliance with the Parole Directive, as the Directive requires. *See id.* at 300:13-301:5, 307:18–308:22.

Finally, Valdez could not explain why the Los Angeles Field Office's parole grant rate since the preliminary injunction issued remains dramatically below the 85% grant rate from earlier years, under the same Parole Directive it was ordered to follow. When asked why the precipitous drop occurred, Valdez responded "**I don't know**." *See id.* at 114:10-115:16 (emphasis added).

3.   *Defendants Refuse to Take Any Steps to Ensure Compliance with the Preliminary Injunction*

At a status conference on February 7, 2019, Plaintiffs raised concerns about the failure of the Los Angeles Field Office and the other field offices at issue in the case to comply with this Court's preliminary injunction order. *See* Ex. D, Hearing Tr. 12:8-20:24. The Court similarly raised concerns about Defendants' compliance, asking in particular for Defendants to explain why the Court should not be troubled when ICE's witnesses testified that **nothing had changed** since the preliminary injunction issued. *See id.* at 21:2-6, 22:10-23:7.

On February 25, 2019, following the status conference, the parties conferred about steps Defendants might take to address the Court's concerns. Plaintiffs requested that Defendants take the following specific steps to comply with the preliminary injunction: (1) provide training on the Parole Directive and the preliminary injunction for ICE personnel involved in the parole process, in accordance with paragraph 7.3(5) of the Parole Directive; (2) establish an ongoing quality assurance audit process to ensure compliance with all terms of the Parole Directive, in accordance with paragraphs 6.3, 7.2(3), 7.3(1), 8.11, and 8.12 of the Parole Directive; (3) when parole is denied, provide an individualized explanation of the reason(s) for such denial, in accordance with

paragraph 6.5 of the Parole Directive; and (4) appoint a compliance monitor to oversee appropriate implementation of these measures.  *See* Ex. E (Feb. 18, 2019 email from P. Levitz).

Defendants refused to take *any* of these steps in any field office.  Moreover, Defendants proposed no alternative measures to bring the field offices into compliance with the Parole Directive and the preliminary injunction.  On March 24, 2019, Defendants filed their monthly report reflecting parole grant rates since the preliminary injunction issued.  *See* Defs.' Status Report, March 2019, ECF No. 72, at 2.  As noted, the report reflects that the effective grant rate in Los Angeles since July remains just 11%.

## LEGAL STANDARD

Courts have "inherent power to enforce compliance with their lawful orders through civil contempt."  *Shillitani v. United States*, 384 U.S. 364, 370 (1966).  A party moving for civil contempt must prove by clear and convincing evidence that "(1) there was a [clear and unambiguous] court order in place; (2) the order required certain conduct by the defendant; and (3) the defendant failed to comply with that order."  *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 38 (D.D.C. 2010) (citations omitted).  When establishing non-compliance with the court order, the moving party need not demonstrate bad faith or intentional violations.  *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *National Labor Relations Board v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183 (D.C. Cir. 1981).

# ARGUMENT

## I.      THE LOS ANGELES FIELD OFFICE IS IN CONTEMPT OF THE PRELIMINARY INJUNCTION.

### A.      The Preliminary Injunction Imposes Clear and Unambiguous Requirements.

The Court's preliminary injunction order is clear and unambiguous.  It (1) requires individualized parole reviews for all class members "based on the specific facts of each provisional class member's case"; and (2) requires Defendants to provide class members with "parole determinations that conform to all of the substantive and procedural requirements of" the Parole Directive.  PI Order, ECF No. 33, ¶¶ 3-5.

### B.      The Los Angeles Field Office Is Not Complying with the Clear Requirements of the Preliminary Injunction Order.

#### 1.      *The Los Angeles Field Office Has Not Changed Its Parole Practices Since the Preliminary Injunction Issued; Nor Has Its Grant Rate Materially Changed.*

The Los Angeles Field Office is violating these clear requirements.  Notwithstanding the Court's holding that the Los Angeles Field Office is likely in violation of the Parole Directive, Assistant Field Office Director Valdez testified that the Field Office made no changes to its parole-review practices following the preliminary injunction.  *See supra* pp. 3-4.  To the contrary, office personnel were instructed to **"[d]o what you always do."**  Ex. C at 66:11-67:16 (emphasis added).

