**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANSLY DAMUS, *et al.*, on behalf of themselves and others similarly situated, ) ) ) ) *Plaintiffs,* ) ) *v.* ) ) KEVIN McALEENAN, Acting Secretary of the Department of Homeland Security, in his official capacity, *et al.*, ) ) ) ) ) *Defendants.* ) ) | Civil Action No.  1:18-cv-00578 (JEB) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Dennis B. Auerbach (D.C. Bar No. 418982)
Andrew E. Siegel (D.C. 1029365)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

*Additional counsel listed at end of memorandum*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I.  UNDISPUTED FACTUAL BACKGROUND ................................................................ 3

    A.  Legal Framework Governing Parole Decisions .................................................... 3

        1.  The Immigration and Nationality Act ("INA") and Implementing Regulations .......... 3

        2.  The Parole Directive ............................................................................... 4

    B.  Unlawful Detention of Virtually All Asylum Seekers at the Five ICE Field Offices ........ 6

    C.  Violation of Procedural Requirements of the Parole Directive ......................................... 7

    D.  Application of Unlawful Detention Policies to Plaintiffs .................................................. 8

    E.  The Preliminary Injunction ................................................................................. 9

II.  LEGAL STANDARD ....................................................................................................... 10

III. ARGUMENT .................................................................................................................... 10

    A.  Defendants' Violations of the Parole Directive Are Contrary to Law Under the APA.... 10

        1.  The Parole Directive Imposes Binding Obligations on the Government. .................. 11

        2.  Defendants Have Violated the Parole Directive. ......................................................... 14

    B.  All Other Requirements of the APA Are Satisfied. ......................................................... 16

        1.  Defendants' Violations of the Parole Directive Constitute Final Agency Action. ...... 16

        2.  Plaintiffs Have No Adequate Remedy. ....................................................................... 18

        3.  There Is No Statutory Bar to Review or a Commitment to Agency Discretion. ........ 19

IV. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE
    RELIEF. ............................................................................................................................ 20

    A.  Classwide Relief Is Necessary and Appropriate. ............................................................. 21

V.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR INJUNCTIVE
    RELIEF ............................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ............................................................................................................. 18

*Abdi v. Duke*,
   280 F. Supp. 3d 373, 386 (W.D.N.Y. 2017) ......................................................... 11, 14, 19, 21

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ...................................................................................................... 2, 11

*Appalachian Power Co. v. E.P.A.*,
   208 F.3d 1015 (D.C. Cir. 2000) ............................................................................................ 17

*Aracely, R. v. Nielsen*,
   319 F. Supp. 3d 110 (D.D.C. 2018) .......................................................................... 11, 14, 19

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................... 16, 17

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) .......................................................................................................... 18

*Bowen v. Michigan Academy of Family Physicians*,
   476 U.S. 667 (1986) .......................................................................................................... 19

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ....................................................................................... 20, 21

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
   637 F.3d 408 (D.C. Cir. 2011) ............................................................................................. 17

*DL v. District of Columbia*,
   713 F.3d 120 (D.C. Cir. 2013) ............................................................................................. 22

*DL v. District of Columbia*,
   860 F.3d 713 (D.C. Cir. 2017) ............................................................................................. 23

*Darby v. Cisneros*,
   509 U.S. 137 (1993) .......................................................................................................... 18

*Doe v. Hampton*,
   566 F.2d 265 (D.C. Cir. 1977) ............................................................................................. 11

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*,
  396 F.3d 1265 (D.C. Cir. 2005) ......................................................................18

*Fund for Animals v. Williams*,
  391 F. Supp. 2d 191 (D.D.C. 2005) ................................................................16

*Gen. Tel. Co. v. Falcon*,
  457 U.S. 1476 (1982) .....................................................................................22

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .........................................................................24

*Hispanic Affairs Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) .......................................................................16

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012) .......................................................................16

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
  213 F.3d 124 (3d Cir. 2000)............................................................................23

*INS v. St. Cyr*,
  533 U.S. 289 (2001).......................................................................................19

*Jefferson v. Harris*,
  2018 WL 324209 (D.D.C. Jan. 5, 2018) ...................................................2, 11, 12

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018).....................................................................................18

*Lightfoot v. District of Columbia*,
  273 F.R.D. 314 (D.D.C. 2011).........................................................................23

*Lopez v. FAA*,
  318 F.3d 242 (D.C. Cir. 2003) .......................................................................12

*Mass. Fair Share v. Law Enforcement Assistance Admin.*,
  758 F.2d 708 (D.C. Cir. 1985) .................................................................11, 12

*Morton v. Ruiz*,
  415 U.S. 199 (1974).................................................................................11, 12

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009).....................................................................24

*Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*,
  120 F. Supp. 2d 33 (D.D.C. 2000) .................................................................10

*O'Donnell Const. Co. v. District of Columbia*,
   963 F.2d 420 (D.C. Cir. 1992) ................................................................................24

*Pharm. Research & Manufacturers of Am. v. United States Dep't of Health & Human Servs.*,
   138 F. Supp. 3d 31, 46 (D.D.C. 2015) ...................................................................18

*R.I.L-R. v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ................................................18, 20, 21, 24

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) ..................................................................................19

*Seretse-Khama v. Ashcroft*,
   215 F. Supp. 2d 37 (D.D.C. 2002) .........................................................................24

*Steenholdt v. FAA*,
   314 F.3d 633 (D.C. Cir. 2003) ...........................................................................2, 11

*Twelve John Does v. District of Columbia*,
   117 F.3d 571 (D.C. Cir. 1997) ...............................................................................22

*United States v. Bogle*,
   855 F.2d 707 (11th Cir. 1988) ...............................................................................20

*United Student Aid Funds, Inc. v. Devos*,
   237 F. Supp. 3d 1, 4 (D.D.C. 2017) .......................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................................................22

