**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANSLY DAMUS, *et al.*, on behalf of themselves and others similarly situated, )<br>)<br>*Plaintiffs,* )<br>)<br>*v.* )<br>)<br>KEVIN McALEENAN, Acting Secretary of the Department of Homeland Security, in his official capacity, *et al.*, )<br>)<br>*Defendants.* ) | Civil Action No. 1:18-cv-00578 (JEB) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs hereby submit this statement of the undisputed facts that support entry of summary judgment in favor of Plaintiffs. Exhibits referenced below are attached to the Declaration of Andrew E. Siegel.

## THE PLAINTIFF CLASS

1. Plaintiffs are a class of arriving asylum seekers fleeing persecution in their home countries and detained by five U.S. Immigration and Customs Enforcement ("ICE") Field Offices pending resolution of their asylum claims by an immigration judge. *See* Complaint ¶ 10 (ECF No. 3). All class members have demonstrated a credible fear of persecution and thus a "significant possibility" that they are eligible for asylum. *Id.*; Answer ¶¶ 2, 10 (ECF No. 69).

**DETENTION OF CLASS MEMBERS**

2.      The time between an asylum seeker's credible fear determination and a decision on his or her asylum claim by an immigration judge is typically several months.  *See, e.g.*, Ex. 1, Stambaugh Decl. ¶ 13 (ECF No. 17-3); Ex. 2, Spector Decl. ¶ 9 (ECF No. 17-4); Ex. 3, Ford Decl. ¶ 15 (ECF No. 17-5); Ex. 4, Miles Decl. ¶ 9 (ECF No. 17-6); Ex. 5, Knowles Decl. ¶ 9 (ECF No. 17-7); Ex. 6, Major Decl. ¶ 13 (ECF No. 17-8).  Detention may stretch more than a year if either the asylum seeker or the Department of Homeland Security ("DHS") appeals the immigration judge's asylum decision.  *See, e.g.*, Ex. 7, Damus Decl. ¶¶ 5-9 (ECF No. 17-9); Ex. 2, Spector Decl. ¶ 9.

3.      Prolonged detention inflicts severe psychological harm on asylum seekers, especially those suffering from trauma as a result of their flight from persecution.  *See* Ex. 8, Keller Decl. ¶¶ 12-23 (ECF No. 17-23) ("Detention substantially contributes to psychological distress in asylum seekers, both exacerbating pre-existing symptoms and fostering development of new symptoms."); Ex. 7, Damus Decl. ¶¶ 17-20; Ex. 9, N.J.J.R. Decl. ¶¶ 15-16 (ECF No. 17-14); Ex. 10, Callol Decl. ¶ 18 (ECF No. 17-15); Ex. 11, Castro Decl. ¶ 20 (ECF No. 17-16); Ex. 12, H.A.Y. Decl. ¶¶ 27-30 (ECF No. 11-7); Ex. 13, A.M.M. Decl. ¶¶ 30-33 (ECF No. 17-18); Ex. 14, L.H.A. Decl. ¶¶ 19-24 (ECF No. 17-21); Ex. 15, E.E.C.S. Decl. ¶ 11 (ECF No. 17-19); Ex. 16, L.I.L.M. Decl. ¶ 12 (ECF No. 17-22).  Detained asylum seekers are often separated from their families and confined in conditions that impair their access to necessary medical and mental health services and impede pursuit of their asylum claims.  Ex. 8, Keller Decl. ¶¶ 14, 16, 18-23; Ex. 7, Damus Decl. ¶¶ 17-20; Ex. 9, N.J.J.R. Decl. ¶ 16; Ex. 12, H.A.Y. Decl. ¶ 27; Ex. 13, A.M.M. Decl. ¶¶ 30-31; Ex. 15, E.E.C.S. Decl. ¶ 11; Ex. 16, L.I.L.M. Decl. ¶ 12.  These conditions include confinement in windowless rooms without access to the outside and a lack of

adequate sleeping accommodations. Ex. 7, Damus Decl. ¶¶ 18, 20; Ex. 9, N.J.J.R. Decl. ¶ 15; Ex. 15, E.E.C.S. Decl. ¶ 11; Ex. 14, L.H.A. Decl. ¶ 23. Each day of detention exacerbates these harms. Ex. 8, Keller Decl. ¶ 12.

