UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ansly Damus, *et al.*,<br><br>                              *Plaintiffs*,<br><br>             v.<br><br>Kevin K. McALEENAN, Acting Secretary of Homeland Security, *et al.*, in their official capacities,<br><br>                              *Defendants* | Civil Action. No. 18-cv-00578-JEB |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Rule 7(h) of the U.S. District Court for the District of Columbia, Defendants hereby submit this Statement of Undisputed Material Facts. The exhibits referenced herein are attached to the Declaration of Alexander J. Halaska.

### DHS's Parole Authority

1.      The Immigration and Nationality Act (INA) allows the Secretary of Homeland Security,[1] "in his discretion," to "parole into the United States temporarily and under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The Secretary delegated this parole authority to U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). *See* Defs.' Ex. 1, *Memorandum of Agreement Between USCIS, ICE, and CBP for the Purpose of*

---

[1] Although the text of the parole statute refers to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107–296, Title IV, § 402(3), 116 Stat. 2177–78 (Nov. 25, 2002), vested immigration enforcement functions in the Secretary. *See* 6 U.S.C. §§ 202(3), 251. Many of the INA's references to the Attorney General, including the reference in the parole statute, are now understood to refer to the Secretary. *See, e.g.*, *Nielsen v. Preap*, 139 S. Ct. 954, 959 n.2 (2019).

*Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States*, at 1 (Sept. 2008) (hereinafter "Parole MOA"). ICE is responsible for adjudicating parole requests "relating to aliens in removal proceedings." *Id.* at 6. The agencies explained when executing the Memorandum of Agreement that, "[g]iven the context of removal proceedings, it is anticipated that parole of such aliens would occur only in very rare circumstances." *Id.*

2.       On December 8, 2009, then-Director of U.S. Immigration and Customs Enforcement John Morton issued ICE Directive No. 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture" (hereinafter "Parole Directive"), which took effect on January 4, 2010 (attached hereto as Defs.' Ex. 2). The Directive "provides guidance to [ERO] Field Office personnel for exercising their discretion to consider the parole of arriving aliens processed under the expedited removal provisions of section 235 of the [INA] and who have been found to have a 'credible fear' of persecution of torture[.]" *Id.* ¶ 1. It states that "applicable regulations describe five categories of aliens who may meet the parole standard based on a case-by-case determination, provided they do not present a flight risk or security risk," including "aliens whose continued detention is not in the public interest." *Id.* ¶ 4.3 (citing 8 C.F.R. § 212.5(b)). The Parole Directive "explains how the term [public interest] is to be interpreted by [ERO] when it decides whether to parole arriving aliens determined to have a credible fear." *Id.* ¶ 4.4. It emphasizes that "[p]arole remains and inherently discretionary determination entrusted to the agency," and that the Directive itself serves only "as a guide to the exercise of that discretion." *Id.*

3.       On February 20, 2017, then-Secretary of Homeland Security John Kelly issued a memorandum to the Acting Commissioner of CBP, the Acting Director of ICE, the Acting Director

of USCIS, and other U.S. Department of Homeland Security (DHS) officials entitled "Implementing the President's Border Security and Immigration Enforcement Improvement Policies" (hereinafter "Kelly Memo") (attached hereto as Defs.' Ex. 3). The memorandum implements Executive Order 13,767, "Border Security and Immigration Enforcement Improvements," 82 Fed. Reg. 8,793 (Jan. 25, 2017). *Id.* at 1. Section A of the Kelly Memo, entitled "Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act," states: "The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders." *Id.* at 2. The memorandum continues: "These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(5) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as 'catch-and-release,' shall end." *Id.* Section A goes on to state that aliens processed for expedited removal may be paroled in six specific situations, one of which is "[w]hen an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a 'credible fear' of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any

additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings." *Id.* at 2–3.

4.      Section K of the Kelly Memo, entitled "Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA," and directed at the heads of USCIS, CBP, and ICE, states: "The authority to parole aliens into the United States is set forth in section 2l2(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly." Defs.' Ex. 3, at 9. The Kelly Memo goes on to state: "Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or torture [referring to the Parole Directive] shall remain in full effect. The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case." *Id.* at 9–10.

5.      On February 21, 2017, Matthew Albence, ICE's Executive Associate Director for Enforcement and Removal Operations ("ERO"), issued a guidance memorandum to all ICE ERO employees entitled "Implementing the President's Border Security and Interior Immigration Enforcement Policies" (the "Albence Memo") (attached hereto as Defs.' Ex. 4). Section B of the

Albence Memo, entitled "Detention Policy," states that ICE may release arriving aliens processed under the expedited removal provisions who establish a credible fear of persecution or torture, if they can establish their identity, that they are not a flight risk, and that they are not dangerous. *Id.* at 2–3. Section C of the Albence Memo, entitled "Release and Parole Policy," states: "Agency policy establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or torture [referring to the Parole Directive] will remain in full force and effect until further evaluation is completed and additional guidance is issued. ERO officers are reminded, however, to apply ICE policy consistent with its plain language, and to ensure that the alien is held to his or her burden of establishing identity and that his or her release will not pose a danger or risk of flight. There is no presumption that an individual alien's release would not pose a danger or risk of flight." *Id.* at 3.

6.     On June 13, 2017, ICE ERO's headquarters component sent an email to ICE's field office directors and deputy field office directors on behalf of ERO Executive Associate Director Albence requesting that the field offices "review all local Field Office policies, procedures, guidance, local broadcasts, and other related documents to assure compliance with Executive Orders (EO) 13767, 13768, and related implementation instructions." *See* Email from Matthew T. Albence to Field Office Directors and Deputy Field Office Directors, Subject: "Field Office Policy Review" (June 13, 2017) (attached hereto as Defs.' Ex. 5). Upon completion of the review, each field office was requested to reply and note either that "[t]he review [was] completed and the EOs had no impact on Field Office policies, procedures, guidance, local broadcasts, and other related documents," or that "[t]he review was completed and the Field Office has identified certain policies, procedures, guidance, local broadcasts and other related documents that were impacted by the EOs" and was thus "taking the necessary actions to make edits to these documents in order to

be in compliance with the EOs." *Id.* at 1.