The Los Angeles Field Office's failure to modify its parole-review practices in response to the preliminary injunction constitutes civil contempt.  The court addressed a comparable situation in *Melendres v. Arpaio*, 2016 WL 2783715 (D. Ariz. May 13, 2016), *aff'd sub nom. Melendres v. Maricopa Cty.*, 897 F.3d 1217 (9th Cir. 2018).  There, the court held defendants in civil contempt because "[a]fter the preliminary injunction was entered, no changes were made to the [Maricopa County Sheriff's Office]'s active enforcement of immigration laws, nor to its policies, practices, or operations related to immigration enforcement."  *Id*. at *3.  The court relied on testimony that

"nothing at all changed about the way they conducted business after the Court order." *Id.* (internal quotation marks and citation omitted).  Similarly, in *Powell v. Ward*, 643 F.2d 924 (2d Cir. 1981), the court of appeals affirmed the district court's finding that defendants were in contempt where they "concede[d] that they made no effort to institute the procedures set forth in the [preliminary injunction] Order." *Id.* at 932-33.  Likewise, here, the Court should find that the Los Angeles Field Office's failure to make any changes in response to the preliminary injunction order constitutes civil contempt.

Parole data from Defendants' monthly status reports confirms that the Los Angeles Field Office is not complying with the preliminary injunction.  Defendants' most recent report shows that, since the Court issued the preliminary injunction, the Los Angeles Field Office has an effective parole grant rate of 11%.  *See* Defs.' Status Report, ECF No. 72, at 2.  That is dramatically below the 85% grant rate just a few years ago, and hardly changed from the 8% grant rate during the first eight months of the Trump Administration.  Declarations from legal practitioners in the Los Angeles Field Office confirm that asylum seekers with similar, or even stronger, parole applications than those of others who were granted parole before 2017 have routinely been denied parole since the preliminary injunction.  *See* Ex. F, Supplemental Declaration of Madelaine Behr, ¶¶ 4-5; Ex. G, Declaration of Joyce Noche, ¶¶ 6-7; Ex. H, Declaration of Monica Glicken, ¶¶ 6-8; *see also* Ex. I, Supplemental Declaration of Elizabeth Hercules-Paez, ¶¶ 3-7 (Los Angeles Field Office still denying parole to applicants who plainly qualify for parole under the Directive); Declaration of Rafael Reyneri, ECF No. 41-5, ¶¶ 4-5, 7-8 (similar); Declaration of Troy E. Elder, ECF No. 41-6, ¶¶ 4, 9 (similar).

A contempt order is appropriate where, as here, outcomes do not meaningfully change based on a court order to comply with the law, particularly when weighty interests — such as

Plaintiffs' interest in avoiding unlawful detention — are at stake. *See, e.g.*, *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 793-95 (1st Cir. 1982) (affirming finding that defendant was in contempt of consent decree requiring timely processing of applications for subsistence-level benefits, where rate of timely processing increased from 66.8% to 79% for one program and from 52.5% to 87% for another program after entry of consent decree).

### 2.   *The Los Angeles Field Office Continues to Violate Specific Requirements of the Parole Directive.*

Evidence from Defendants' own status reports and testimony also demonstrates that the Los Angeles Field Office continues to violate specific provisions of the Parole Directive and preliminary injunction order.

*First*, Defendants' latest status report reflects that some 73 class members — nearly a quarter of all class members in the Los Angeles Field Office — have not received *any* parole determination, in many cases after being detained for months. *See* Defs.' Status Report, March 2019, ECF No. 72, at 2 & ECF No. 75-3; Ex. B, Watson Decl. ¶ 8.  This ongoing detention without a parole determination plainly violates the preliminary injunction requirement that all provisional class members receive parole determinations. *See* PI Order, ECF No. 33, ¶ 5.  It also violates the specific Parole Directive requirement that class members normally "must" have a parole interview "no later than seven days" following a credible fear finding, and "shall" receive "[w]ritten notifications of parole decisions . . . within seven days" of the parole interview. Ex. A, §§ 6.6, 8.2.