*Washington Legal Found. v. Kessler*,
   880 F. Supp. 26 (D.D.C. 1995) ...............................................................................17

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985) ...............................................................................20

**Statutes**

5 U.S.C. §§ 701(a), 704 ..............................................................................................16

5 U.S.C. § 706(2)(A) ............................................................................................10, 11

8 U.S.C. § 1182(d)(5)(A) ..............................................................................................4

8 U.S.C. § 1225(b)(1)(B)(v) .........................................................................................3

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ..............................25

**Other Authorities**

8 C.F.R. § 208.30(f) ................................................................................................................3

8 C.F.R. § 212.5(b) ............................................................................................................4, 12

8 C.F.R. § 235.3(c) ................................................................................................................4

Fed. R. Civ. P. 23 ................................................................................................................22

Fed. R. Civ. P. 23(b)(2) ........................................................................................................23

Fed. R. Civ. P. 56(a) ............................................................................................................10

Fed. R. Evid. 801(d)(2)(D) ....................................................................................................15

Mark Noferi, *A Humane Approach Can Work: The Effectiveness of Alternatives to
    Detention for Asylum Seekers* (July 2015) ................................................................6

## INTRODUCTION

The U.S. Department of Homeland Security ("DHS") has unlawfully detained asylum seekers at five U.S. Immigration and Customs Enforcement ("ICE") Field Offices across the country, causing irreparable injury. The Court entered a preliminary injunction in July 2018 prohibiting this unlawful detention. ECF No. 33. The facts on which the Court based its decision are not disputed and nothing has happened since the preliminary issued to warrant a different result. Accordingly, the Court should now enter summary judgment for Plaintiffs and convert the preliminary injunction into a permanent one.

As the Court recognized in granting preliminary relief, the "raw numbers" in this case are "irrefutable." Preliminary Injunction Opinion ("PI Op."), ECF No. 34, at 31. Between 2011 and 2013, the five ICE Field Offices released asylum seekers on parole in more than 90% of cases. *See* Statement of Undisputed Facts ("SUF") ¶ 6. They did so pursuant to a "Parole Directive" issued by the DHS in 2009, which governs how ICE Field Offices should adjudicate parole claims by asylum seekers. ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, ¶ 4.4 (Dec. 8, 2009). The Directive provides that, absent exceptional overriding factors, an asylum seeker who has established a credible fear of persecution "should" be granted parole in the "public interest" and released from detention while pursuing his or her asylum claim, so long as the individual establishes his or her identity and presents neither a flight risk nor danger to the community. Parole Directive ¶ 6.2. Defendants themselves acknowledge that the Parole Directive "certainly envisions case by case determinations that will result in parole." *See* PI Op. at 33 (emphasis added) (citing transcript of hearing dated May 17, 2018 (ECF No. 32-1) at 20:23-24). And that is precisely what occurred from 2011 to 2013 in the overwhelming majority of cases.

The Parole Directive remains in effect, without amendment. *See* SUF ¶ 7. Yet in 2017 a seismic shift occurred: the parole-grant rate at the five ICE Field Offices ***plummeted from 92% to zero or near zero***. Defendants offer no viable explanation for these "irrefutable" numbers, nor could they. There is no evidence that the characteristics of asylum seekers suddenly changed, such that virtually all were a flight risk or danger to the community in 2017, while virtually none were in prior years. In fact, undisputed testimony from immigration practitioners in the relevant jurisdictions is directly to the contrary. Testimony from practitioners further establishes that similarly situated asylum seekers who were routinely ***granted*** parole in prior years were ***denied*** parole under the new regime. *See id.* ¶ 12.

By denying parole in virtually every case, the five ICE Field Offices effectively ceased to follow the Parole Directive. That contravenes the "*Accardi* Doctrine": that "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions." *Jefferson v. Harris*, 2018 WL 324209, at *6 (D.D.C. Jan. 5, 2018) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)); *accord Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003). Instead of reviewing each parole claim "based on the facts of the individual alien's case" (Parole Directive ¶ 6.2) and generally granting parole in the "public interest," as the Parole Directive mandates (and as the Field Offices did between 2011 and 2013), the Field Offices instead embarked on a de facto policy of denying parole in all but a handful of instances. As the Court recognized in granting a preliminary injunction, the Parole Directive became "honored more in the breach than the observance." PI Op. at 2.

This breach should be permanently enjoined. It is "no great judicial leap" to mandate that Defendants provide the protections of the Parole Directive to "those entering our country —

individuals who have fled violence and persecution to seek safety on our shores." PI Op. at 38. By entering summary judgment and imposing a permanent injunction, the Court will be "simply ordering that Defendants do what they already admit is required – follow the [Parole] Directive when adjudicating asylum seekers' detention." *Id*. at 37-38.  Plaintiffs' motion should thus be granted.[1]

# I.    UNDISPUTED FACTUAL BACKGROUND

## A.    Legal Framework Governing Parole Decisions

### 1.    *The Immigration and Nationality Act ("INA") and Implementing Regulations*

A person who requests asylum at a port of entry to the United States must demonstrate a credible fear of persecution in his or her home country—meaning there is a "significant possibility" that the individual is eligible for asylum—during an interview with an immigration officer.  8 U.S.C. § 1225(b)(1)(B)(v).  If an individual establishes a credible fear of persecution, he or she is entitled to a hearing before an immigration judge to adjudicate the asylum claim. *See id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

The time from a detained asylum seeker's credible fear interview with an immigration officer to a decision on his or her asylum claim by an immigration judge is typically several months.  *See* SUF ¶¶ 2.  If either the asylum seeker or DHS appeals the immigration judge's asylum decision to the Board of Immigration Appeals or a federal court of appeals, the process can take longer than a year.  *See id.*

---

[1] Because Plaintiffs are entitled to summary judgment based on Defendants' violations of the Parole Directive (Count I of the Complaint), the Court need not at this stage reach whether Plaintiffs would also be entitled to summary judgment on the other counts.  Plaintiffs reserve the right to seek summary judgment on the remaining counts should this Court deny Plaintiffs' motion on Count I.