**PAROLE OF CLASS MEMBERS**

4. In 2009, DHS issued ICE Directive 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture ("Parole Directive") (Dec. 8, 2009), which implements relevant statutes and regulations, *see, e.g.*, 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b); 8 C.F.R. § 235.3(c). Ex. 17, ICE0000085-94. The Parole Directive establishes standards and procedures for determining whether to release, *i.e.*, "parole" asylum seekers who have already demonstrated a credible fear of persecution, or whether to continue detaining them until a final asylum decision is rendered. The Parole Directive provides that, absent "exceptional, overriding factors," an asylum seeker who has established a credible fear of persecution "should" be granted parole in the "public interest" and released from detention while pursuing his or her asylum claim, so long as the individual establishes his or her identity and presents neither a flight risk nor danger to the community. *Id.* ¶¶ 6.2, 8.3.

5. The Directive requires that, in considering parole applications, "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." *Id.* ¶ 6.2.

**PAROLE DETERMINATIONS BEFORE FEBRUARY 2017**

6. Before 2017, the five Defendant ICE Field Offices (hereinafter, "ICE Field Offices")[1] relied on the Parole Directive to grant parole to thousands of asylum seekers who had demonstrated a credible fear of persecution, based on individualized findings that their detention was unnecessary. Between 2011 and 2013, for example, the ICE Field Offices paroled 92% of arriving asylum seekers pursuant to the Directive. Ex. 18, Daher Decl. ¶ 9 (ECF No. 17-10). These grant rates reflect that the overwhelming majority of asylum seekers who established a credible fear lacked any criminal history, posed no threat to public safety, and did not need to be detained to ensure their appearance for court proceedings. *See* Ex. 17, Parole Directive ¶ 6.2.

7. As of February 2017, the Parole Directive remained in place. On February 20, 2017, the then-Secretary of the Department of Homeland Security ("DHS") issued a memorandum confirming the Directive "remain[ed] in full force and effect," notwithstanding the recent change in administration. Ex. 19, ICE0000007, at 015–016, Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies ("Kelly Memorandum"), at 9-10 (Feb. 20, 2017). Likewise, the Government represented to the U.S. Supreme Court that the Parole Directive remains "in full force and effect" and reiterated its substantive and procedural requirements. Pet. Suppl. Reply Br., *Jennings v. Rodriguez*, No. 15-1204, 2017 WL 727754, at *6 n.2 (U.S. filed Feb. 21, 2017) (quoting Kelly Memorandum at 10).

8. DHS has not withdrawn or amended the Parole Directive since that time. Complaint ¶ 34; Answer ¶ 34.

---

[1] The Defendant ICE Field Offices are the Detroit Field Office, El Paso Field Office, Los Angeles Field Office, Newark Field Office, and Philadelphia Field Office.