7.     The June 13, 2017 email included as an attachment a bulleted "list of major takea-ways and policy changes" found in the February 2017 Kelly Memo implementing EO 13,767. *See* Defs.' Ex. 5, at 3. The list states that "ICE policy directive (ICE Policy No. 11002.1) with respect to parole for certain arriving aliens found to have a credible fear of persecution or torture remains in full effect." *Id.* The document also reiterates, consistent with the Parole Directive, that "ICE policies must reflect that aliens should be released from detention only under the following limited circumstances, on a case-by-case basis," including "when an arriving alien has been found to have a credible fear of persecution or torture and the alien satisfactorily establishes his identity and that he is not a security or flight risk." *Id.* Emails from or within each Field Office show that they conducted reviews of their local policies and were in full compliance. *See* Email Response from Detroit Field Office, Subject: "DETROIT Field Office Policy Review" (June 19, 2017) (attached hereto as Defs.' Ex. 6); Email Response from El Paso Field Office, Subject: "EL PASO Field Office Policy Review" (June 21, 2017) (attached hereto as Defs.' Ex. 7); Email Response from Los Angeles Field Office, Subject: "LOS ANGELES Field Office Policy Review" (June 21, 2017) (attached hereto as Defs.' Ex. 8); Email Response from Newark Field Office, Subject: "NEWARK Field Office Policy Review" (June 21, 2017) (attached hereto as Defs.' Ex. 9); Email Response from Philadelphia Field Office, Subject: "PHILADELPHIA Field Office Policy Review" (June 21, 2017) (attached hereto as Defs.' Ex. 10).

8.     None of the Deputy Field Office Directors or Assistant Field Office Directors from the five Field Offices testified that they received instructions from DHS or ICE headquarters that the parole grant rates were too high or too low. *See, e.g.*, Defs.' Ex. 11, Dep. of Detroit Deputy Field Office Director Mark J. Hamilton ("Hamilton Dep.") 24:8–25:7, 36:3–6, 52:17–53:5 (Dec.

12, 2018); Defs.' Ex. 12, Dep. of El Paso Deputy Field Office Director Diane Lynn Witte ("Witte Dep.") 160:17–162:10 (Dec. 4, 2018); Defs.' Ex. 13, Dep. of Los Angeles Asst. Field Office Director Gabriel Anthony Valdez ("Valdez Dep.") 133:17–134:10 (Dec. 7, 2018); Defs.' Ex. 15, Dep. of Philadelphia Asst. Field Office Director Joseph Dunn ("Dunn Dep.") 58:17–20 (Dec. 11, 2018). Based on a rough comparison of certain data, ICE officials believe that the Field Offices were likely underreporting the number of Parole Directive determinations made during the relevant timeframe. *See, e.g.*, Defs.' Ex. 16, Decl. of David W. Jennings ("Jennings Decl.") ¶¶ 6–9 (June 8, 2018) (ECF No. 31-1); Defs.' Ex. 22, Decl. of Jack Bennett ("Bennett Decl.") ¶¶ 5–12 (Sept. 19, 2019); Defs.' Ex. 14, Dep. of Ruben Perez, Jr. ("Perez Dep.") Dep. 94:9–95:15 (Dec. 14, 2018) ("We adjudicated a lot more than ten parole reviews during the months of February through September 2017.").

**ICE's Detroit Field Office**

9.      ICE's Detroit Field Office is and has been following the substantive and procedural requirements of the Parole Directive since at least 2011, including during the contested February–September 2017 time period. Hamilton Dep. 35:4–36:6; *id.* at 92:3–8 ("It's my belief and understanding that we were providing individualized determinations, and we were following in good faith the parole directive."). The Field Office confirmed as much when, in June 2017, it conducted a review of its policies, procedures, and practices and determined that the January 2017 Executive Orders had "no impact" on local operations, including with regard to the implementation of the Parole Directive. *See* Defs.' Ex. 6, at 1.

10.      The Detroit Field Office serves Parole Advisals after receiving notice from U.S. Citizenship and Immigration Services ("USCIS") that an individual has a positive credible fear determination. Defs.' Ex.17, Decl. of Rebecca Adducci ("Adducci Decl.") ¶¶ 3–4 (Apr. 19, 2018).

The Field Office then conducts parole interviews with the applicant, using an interpreter, if necessary. *Id.* ¶ 5.

11.     When the Detroit Field Office evaluates whether a parole applicant has established his identity, there is no policy or categorical requirement that the applicant submit his passport to qualify for parole. Hamilton Dep. 63:7–21. The Field Office may consider whether the applicant has provided a passport, but the identity requirement can also be established, for example, through the submission of other government-issued identity documents. *Id.*; *id.* at 112:22–113:9.

12.     When evaluating whether a parole applicant has established that he would not be a flight risk, the Detroit Field Office looks only to those factors laid out in the Parole Directive. Hamilton Dep. 60:18–61:2. There is no formal or informal rule that would render someone categorically a flight risk. *Id.* at 64:11–15. The Field Office might consider, for example, whether the applicant has "prior status as a fugitive or absconder from other proceedings or immigration matters," and "perhaps any incidents during the encounter by the arresting entity or at the detention facility where they were detained," as factors among several "potential factors that would be considered." *Id.* at 64:21–65:16. But those are simply factors; "there is no specific view" of the Detroit Field Office when determining whether an individual is a flight risk. *See id.* at 66:2–10.

13.     Similarly, when the Detroit Field Office evaluates whether a parole applicant has proposed an adequate sponsor, it applies the "[s]ame criteria as generally described in the parole directive." Hamilton Dep. 61:12–16. The primary question is the stability of the sponsor's residence; the Field Office looks to whether the proposed residence is "[t]he residence that the individual would be living at; whether the individual owns the home, rents the home; how long they've established residence there." *Id.* at 69:13–70:6. There is no categorical requirement that a proposed sponsor be a family member; indeed, a parole applicant's friend is potentially eligible to serve as

a sponsor. *Id.* at 61:17–22. Nor is there a requirement in the Detroit Field Office that a proposed sponsor know the applicant for any particular length of time. *Id.* at 62:1–5.