*Second*, the Los Angeles Field Office categorically denies parole to asylum seekers based on manner of entry into the United States.  Assistant Field Office Director Valdez testified that attempts to "elude immigration controls" when entering the United States "will result in flight risk with no ability to mitigate" and that "[t]hose are absolutes for us." Ex. C at 195:17–196:22. Valdez further testified that the Los Angeles Field Office categorically denies parole to anyone who

"use[d] falsified documents in an attempt to enter the U.S." *Id.*[4]  Both the Parole Directive and the preliminary injunction, however, expressly require Defendants to conduct "individualized determinations of flight risk and danger" for each class member, and forbid such categorical practices. *See* PI Order, ECF No. 33, at 1; PI Mem. Op., ECF No. 34, at 34-35; Ex. A, § 6.2.

*Third*, the Los Angeles Field Office categorically denies parole to asylum seekers who do not provide original documentation to establish their identities. *See* Ex. C at 177:1-4.  This violates section 8.3(1)(d)-(e) of the Parole Directive, which expressly permits asylum seekers to establish their identities *without* original documentation. Ex. A, § 8.3(1)(d)-(e); *see also id.*, § 8.3(1)(a) (recognizing that "many individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation").

*Fourth*, the Los Angeles Field Office continues to use the same boilerplate forms it used before the preliminary injunction issued to inform asylum seekers of parole denials, even though those forms do not explain why the asylum seeker has been denied parole. *See, e.g.*, Ex. C at 293:13–15.  This violates the Parole Directive's requirement that ICE provide in writing a "brief explanation of the reasons for any decision to deny parole." Ex. A, § 6.5.[5]

*Fifth*, the Los Angeles Field Office is not conducting the oversight and monitoring of compliance required by several sections of the Parole Directive.  Assistant Field Office Director

---

[4] *Compare Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) ("When a petitioner who fears deportation to his country of origin uses false documentation . . . in order to gain entry to a safe haven, that deception does not detract from but supports his claim of fear of persecution."); *Huang v. I.N.S.*, 436 F.3d 89, 100 (2d Cir. 2006) (similar).

[5] Defendants have claimed that the checkboxes they provide for "identity," "flight risk," and "dangerousness" are sufficient to meet the Parole Directive's requirement. *See* Joint Status Report, ECF No. 60, at 10.  These checkboxes, however, only identify purported "reasons" for denials; they do not provide the requisite "*explanation of* the reasons." Ex. A, Parole Directive, § 6.5 (emphasis added).  Further, these form denial letters offer virtually no information to an applicant who wants to request a redetermination. *See id.*

Valdez testified that he was unaware of *any* efforts by ICE to oversee the parole-decision process in Los Angeles or ensure considered, consistent parole decision-making and recordkeeping, as required by Parole Directive §§ 7.1-7.2. *See* Ex. C at 307:18–308:22. Valdez also testified that he was unaware of any systematic quality assurance process at the Los Angeles Field Office. He instead recalled only sporadic "times when the field office director has had deputy field office directors come out to my office and help review some of the paroles just so they remain familiar with it," and not since at least 2016 — well before the preliminary injunction. *Id.* at 300:13–301:5. This violates various provisions of the Parole Directive that mandate implementation of quality assurance processes. *See* Ex. A, §§ 6.3, 7.2(3), 7.3(1), 8.11, 8.12.

Because the Los Angeles Field Office has taken no steps to comply with the preliminary injunction and continues to violate clear substantive and procedural requirements of the injunction and the Parole Directive, the Court should find that it is in contempt.