While the asylum seeker's claim is being decided, DHS must determine whether the individual should be detained or released pending resolution of the asylum claim. Pursuant to the INA, the Secretary of DHS "may . . . in his discretion parole into the United States" "any alien applying for admission to the United States," including any asylum seeker, "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The INA's implementing regulations similarly provide that DHS must exercise its parole discretion on a "case-by-case basis" and that it may parole arriving aliens who "present neither a security risk nor a risk of absconding" and "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

### 2.    *The Parole Directive*

In 2009, DHS issued the Parole Directive. The Parole Directive defines circumstances under which there is a "public interest" in granting parole pursuant to the INA and implementing regulations. *See* PI Op. at 3-4 ("The Directive explains the agency's interpretation of 'public benefit'"). "[T]he Directive sets out a series of procedures ICE *must* undertake to determine whether a given asylum seeker should be granted parole[.]" *Id*. at 4 (emphasis added) (Parole Directive "establishes certain minimum procedures and processes that are to be utilized in making these determinations"). The Directive provides that, absent exceptional overriding factors, an asylum seeker who has established a credible fear of persecution "should" be granted parole in the "public interest" and released from detention while pursuing his or her asylum claim, so long as the individual establishes his or her identity and presents neither a flight risk nor danger to the community. Parole Directive ¶ 6.2. In considering parole applications, the Directive requires that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." *Id.*

The Parole Directive also sets out a number of procedural requirements for DHS's adjudication of parole applications.  These include that the agency must:

- Provide arriving noncitizens with notice of their right to seek parole, which "shall be explained . . . in a language they understand," *id.* ¶ 6.1;

- Conduct a parole interview within "seven days following a finding that an arriving [noncitizen] has a credible fear," *id.* ¶ 8.2;

- Provide written notification of the parole decision that contains "a brief explanation of the reasons for any decision to deny parole" within seven days of the interview, *id.* ¶ 6.5; *see also id.* ¶¶ 6.6, 8.4;

- Notify applicants whose applications are denied that they may request a redetermination, *see id.* ¶ 8.2;

- "Review all relevant documentation offered" by the asylum seeker, as well as "any other information available," in determining identity, *id.* ¶ 8.3.1.b;

- "[C]onsider whether setting a reasonable bond and/or" an alternative to detention program would mitigate any flight risk concerns, *id.* ¶ 8.3.2.c; and

- Engage in supervisory review of individual officers' decisions, *see id.* ¶ 8.5-8.6.

In past years, the five ICE Field Offices applied the Parole Directive to grant parole to thousands of asylum seekers with credible fears of persecution, based on individualized findings that their detention was unnecessary and contrary to the public interest as defined by the Directive.  For example, as noted, between 2011 and 2013, the Field Offices paroled 92% of

arriving asylum seekers pursuant to the Directive.  *See* SUF ¶ 6.[2]  This is not surprising: the overwhelming majority of asylum seekers who establish a credible fear lack any criminal history; pose no threat to public safety; and do not need to be detained to ensure their appearance for court proceedings.[3]

**B.      Unlawful Detention of Virtually All Asylum Seekers at the Five ICE Field Offices**

In February 2017, then-DHS Secretary John Kelly affirmed that the Parole Directive "remain[s] in full force and effect," pending the DHS Secretary's "further review and evaluation."  SUF ¶ 9.  At the same time, however, Secretary Kelly and other Trump Administration officials expressed their intent to end the practice they referred to as "catch and release," i.e., the practice in which asylum seekers are generally released from detention while they await their asylum hearings before an Immigration Court.  *Id.*  Consistent with this aim, ICE's Executive Associate Director issued a memorandum to officers in the field on February 21, 2017, stating that parole should be granted "sparingly."  *Id.*

Thereafter, the Parole Directive was "honored more in the breach than the observance." PI Op. at 2.  According to ICE data, from February to September 2017 — the data most recently available before the preliminary injunction issued, the five ICE Field Offices, in the aggregate, denied more than 96% of parole requests — a 180-degree reversal from what transpired between 2011 and 2013.  *See* SUF ¶¶ 10-11.  Specifically, the El Paso Field Office denied 349 of 349

---

[2] Plaintiffs do not have access to parole data for 2010, the first year the Parole Directive was in effect.  *See* Parole Directive (effective January 4, 2010).

[3] *See, e.g.*, Mark Noferi, *A Humane Approach Can Work: The Effectiveness of Alternatives to Detention for Asylum Seekers* at 1, 3 (July 2015), https://www.americanimmigrationcouncil.org/ sites/default/files/research/a_humane_approach_can_work_the_effectiveness_of_alternatives_to _detention_for_asylum_seekers.pdf (summarizing research showing that asylum seekers are likely to comply with legal processes).

parole requests — 100% of cases; the Philadelphia Field Office denied 43 of 43 parole requests —also 100% of cases; the Newark Field Office denied 10 of 10 parole requests —  again 100% of cases; the Detroit Field Office denied 63 of 64 parole requests — 98% of cases; and the Los Angeles Office denied 326 of 354 parole requests — 92% of cases.  *See* SUF ¶ 11.