## PAROLE DETERMINATIONS AFTER FEBRUARY 2017

9. Beginning in early 2017, the new administration announced changes in DHS's immigration detention practices. On January 25, 2017, President Trump issued Executive Order No. 13,767, "Border Security and Immigration Enforcement Improvements," 82 Fed. Reg. 8793 (Jan. 30, 2017), which articulates a policy of the Executive Branch to "detain individuals apprehended on suspicion of violating . . . Federal immigration law, pending further proceedings regarding those violations." *Id.* In an effort to implement this Executive Order, then DHS Secretary Kelly directed in a memorandum dated February 20, 2017 that "[p]olicies that facilitate the release of removable aliens at the border . . . referred to as 'catch and release,' must end." Ex. 19, at ICE0000008. That memorandum acknowledged that the Parole Directive "remain[ed] in full force and effect" pending "further review and evaluation" but advised that DHS's parole authority should otherwise be "exercised sparingly." *Id.* at -009–010. On February 21, 2017, then-ICE Executive Associate Director Matthew Albence, implementing the Kelly Memorandum, further instructed that ICE detention officers "should process requests for parole . . . sparingly." Ex. 20, ICE0000035, at -037, Memorandum from Matthew Albence, Implementing the President's Border Security and Interior Immigration Enforcement Policies (Feb. 21, 2017).

10. Parole grant rates plummeted in the ICE Field Offices during the first eight months of the Trump Administration. From February to September 2017, the ICE Field Offices collectively denied nearly 800 requests for parole by asylum seekers who passed their credible fear interviews — a denial rate of more than 96%. Ex. 18, Daher Decl. ¶ 10.

11. Between February and September 2017, the ICE Field Offices denied parole at the following rates: the El Paso Field Office denied 349 of 349 parole requests, or 100% of

5

cases; the Philadelphia Field Office denied 43 of 43 cases, or 100% of cases; the Newark Field Office denied 10 of 10 parole requests, or 100% of cases; the Detroit Field Office denied 63 of 64 parole requests, or 98% of cases; and the Los Angeles officers denied 326 of 354 parole requests, or 92% of cases. Ex. 18, Daher Decl. ¶ 11. These denial rates contrast starkly with the 92% parole *grant* rate across the five ICE Field Offices from 2011 to 2013. *Id.* ¶ 9.

12. Starting in February 2017, the ICE Field Offices routinely denied parole to asylum seekers who established their identity and posed no flight risk or danger, whereas similarly situated asylum seekers were routinely granted parole in earlier years. *See* Ex. 21, Bellis Decl. ¶¶ 9-10, 14-15 (ECF No. 17-11); Ex. 2, Spector Decl. ¶ 5; Ex. 3, Ford Decl. ¶¶ 6-8; Ex. 4, Miles Decl. ¶¶ 5-7; Ex. 22, Del Valle Decl. ¶¶ 5-8 (ECF No. 17-12); Ex. 5, Knowles Decl. ¶ 10; Ex. 1, Stambaugh Decl. ¶¶ 4-6; Ex. 23, Maze Decl. ¶¶ 7, 11 (ECF No. 17-13); Ex. 6, Major Decl. ¶ 5. The ICE Field Offices denied parole even to asylum seekers with stronger parole applications than those released in prior years. Ex. 3, Ford Decl. ¶ 8.

13. According to immigration practitioners, ICE officers in the Field Offices told some practitioners that "there is no more parole" for arriving asylum seekers and that such individuals "should not even bother to submit a parole request because ICE ha[s] to deny all parole requests." Ex. 22, Del Valle Decl. ¶ 8; *accord*, *e.g.*, Ex. 4, Miles Decl. ¶ 6; Ex. 1, Stambaugh Decl. ¶ 6; Ex. 24, Valdez Dep. 128:6-131:3 (conceding that these interactions may have occurred); Ex. 25, Dunn Dep. 53:5-55:9 (same).

14. ICE Field Office personnel could not explain why parole grants rates fell from roughly 92% in earlier years to less than 4% between February and September 2017. *See, e.g.*, Ex. 24, Valdez Dep. at 114:10-115:16; Ex. 26, Hamilton Dep. 27:6-14, 29:12-30:9, 39:17-40:7, 43:9-13; Ex. 27, Witte Dep. at 28:16-19, 57:19-22, 147:8-22; Ex. 28, Perez Dep. at 106:8-12.

**PAROLE DETERMINATION PROCEDURES AFTER FEBRUARY 2017**

15. In addition to defining the substantive criteria for parole determinations (i.e., identity, flight risk, danger), the Parole Directive also establishes procedural requirements for ICE's adjudication of parole applications.