14.     When the Detroit Field Office considers whether a parole applicant has established that he has adequate community ties, it "does not have its own set of criteria or specific criteria." Hamilton Dep. 66:15–20. Rather, the community-ties determination "generally . . . involves a judgment and analysis of all the information available related or potentially related to community ties." *Id.* There are no "specific criteria" that the Field Office uses that, if met, would or would not establish a parole applicant's community ties. *Id.* at 67:2–8. If the parole applicant seeks to establish his community ties based on a purported relationship with a community organization, the Detroit Field Office looks to "[t]he history of the individual with their association with that organization [and] the degree to which they're involved and the nature of the relationship." *Id.* at 67:9–16. If the parole applicant seeks to establish his community ties based on a purported relationship with an individual, the Detroit Field Office looks to "the nature of the relationship," meaning "[i]s it a friend; is it a former colleague; is it a family member. What's the degree or significance of the relationship." *Id.* at 67:17–68:2. In sum, the Detroit Field Office "look[s] at the totality of the ties, the nature of the relationship, what [the proposed sponsor has] provided as far as supporting evidence or documentation to be—to have the capacity and willingness to provide sponsorship." *Id.* at 69:4–9. "[T]here is no specific set of criteria that in every case must be met in order to establish sponsorship. It's the totality of the information and supporting documentation that's provided, and ultimately a judgment call is made by that official." *Id.* at 85:11–16.

15.     The Detroit Field Office does not use specific criteria when evaluating whether a parole applicant would be a danger to the community, but an individual's criminal history can be a significant factor. Hamilton Dep. 129:17–130:14.

16.     The Detroit Field Office also follows all the procedural requirements of the Parole Directive as a matter of policy and practice. The Field Office's deportation officers are responsible for serving detainees with notice of the upcoming parole evaluation following the credible fear determination, and the officers fill out a Record of Determination/Parole Determination worksheet in every case. Hamilton Dep. 13:13–14:2, 94:19–95:12. If parole is not granted, Field Office personnel provide a letter to the alien or his representative informing him of the determination and notifying him that he may seek a redetermination of the request. Adducci Decl. ¶ 7. Field Office personnel expect officers to explain the contents of the denial letter in a language the alien understands. Hamilton Dep. 49:1–50:5.

17.     The Detroit Field Office, "[a]s a matter of thoroughness and practice," also applies an additional level of supervisory review to parole determinations beyond what is required by the Parole Directive. Hamilton Dep. 101:1–19. Whereas the Directive and its accompanying documents require only that there be an initial recommendation by a first-line deportation officer, review by a second-line supervisory detention and deportation officer, and a determination by a deciding official (a Deputy Field Office Director, in the Detroit Field Office's case), *see* Parole Directive ¶ 6.2, the Detroit Field Office "expect[s] when possible" that an Assistant Field Office Director also "would review the document as part of their reviewing of the supervisor's work." *Id.*

18.     Detroit Field Office personnel have not been instructed by DHS or ICE headquarters to parole any minimum or maximum number of parole applicants. Hamilton Dep. 24:13–25:7. Nor are Detroit Field Office personnel aware of any discussions within DHS or ICE that granting parole more often would encourage migration to the United States, or that denying parole more often would discourage or deter migration to the United States. *Id.* at 52:17–53:5.

19.     The Detroit Field Office provided Ansly Damus with an individualized review of

his eligibility for parole. Mr. Damus was found to have a credible fear of persecution or torture on

or about December 6, 2016, and was served with a Parole Advisal on or about December 19, 2016,

after he was transferred to a detention center in the Detroit Field Office's area of responsibility.

*See, e.g.*, Adducci Decl. ¶ 11; *see also* Defs.' Ex. 17, at 8–9, Parole Advisal and Scheduling Noti-

fication for Ansly Damus. Mr. Damus was notified in his native language that his parole interview

would be conducted on January 3, 2017, and that he could submit documents in support of his

parole application on or before January 2, 2017. Adducci Decl. ¶ 11. The interview was conducted

with Mr. Damus on January 3, 2017, in Creole. *Id.* ¶ 12. Mr. Damus's attorney submitted docu-

ments in support of his parole application the next day, on January 4, 2017, which included a

declaration from an initial proposed sponsor living in New Jersey. *Id.* ¶ 12. The Detroit Field Of-

fice completed a Parole Determination Worksheet for Mr. Damus on January 10, 2017, which

shows that Mr. Damus was denied parole because he did not establish to the Field Office's satis-

faction that his community ties were substantial enough that he would not be a flight risk. *Id.* ¶ 13.

In a subsequent parole redetermination request, submitted while ICE appealed an immigration

judge's initial grant of asylum to the Board of Immigration Appeals, Mr. Damus's second proposed

sponsors submitted a letter admitting that they had never met him before. *See* Decl. of Ansly Da-

mus, at 42, 45 (ECF No. 96-10).

**ICE's El Paso Field Office**

20.     ICE's El Paso Field Office is and has been following the substantive and procedural

requirements of the Parole Directive since at least January 2017, including during the contested

February–September 2017 time period. Witte Dep. 28:6–29:6 ("The individuals performing the

daily duties of adjudicating parole requests, conducting interviews, et cetera, were well-versed in

the policy prior to my arrival [in January 2017], and the policy hasn't changed."); *id.* at 71:20–

72:3. The Field Office confirmed as much when it conducted a review of its operations in June

2017 and confirmed that "the EOs had no impact on Field Office policies, procedures, guidance, local broadcasts, and other related documents." Defs.' Ex. 7, Email Response from El Paso Field Office, at 1.

21.    The El Paso Field Office provides considered, consistent parole adjudications, and follows all procedural requirements of the Parole Directive. "The officers serve the parole advisals. They conduct interviews with the aliens. They review the documentation submitted by the alien and/or the attorney. They conduct any further review that they need to regarding the evidence submitted in the interview conducted. They complete the parole determination worksheet and submit it to the first-line supervisor for review and concurrence, and then the first-line supervisor submits it to the deciding official for a final decision. That's a consistent practice throughout the field office." Witte Dep. 41:12–42:4; *id.* at 47:6–48:4, 51:13–52:22. There are also numerous ways for parole applicants to communicate with ICE officers about their parole application and to provide initial or supplementary documents for parole determinations and redeterminations. *Id.* at 136:19–137:5, 138:11–139:5, 141:5–10. Sponsors are similarly able to communicate with ICE officers to provide information in support of a parole application. *Id.* at 139:13–140:18, 141:5–10. The El Paso Field Office also uses translation services any time its officers communicate with aliens who do not understand or are not proficient in English, including during parole interviews and when serving parole denial letters. *Id.* at 219:4–220:22, 221:12–20. In cases where an applicant speaks an uncommon language or a translator is otherwise not immediately available, this may result in a delay in a parole interview. *Id.* at 219:13–21.