## II.  THE COURT SHOULD ORDER TARGETED REMEDIAL MEASURES TO ADDRESS THE LOS ANGELES FIELD OFFICE'S CONTEMPT.

Civil contempt "is characterized as remedial in nature, [and is] used to obtain compliance with a court order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 29 (D.D.C. 2014) (internal citations omitted). Courts have "wide discretion" in imposing appropriate sanctions to assure compliance. *Id.* at 36 (internal quotation marks and citation omitted). Plaintiffs respectfully submit that the following targeted remedial measures (many required by the Parole Directive itself) should be imposed here to bring the Los Angeles Field Office into compliance with the preliminary injunction order and the Parole Directive.

### **<u>Training</u>**

First, the Los Angeles Field Office must provide formal training to all personnel involved in the parole process on how to conduct parole determinations consistent with the preliminary

injunction and the Parole Directive.   The Parole Directive requires field office directors to "[e]nsur[e] that [E]RO field personnel .  .  . assigned to make parole determinations are familiar with this directive and corresponding legal authorities." Ex. A, § 7.3(5).  Assistant Field Office Director Valdez testified, however, that the Los Angeles Field Office has taken no steps to provide training to staff on the requirements of the preliminary injunction.  *See* Ex. C at 66:2–10.  This Court should order that the Field Office provide training, as required by the Directive.  Indeed, even without a specific training requirement like that contained in the Directive, courts have ordered training as an appropriate remedy for civil contempt.  *See, e.g.*, *Melendres v. Arpaio*, 2016 WL 3996453, at *1, 13-14 (D. Ariz. July 26, 2016), *aff'd sub nom. Melendres v. Maricopa Cty.*, 897 F.3d 1217 (9th Cir. 2018).

### Quality Assurance

Second, the Los Angeles Field Office must implement a quality assurance audit process to ensure full compliance with the Parole Directive.  The Parole Directive requires field offices to implement such quality assurance.  *See* Ex. A, § 8.11-8.12.  Assistant Field Office Director Valdez testified, however, that the Los Angeles Field Office has not implemented a regular quality assurance process, despite this requirement.  *See* Ex. C at 300:13-301:5.  It should be required to do so now.  Courts have imposed even more invasive auditing as a remedy for civil contempt.  *See, e.g.*, *Oil Chemical and Atomic Workers Int'l Union AFL-CII v. NLRB*, 547 F.2d 575, 596-97 (D.C. Cir. 1976) (ordering defendants to "[p]reserv[e] and mak[e] available to the [National Labor Relations] Board upon request, for examination and copying, all the Company's correspondence, books, records and other documents necessary or useful to determine the amounts due to make whole the employees").

### Individualized Explanations of Parole Decisions

Third, the Los Angeles Field Office must provide individualized explanations for parole denials beyond a checked box. As noted, section 6.5 of the Parole Directive requires that field offices "provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole." Ex. A, § 6.5. Without such an explanation, Plaintiffs have no means to verify whether the Los Angeles Field Office has actually considered their evidence on an individualized basis, or to learn the information necessary for an effective reconsideration request. Assistant Field Office Director Valdez testified, however, that the Los Angeles Field Office continues to use boilerplate forms for parole denials that do not explain why the asylum seeker has been denied parole. *See, e.g.*, Ex. C at 293:13–15. In light of this violation of section 6.5, the Court should require the Los Angeles Field Office to provide individualized *explanations* of the reason(s) for any parole denial — not just a checked box in a parole-denial letter.

### Appointment of a Special Master

Fourth, the Court should appoint a special master to oversee the implementation of the above measures and report to the Court concerning such implementation. The Los Angeles Field Office has refused to take action on its own to comply with the Parole Directive and the preliminary injunction. Instead, it has elected to continue without modification the very same practices that prompted the Court to enter a preliminary injunction. In these circumstances, it is appropriate for the Court to appoint an independent party to ensure compliance.

The Court has "inherent power" to appoint special masters "for the administration of justice when deemed by it essential." *In re Peterson*, 253 U.S. 300, 312 (1920). Consistent with this authority, courts have appointed special masters where a party has violated a court order, including

to ensure compliance with a preliminary injunction.  *See, e.g.*, *Nat'l Org. for the Reform of Marijuana Laws v. Mullen,* 828 F.2d 536 (9th Cir. 1987) (as remedy for contempt of preliminary injunction, court appointed special master to monitor compliance); *Powell v. Ward*, 487 F. Supp. 917, 935 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981) (same); *see also Blackman v. D.C.*, 185 F.R.D. 4, 7 (D.D.C. 1999) (appointing special master where "defendants' liability already has been established and the District cannot plausibly argue that it currently is in compliance").  The Court should likewise do so here.