Legal services providers confirm that the Field Offices effectively stopped granting parole.  *See* SUF ¶ 13.  Indeed, ICE officers in the Field Offices told some practitioners that "there is no more parole" for arriving asylum seekers and that such individuals "should not even bother to submit a parole request because ICE ha[s] to deny all parole requests."  *Id.*

There is no evidence that the characteristics of asylum seekers as a group substantially changed between 2011-13 and 2017.  For example, there is no evidence that asylum seekers suddenly became greater flight risks than was the case in prior years.  In fact, asylum seekers were denied parole during the first eight months of the Trump Administration, despite the fact that similarly situated individuals were routinely granted parole in earlier years.  *See* SUF ¶ 12. Some asylum seekers were even denied parole in 2017, despite having ***stronger*** parole claims than those of asylum seekers who were granted parole in prior years.  *See id.*

### C.    Violation of Procedural Requirements of the Parole Directive

In addition to unlawfully ceasing to grant parole in virtually all cases, the five ICE Field Offices also failed to follow the procedural requirements of the Parole Directive.  For instance, asylum seekers routinely were not notified of the availability of parole, in violation of section 6.1 of the Parole Directive.  *See* SUF ¶ 16.  When notification was provided, the ICE officer often did not "explain the contents of the notification to the [asylum seeker] in a language he or she understands," as required by section 8.1 of the Parole Directive.  *Id.*  Some asylum seekers were

denied parole without a meaningful opportunity to provide information in support of their requests. *See* SUF ¶ 16.

Many asylum seekers also were not given parole interviews within seven days of passing a credible fear screening, in violation of section 8.2 of the Directive. *See* SUF ¶ 17. Some were not interviewed at all before their parole requests were denied. *See id.* And the ICE Field Offices routinely failed to provide asylum seekers denied parole with "a brief explanation of the reasons for denying parole," as required by sections 6.5, 6.6 and 8.2 of the Parole Directive. *See* SUF ¶¶ 18-19.

### D.    Application of Unlawful Detention Policies to Plaintiffs

Plaintiffs are asylum seekers who came to the United States fleeing grave persecution or the threat of death and were found to have a credible fear of persecution. *See* SUF ¶ 1. Yet DHS imprisoned all Plaintiffs and many others like them, continuing to hold them during the pendency of their asylum cases, with no bona fide individualized reviews of whether such detention was necessary. *See id.*

For example, Ansly Damus came to the United States seeking asylum from political persecution in Haiti. *See* SUF ¶ 21. After Mr. Damus spoke in a seminar about a local government official who used armed gangs to intimidate the population, members of one of these armed gangs attacked him, accused him of telling his students to vote against the government official, and threatened to kill him. *See id.* Mr. Damus came to the United States in October 2016, and an asylum officer found he had a credible fear of persecution. *See id.* ¶ 22.

Before finally being released after the preliminary injunction issued, Mr. Damus was detained by ICE for over two years. *See id.* ¶ 23. He submitted two parole requests, which included ample evidence of his identity, his lack of flight risk, and lack of danger. *See id.* ¶ 25.

To establish his identity, Mr. Damus submitted copies of his birth certificate, marriage certificate, Haitian identification card, a valid and unexpired passport, his school diplomas and school certification, and a letter of support from his sponsor attesting to his identity. *See id.* His parole requests explained that he had sponsors who he could live with and would support him if he were released, confirming that he is not a flight risk. *See id.* And the requests explained that Mr. Damus is a former ethics teacher with no criminal record. *See id.* Yet the Detroit ICE Field Office repeatedly denied his parole requests without providing any explanation. *See id.* ¶ 26.

The other named Plaintiffs also experienced grave persecution before coming to the United States. Abelardo Asensio Callol left Cuba due to oppression at the hands of the Cuban government, after he refused to join the Communist Party and attend a rally held in memory of Fidel Castro. *See* SUF ¶ 27. Alexi Ismael Montes Castro sought asylum in the United States after fleeing assault and threats at gunpoint in Honduras because he is gay. *Id.* N.J.J.R. came to the United States after beatings and threats from armed groups that seek to eliminate opposition to the Venezuelan government. *See id.* L.H.A. and E.E.C.S. fled persecution from notoriously violent Salvadoran gangs, which the government cannot or will not control. *See id.* H.A.Y., A.M.M., and L.I.L.M. fled dangerous criminal cartels in Mexico. *See id.* Like Mr. Damus, the other Plaintiffs submitted parole requests with evidence demonstrating that they satisfied the Parole Directive's criteria. Yet all were denied parole and imprisoned, with no meaningful explanation. *See id.* ¶ 28.

### E. The Preliminary Injunction

The Court entered a class-wide preliminary injunction on July 2, 2018. The Court found that "the numbers here are irrefutable" and reflected that the individualized parole reviews required by the Parole Directive "are likely no longer par for the course." PI Op. at 31, 35. The

Court further determined that Plaintiffs faced irreparable harm from their continued unlawful detention.  *See id*. at 37.  The Court stated that "[h]aving extended the safeguards of the Parole Directive to asylum seekers, ICE must now ensure that such protections are realized."  *Id*. at 2.  The Court accordingly enjoined Defendants "from denying parole to any provisional class members absent an individualized determination, through the parole process, that such provisional class member presents a flight risk or a danger to the community; required that "[t]he individualized determinations of flight risk and danger to the community . . . be based on the specific facts of each provisional class member's case" and not on "categorical criteria applicable to all provisional class members;" and mandated that Defendants "shall provide provisional class members with parole determinations that conform to all of the substantive and procedural requirements of [the Parole Directive]."  ECF No. 33.

## II.     LEGAL STANDARD

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Moreover, summary judgment on a request for injunctive relief is appropriate where the undisputed evidence establishes that (a) plaintiff is entitled to relief on the merits; (b) plaintiff will suffer irreparable harm absent an injunction; (3) the balance of hardship tips in favor of the plaintiff if an injunction is not granted; and (4) the public interest lies in granting an injunction. *See Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 44 (D.D.C. 2000).  That is the case here.