16. Beginning at least in February 2017, asylum seekers often were not notified of the availability of parole. *Compare* Ex. 17, Parole Directive ¶ 6.1, *with*, Ex. 7, Damus Decl. ¶¶ 10-11; Ex. 9, N.J.J.R. Decl. ¶ 9; *and* Ex. 6, Major Decl. ¶ 6. Notifications that were provided often did not "explain the contents of the notification to the [asylum seeker] in a language he or she understands." *Compare* Ex. 17, Parole Directive ¶¶ 6.1, 8.1, *with* Ex. 12, H.A.Y. Decl. ¶ 22; Ex. 13, A.M.M. Decl. ¶ 23; Ex. 14, L.H.A. Decl. ¶ 13; Ex. 15, E.E.C.S. Decl. ¶ 8; Ex. 16, L.I.L.M. Decl. ¶ 9; Ex. 21, Bellis Decl. ¶ 13; Ex. 22, Del Valle Decl. ¶ 9; *and* Ex. 6, Major Decl. ¶ 6. Some asylum seekers requesting parole were also denied parole without a meaningful opportunity to provide information in support of their requests. *See* Ex. 29, Ritchey Decl., Exs. 2-5 (ECF No. 20-6).

17. Asylum seekers frequently were not given parole interviews within seven days of passing a credible fear screening, or even before their parole requests were denied. *Compare* Ex. 17, Parole Directive ¶ 8.2, *with* Ex. 7, Damus Decl. ¶ 10; Ex. 9, N.J.J.R. Decl. ¶ 13; Ex. 10, Callol Decl. ¶ 9; Ex. 11, Castro Decl. ¶ 13; Ex. 15, E.E.C.S. Decl. ¶ 8; Ex. 21, Bellis Decl. ¶ 14; Ex. 3, Ford Decl. ¶ 14; Ex. 1, Stambaugh Decl. ¶ 7; Ex. 30, Adducci Decl. ¶ 10-11 (ECF No. 23-5); *and* Ex. 29, Ritchey Decl., Exs. 2-5 (parole denied one day after service of parole advisal with interview date of "TBD"); Ex. 2, Spector Decl. ¶ 6 (recalling no parole interviews with asylum seeker clients); Ex. 22, Del Valle Decl. ¶ 10 (same); *and* Ex. 31, Quinones Decl. ¶ 4 (ECF No. 23-3) (admitting that "parole interviews are not conducted in every case").

7

18. When parole interviews and formal denials were provided, certain ICE Field Offices frequently failed to provide written letters explaining parole denials within seven days of the interview, *compare* Ex. 17, Parole Directive ¶¶ 6.5-6.6, *with* Ex. 7, Damus Decl. ¶¶ 11, 15; Ex. 9, N.J.J.R. Decl. ¶¶ 10, 13; Ex. 13, A.M.M. Decl. ¶¶ 25, 27; Ex. 1, Stambaugh Decl. ¶ 7; Ex. 22, Del Valle Decl. ¶ 11; Ex. 21, Bellis Decl. ¶ 15; Ex. 2, Spector Decl. ¶ 7; Ex. 23, Maze Decl. ¶ 8; *and* Ex. 6, Major Decl. ¶ 8, or even any written denials at all, Ex. 14, L.H.A. Decl. ¶ 16; *and* Ex. 16, L.I.L.M. Decl. ¶ 11.