22.    When considering whether a parole applicant has established his identity, the El Paso Field Office will accept government-issued documents from the applicant's country of origin, a sworn affidavit from a third party, or the applicant's own credible statements, and will accept

evidence even if not specifically provided for on the agency forms. Witte Dep. 68:5–20, 69:3–16, 101:6–16. The Field Office also allows a parole applicant to contact their home embassy or consulate to request their government identity documents, if they choose. *Id.* at 68:9–12. The El Paso Field Office's practices for evaluating whether a parole applicant has established his identity have not changed since at least January 2017. *Id.* at 71:20–72:3.

23.     When evaluating whether a parole applicant has established that he is not a flight risk, the El Paso Field Office takes into consideration whether the applicant has "family ties, equities in the United States, employment history, manner of entry, length of residence in the United States, stability of residence, record of appearance for court hearings, compliance with reporting requirements, prior immigration and criminal history, [and] property ownership, to name a few." Witte Dep. 72:7–73:1. An applicant's inability to establish any one of these factors is not automatically disqualifying. For example, an applicant that does not have family ties in the United States can still be eligible for parole. *Id.* at 77:6–10. Similarly, while length of residence is one way that an applicant can indicate that he has a stable place to reside, *id.* at 73:2–7, it is only one factor that "would be weighed amongst the rest of the factors that are considered, and a determination would be made upon the totality of the circumstances," *id.* at 74:11–18. Not having any prior residence in the United States is also "neither negative [n]or positive. The alien has the opportunity to provide other evidence of a stable residence." *Id.* at 75:19–76:5.

24.     With regard to who can serve as a parole applicant's sponsor, "[t]here are no blanket approval or denial policies for ERO El Paso." Witte Dep. 105:21–106:2. The El Paso Field Office does not have categorical rules or requirements about who can serve as a parole applicant's sponsor. Anyone from an immediate family member to a personal friend can be deemed an adequate

sponsor. *Id.* at 87:2–89:20; *see also id.* at 189:8–190:15. Sponsors simply "need to be able to pro-

vide information relating to a stable address, indicators that they currently reside at that address

and have, for example, a telephone bill or a utility statement. These individuals need to be green

card holders or U.S. citizens. They need to prove their identity. And oftentimes they need to be

able to explain their relationship to the alien they're going to sponsor." *Id.* at 87:6–15.

25.     Prior to the issuance of the preliminary injunction, the El Paso Field Office also

used the term "recent entrant" with regard to some parole determinations. That term "was a type

of shorthand used within the El Paso field office to indicate a particular alien who had recently

arrived at the country in the U.S., did not have—was lacking significant equities as far as ties to

the community, family ties, stability of residence, length of residence, employment history, all

those—all those things that we talked about earlier that go towards indicating that an alien is likely

to appear for court, immigration proceedings and any reporting that's required by immigration."

Witte Dep. 128:20–129:13. After the preliminary injunction issued, El Paso Field Office personnel

were instructed to provide more detailed explanations on the Parole Determination Worksheets

why they determined an applicant to be a flight risk. *See id.* at 58:8–13, 246:6–22.

26.     The El Paso Field Office considers the information available to it to assess whether

a parole applicant would pose a danger to the community, including any statements or evidence

submitted by the applicant. Witte Dep. 112:18–115:5.

27.     The El Paso Field Office has not received any instructions from DHS or ICE head-

quarters that the parole grants rates within the Field Office were ever too high or too low. Witte

Dep. 160:17–162:9. Field Office personnel are not aware of any officers using deterrence of future

migration as a factor in making parole determinations. Defs.' Ex. 18, Decl. of Diane L. Witte

("Witte Decl.") ¶ 4 (Apr. 20, 2018).

28.     The El Paso Field Office provided H.A.Y. with an individualized determination of her eligibility for parole. H.A.Y. was served with a Parole Advisal on January 17, 2018, which notified her that that she would be considered for eligibility for parole and informed her that she could submit documents on or before January 24, 2018, in support of her application. Witte Decl. ¶ 21; *see* Defs.' Ex. 18, at 21–22, Parole Advisal and Scheduling Notification for H.A.Y. H.A.Y. submitted documents on January 23, 2018. Witte Decl. ¶ 21. The El Paso Field Office reviewed the evidence relating to H.A.Y.'s eligibility for parole and determined that she was a "recent entrant" who had not submitted sufficient evidence to show that she was not a flight risk. Witte Decl. ¶ 23; *see* Witte Dep. 128:20–129:13. The El Paso Field Office provided H.A.Y. with notice of its decision on February 1, 2018. Witte Decl. ¶ 23; *see also* Defs.' Ex. 18, at 23–24, Letter from Diane L. Witte to H.A.Y. (Feb. 1, 2018).

29.     The El Paso Field Office provided A.M.M. with an individualized determination of his eligibility for parole. A.M.M. submitted documents in support of his parole application to the El Paso Field Office on or about January 31, 2018. Witte Decl. ¶ 17. The Field Office then served A.M.M. with a Parole Advisal on February 1, 2018, which notified him that he would be considered for eligibility for parole and informed him that he could submit additional documents on or before February 8, 2018, in support of his application. *Id.* ¶ 18; *see* Defs.' Ex. 18, at 18, Parole Advisal and Scheduling Notification for A.M.M. After conducting an interview with A.M.M. and reviewing the documents he submitted in support of his application, the El Paso Field Office determined that A.M.M. had not established a relationship with his proposed sponsor, such that he would not be a flight risk. Witte Decl. ¶ 19. The Field Office provided A.M.M. a letter dated Feb. 13, 2018, notifying him of its decision. *Id.*; *see* Defs.' Ex. 18, at 19–20, Letter from Diane L. Witte to A.M.M. (Feb. 13, 2018).