Specifically, the Court should appoint a special master empowered to:

- Supervise the Los Angeles Field Office's training efforts, including developing and (as needed) attending or leading trainings, and setting and monitoring benchmarks for ensuring that all personnel involved in parole determinations are trained;

- Oversee development and implementation of quality assurance processes, including by assisting the Field Office in developing quality assurance metrics and receiving periodic reports on implementation of those metrics;

- Monitor the requirement of individualized explanations for parole denials, including through authority to (1) review class members' parole denials for consideration of the applicant's individual circumstances and sufficiency of explanations; and (2) require the Field Office to provide reconsiderations or further explanation where parole denials are deemed insufficient;

- Request and investigate documents in individual cases, including in cases in which parole determinations have not been issued; and

- Serve as an ombudsperson for local immigration providers to report potential violations of the preliminary injunction and Parole Directive.

14

The special master also should issue regular reports to the Court concerning the Los Angeles Field Office's compliance efforts, specifying what training has been provided to which personnel; the quality assurance measures planned and/or instituted and the results of such measures; and any other information the special master deems pertinent.[6]

## CONCLUSION

The Los Angeles Field Office admits that it has not changed the way it conducts parole determinations since the preliminary injunction issued.  The parole grant rate in Los Angeles remains dramatically lower than it was just a few years ago — a drop that the Field Office cannot justify or explain.  And the evidence reflects that the Los Angeles Field Office continues to violate specific important provisions of the Parole Directive.  As a result of these violations, hundreds of class members are suffering irreparable harm from unlawful detention.  The Court should thus hold the Los Angeles Field Office in contempt of the preliminary injunction order and impose the remedial measures outlined above.

---

[6] Should the Court determine not to appoint a special master at this time, Plaintiffs respectfully submit that the Los Angeles Field Office should be required to submit periodic reports directly to the Court concerning its compliance efforts.

Dated: April 11, 2019

Respectfully submitted,

/s/ Philip J. Levitz

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Hardy Vieux (D.C. Bar No. 474762)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692

Eleni Bakst
HUMAN RIGHTS FIRST
75 Broad Street, 31st floor
New York, NY 10004
(212) 845-5200

Leon Howard
Kristin Greer Love
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87104
(505) 266-5915, x1007

Dennis B. Auerbach (D.C. Bar No. 418982)
Philip J. Levitz (D.C. Bar No. 1018430)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

Eunice Lee
Blaine Bookey
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA
915 15th Street, NW, 2nd floor
Washington, D.C. 20005-2302
(202) 457-0800

Farrin R. Anello
Edward Barocas
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
P.O. Box 32159
Newark, NJ 07102
(973) 642-2084

Witold J. Walczak
Golnaz Fakhimi
ACLU OF PENNSYLVANIA
247 Ft. Pitt Blvd., 2nd floor
Pittsburgh, PA 15222
(412) 681-7864

Edgar Saldivar
Andre Segura
ACLU FOUNDATION OF TEXAS, INC.
1500 McGowen, Suite 250
Houston, TX 77004
(713) 942-8146 x111

Freda J. Levenson
ACLU OF OHIO
4506 Chester Ave.
Cleveland, OH 44103
(216) 472-2220

Ahilan T. Arulanantham
Sameer Ahmed
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232

## CERTIFICATE OF SERVICE

I certify that, on April 11, 2019, I electronically transmitted the attached motion and accompanying exhibits using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants for this case.

Date: April 11, 2019                              Signed:    /s/ Philip J. Levitz
                                                             Philip J. Levitz
                                                             COVINGTON & BURLING LLP
                                                             One CityCenter
                                                             850 Tenth St., N.W.
                                                             Washington, D.C. 20001–4956
                                                             (202) 662-6000