## III.    ARGUMENT

### A.     Defendants' Violations of the Parole Directive Are Contrary to Law Under the APA.

Defendants' conduct violates the Parole Directive.  It should thus be "set aside" as "not in

accordance with law" under the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A).

       1.    *The Parole Directive Imposes Binding Obligations on the Government.*

"The *Accardi* doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions."  *Steenholdt*, 314 F.3d at 639 (D.C. Cir. 2003); *accord Jefferson*, 2018 WL 324209, at *6 ("government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions") (citing *Accardi*, 347 U.S. at 267-68); *Abdi v. Duke*, 280 F. Supp. 3d 373, 386 (W.D.N.Y. 2017). In particular, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Jefferson*, 2018 WL 324209, at *6 ("interference with regulations that seek to safeguard plaintiff's individual rights implicates the *Accardi* doctrine and its requirement that agencies abide by their own procedures").  The court in *Abdi* specifically held that a violation of the Parole Directive implicates the *Accardi* doctrine because it "pertains to individual rights" — even though the Parole Directive constitutes an "internal policy."  280 F. Supp. 3d at 389; *accord Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 150-53 (D.D.C. 2018) ("The [Parole] Directive's provisions make clear that it governs the rights of [port of entry] asylum seekers requesting parole, and therefore that it can support an APA claim under [*Accardi*].").

The requirement that an agency follow its own directives is not "limited to rules attaining the status of formal regulations."  *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985); *accord Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977). Rather, even an unpublished manual or policy binds the agency if "an examination of the provision's language, its context, and any available extrinsic evidence" supports the conclusion that it is "mandatory rather than merely precatory."  *Doe*, 566 F.2d at 281; *see also Mass. Fair*

*Share*, 758 F.2d at 711-12 (invalidating agency action that violated the "highly-refined procedures for treatment of applications for grants" found in internal program documents); *Jefferson*, 2018 WL 324209, at *6 (plaintiff pleaded valid *Accardi* claim based on agency violations of its "policies[,]" "regulations[,] and guidelines"). Again, this is particularly so "[w]here the rights of individuals are affected," *Morton*, 415 U.S. at 235, and where the guidance provides one of "the only safeguard[s] . . . against unlimited agency discretion," *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

The Parole Directive is binding on DHS under this standard. DHS itself refers to it as a "directive." *See, e.g.*, Parole Directive ¶ 1 ("The purpose of this ICE policy *directive* is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States" (emphasis added)). Consistent with its status as a "directive," the Parole Directive imposes numerous substantive and procedural obligations on DHS and ICE, many of which affect the "rights of individuals." *Morton*, 415 U.S. at 235. Most importantly, the Parole Directive "explain[s] how the term ['public interest' in 8 C.F.R. § 212.5(b)] is to be interpreted by [DHS] when it decides whether to parole arriving aliens." Parole Directive ¶ 4.4. In doing so, the Directive instructs that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." *Id*. ¶ 6.2. Moreover, if a noncitizen "establishes to the satisfaction of [DHS] his or her identity and that he or she presents neither a flight risk nor danger to the community, [DHS] should, absent additional factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." *Id.*

As noted, the Parole Directive also mandates that DHS "shall" follow a number of procedures in making parole decisions, such as the requirement that its officers inform asylum

seekers of the availability of parole in a language they understand. *Id.* ¶ 6.1; *see also supra* pp. 5-6. All of the referenced substantive and procedural provisions impose obligations on the agency that it is bound to follow, and that affect whether or not individuals will continue to be deprived of their liberty.

The Government itself has confirmed that the Parole Directive imposes meaningful constraints on how DHS adjudicates parole requests. The Government represented to the Supreme Court in 2017 that the Parole Directive requires DHS to "automatically consider parole for arriving aliens found to have a credible fear, and to release the alien if he establishes his identity, demonstrates that he is not a flight risk or danger, and there are no countervailing considerations." Pet. Suppl. Reply Br., *Jennings v. Rodriguez*, No. 15-1204, 2017 WL 727754, at *6 (U.S. filed Feb. 21, 2017). The Government further represented to the Supreme Court that the Directive requires a parole review that "calls for far more than 'checking a box on a form,'" and specifically "provides for notice to the alien, an interview, the opportunity to respond and present evidence," and other procedural requirements. *Id.* The Government additionally told the Supreme Court that the Parole Directive provides critical safeguards against the arbitrary detention of arriving asylum seekers and that it remains "in full force and effect." *Id.* at *6 n.2.

Defendants previously have cited to boilerplate language in the Parole Directive stating that the Directive is not intended to create enforceable substantive or procedural rights. *See* Parole Directive ¶ 10. The Court, however, specifically rejected that argument in its preliminary-injunction ruling, and it should do so again here. As the Court recognized in granting preliminary relief (*see* PI Op. at 29), Defendants themselves conceded at the preliminary-injunction hearing that "the Parole Directive creates a ***requirement*** on ICE officers

13

absolutely, Your Honor."  Tr. of Hr'g on May 17, 2018 (ECF No. 73) at 19:12-13 (emphasis added).

Even if Defendants had not represented that the Parole Directive imposes "a requirement," the Court correctly determined that it "was intended — at least in part — to benefit asylum seekers navigating the parole process."  PI Op. at 30.  An agency directive that is intended to benefit individuals constitutes a binding rule under the *Accardi* doctrine, notwithstanding a disclaimer of the kind set forth in the Parole Directive.  *See id.* at 29-30 (citing *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1152-53 (D.C. Cir. (2006)).  Accordingly, "the disclaimer language contained within the Directive does not bar the application of the *Accardi* doctrine."  *Id.* at 30.  As the court aptly explained in *Abdi* – a case also involving the Parole Directive – an agency cannot "avoid application of *Accardi* by simply disclaiming any binding effect in the [D]irective itself . . .  To find otherwise would render the teachings of *Accardi* and its progeny meaningless."  280 F. Supp. 3d at 389; *accord Aracely, R.*, 319 F. Supp. 3d at 152.