19. Where ICE did provide notice of denial, the notices typically came as short-form letters containing boilerplate language and/or checkboxes indicating that the asylum seeker posed a "flight risk" or had not sufficiently demonstrated her identity. *See e.g.*, Ex. 9, N.J.J.R. Decl. ¶ 13; Ex. 10, Callol Decl. ¶¶ 10, 15; Ex. 11, Castro Decl. ¶¶ 15-17; Ex. 12, H.A.Y. Decl. ¶¶ 23-24; Ex. 13, A.M.M. Decl. ¶¶ 26-27; Ex. 15, E.E.C.S. Decl. ¶ 10; Ex. 2, Spector Decl. ¶ 8; Ex. 3, Ford Decl. ¶ 7; Ex. 4, Miles Decl. ¶ 8; Ex. 22, Del Valle Decl. ¶ 13; Ex. 5, Knowles Decl. ¶¶ 7, 11; Ex. 23, Maze Decl. ¶ 9; Ex. 6, Major Decl. ¶ 10. These letters provided no individualized explanation of why parole was denied nor any indication that ICE considered the evidence submitted in support of the parole requests. *Compare* Ex. 17, Parole Directive ¶¶ 6.5, 8.2, *with* Ex. 10, Callol Decl. ¶ 17; Ex. 11, Castro Decl. ¶ 15; Ex. 12, H.A.Y. Decl. ¶ 33; Ex. 13, A.M.M. Decl. ¶ 27; Ex. 31, A.M.M. Supplemental Decl. ¶ 3 (ECF No. 17-20); Ex. 15, E.E.C.S. Decl. ¶ 10; Ex. 2, Spector Decl. ¶ 8; Ex. 3, Ford Decl. ¶¶ 11, 14; Ex. 4, Miles Decl. ¶ 8; Ex. 22, Del Valle Decl. ¶ 13; Ex. 5, Knowles Decl. ¶¶ 8, 11; Ex. 1, Stambaugh Decl. ¶¶ 9-12; Ex. 23, Maze Decl. ¶ 9; *and* Ex. 6, Major Decl. ¶¶ 10-12.

20. In some cases, ICE failed to inform asylum seekers of their right to seek redetermination of the denial, *compare* Ex. 17, Parole Directive ¶ 6.5, *with* Ex. 5, Knowles Decl.

¶ 12.  In some cases where redeterminations were made, a denial was communicated solely by reattaching the original parole denial letter.  Ex. 6, Major Decl. ¶ 12.

**THE CLASS REPRESENTATIVES**

21. Ansly Damus came to the United States seeking asylum from political persecution in Haiti.  *See* Ex. 7, Damus Decl. ¶ 3.  After Mr. Damus spoke in a seminar about a local government official who used armed gangs to intimidate the population, members of one of these armed gangs attacked him, accused him of telling his students to vote against the government official, and threatened to kill him.  *See id*.

22. Mr. Damus came to the United States in October 2016, and an asylum officer found he had a credible fear of persecution.  *See id*. ¶¶ 1, 5.

23. At the time Plaintiffs filed this lawsuit, Mr. Damus had been granted asylum twice by an immigration judge, and the Government had appealed both times to the Board of Immigration Appeals.  *See id*. ¶¶ 6-8.

24. Mr. Damus was detained during this entire period and was released only after the preliminary injunction issued in 2018.  *See id*. ¶ 9; Ex. 32, Michael Sangiacomo, *Haitian Asylum Seeker Ansly Damus Released from Jail After Two Years*, Cleveland Plain Dealer, https://www.cleveland.com/news/2018/11/haitian-amnesty-seeker-ansly-damus-released-from-jail-after-two-years.html (Nov. 30, 2018).

25. Mr. Damus had submitted two parole requests, which included ample evidence of his identity, his lack of flight risk, and lack of danger.  Ex. 7, Damus Decl. ¶¶ 11-16.  To establish his identity, Mr. Damus submitted copies of his birth certificate, marriage certificate, Haitian identification card, a valid and unexpired passport, his school diplomas and school certification, and a letter of support from his sponsor attesting to his identity.  *See id*. ¶ 12.  Mr.