30.     The El Paso Field Office provided L.H.A. with multiple individualized determinations of his eligibility for parole. The Field Office served L.H.A. with a Parole Advisal on July 8, 2016, which notified him that ICE would be evaluating his eligibility for parole and informed him that he could submit documents in support of his application by July 15, 2016. Witte Decl. ¶ 8; *see* Defs.' Ex. 18, at 20–21, Parole Advisal and Scheduling Notification for L.H.A. L.H.A. did not submit any documents in support of his application and did not provide the Field Office with information relating to his sponsor, such that he would not be a flight risk. Witte Decl. ¶ 9. The El Paso Field Office informed L.H.A. that he would not be granted parole in a letter dated August 14, 2016. *Id.*; *see* Defs.' Ex. 18, at 10–11, Letter from Alfredo Fierro to L.H.A. (Aug. 14, 2016). L.H.A. requested a parole redetermination on November 16, 2016, but did not provide sufficient information to establish that his proposed sponsor could financially support him. Witte Decl. ¶¶ 10–11. The Field Office provided L.H.A. with a letter dated December 2, 2016, notifying him of its decision to deny parole. *Id.*; *see* Defs.' Ex. 18, at 12–13, Letter from Tom Hernandez to L.H.A. (Dec. 2, 2016). L.H.A. made a second parole redetermination request on January 30, 2017, but the El Paso Field Office determined that he had not provided information that warranted a different parole outcome. *See* Witte Decl. ¶¶ 12–13. The Field Office provided L.H.A. with a letter dated February 27, 2017, notifying him of its decision. *Id.* ¶ 13; *see* Defs.' Ex. 18, at 29–30, Letter from Alejandro Garcia to L.H.A. (Feb. 27, 2017). L.H.A. submitted a third parole redetermination request on June 14, 2017, after learning that his previous representative had fraudulently held herself out as an attorney. Witte Decl. ¶ 14. After reviewing the redetermination request, the El Paso Field Office determined that L.H.A. had not provided information that would change its previous determinations. *Id.* ¶ 15. The Field Office provided L.H.A. with a letter dated August 9, 2017, informing him of its decision. *Id.*; *see* Defs.' Ex. 18, at 16–17, Letter from Diane L. Witte to L.H.A.

(Aug. 9, 2017).

**ICE's Los Angeles Field Office**

31.      ICE's Los Angeles Field Office has followed the Parole Directive as a matter of local policy since at least 2011, including during the contested February–September 2017 time period. Valdez Dep. 134:16–135:4, 139:9-18; 140:1-4, 141:12–142:3 ("Q: "Shortly before the pre-liminary injunction in the 2017 and early 2018 period, how did the Los Angeles Field Office make parole determinations?" A: "In the same manner I just described. We didn't change anything."). The Field Office confirmed as much when, in June 2017, it conducted a review of its policies, procedures, and practices and determined that the January 2017 Executive Orders had "no impact" on local operations, including with regard to the implementation of the Parole Directive. Defs.' Ex. 8, at 1.

32.      The Los Angeles Field Office received guidance in early 2017 stating that the Pa-role Directive remained in place. *See* Valdez Dep. 116:1–4; *see also id.* at 313:8–314:17. Other than this guidance, the Los Angeles Field Office did not receive "any other communications relat-ing to the parole process for asylum seekers in th[e] early 2017 time period." *Id.* at 125:20–126:2; *see id.* at 134:5–10 ("Q: Are you aware . . . of any statement from ICE or DHS orally or in writing that parole grant rates in the past were too high? A: No."). ICE officers at the Los Angeles Field Office were not directed to "apply different standards in determining whether to grant parole around 2017." *Id.* at 127:14–17. Assistant Field Office Director Gabriel Valdez stated that he did not understand the Secretary's order to end "catch-and-release" practices as affecting the expedited removal/credible fear process. *Id.* at 118:19–119:11 ("I think that's more of a border patrol thing.").

33.      In evaluating whether a parole applicant has established his identity, the Los Ange-

les Field Office analyzes the "totality of the circumstances," Valdez Dep. 136:22–137:7, and considers official identity documents, copies of official identity documents, and statements submitted by the applicant's relatives, *see id.* at 135:5–138:7. The Los Angeles Field Office does not categorically require parole applicants to produce any particular documents to establish identity. *Id.* at 175:4–13.

34.    In evaluating whether a parole applicant poses a flight risk, the Los Angeles Field Office analyzes the totality of the circumstances, Valdez Dep. 139:21–22, and considers whether an applicant has ties to the community, whether the applicant has a history of absconding, and whether the applicant used false identification at the border or attempted to otherwise elude immigration controls, *id.* at 139:9–22. In cases where a parole applicant is determined to pose a flight risk, the Los Angeles Field Office considers whether releasing the alien under bond or placing the alien in an alternative-to-detention ("ATD") program could mitigate the flight risk sufficiently to allow the alien's release. *Id.* at 213:8–15.

35.    In evaluating whether a parole applicant is dangerous, the Los Angeles Field Office considers the criminal history of the alien in the United States and abroad and the alien's conduct in ICE custody. Valdez Dep. 140:1–17. In evaluating dangerousness, the Los Angeles Field Office will also consider evidence that a parole applicant has been rehabilitated following criminal conduct. *Id.* at 140:19–141:3.

36.    The Los Angeles Field Office allows parole applicants to submit "support documents anywhere along the process," and considers these documents in making parole determinations. Valdez Dep. 37:22–38:1; *see id.* at 33:21–34:10.

37.    The Los Angeles Field Office serves all aliens eligible for parole determinations under the Parole Directive with the Parole Advisal form. *See* Valdez Dep. 164:21–165:2. The Field

Office uses translation services to explain the contents of the Advisal to the alien in a language he understands. *Id.* at 244:18–246:10. When parole is denied, the Los Angeles Field Office serves the parole applicant with a denial letter stating the reason that parole was denied. *Id.* at 293:9–18. This letter is also mailed to the applicant's attorney, where applicable. *Id.* at 289:4–13. Parole applicants may also speak with deportation officers, utilizing translations services if necessary, concerning the reasons their parole applications were denied. *Id.* at 296:15–297:9; *see id.* at 288:6–11 ("[T]he officer would be the one to say I need to call the LanguageLine in order to translate this to you . . . because the officer's required to provide notice to the detainee of the [parole] decision"). Following a parole denial, the Los Angeles Field Office will consider a parole applicant's request for a parole redetermination. *Id.* at 39:6–10.

38.     Prior to the July 2018 preliminary injunction, detention facilities in Orange County were sometimes conducting "informal" interviews at times different than the times stated on the Parole Advisal, and then not conducting the "formal" interview scheduled on the Parole Advisal. Valdez Dep. 147:2–149:12. However, following the preliminary injunction, deportation officers at the Orange County facilities began conducting interviews at the time specified on the Parole Advisal in every case. *Id.* at 149:13–150:6.

39.     The Los Angeles Field Office utilizes the Parole Determination Worksheet when conducting a parole determination. *See* Valdez Dep. 31:18–32:1, 32:22–33:6. Deportation officers in one facility in the Los Angeles detention facility, the Adelanto ICE Processing Center, also utilize a Q&A form, developed by ICE personnel at the facility, to assist them is obtaining information from parole applicants. *Id.* at 142:8–13; *see id.* at 279:7–15. The Q&A form is provided to parole applicants at the Adelanto facility with the Parole Advisal, *id.* at 145:2–6, but they are not required to complete it, *id.* at 146:16–19.