### 2.  *Defendants Have Violated the Parole Directive.*

The ICE Field Offices stopped following the Parole Directive at least until the preliminary injunction issued.  As DHS's own parole data indicates, between 2011 and 2013, the Field Offices paroled 92% of arriving asylum seekers pursuant to the Parole Directive.  *See* SUF ¶ 6.  By contrast, during the first eight months of the Trump Administration, the parole-grant rate fell to *less than 4%* across the Field Offices during the period between February and September 2017.  *See id.* ¶ 10.  Indeed, in three of the Field Offices, a total of 402 parole applications were considered between February and September 2017 and *not a single* asylum seeker was granted parole.  *Id.* ¶ 11.

As the Court determined in entering a preliminary injunction, this "irrefutable" statistical evidence shows that that the five ICE Field Offices had stopped providing the individualized parole reviews mandated by the Parole Directive.  PI Op. at 30.  The Government itself concedes that the case-by-case determinations envisioned by the Parole Directive "will result in parole." *Id.* at 33 (quoting May 17, 2019 Tr. at 20:23-24).  Yet parole essentially ceased at the five ICE Field Offices in 2017.  Indeed, as noted above, ICE officials expressly acknowledged to legal services providers that, as a practical matter, parole was no longer being granted.  *See* SUF ¶ 13.[4]

Although this case has been pending for well over a year, Defendants have never explained why parole-grant rates were more than 90% between 2011 and 2013, then precipitously fell to zero or near zero before the preliminary injunction issued.  As the Court noted in granting preliminary relief, "the Government does not dispute Plaintiffs' assertion that 'there has been no significant change in the types of asylum seekers traveling to the United States' . . . nor does it indicate any other change in circumstances that would lead to a shift in how the Parole Directive is being applied."  PI Op. at 32.  That remains true today.  "Defendants cannot claim that the ICE Directive remains fully in effect, and yet, at the same time, provide no explanation for the sudden shift in the day-to-day treatment of asylum seekers under the current administration."  *Id* at 33.

Given the absence of any explanation for the "irrefutable" numbers, the only plausible conclusion is the one reached by the Court when it entered the preliminary injunction:  that the Parole Directive was "honored more in the breach than the observance."  *Id.* at 2.  This breach

---

[4] Contrary to what Defendants have suggested in earlier proceedings in this case, these admissions by ICE employees are not hearsay.  *See* Fed. R. Evid. 801(d)(2)(D) (admissions by "party's agent or employee on a matter within the scope of that relationship and while it existed").

included not only Defendants' failure to provide bona fide individualized parole reviews, but violations of several of the Directive's procedural requirements. *See supra* at 5. Pursuant to the *Accardi* doctrine, this unlawful conduct should be permanently enjoined.[5]

### B.     All Other Requirements of the APA Are Satisfied.

Under the APA, this Court may set aside and enjoin unlawful agency action that is (1) "final agency action," and (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704. None of these criteria poses an obstacle to entering a permanent injunction here.

### 1.     *Defendants' Violations of the Parole Directive Constitute Final Agency Action.*

An agency action is final if two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012). Both conditions are satisfied.

_____

[5] Defendants may argue that evidence of their non-compliance with the Parole Directive should be ignored because it is not part of what Defendants have designated as the "administrative record." However, "the D.C. Circuit has consistently stated that where the district court cannot determine from the administrative record whether the agency complied with its procedural obligations, the district court may consider extra-record evidence." *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 4 (D.D.C. 2017); *accord Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018); *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 199 (D.D.C. 2005). Here, consideration of material outside the purported administrative record is necessary to resolve whether the Government complied with the Parole Directive by providing individualized parole reviews.

*First*, an agency's "settled position" applied by "officials in the field" constitutes final agency action. *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022 (D.C. Cir. 2000).  The evidence here establishes that ICE officers at the five Field Offices were applying a "settled position" in denying parole to all or virtually all asylum seekers, including those who plainly meet the Parole Directive's criteria for release.  *See* SUF ¶ 28.  Administration officials have repeatedly stated their aim of eliminating what they refer to as "catch and release;" ICE issued a memo to officers in the field instructing that parole should be granted "sparingly"; and the resulting numbers speak for themselves.  That is enough to establish a "definitive agency position" that is ripe for APA review.  *See, e.g.*, *Washington Legal Found. v. Kessler*, 880 F. Supp. 26, 35 (D.D.C. 1995) (examining existence of final agency action by analyzing "aggregate effect of [individual] acts" of enforcement, as well as "general remarks" by "high-ranking officers" of agency).

*Second*, Defendants' conduct both determines "rights or obligations," and constitutes action from which "legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks and citation omitted).  The virtually across-the-board refusal to grant parole at the five Field Offices has had profound and immediate consequences for asylum seekers, who, but for DHS's action, would have received individualized parole assessments based on danger to the community and flight risk, and in most cases would have been released.  As a result, Plaintiffs and those similarly situated have suffered lengthy unlawful detention, which has detrimental impacts, particularly on asylum seekers who are already traumatized.  *See* SUF ¶ 3.  Agency action is "final" under the APA where, as here, it imposes an "immediate and significant burden" on parties subject to that action.  *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011); *see also Pharm. Research & Manufacturers of Am. v. United States Dep't*

*of Health & Human Servs.*, 138 F. Supp. 3d 31, 46 (D.D.C. 2015) (infliction of "acute burden" and "real consequences" reflected final agency action).

### 2.    *Plaintiffs Have No Adequate Remedy.*

The Supreme Court has long interpreted the "other adequate remedy" limitation on APA review narrowly, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 902-03 (1988); *see also El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("The Supreme Court has long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967))).   Instead, "Congress intended by [the 'other adequate remedy'] provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993); *see also R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 185 (D.D.C. 2015).