9

Damus's parole requests stated that he had sponsors who he could live with and who would support him if he were released, confirming that he is not a flight risk. *See id.* ¶¶ 13, 16. And the requests explained that Mr. Damus is a former ethics teacher with no criminal record. *See id.* ¶ 14.

26. The Detroit ICE Field Office denied Mr. Damus's requests without any written decision or explanation for why he should be denied. *See id.* ¶¶ 15-16.

27. Abelardo Asensio Callol left Cuba due to oppression at the hands of the Cuban government, after he refused to join the Communist Party and attend a rally held in memory of Fidel Castro. Ex. 10, Callol Decl. ¶ 3. Alexi Ismael Montes Castro sought asylum in the United States after fleeing assault and threats at gunpoint in Honduras because he is gay. Ex. 11, Castro Decl. ¶¶ 4-8. N.J.J.R. came to the United States after beatings and threats from armed groups that seek to eliminate opposition to the Venezuelan government. Ex. 9, N.J.J.R. Decl. ¶ 3. L.H.A. and E.E.C.S. fled persecution from notoriously violent Salvadoran gangs, which the government cannot or will not control. Ex. 14, L.H.A. Decl. ¶¶ 6-9; Ex. 15, E.E.C.S. Decl. ¶ 4. H.A.Y., A.M.M., and L.I.L.M. fled dangerous criminal cartels in Mexico. Ex, 12, H.A.Y. Decl. ¶¶ 7-16; Ex. 13, A.M.M. Decl. ¶¶ 7-19; Ex. 16, L.I.L.M. Decl. ¶ 4.

28. Like Mr. Damus, the other named Plaintiffs submitted parole requests with evidence demonstrating that they satisfied the Parole Directive's criteria. Each was denied parole and received only a boilerplate form letter communicating that denial. *See* Ex. 10, Callol Decl. ¶¶ 12-17; Ex. 14, Castro Decl. ¶ 11; Ex. 1, A.M.M. Decl. ¶ 27; Ex. 9, N.J.J.R. Decl. ¶ 13; Ex. 15, E.E.C.S. Decl. ¶ 10; Ex. 12, H.A.Y. Decl. ¶¶ 25, 33; Ex. 16, L.I.L.M. Decl. ¶ 11; Ex. 14, L.H.A. Decl. ¶ 16.

Dated: July 19, 2019

Judy Rabinovitz
Michael K.T. Tan
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Hardy Vieux (D.C. Bar No. 474762)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 547-5692

Eleni Bakst
HUMAN RIGHTS FIRST
75 Broad Street, 31st floor
New York, NY 10004
(212) 845-5200

Leon Howard
Kristin Greer Love
ACLU OF NEW MEXICO
1410 Coal Ave. SW
Albuquerque, NM 87104
(505) 266-5915, x1007

Respectfully submitted,

 s/ Andrew E. Siegel            
Dennis B. Auerbach (D.C. Bar No. 418982)
Andrew E. Siegel (D.C. Bar No. 1029365)
Julia H. Brower (D.C. Bar No. 1048925)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

Eunice Lee
Blaine Bookey
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
(415) 565-4877

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA
915 15th Street, NW, 2nd floor
Washington, D.C. 20005-2302
(202) 457-0800

Farrin R. Anello
Edward Barocas
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY FOUNDATION
P.O. Box 32159
Newark, NJ 07102
(973) 642-2084

Witold J. Walczak
Golnaz Fakhimi
ACLU OF PENNSYLVANIA
247 Ft. Pitt Blvd., 2nd floor
Pittsburgh, PA 15222
(412) 681-7864

Edgar Saldivar
Andre Segura
ACLU FOUNDATION OF TEXAS, INC.
1500 McGowen, Suite 250
Houston, TX 77004
(713) 942-8146 x111

Freda J. Levenson
ACLU OF OHIO
4506 Chester Ave.
Cleveland, OH 44103
(216) 472-2220

Ahilan T. Arulanantham
Sameer Ahmed
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5232