40.     The Los Angeles Field Office does not consider deterrence of future migration as a factor in parole determinations. Defs.' Ex. 19, Decl. of Andre G. Quinones ("Quinones Decl.") ¶ 5 (Apr. 19, 2017).[2] Los Angeles Field Office personnel were not instructed by DHS or ICE headquarters that parole should be granted at any given rate, or that parole grant rates were too high in the past. Valdez Dep. 133:18–134:10. The Los Angeles Field Office did not engage in blanket parole denials; indeed, as AFOD Valdez explained, if his Office were engaging in blanket conduct with regard to parole determinations, it would be "[m]uch easier to grant" parole to everyone than to deny it. *Id.* at 123:10–125:10.

41.     The Los Angeles Field Office provided E.E.C.S. with an individualized review of his eligibility for parole. E.E.C.S.'s attorney submitted documents to the Los Angeles Field Office in support of E.E.C.S.'s parole application on February 1, 2018. Quinones Decl. ¶ 15. The Field Office then served E.E.C.S. with a Parole Advisal on February 8, 2018, which notified him that the Field Office was considering his eligibility for parole. *Id.* ¶ 16; *see* Defs.' Ex. 19, at 17–18, Parole Advisal and Scheduling Notification for E.E.C.S. After reviewing E.E.C.S.'s documents and statements, the Los Angeles Field Office determined that E.E.C.S. had not established that he was not a flight risk for three primary reasons: (1) three months prior to his February 2018 parole adjudication, he had been found by an immigration judge to not have a credible fear of persecution; (2) he had used a counterfeit Mexican passport and visa under another person's name in his December 2017 attempt to enter the United States; and (3) some of the letters of support submitted by E.E.C.S.'s attorney were written in support of other people, not E.E.C.S. Quinones Decl. ¶¶ 13–14, 16. The Los Angeles Field Office notified E.E.C.S. in a letter dated February 8, 2018, of its

---

[2] Likely should be "2018."

decision not to grant parole. *Id.* ¶ 18; *see* Defs.' Ex. 19, at 19–20, Letter from Andre Quinones to E.E.C.S. (Feb 8, 2018).

42.     The Los Angeles Field Office provided L.I.L.M. with an individualized determination of his eligibility for parole. The Los Angeles Field Office served L.I.L.M. with a Parole Advisal, which notified him that the Field Office was considering his eligibility for parole, and that he could submit documents in support of his application by November 7, 2017. Quinones Decl. ¶¶ 6–8; *see* Defs.' Ex. 19, at 8–9, Parole Advisal and Scheduling Notification for L.I.L.M. An individual named Freddy Ponce submitted an affidavit of support for L.I.L.M., claiming that they were cousins. Quinones Decl. ¶ 9. L.I.L.M., however, had stated previously under oath that Ponce was "a friend," and that he had "known [Ponce] for three weeks." *Id.*; *see* Defs.' Ex. 19, at 10–13, Form I-867A for E.E.C.S. After reviewing this and the totality of L.I.L.M.'s parole application, the Los Angeles Field Office determined that he had not established his identity or that he was not a flight risk. Quinones Decl. ¶ 10. The Field Office served L.I.L.M. with a letter dated November 15, 2017, informing him of its decision to not grant parole. *Id.* ¶ 12; *see* Defs.' Ex. 19, at 14–15, Letter from Andre Quinones to L.I.L.M. (Nov. 15, 2017).

**ICE's Newark Field Office**

43.     ICE's Newark Field Office is and has been following the substantive and procedural requirements of the Parole Directive since at least June 2017. Perez Dep. 56:10–57:18; *see id.* at 59:3–10 ("[T]he [P]arole [D]irective is clear; we have to conduct a [P]arole [D]irective [review] on anybody that's under credible fear."). The Field Office confirmed as much when, in June 2017, it conducted a review of its policies, procedures, and practices and determined that the January 2017 Executive Orders had "no significant impact" on local operations and policies, including with regard to the implementation of the Parole Directive. Defs.' Ex. 9, at 1. However, the Newark

21

Field Office likely was underreporting the number of parole adjudications it completed from February to September 2017. Perez Dep. 94:9–95:15 (with regard to the 10 out of 10 denial rate: Q: "So does that sound about right to you?" A: "No." Q: "It does not sound about right?" A: "No." Q: "Why do you say that, sir?" A: "We adjudicated a lot more than ten parole reviews during the months of February through September 2017." Q: "How do you know that, Mr. Perez?" A: "I don't have the data right now in front of me to disprove it. It just seems as that's low. It seems as that's not consistent with what I'm seeing in the last 18 months as the person adjudicating it solely in the Newark Field Office.").

44.     The Newark Field Office did not receive any directive to grant parole under the Parole Directive in a certain percentage of cases, Perez Dep. 109:6–10, and did not receive guidance indicating that granting parole under the Parole Directive encouraged migration or the submission of asylum applications, *id.* at 109:15–110:2.

45.     When considering whether to grant parole under the Parole Directive, the Newark Field Office, consistent with the substantive requirements of the Parole Directive, considers on a case-by-case basis whether the applicant has established his identity, whether the applicant has established that he is not a flight risk, and whether the applicant has established that he is not a danger to the community. Perez Dep. 37:5–11; *see id.* at 144:20–145:5. The Newark Field Office also takes into account "additional factors based on the totality of the file and circumstances." *Id.* at 37:11–14.

46.     When determining whether a parole applicant has established his identity, the Newark Field Office considers documents such as passports, originals and copies of birth certificates, national identification cards, and affidavits from individuals attesting to an applicant's identity. Perez Dep. 39:8–40:15; 149:8–14.

47.     When determining whether a parole applicant has established that he is not a flight risk, the Newark Field Office considers the applicant's "community and family ties, employment history, manner of entry, length of residence in the United States . . . record of appearance for [c]ourt hearings, compliance with past reporting requirements, prior immigration and criminal history, agree[ment] to post bond, property ownership, [and] possible relief from protection available." Perez Dep. 164:3–12. In considering flight risk, the Newark Field Office also considers letters from individuals who intend to support a parole applicant. *Id.* at 40:16–21. In this regard, the Newark Field Office allows parole applicants to designate anyone as their sponsor, *id.* at 213:18–214:13, and in evaluating the intended sponsorship, considers the relationship between the applicant and the intended sponsor in the totality of the circumstances, *id.* at 216:11–13. The Newark Field Office does not use categorical determinants in evaluating the flight risk an applicant poses; rather, it evaluates flight risk on a case-by-case basis. *See id.* at 166:3–170:14; 178:20–181:10; 183:22; 185:18–188:7.