Here, there is no adequate relief available through the immigration system.   Under current agency practice, asylum seekers who are denied parole have no recourse to further hearings or review by neutral decision-makers and parole constitutes the only "exception" to detention for arriving asylum seekers under the INA.   *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).   Although the Parole Directive purportedly affords the right to reconsideration by an ICE officer, that process merely permits an asylum seeker to seek relief from the same office — and likely the same officers — that previously violated the Parole Directive by failing to provide a bona fide individualized parole review in the first place.   Given that parole requests were being

nearly uniformly denied at the five Field Offices during the relevant period, "it makes little sense to seek redetermination under the same regime as a route to meaningful relief."  PI Op. at 36-37.  Moreover, as legal services providers in the Field Office jurisdictions make clear, redetermination requests have been denied without meaningful consideration.  *See* SUF ¶ 20.

> 3. *There Is No Statutory Bar to Review or a Commitment to Agency Discretion.*

Congress has done nothing here to override "the strong presumption that Congress intends judicial review of administrative action."  *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 671 (1986) ("clear and convincing" evidence required to "restrict access to judicial review" (internal quotation marks and citation omitted));  *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001).  This is especially true because Plaintiffs "do not rest their case on a challenge to discrete parole determinations" but rather contend that "ICE is, as a matter of general course, not complying with the policies and procedures of the Parole Directive."  PI Op. at 9; *see also Abdi*, 280 F. Supp. 3d at 385 (no statutory bar to "[a] claim . . . seek[ing] a ruling that Respondents' failure to follow their own policy directive is unlawful," but "not seek[ing] to have this Court interfere with the ultimate parole decision"); *accord Aracely, R.*, 319 F. Supp. 3d at 134-35.

This is not a case where an agency has been afforded unfettered discretion, rendering its actions unreviewable under the APA.  Agency action is subject to APA review "unless the statutory scheme, taken together with other relevant materials, provides ***absolutely no guidance*** as to how [the agency's] discretion is to be exercised."  *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (emphasis added).  Here, the Parole Directive provides ***extensive*** guidance regarding how parole reviews should proceed.  Indeed, according to its own terms, the purpose of the Parole Directive is to provide "***guidance*** to Detention and Removal Operations (DRO)

Field Office personnel for exercising their discretion[.]"  Parole Directive ¶ 1 (emphasis added). Specifically, it states that, absent exceptional overriding factors, an asylum seeker who has established a credible fear of persecution "should" be granted parole in the "public interest" and released from detention while pursuing his or her asylum claim, so long as the individual establishes his or her identity and presents neither a flight risk nor danger to the community.  *Id.* ¶ 6.2.  In considering parole applications, the Directive also requires that "[e]ach alien's eligibility for parole ***should*** be considered and analyzed on its own merits and based on the facts of the individual alien's case."  *Id.* (emphasis added).  Moreover, the Parole Directive sets forth procedural requirements that ICE "shall" follow in adjudicating parole applications.  *See*, *e.g.*, *id.* ¶¶ 6.1, 6.5, 6.6, 8.2, 8.3, 8.5, 8.6.  In short, the Parole Directive includes guidance that is both specific and mandatory.

## IV.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Members of the Plaintiff class will suffer irreparable harm absent an injunction.  To demonstrate irreparable harm, the moving party must show that the injury is "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  The injury must be "both certain and great; it must be actual and not theoretical."  *Id.* (quoting *Wisconsin Gas*, 758 F.2d at 674).  The injury must also be "beyond remediation."  *Id.*

The standard is easily satisfied.  This case involves unlawful detention.  The "unnecessary deprivation of liberty clearly constitutes irreparable harm."  *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (citation omitted).  Unlawful detention irreparably harms class members "in myriad ways."  PI Op. at 36; *accord R.I.L-R.*, 80 F. Supp. 3d at 191.

Specifically, the undisputed evidence reflects that detainees have been separated from their families, denied access to suitable medical care, and housed in unsanitary conditions. *See* SUF ¶ 3; *see also Abdi*, 280 F. Supp. 3d at 404 (detained asylum seekers suffered irreparable harm in "negative physical and mental health effects of prolonged detention and the fact that their continued detention has prevented putative class members from adequately preparing for their asylum hearings before an immigration judge").

Moreover, class members already experienced trauma before fleeing their home countries, and are thus particularly vulnerable to the harm inflicted by continued detention, which worsens pre-existing symptoms of trauma and inflicts severe psychological harm on asylum seekers. *See* SUF ¶ 3. These harms only grow worse with each additional day of incarceration. *See id.* As such, the injuries here are "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (internal quotation marks, citation and emphasis omitted).

Plaintiffs' injuries also are "beyond remediation." Plaintiffs do not seek monetary compensation for their injuries. Rather, they seek an injunction precluding Defendants from detaining them and other class members in violation of the Parole Directive. As the Court determined in granting a preliminary injunction, "[u]nlike economic harm, the harm from detention pursuant to an unlawful departure from agency procedure cannot be remediated after the fact." PI Op. at 37; *accord R.I.L-R.*, 80 F. Supp. 3d at 191.

### A.   Classwide Relief is Necessary and Appropriate.

To achieve adequate relief, Plaintiffs seek final certification of a class comprising all arriving asylum seekers who are found to have a credible fear and have been or will be denied parole pursuant to Defendants' failure to follow the Parole Directive.

As the Court determined in certifying a provisional class, each requirement for class certification under Fed. R. Civ. P. 23 is satisfied here:  (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of those of the class; and (4) the class representative will fairly and adequately protect the interests of the class ("adequacy of representation").  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345-50 (2011).  That remains the case today:

Numerosity.  The numerosity requirement for certification is satisfied and has not been challenged by Defendants.  *See* PI Op. at 16.