48.     When considering whether a parole applicant poses a danger, the Newark Field Office considers an applicant's criminal history in the United States and abroad, Perez Dep. 245:13–22, including evidence that the applicant is rehabilitated, *id.* at 41:1–6; 262:3–9. The Newark Field Office reviews this information based on data systems checks and based on any information the applicant provides. *Id.* at 246:17–247:6. The Newark Field Office does not use categorical determinants in evaluating danger. *See id.* at 247:7–250:10; *see also* 250:8–10 ("[W]e would have to analyze [the criminal conduct that] occurred and combine that with the other factors we are required to look at."); 259:10–12 (whether an applicant with a criminal conviction is a danger "would depend on the criminal conviction, the circumstances behind it").

49.     The Newark Field Office, when evaluating the above factors, accepts, reviews, and

considers "anything that the [applicant] or attorney or sponsor provides for this review process."
Perez Dep. 124:6–125:4.

50.     The Newark Field Office also complies with the procedural requirements of the
Parole Directive. Deportation officers provide arriving aliens determined to have a credible fear
with the Parole Advisal as soon as practicable, Perez Dep. 75:14–76:18, 274:9–17; 275:7–8, con-
duct parole interviews with these individuals using an interpreter, if necessary, *id.* at 280:13–15,
298:4–8, 75:14–76:18, and, if parole is denied, provide the applicants (and their attorneys, if ap-
plicable) with denial letters stating the reason for the denial, *id.* at 299:7–14; 208:21–309:5, and
apprising the applicant of their right to seek a parole redetermination, *id.* at 262:13–263:19. If
parole is denied, the deportation officer serving the applicant with the denial letter also speaks to
the applicant and explains to him, in a language he understands, why parole was denied. *Id.* at
298:9–13, 301:5–18.

51.     Sometime between April and July of 2018, the Newark Field Office identified sev-
eral cases where a parole interview did not take place. Perez Dep. 282:4–17. The Newark Field
Office recognized that failing to conduct a parole interview was "inappropriate[]" and not in com-
pliance with the Parole Directive. *Id.* at 282:14–15. Since the summer of 2018, the Newark Field
Office has conducted parole interviews in every case. *See id.* at 283:13–16.

52.     The Newark Field Office utilizes the Parole Determination Worksheet when mak-
ing parole determination under the Parole Directive. Perez Dep. 125:11–14. Between June 2017
and November 2018, deportation officers in the Newark Field Office also completed a written
"case synopsis," which was submitted with the Parole Determination Worksheet to Newark's de-
ciding official. *Id.* at 125:14–127:7. Based on the fact that the Newark Field Office was the only
field office using a "case synopsis," and in the interest of uniformity across the field offices, the

Newark Field Office Director determined in November 2018 that the "case synopsis" would no longer be used. *See id.*; *see also id.* at 132:17–20.

53.     The Newark Field Office provided N.J.J.R. with an individualized review of his eligibility for parole. N.J.J.R. was served with a Parole Advisal on or about January 2, 2018. Defs.' Ex. 20, Decl. of Ruben Perez, Jr. ("Perez Decl.") ¶ 18 (Apr. 19, 2018); *see also* Defs.' Ex. 20, at 9, Parole Advisal and Scheduling Notification for N.J.J.R.. The Parole Advisal notified him that his interview was scheduled for January 23, 2018, and that he could submit documents in support of his application by that same date. Perez Decl. ¶ 18. The Newark Field Office conducted N.J.J.R.'s parole interview on January 23, 2018, as scheduled. *Id.* ¶ 19. N.J.J.R.'s attorney submitted documents in support of his parole application on or about January 25, 2018. *Id.* After examining the documents, the Newark Field Office concluded that N.J.J.R. failed to provide evidence of a familial relationship with his purported niece, such that he would not be a flight risk, and denied N.J.J.R.'s parole application. *Id.* ¶ 20. The Newark Field Office sent N.J.J.R.'s attorney a letter informing her of its decision on February 6, 2018. *Id.* ¶ 21; *see* Defs.' Ex. 20, at 10, Letter from John Tsoukaris to Jacqueline C. Guinan, Esq. (Feb. 6, 2018).

**ICE's Philadelphia Field Office**

54.     ICE's Philadelphia Field Office "w[asn't] really complying with the [P]arole [D]irective" prior to January 2017. Dunn Dep. at 46:4–17. Rather, the Field Office was "pretty much releasing people whenever possible, even if they didn't hit all of the elements" required under the Directive. *Id.* at 46:4–49:14, 62:3–63:19.

55.     In early 2017, the Philadelphia Field Office conducted a review of its own compliance with agency policies and procedures, a typical practice after a new administration takes office. Dunn Dep. at 41:13–42:14, 42:9–14; *see* Defs.' Ex. 10, at 1. For a brief time after this review, the

Philadelphia Field Office began requiring parole applicants to demonstrate an "urgent humanitarian reason" as a condition for parole eligibility, in addition to the other Parole Directive requirements. Dunn Dep. 38:17–39:15. This was because the Field Office mistakenly read the Parole Directive to include such a requirement, not because of any instruction from DHS or ICE headquarters. *Id.*; *id.* at 40:17–43:9. Around the time the complaint in this case was filed, but before the preliminary injunction issued, the Philadelphia Field Office reviewed its compliance with the Parole Directive again and realized its mistake. *Id.* at 38:17–43:9. The Field Office no longer requires an applicant to show an urgent humanitarian reason to be eligible for parole consideration and is in full compliance with the Parole Directive. *Id.* at 38:17–22.

56.     The Philadelphia Field Office currently utilizes a Parole Advisal/Scheduling Notification form in its parole determinations, and has done so since at least 2011. Dunn. Dep. at 71:17–72:21. Deportation officers provide detainees with copies of the Parole Advisal in person and explain to them what they need to show to establish their eligibility for parole. *Id.* at 75:11–77:20. The officers use translation services to explain the contents of the Parole Advisal to the detainee, if necessary. *See id.* at 149:1–150:20. Field Office personnel use Parole Determination Worksheets to document their parole reviews. *Id.* at 78:4–10. In cases where parole is not granted, the Field Office provides applicants and their attorneys with decision letters informing them of the determination and informing them that the applicant may seek a redetermination. *Id.*; *id.* at 158:4–19.