Adequacy.  The proposed class is adequate if there is no conflict of interest between the named members and the rest of the class and counsel is competent to represent the class.  *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).  The Court has found that that is the case here.  *See* PI Op. at 17.

Commonality and Typicality.  Class members' claims must depend on "a common contention [that] is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores*, 131 S. Ct. at 2551.  This prong is satisfied where there is "a uniform policy or practice that affects all class members."  *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013).  Typicality means that the representative plaintiffs must "possess the same interest and suffer the same injury" as the other class members.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982) (citations omitted).

The claims of all class members here are united by a common question of law and fact — whether the ICE Field Offices are providing "individualized determinations" of parole eligibility

and procedural protections required by the Parole Directive.  The virtually uniform denial of parole across the class thus establishes a uniform course of conduct that satisfies the commonality and typicality requirements.  *See* PI Op. at 21-22.

Rule 23(b)(2).  The Court may certify the proposed class so long as Defendants have "acted or refused to act on a grounds that apply generally to the class" and "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole must be appropriate."  Fed. R. Civ. P. 23(b)(2); *see Lightfoot v. District of Columbia*, 273 F.R.D. 314, 329 (D.D.C. 2011).  Defendants' failure to comply with the Parole Directive is a systematic harm to all class members.  Determining whether Defendants' conduct is unlawful "would therefore resolve all members' claims 'on one stroke.'"  PI Op at. 23.

Standing.  Finally, the class members have standing.  Each class member has been or will be detained in violation of the Parole Directive and each therefore "has suffered a concrete injury[.]"  PI Op. at 14.  Granting injunctive relief "would therefore result in a greater opportunity for class members' release on parole."  PI Mem. Op. at 15-16.  Consequently, the injuries of class members who have been denied parole pursuant to Defendants' misconduct would be redressed by a favorable decision of this Court.  *See* PI Mem. Op at 15.  Because the class members had standing at the time they sought class certification, certification remains appropriate; subsequent events are irrelevant to certifying the class.  *See DL v. District of Columbia*, 860 F.3d 713, 721 (D.C. Cir. 2017) (class properly certified even though named plaintiffs no longer met class definition upon certification); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000) ("So long as a class representative has a

live claim at the time he moves for class certification, neither a pending motion nor a certified class action need be dismissed if his individual claim subsequently becomes moot.").

## V.     THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.

Plaintiffs ask the Court to enjoin Defendants' unlawful violations of the Parole Directive to prevent irreparable harm to numerous vulnerable asylum seekers.  Plaintiffs seek nothing more than bona fide individualized reviews to determine whether each class member should be detained based on failure to establish identity, flight risk, or danger to the community.  Neither the Government nor the public has any legitimate interest in denying this modest relief.  Indeed, the Parole Directive itself confirms that the "continued detention" of asylum seekers who have passed credible fear, established their identity, and are not flight risks or dangers to the community "is not in the public interest."  Parole Directive ¶ 6.2.

Numerous courts have held that the likelihood that individuals "will . . . be deprived of their physical liberty . . . in the absence of the injunction" weighs heavily in favor of granting injunctive relief.  *E.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 995-96 (9th Cir. 2017) (describing numerous harms suffered by noncitizens in immigration detention); *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) ("[T]he harm to petitioner if he is not released is immeasurably significant.").  These grave harms far outweigh any countervailing interest that the Government may have.

Moreover, there is a strong public interest "in maintaining a system of laws" where the Government must comply with its legal obligations.  *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992).  Specifically, "[t]he public interest is served when administrative agencies comply with their obligations under the APA."  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); *see also R.I.L-R.*, 80 F. Supp. 3d

at 191 (public interest is served by injunction that "ends an unlawful practice" and ensures compliance with APA (citation and quotation marks omitted)).

Finally, far from undermining the public interest, treating asylum seekers with basic fairness and dignity is among our nation's best traditions. *See*, *e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

In short, the balance of harms and the public interest decisively favor requiring Defendants to follow the law and to afford asylum seekers the process required by DHS's binding Parole Directive.

## CONCLUSION

The evidence that supported the entry of a preliminary injunction last year is undisputed and continues to warrant injunctive relief. Accordingly, Plaintiffs' motion for summary judgment should be granted and the preliminary injunction should be converted to a permanent one.

Dated: July 19, 2019

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Hardy Vieux (D.C. Bar No. 474762)
Patricia Stottlemyer (D.C. Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692

Eleni Bakst
HUMAN RIGHTS FIRST
75 Broad Street, 31st floor
New York, NY 10004
(212) 845-5200

Leon Howard
Kristin Greer Love
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87104
(505) 266-5915, x1007

Respectfully submitted,

 s/ Andrew E. Siegel
Dennis B. Auerbach (D.C. Bar No. 418982)
Andrew E. Siegel (D.C. Bar No. 1029365)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

Eunice Lee
Blaine Bookey
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA
915 15th Street, NW, 2nd floor
Washington, D.C. 20005-2302
(202) 457-0800

Farrin R. Anello
Edward Barocas
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
P.O. Box 32159
Newark, NJ 07102
(973) 642-2084

Witold J. Walczak
Golnaz Fakhimi
ACLU OF PENNSYLVANIA
247 Ft. Pitt Blvd., 2nd floor
Pittsburgh, PA 15222
(412) 681-7864

Edgar Saldivar
Andre Segura
ACLU FOUNDATION OF TEXAS, INC.
1500 McGowen, Suite 250
Houston, TX 77004
(713) 942-8146 x111

Freda J. Levenson
ACLU OF OHIO
4506 Chester Ave.
Cleveland, OH 44103
(216) 472-2220

Ahilan T. Arulanantham
Sameer Ahmed
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232