57.     When the Philadelphia Field Office considers whether an alien has established his identity, there are "no specific document[s] that [are] required to establish identity. [The officers] look at all the documents the alien provides to see if [they]'re comfortable that that person is who in fact they say they are," including passports, official foreign government-issued identification, originals and copies of birth certificates, and affidavits. Dunn Dep. at 79:15–19, 79:3–8. There is

"no magical checkbox to establish your identity." *Id.* at 79:2–3. The Field Office "will accept whatever documentation [the applicants] want to provide, and then [it] will do an individualized assessment of that documentation to determine if they are who they say they are." *Id.* at 80:3–8. The Field Office also considers an alien's own credible statements. *Id.* at 82:5–17. For example, the Field Office recently interviewed a parole applicant who stated that he was a professional baseball player in Cuba; Field Office personnel were able to look him up online and verify that he was who he claimed to be. *Id.*

58.     Similarly, there is "no formula that makes somebody a flight risk or not a flight risk" in the eyes of the Philadelphia Field Office. Dunn Dep. at 94:4–6. The determination is based on "the totality of all the circumstances." *Id.* When the Philadelphia Field Office considers whether an alien is or is not a flight risk, it look at "all sorts of different things," such as the applicant's proposed residence, the applicant's proposed sponsor, the applicant's stated relationship to the proposed sponsor, whether the applicant has any family members or relationships with other people in the United States, and what "equities" the applicant might have in the United States (for example, whether the applicant has a house or business). *Id.* at 83:11–84:1; *id.* at 87:19–91:21; *id.* at 114:4–116:9. The Philadelphia Field Office today "follow[s] the letter of the [Parole] [D]irective and appl[ies] it consistently as it's written," especially with regard to the flight risk analysis. *Id.* at 86:14–19. This differs from years past, when the Field Office was not "looking too deep[ly]" into whether an applicant established a lack of flight risk. *Id.* at 84:2–85:12.

59.     The Philadelphia Field Office considers whether setting a bond or using an alternative to detention, such as ankle monitoring or telephonic reporting, would reduce a parole applicant's flight risk. *See* Dunn Dep. 95:12–99:12.

60.     When evaluating whether a parole applicant presents a danger to the community,

the Philadelphia Field Office examines the specific circumstances of the applicant's backgrounds, such as, for example, the applicant's criminal history, convictions, prior arrests, or warrants. Dunn Dep. at 132:20–133:6. The Field Office examines the facts of the convictions or arrest to assess whether the applicant poses a danger. *Id.* at 133:22–134:9. There is no *per se* rule that an arrest or a criminal conviction makes a parole applicant a danger to the community. *See id.* at 133:22–136:14, 137:11–138:4.

61.     The Philadelphia Field Office accepts requests for parole redeterminations in any form. Dunn Dep. 139:8–142:17. The process for adjudicating a parole redetermination is the same as the process for the initial parole determination, in that a deportation officer makes an initial assessment, an assistant field office director conducts a second-line review, and a deputy field office director makes a final decision. typically within a week of the request. *Id.* at 142:18–144:10, 147:14–19.

62.     The Philadelphia Field Office conducts parole interviews in a language the parole applicant understands. Dunn Dep. at 155:3–8. The Field Office provides parole applicants and their attorneys, where applicable, with written notice of a parole decision in English. *Id.* at 155:21–156:4; *see also id.* at 156:22–158:19. If the applicant does not speak or read English, deportation officers explain the parole decision to the applicant in a language he understands, using a translation service if necessary. *Id.* at 155:21–156:21; *id.* at 159:15–160:15.

63.     Philadelphia Field Office personnel were not instructed to grant parole less often, or that the parole grant rates in the past were too high. Dunn Dep. 58:15–59:18.

64.     The Philadelphia Field Office provided Abelardo Asensio Callol with an individualized review of his eligibility for parole. Mr. Callol was served with a Parole Advisal on January 11, 2018, which notified him that he would be considered for eligibility for parole and informing

him that he could submit documents in support of his application. *See* Defs.' Ex. 21, at 9–10, Parole Advisal and Scheduling Notification for Abelardo Asensio Callol. Mr. Callol's parole interview was conducted on January 12, 2018, through an interpreter. *See* Defs.' Ex. 21, Decl. of Jennifer Ritchey ("Ritchey Decl.") ¶ 8 (Apr. 19, 2018). Mr. Callol was denied parole because he did not provide evidence of an ongoing relationship with his proposed sponsor, and because he did not provide sufficient evidence of a stable residence or other ties to the United States, such that he would not be a flight risk. *Id.* Mr. Callol was provided a letter dated January 12, 2018, notifying him of the Field Office's decision. *Id.*; *see* Defs.' Ex. 21, at 11–12, Letter from Jennifer Ritchey to Abelardo Asensio Callol (Jan. 12, 2018).

65.    The Philadelphia Field Office provided Alexi Montes Castro with an individualized review of his eligibility for parole. Mr. Castro was served with a Parole Advisal on January 11, 2018, which notified him that he would be considered for eligibility for parole and informing him that he could submit documents in support of his application. *See* Defs.' Ex. 21, at 5–6, Parole Advisal and Scheduling Notification for Alexi Montes Castro. Mr. Castro's parole interview was conducted on January 12, 2018, through an interpreter. *See* Ritchey Decl. ¶ 7. Mr. Castro was denied parole because his proposed sponsor had no legal immigration status in the United States, and because Mr. Castro had not otherwise established sufficient ties to the United States. *Id.* Mr. Castro was provided a letter dated January 12, 2018, notifying him of the Field Office's decision. *Id.*; *see* Defs.' Ex. 21, at 7–8, Letter from Jennifer Ritchey to Alexi Ismael Montes Castro (Jan. 12, 2018).

//

//

Dated: September 20, 2019                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director

KATHLEEN A. CONNOLY
Deputy Chief

*/s/ Alexander J. Halaska*
ALEXANDER J. HALASKA
VICTORIA BRAGA
Trial Attorneys
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8704 | Fax: (202) 305-7000
alexander.j.halaska@usdoj.gov

30