# DEFENDANTS' EXHIBIT 12

Excerpts from the Deposition of Diane Lynn Witte

(Dec. 4, 2018)

*Damus v. McAleenan*, No. 1:18-cv-00578-JEB (D.D.C.)

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLUMBIA

3

4     - - - - - - - - - - - - - - - X

5     ANSLY DAMUS, et al.,            :

6               Plaintiffs,      : Civil Action No.

7     vs.                             : 1:18-cv-00578

8     KIRSTJEN NIELSEN, Secretary,    :

9     U.S. Department of Homeland     :

10    Security, in her official       :

11    capacity, et al.,               :

12    - - - - - - - - - - - - - - - X

13

14

15          Deposition of DIANE LYNN WITTE

16               Washington, D.C.

17          Tuesday, December 4, 2018

18                  9:13 a.m.

19

20    Job No. 82879

21    Pages:  1 - 250

22    Reported by:  Dana C. Ryan, RPR, CRR

```
 1

 2

 3

 4                                    December 4, 2018

 5                                    9:13 a.m.

 6

 7

 8

 9              Deposition of DIANE LYNN WITTE, held at

10      the United States Attorney's Office, 501 Third

11      Street, Northwest, Washington, D.C., before Dana

12      C. Ryan, Registered Professional Reporter,

13      Certified Realtime Reporter and Notary Public in

14      and for the District of Columbia, who officiated

15      in administering the oath to the witness.

16

17

18

19

20

21

22
```

Diane Lynn Witte

```
1                   A P P E A R A N C E S

2        ON BEHALF OF THE PLAINTIFFS:

3                EUNICE C. LEE, Esquire

4                JESSICA CABOT, Esquire

5                University of California

6                Hastings College of the Law Center

7                    For Gender & Refugee Studies

8                200 McAllister Street

9                San Francisco, California 94102

10               Telephone:  (415) 581-8836

11               Email: leeeunice@uchastings.edu

12               Email: cabotanna@uchastings.edu

13

14                    - and -

15

16               PATRICIA STOTTLEMYER, Esquire

17               Human Rights First

18               805 15th Street, Northwest

19               Suite 900

20               Washington, D.C. 20005

21               Telephone: (202) 370-3317

22               Email: stottlemyerp@humanrightsfirst.org
```

```
 1        A P P E A R A N C E S   C O N T I N U E D

 2

 3         ON BEHALF OF THE PLAINTIFFS:

 4              BRANDON GOULD, Esquire

 5              JULIA BROWER, Esquire

 6              Covington & Burling LLP

 7              One CityCenter

 8              850 Tenth Street, Northwest

 9              Washington, D.C. 20001

10              Telephone:  (202) 662-6000

11              Email: bgould@cov.org

12              Email: jbrower@cov.com

13

14

15

16

17

18

19

20

21

22
```

```
 1           A P P E A R A N C E S   C O N T I N U E D

 2

 3        ON BEHALF OF THE DEFENDANTS:

 4              VICTORIA M. BRAGA, Esquire

 5              KATHLEEN A. CONNOLLY, Esquire

 6              ALEXANDER J. HALASKA, Esquire

 7              U.S. Department of Justice

 8              Office of Immigration Litigation

 9              450 Fifth Street, Northwest

10              Room 6224

11              Washington, D.C. 20530

12              Telephone:  (202) 305-8627

13              Email: victoria.m.braga@usdoj.gov

14              Email: kathleen.a.connolly@usdoj.gov

15              Email: alexander.j.halaska@usdoj.gov

16

17                      - and -

18

19

20

21

22
```

```
1           A P P E A R A N C E S   C O N T I N U E D

2

3          ON BEHALF OF THE DEFENDANTS:

4               MARYELLEN MEYMARIAN, Esquire

5               ANDREW M. CROW, Esquire

6               U.S. Department of Homeland Security

7               U.S. Immigration and Customs Enforcement

8               500 12th Street, Southwest

9               Mailstop 5900

10              Washington, D.C. 20536

11              Telephone: (202) 732-5319

12              Email: maryellen.meymarian@ice.dhs.gov

13              Email: andrew.m.crow@ice.dhs.gov

14

15

16

17

18

19

20

21

22
```

1                    C O N T E N T S

2

3    EXAMINATION OF DIANE LYNN WITTE              PAGE:

4      By Ms. Lee                                    13

5      By Ms. Braga                                 233

6      By Ms. Lee                                   242

7

8

9

10                   E X H I B I T S

11           (Attached to the Transcript)

12   WITTE DEPOSITION                            PAGE:

13   Exhibit 1     U.S. Immigration And Customs     20

14                 Enforcement Policy Directive

15                 11002.1, Effective Date

16                 January 4, 2010

17   Exhibit 2     Court Order Granting             32

18                 Plaintiffs' Motion For

19                 Preliminary Injunction And

20                 Plaintiffs' Motion For Class

21                 Certification

22

```
 1          E X H I B I T S   C O N T I N U E D

 2             (Attached to the Transcript)

 3     WITTE DEPOSITION                        PAGE:

 4     Exhibit 3    July 9, 2018 Notification       66

 5                  Declining To Grant Parole To

 6                  Antonio Mateo And Maria Nivia

 7     Exhibit 4    Declaration Of Diane L. Witte,   96

 8                  Deputy Field Office Director

 9     Exhibit 5    Declaration Of Anne Daher       142

10     Exhibit 6    Defendants' Status Report For   145

11                  November 2018

12     Exhibit 7    August 2018 El Paso             153

13                  Spreadsheet Attached To The

14                  August 2018 Status Report

15     Exhibit 8    September 2018 El Paso          153

16                  Spreadsheet Attached To The

17                  September 2018 Status Report

18     Exhibit 9    October 2018 El Paso            153

19                  Spreadsheet Attached To The

20                  October 2018 Status Report

21

22
```

```
 1              E X H I B I T S   C O N T I N U E D

 2                (Attached to the Transcript)

 3      WITTE DEPOSITION                            PAGE:

 4      Exhibit 10    November 2018 El Paso          153

 5                    Spreadsheet Attached To The

 6                    November 2018 Status Report

 7      Exhibit 11    U.S. Department Of Homeland    163

 8                    Security, U.S. Immigration

 9                    And Customs Enforcement

10                    Record Of

11                    Determination/Parole

12                    Determination Worksheet For

13                    Antonio Mateo And Maria Nivia

14      Exhibit 12    U.S. Department Of Homeland    172

15                    Security, U.S. Immigration

16                    And Customs Enforcement

17                    Record Of

18                    Determination/Parole

19                    Determination Worksheet For

20                    Catalan Garcia And Lidia

21                    Yolanda

22
```

```
1              E X H I B I T S   C O N T I N U E D

2                  (Attached to the Transcript)

3     WITTE DEPOSITION                          PAGE:

4     Exhibit 13   U.S. Department Of Homeland      177

5                  Security, U.S. Immigration

6                  And Customs Enforcement

7                  Record Of

8                  Determination/Parole

9                  Determination Worksheet For

10                 Valentin-Bakoume, Oumbiliteck

11    Exhibit 14   U.S. Department Of Homeland      180

12                 Security, U.S. Immigration

13                 And Customs Enforcement

14                 Record Of

15                 Determination/Parole

16                 Determination Worksheet For

17                 Abadi-Osorio, Armando

18

19

20

21

22
```

```
 1            E X H I B I T S   C O N T I N U E D

 2              (Attached to the Transcript)

 3    WITTE DEPOSITION                        PAGE:

 4    Exhibit 15   U.S. Department Of Homeland    199

 5                 Security, U.S. Immigration

 6                 And Customs Enforcement

 7                 Record Of

 8                 Determination/Parole

 9                 Determination Worksheet For

10                 Kassas, Amer

11    Exhibit 16   U.S. Department Of Homeland    204

12                 Security, U.S. Immigration

13                 And Customs Enforcement

14                 Record Of

15                 Determination/Parole

16                 Determination Worksheet For

17                 Qaneei Fard, Erfan

18

19

20

21

22
```

```
 1              E X H I B I T S   C O N T I N U E D

 2              (Attached to the Transcript)

 3     WITTE DEPOSITION                           PAGE:

 4     Exhibit 17   U.S. Department Of Homeland       207

 5                  Security, U.S. Immigration

 6                  And Customs Enforcement

 7                  Record Of

 8                  Determination/Parole

 9                  Determination Worksheet For

10                  Ali, Shujaat

11     Exhibit 18   U.S. Department Of Homeland       209

12                  Security, U.S. Immigration

13                  And Customs Enforcement

14                  Record Of

15                  Determination/Parole

16                  Determination Worksheet For

17                  Sacko, Lansana

18     Exhibit 19   Declaration Of                    225

19                  Linda Corchado, Esquire

20

21

22
```

```
1                 P R O C E E D I N G S

2             - - - - - - - - - - - - - - -

3                 DIANE LYNN WITTE,

4    having been duly sworn, testified as follows:

5             - - - - - - - - - - - - - - -

6             MS. BRAGA:  Before we begin, defendants

7    would like to put on the record that all

8    objections except for those as to form, privilege

9    and the scope of the court's order are preserved

10   until trial and not waived.

11            MS. LEE:  Okay.  Understood.  Thank

12   you.

13      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

14       BY MS. LEE:

15       Q    Good morning, Ms. Witte.  Thank you for

16   coming here.  I know it's a bit of a ways for you.

17            I'm Eunice Lee with the Center for

18   Gender & Refugee Studies.  I represent plaintiffs

19   in this action.

20            Can you please state your full name for

21   the record?

22       A    Diane Lynn Witte.
```

Diane Lynn Witte
Washington, DC

1          A     Yes.

2          Q     Okay.  And how were you able to do

3     that?

4          A     Maintain consistent --

5          Q     Uh-huh.

6          A     Okay.  This directive was implemented

7     in 2010, which is significantly prior to when I

8     arrived at the El Paso field office.  The

9     individuals performing the daily duties of

10    adjudicating parole requests, conducting

11    interviews, et cetera, were well-versed in the

12    policy prior to my arrival, and the policy hasn't

13    changed.

14         Q     It hasn't changed since -- since when?

15         A     When it was issued in 2009.

16         Q     Okay.  Have any of the practices

17    regarding the policy changed even though the

18    written policy itself has not changed?

19         A     Not to my knowledge.

20         Q     Since from 2010 to date -- to today,

21    there haven't been changes in practices with

22    regard to parole?

```
 1          A     I can only speak for the time that I

 2     was actually present in the office.

 3          Q     Uh-huh.

 4          A     So that would be from January 2017, and

 5     they did not change during the time that I was

 6     there.

 7          Q     Sorry.  I know we covered this before,

 8     but immediately before January 2017, where --

 9     where were you?  You were --

10          A     I was a unit chief --

11          Q     Okay.

12          A     -- for removal and international

13     operations.

14          Q     Okay.  Can we go back to your

15     responsibilities as deputy field office director

16     with regard to parole?

17          A     Okay.

18          Q     What were your main areas of

19     responsibility in the parole process -- or what

20     are in that capacity?

21          A     The adjudication of paroles is

22     initiated by the deportation officers.  The
```

1    El Paso assistant field office director and the

2    Otero assistant field office director, is there

3    any coordination between the three assistant field

4    office directors to ensure that there's

5    consistency between their offices or between their

6    respective jurisdictions?

7         A    Not to my knowledge.

8         Q    Okay.  Are the practices between the

9    three jurisdictions consistent?

10        A    As far as I've seen, they are

11   consistent.

12        Q    Okay.  Can you describe how they are

13   consistent?

14        A    The officers serve the parole advisals.

15   They conduct interviews with the aliens.  They

16   review the documentation submitted by the alien

17   and/or the attorney.  They conduct any further

18   review that they need to regarding the evidence

19   submitted in the interview conducted.  They

20   complete the parole determination worksheet and

21   submit it to the first-line supervisor for review

22   and concurrence, and then the first-line

1    supervisor submits it to the deciding official for

2    a final decision.

3              That's a consistent practice throughout

4    the field office.

5         Q    What about -- are results between the

6    three field office -- or assistant field office

7    directors -- are the outcomes consistent, meaning

8    that, you know, if an individual presented the

9    same set of facts to all three officials, would

10   there be roughly the same decision made in those

11   cases?

12        A    I have no way of knowing that honestly.

13   It's a -- parole is a discretionary decision on

14   the part of the officer reviewing, the first-line

15   supervisory reviewing and the deciding official.

16        Q    Okay.  Can you describe the scope of

17   that discretion?

18        A    I don't understand what that means.

19        Q    You just mentioned that parole is a

20   discretionary decision by the first-line officer

21   and then the subsequent levels of review.

22             Can you describe what you mean by it

1    review documents differently or require slightly

2    different documents.

3            Can you describe the role of an

4    individual deportation officer in parole

5    determination?

6        A    The officer in charge of the particular

7    alien's case is typically the officer who is going

8    to conduct the parole determination, and that

9    officer will upon receipt of information from

10   United States citizenship and immigration services

11   of a positive credible fear decision.

12           The officer will serve the parole

13   advisal on the alien and indicate all the

14   documents that the alien is able -- you know, that

15   would be acceptable for the alien to produce as

16   evidence in favor of a parole grant.  And it also

17   indicates the time and date of the interview as

18   well as where the alien can submit the

19   documentation that they want to -- want to submit.

20           At the time and date of the interview,

21   the deportation officer would then interview the

22   alien and collect any documentation that the alien

1    might have.  And then the officer would review

2    everything and make a determination -- or make

3    recommendation using the parole determination

4    worksheet.

5         Q     Roughly, how many deportation officers

6    are there in the El Paso jurisdiction?

7         A     I don't know that information offhand.

8         Q     Okay.  Do you know roughly how many

9    individuals are assigned to a single deportation

10   officer?

11        A     How many --

12        Q     In El Paso?

13              How many cases or how many individuals

14   they oversee in total of all detained folks?

15        A     All detained population?

16        Q     Uh-huh.

17        A     I don't know the exact breakdown of the

18   dockets.

19        Q     In terms of arriving asylum seekers,

20   how many typically -- cases, you know, involving

21   parole determinations would a single officer

22   conduct, say, in a month?

```
 1    supervises the deportation officers reviewing the

 2    parole request, their job is to review those

 3    parole determination worksheets and any other

 4    documentation they feel is necessary for review in

 5    order to make a recommendation to the deciding

 6    official.

 7         Q    Do they examine all documents submitted

 8    in support of a parole request?

 9         A    It isn't my practice to sit with those

10    supervisors to watch exactly what they do.  They

11    have available to them the A-File and all the

12    documents submitted for their review.

13         Q    And would you say that this

14    examination -- is it a de novo review?  Is it,

15    like, a fresh look, or is it more to just confirm

16    what the first officer had decided?

17         A    So each reviewing official is able to

18    access documents, is able to access the officer

19    who -- who made the determination or made the

20    recommendation.  They're able to ask questions.

21    These officers are usually located relatively

22    close together, and everybody has the ability
```

1    to -- to talk if there are questions.

2              It's -- I rely upon the officers to,

3    you know, have a very thorough review of the

4    A-File, of the documents submitted, et cetera, and

5    that -- that review is something that, you know,

6    we place trust in.

7         Q    Can you describe a little bit more how

8    you place trust in that first line of review?

9              MS. BRAGA:  Objection to form.

10        BY MS. LEE:

11        Q    Okay.  Can you describe what you mean

12   by you place trust in that review?

13        A    The officers have training, and they

14   have access to the policy.  They have access to

15   the office of chief counsel, and there are

16   supervisors and many more experienced deportation

17   officers in their units.

18             All those factors go into a comfort

19   level of -- and the fact that these -- these folks

20   do this work every day.  This is their job.  And

21   all of that goes into the -- the reliability of

22   them performing their job appropriately.

1       Q       What about the types of information

2    that your office looks at?  Has that changed at

3    all since the issuance of the PI?

4       A       No, that information is covered under

5    the advisal.  And the advisal hasn't changed, so

6    the requirements of the documentation have not

7    changed.

8       Q       Have the practices changed at all since

9    the issuance of the PI in any way?

10      A       The officers have been instructed to

11   provide greater detail on the parole determination

12   worksheet with regard to their comments in the

13   comment section.

14      Q       Okay.  Can you describe a little bit

15   more what you mean by "greater detail"?

16      A       For example, if the alien is unable to

17   provide a sponsor address for where they'll be

18   residing if they were to be released, then the

19   parole determination worksheet in that section

20   should indicate that the alien did not provide an

21   address.

22      Q       And previously how much detail was

1    It doesn't go into as great a detail regarding the

2    documents that are acceptable as the parole

3    advisal does.  So my answer can be more complete

4    if I can access that advisal.

5         Q     Okay.

6         A     But in lieu of that, the alien can

7    submit valid government-issued documents that

8    would support their identity from their country of

9    origin.  If they cannot access those documents,

10   the alien can request those documents from their

11   government by contacting their embassy or

12   consulate.

13              The alien can provide a sworn affidavit

14   from a third party who can attest to that alien's

15   identity and can also provide proof of their own

16   identity to the satisfaction of the ICE officer.

17              And it's possible that if the alien is

18   able to establish his or her own identity through

19   credible statements, that that would be acceptable

20   as well.

21        Q     So we'll get you a copy of the parole

22   advisal and ask you some questions about that

Diane Lynn Witte
Washington, DC

1      after the break.

2          A      Okay.

3          Q      But I just wanted to know, you know,

4      based on your experience, how is identity -- you

5      know, what is required for identity in the El Paso

6      field office?

7          A      The documents listed on the parole

8      advisal --

9          Q      Okay.

10         A      -- are the ones that are accepted.

11         Q      And are -- can individuals ever

12     establish identity without documents?

13         A      If they provide a third-party

14     affidavit, they could possibly do that.

15         Q      Okay.

16         A      Or credible statements.

17         Q      Okay.  And what would constitute

18     credible statements?

19         A      Statements from the alien that indicate

20     to the officer who is reviewing the statements

21     that the alien is who they say they are.

22         Q      Okay.  And in your experience, are

1    these sort of statements ever accepted as proof of

2    identity absent documentation?

3         A    I have not, myself, conducted any

4    parole determinations where these types of

5    statements have been used.

6         Q    Okay.  Have you ever reviewed any where

7    they've been deemed sufficient?

8         A    Not to my knowledge.

9         Q    Okay.  Do you know if your field office

10   ever grants parole without documents, just based

11   on credible statements for identity?

12        A    I don't know that information.

13        Q    Have the documents or information

14   accepted to establish identity -- has that changed

15   with the PI in place?

16        A    The documents accepted for proving

17   identity is the same; the parole advisal is the

18   same since before the PI.

19        Q    Does your office review identity

20   documents provided for authenticity?

21        A    How do you mean?

22        Q    To make sure that they're not

1    fraudulent or that they're true copies?

2        A    The -- if the officer thinks that there

3    may be a fraudulent document, then the officer

4    would take steps to confirm that that document is

5    true.

6        Q    Can you describe those steps?

7        A    It's possible that the officer would

8    contact the consulate to find out if that

9    particular document had been issued by the

10   country.  There's the fraudulent document

11   laboratory that could also review the document as

12   well.

13       Q    Have the practices for -- with regard

14   to requiring a class member to establish

15   identity -- have those changed at all at any point

16   in time while you were at the El Paso field

17   office?

18       A    Can you repeat the question?  I'm

19   sorry.

20       Q    Have -- the practices for establishing

21   identity or ensuring that the class member

22   establishes identity, have those practices changed

 1    at all since you've been at the El Paso field

 2    office?

 3         A     No.

 4         Q     Okay.  You mentioned that flight risk

 5    was also a criteria -- or basis for denial in

 6    cases.

 7              Can you describe what your

 8    understanding is of flight risk from your

 9    experience in reviewing parole determinations and

10    in the parole process?

11         A     Sure.  For the alien not to be

12    considered a flight risk, they have to demonstrate

13    that they're likely to appear as required; that

14    includes for hearings as well as any type of

15    reporting in that the docket officer may require.

16              The things that we take into

17    consideration would be family ties, equities in

18    the United States, employment history, manner of

19    entry, length of residence in the United States,

20    stability of residence, record of appearance for

21    court hearings, compliance with reporting

22    requirements, prior immigration and criminal

1    history, property ownership to name a few.

2         Q      What's the relevance of length of

3    residence in the United States for an arriving

4    asylum seeker with regard to flight risk?

5         A      The alien needs to show that they have

6    a stable place to reside.  Length of residence

7    would indicate that.

8         Q      Does it have to be their own residence?

9         A      It's where the alien will reside.

10        Q      Okay.  But you mentioned length of

11    residence, so if they will reside there, does it

12    matter that they haven't resided there before?

13        A      There's length of residence in the

14    United States which is considered --

15        Q      Okay.

16        A      -- which perhaps an arriving alien may

17    not have unless they're returning to the United

18    States.

19               Is that what you're asking about?

20        Q      Yes, I'm asking --

21        A      Okay.

22        Q      -- what that means.  What length of

1    residence means for arriving asylum seekers.  So

2    in some cases it could be length of residence if

3    they previously lived in the United States?

4         A     It's possible.  For example, an alien

5    returned home for a family funeral or something

6    like that, and -- and they're coming back.

7         Q     Okay.

8         A     And they have a house that they own

9    here, and they've owned that house for five years.

10   That would be length of residence.

11        Q     Okay.  And if an arriving asylum seeker

12   could not establish any prior residence or any

13   length of residence, how would that factor into a

14   parole determination on flight risk?

15        A     That factor would be weighed amongst

16   the rest of the factors that are considered, and a

17   determination would be made upon the totality of

18   the circumstances.

19        Q     Is not having any length of prior

20   residence in the United States -- is that

21   considered a negative factor for a flight risk?

22        A     It's a factor that goes towards whether

1    the alien is able to show that he or she would

2    reliably appear for court appearances or scheduled

3    reporting dates.

4         Q      Okay.  And how -- how would the factor

5    be weighed?

6         A      If they're unable to show that they

7    have a stable residence, then that's a -- that's

8    obviously a negative factor .

9         Q      Okay.  And is it a negative factor if

10   they've never lived in the United States before?

11        A      Again, that's a factor.

12        Q      Okay.

13        A      And -- and there's other things

14   considered as far as somebody who has no prior

15   history in the United States.  Are they able to

16   come up with a sponsor?

17        Q      Okay.

18        A      That -- and --

19        Q      Okay.  So it's a factor.  But would you

20   describe it as either negative or positive?

21        A      If they had no history in --

22        Q      No, length --

1        A      -- in the United States?

2        Q      -- of residence in the United States?

3        A      It's neither negative or positive.  The

4    alien has the opportunity to provide other

5    evidence of a stable residence.

6        Q      Have there been any changes since the

7    PI was issued on how the flight risk criteria is

8    evaluated?

9        A      No, not to my knowledge.

10       Q      Is recency of entry a factor in a

11   flight risk assessment for parole purposes?

12       A      Recency of entry could indicate that

13   the alien is unable to establish a stable

14   residence, family ties, equities in the United

15   States, et cetera.  So on its own, recent entry

16   may not be the factor; it may contribute to the

17   alien being unable to overcome other flight risk

18   factors.

19       Q      Can you describe more what you mean,

20   family ties or ties to the community -- well,

21   first family ties?  Are those required?

22       A      These are indicators that -- these are

Diane Lynn Witte
Washington, DC

1    things that the alien can provide to the officer

2    for consideration in favor of a parole grant.

3    These are one of -- some of many factors that are

4    considered during the parole determination

5    process.

6            So the lack of family ties may not

7    be -- if -- if that's all that's missing but we've

8    established identity, we've -- we've got these

9    other overriding factors, then lack of family ties

10   may not be the deciding factor for parole denial.

11       Q    Is it considered a negative, though,

12   not to have family ties?

13       A    It's one of the factors that if -- you

14   know, if you think of it as a check sheet for

15   what -- what can the alien provide evidence for in

16   favor of parole and what do they not have, you

17   know, it -- it's a -- a balancing.

18            And then a determining at the end of

19   the review of all the evidence provided:  Does the

20   officer feel comfortable that this alien will

21   comply with immigration requirements if released

22   on parole.

1         A       -- directive.

2         Q       Just in your experience, who is

3    accepted, you know, from the parole determinations

4    that you've reviewed or have experience with, in

5    general what types of sponsors are accepted?

6         A       Sponsors need to be able to provide

7    information relating to a stable address,

8    indicators that they currently reside at that

9    address and have, for example, a telephone bill or

10   a utility statement.

11                These individuals need to be green card

12   holders or U.S. citizens.  They need to prove

13   their identity.  And oftentimes they need to be

14   able to explain their relationship to the alien

15   they're going to sponsor.

16        Q       And when they mention they have to

17   explain the nature of their relationship, what

18   types of relationships are accepted?

19        A       That deportation officer needs to be

20   able to confirm the -- when I say "relationship,"

21   how the alien knows the sponsor and how the

22   sponsor knows the alien.

1          Q       Okay.

2          A       And, you know, these stories have to --

3     have to match.  If the sponsor says they don't

4     know who the alien is, then that may not be a good

5     sponsor.

6                  So -- or vice versa with the alien.  If

7     the alien can't describe how they know the

8     sponsor, then they may not actually know them.

9          Q       Does the sponsor have to be an

10    immediate family member --

11         A       No, not necessarily.

12         Q       -- of the applicant?

13         A       No.

14         Q       What about a relative?

15         A       It's possible that they are, but it's

16    not necessarily -- it's not required.

17         Q       Okay.  Is it often expected that the

18    person be related to their sponsor?

19         A       I think you could say it's a typical

20    situation; although, it's not the only situation

21    in which a sponsor would be approved.

22         Q       Okay.  Are sponsors -- are parole

1    applications ever denied because a sponsor is not

2    a relative?

3         A     I don't want to speculate on that.  It

4    hasn't been my experience that that's the sole

5    reason that there's a denial.  There would have to

6    be additional factors that would come into play.

7         Q     Is a biological relationship to the

8    applicant required?

9         A     Not required, no.

10        Q     Is it ever required by any officers?

11        A     That, I wouldn't be able to speculate

12   on.

13        Q     Is a friend relationship sufficient for

14   a sponsorship?

15        A     As long as the sponsor and the alien

16   can both describe how they know each other and the

17   stories are relatively similar and the sponsor is

18   able to financially provide for the alien, provide

19   a stable address, provide a utility bill, those

20   are the requirements.

21        Q     What about a community shelter?  Would

22   that be a sufficient relationship or a sufficient

1        Q       Okay.  And as you understand this

2    document, is one of these four things listed

3    required to establish identity or -- among

4    these -- are these the only documents or the only

5    information that can show identity?

6        A       These -- so this form indicates for the

7    alien the -- the documents and the evidence that

8    can be provided that would provide the most

9    favorable outcome for the alien.  Of course the

10   alien is able to provide any additional

11   documentation that they have, but these documents

12   listed here are the ones that are going to -- that

13   will likely carry the most weight because they're

14   the most typical documents that a deportation

15   officer would be familiar with and would be

16   comfortable with -- with looking at.

17            As far as how many documents need to be

18   provided, that's also covered.  If they have their

19   original, valid passport, that's all they need.

20   But if they only have a copy of the passport, then

21   they need to provide an additional document.

22       Q       Okay.

1    well.  Additional information like that is always

2    helpful.

3        Q    Okay.  And when this -- in your

4    understanding, when this document specifies what

5    the sponsor must include, is that a requirement

6    for sponsors; they must -- you know, as you went

7    through -- you know, they must include their full

8    name, et cetera, et cetera, is that understood to

9    be a requirement?

10       A    Yes.

11       Q    Okay.  And what happens if the sponsor

12   fails to abide by one of these requirements, for

13   example, providing a copy of their passport or

14   green card?

15       A    If the sponsor fails to do any of the

16   things that it says must be included, it is

17   possible that that sponsor would not be approved.

18       Q    Okay.  And when you say "possible," is

19   that -- would you say most likely they wouldn't be

20   approved?

21       A    There's a variety of factors that go

22   into making each individualized determination.

```
1    There are no blanket approval or denial policies

2    for ERO El Paso.

3         Q      Okay.

4         A      So I wouldn't be able to comment on the

5    likely outcome of that situation.

6         Q      All right.  But you did previously say

7    that these generally are understood as

8    requirements for the sponsor --

9         A      Yes.

10        Q      -- and -- okay.

11               And that would be conveyed to the

12   applicant?

13        A      Correct.

14        Q      All right.  What is your understanding

15   for where these requirements come from or what is

16   the basis for these requirements?

17        A      The parole advisal and scheduling

18   notification is a form that was distributed along

19   with the parole directive in 2009.  I would -- in

20   2009, I was a supervisory immigration enforcement

21   agent.  I would have had no participation in

22   coming up with these requirements or knowledge of
```

1    documents listed on the advisal.

2         Q    What if an individual doesn't have any

3    criminal history because all these appear to --

4    they reference, you know, acquittal or dismissal

5    of charges or evidence of rehabilitation?

6              So for an applicant with no criminal

7    history, what, if anything, are they required to

8    submit on showing they're not a danger to the

9    community?

10        A    They're not required to submit any

11   documentation.  It's up to them whether they're

12   able to submit any additional documentation.  They

13   may not have acquittal or dismissal of criminal

14   charges, but they may be volunteers in -- in their

15   church or some other outside organization.  They

16   may have completed a degree.  All of that

17   information, they could provide as well.

18        Q    Okay.  And in your understanding,

19   who -- does the applicant have to affirmatively

20   show they're not a danger to the community?

21        A    It's -- the officer making the

22   determination needs to feel comfortable that the

1    alien is not a danger to the community.  The alien

2    can play a role in that by providing the

3    documentation listed on the parole advisal.

4            If the alien doesn't do that, the

5    deportation officer will still make a

6    recommendation related to danger to the community

7    on the evidence that they've already got available

8    to them.

9        Q    Okay.  So who would you say that -- the

10   applicant then bears the burden to show they're

11   not a danger to the community?

12       A    The applicant is able to present an

13   argument to their case by producing evidence;

14   otherwise, they rely on the deportation officer's

15   assessment of the available evidence.

16       Q    Okay.  My question is if they bear the

17   burden to show they're not a danger.

18            Is that how -- is that, in practice,

19   what's required by ICE or no?

20       A    It's a factor that weighs in for sure.

21            If they're able to produce additional

22   documentation, then -- that shows, you know,

1    favorable activity within the community, then that

2    would be a -- a favorable piece of evidence

3    indicating -- that the officer could use.

4         Q    And in the case of an applicant who

5    provides no evidence, what -- what would be the

6    process for assessing danger to the community by

7    an officer?

8         A    If they provide no documentation?

9         Q    Correct.

10        A    The officer would look at criminal

11   history, any additional information that perhaps

12   the alien volunteered during an interview of --

13   when they were processed or any information during

14   any of the interviewing times: during the parole

15   interview, the processing interview, any time the

16   alien has talked to the officer.

17             All that information might be used but

18   criminal history would be and perhaps even any

19   documented disciplinary infractions while the

20   alien was detained in a facility.

21        Q    Does ICE ever require applicants to

22   show they have no criminal history in their

1    country of origin?

2        A    Aliens are not required to show

3    anything -- to show their criminal history in

4    their country of origin.  Occasionally ICE is able

5    to do determine that on their own.

6        Q    Okay.  And, so, you described that this

7    document has been in existence since the issuance

8    of the parole directive; is that your

9    understanding?

10       A    It's my understanding.

11       Q    Okay.  Have there been -- let's say, in

12   your -- since the issuance of the PI, have there

13   been any changes in El Paso in the way that this

14   document is interpreted with respect to anything

15   we've talked about today?

16       A    To my knowledge, no.

17       Q    Okay.  What about before the issuance

18   of the PI, any changes with regard to the

19   interpretation of this document?

20       A    Not to my knowledge.

21       Q    Okay.  If you could flip to the

22   beginning of this same exhibit, I wanted to ask

1    factors as you've described them present, how is

2    that considered with regard to parole application?

3         A    The humanitarian factors are simply an

4    additional factor that is taken into

5    consideration.  The absence of a humanitarian

6    factor does not necessarily mean that a parole

7    will be denied.

8         Q    Okay.  So if I can turn your attention

9    to paragraph 23, the last paragraph.  If you can

10   read the first two sentences of this paragraph.

11        A    Sure.

12        Q    Thank you.

13        A    I, or a designee, reviewed the request

14   for consideration of parole, considered the

15   statements, evidence, facts therein, and

16   determined H.A.Y. was a recent entrant who did not

17   meet any humanitarian factors for release on

18   parole.  It was also noted that H.A.Y. was a

19   recent entrant and thus presented a flight risk.

20        Q    Can you explain before issuance of the

21   PI the relevance of recency of entry on a parole

22   determination?

1           A     Yes.  With regard to parole

2     determinations, recent -- the term "recent

3     entrant" was a type of shorthand used within the

4     El Paso field office to indicate a particular

5     alien who had recently arrived at the country in

6     the U.S., did not have -- was lacking significant

7     equities as far as ties to the community, family

8     ties, stability of residence, length of residence,

9     employment history, all those -- all those things

10    that we talked about earlier that go towards

11    indicating that an alien is likely to appear for

12    court, immigration proceedings and any reporting

13    that's required by immigration.

14          Q     Okay.  And these -- the -- as a result

15    you're saying of the recency of entry; is that

16    correct?

17          A     Correct.

18          Q     Okay.  And prior to the issuance of the

19    PI, was that considered a negative factor for

20    purposes of parole?

21          A     (Witness reviews document.)

22                Because the alien was unable to provide

Diane Lynn Witte
12/4/2018
Washington, DC
Page 136

1    deportation officers.  So if an arriving asylum

2    seeker wants to speak with a deportation officer

3    with questions about the parole process, how can

4    they go about doing so currently?

5        A    The aliens are able to contact their

6    deportation officers via staff-detainee

7    communication.  There's a deportation officer that

8    comes and collects -- they have, essentially,

9    sheets that they can fill out that will go to

10   their case officer, and the staff-detainee

11   communications officer would come by and collect

12   those sheets.

13          The alien has the opportunity to speak

14   with the staff-detainee communication officer as

15   well.  Or the sheet will be answered by the

16   deportation officer or the detainee will get a

17   visit from the deportation officer depending on

18   what the particular request is.

19          In addition, the detainee is going to

20   be interviewed upon service of the parole advisal.

21   There's a scheduling of the interview date and

22   time indicated on the parole advisal where the

1    alien will have a chance to speak about anything

2    related to parole, any questions they have related

3    to the case, to their eligibility for parole, to

4    the documents they need to provide, how to provide

5    those documents, et cetera.

6         Q     How often are these sheets collected

7    from detainees?

8         A     The staff-detainee communication

9    sheets?

10        Q     Yeah.

11        A     It depends on the facility, but

12   typically three times a week.

13        Q     And can an individual request an

14   in-person meeting with the deportation officer

15   through these sheets?

16        A     Yes.

17        Q     Okay.  If they request one, will

18   they -- will they necessarily get such a meeting?

19        A     Most likely someone will come and speak

20   with them.  It may not be the case officer

21   depending on availability, but someone will

22   respond to the request.

1        Q       How promptly would a meeting be

2    scheduled?

3        A       It really depends on staffing

4    availability.

5        Q       Okay.  Is it normal for a written

6    request to perhaps, say, go maybe three to four

7    weeks without being -- before any meeting is

8    scheduled?

9        A       I wouldn't really have information on

10   that.

11       Q       If a detained individual wishes to

12   write -- provide supplementary materials to a

13   deportation officer, how can they do so?

14       A       The parole advisal indicates how to

15   provide information to their deportation officer.

16   In addition, they can submit that documentation to

17   any of the correctional officers in the facility

18   and indicate that it needs to go to an ICE

19   officer.  They can provide it to the

20   staff-detainee communication officer.  They can

21   provide it to their case officer.  They can mail

22   it.  Their attorney can drop it off in person or

1    email it to the case officer.

2              There are numerous avenues for

3    providing documentation.

4              A family member can drop off

5    documentation.

6         Q    Okay.  And, so, if they provide it

7    to -- you said a correction officer -- any

8    correction officer, it will make its way to their

9    case officers --

10        A    Yes.

11        Q    -- is that correct?

12        A    Uh-huh.

13        Q    Okay.  And if a sponsor wishes to

14   communicate with a deportation officer, are they

15   able to do so directly?

16        A    Yes.

17        Q    Okay.  Can you describe how that would

18   happen?

19        A    If the sponsor has the deportation

20   officer's phone number, they're able to call.  If

21   they don't have that information, they can drop by

22   the office during business hours and request to

1    speak with the deportation officer.  If the

2    deportation officer is available, they will likely

3    come and speak with the individual at that time.

4    If they're unavailable, they may provide a phone

5    number, provide a time for the individual to come

6    back or someone else may ask if they can help.

7         Q    Okay.  If the sponsor doesn't have the

8    phone number of the deportation officer and

9    they're not able to go in person, is there any way

10   they can get in touch with the deportation

11   officer?

12        A    The individual can go to the ICE Web

13   site and obtain the phone number for the El Paso

14   field office and call the El Paso field office and

15   ask for the deportation officer in that way as

16   well.  If the deportation officer is not

17   available, they're able to leave a phone mail and

18   provide a number for a response.

19        Q    Okay.  And are those messages typically

20   returned?

21        A    To my knowledge, yes.

22        Q    And promptly?

```
1        A      It really depends on staffing and

2   availability of the particular officer.  If that

3   officer is on leave for two weeks and they left a

4   message, then as promptly as possible.

5        Q      And is there a way for a sponsor to

6   provide documents directly to a deportation

7   officer?

8        A      Yes.  The sponsor can mail the

9   documents; they can drop them off in person; they

10   could email the documents.

11              MS. LEE:  Okay.  I think this is a good

12   stopping point, so break for lunch, I guess.

13              (Recess -- 12:02 p.m.)

14              (After recess -- 1:11 p.m.)

15        BY MS. LEE:

16        Q      All right.  Welcome back.  Thanks for

17   coming back.  And we just wanted to talk a little

18   bit about parole statistics.  And I know before

19   you said you weren't yourself directly aware of

20   them, but we're going to provide you some

21   documents and see if you can offer any thoughts on

22   what they reflect.
```

1        Q      Okay.

2        A      It's a custom and border protection

3    component.

4        Q      For the record, thank you.

5               Would you say the officers at the

6    El Paso processing center are -- you said that

7    they handle more parole -- or more CFI cases than

8    any other detention centers; is that correct?

9        A      I said they likely do.

10        Q      Okay.

11        A      I don't know for a fact that they do.

12        Q      Is the training that the officers

13    receive at the El Paso processing center different

14    from the trainings at the other detention centers?

15        A      The training should be exactly the

16    same.

17        Q      All right.  Were you at any period of

18    time -- prior to the issuance of the PI, did you

19    receive any instructions at all from any DHS

20    official regarding parole grant or denial rates?

21        A      As in requirements for --

22        Q      Instructions -- with regard to the

Diane Lynn Witte

```
1    rates, if they were too high or too low --

2         A     No.

3         Q     -- or instructions for a target grant

4    or denial rate?

5         A     No, I did not.

6         Q     Okay.  What about after that issuance

7    of the PI?

8         A     No.

9         Q     Prior to the issuance of the PI, are

10   you aware of any instruction from any DHS official

11   about what standard individuals -- let me walk

12   that back.

13           Okay.  Prior to issuance of the PI, did

14   you receive any instructions from any DHS

15   officials about the standard that should apply in

16   reviewing whether an applicant established

17   identity?

18        A     We received the parole directive, and

19   we used the parole advisal and notification form

20   that indicate those factors that need to be taken

21   into account.

22        Q     Okay.  Anything other than that -- than
```

```
 1    those documents?

 2         A     Not that I'm aware of.

 3         Q     Okay.  What about for flight risk?

 4         A     Not that I'm aware of.  Just the

 5    documents I just mentioned.

 6         Q     Okay.  Any for danger to the community?

 7         A     Not that I'm aware of.

 8         Q     Okay.  How about for exceptional

 9    circumstances?

10         A     Not that I'm aware of.

11               MS. LEE:  Can we have Antonio Mateo?

12               MS. CABOT:  So this is Exhibit 11.

13               MS. BRAGA:  Ten?

14               MS. CONNOLLY:  No, we had 10 already.

15               MS. CABOT:  We had 10 already.

16               MS. BRAGA:  Okay.

17               MS. CONNOLLY:  It's the November

18    report.

19               MS. CABOT:  And then the denial letter

20    for this case was Exhibit 3 in case you reference

21    it.

22               MS. LEE:  Okay.
```

```
 1          BY MS. LEE:

 2          Q     So in the past couple of exhibits,

 3    there were multiple notations that the sponsor is

 4    not a relative as an explanation for a negative

 5    flight risk determination; is that correct from

 6    your review?

 7          A     Yes.

 8          Q     Okay.  Is a relative required for -- is

 9    it required that a sponsor be a relative?

10          A     It is not required.

11          Q     Okay.  Is it considered a negative

12    factor if the sponsor is not a relative?

13          A     Not necessarily.

14          Q     Okay.  But can it be a negative factor

15    if a sponsor is not a relative?

16          A     If there are no additional factors that

17    tie the individual to the alien as far as lifelong

18    friend; we went to school together; I call him

19    every month; we talk all the time; we email -- you

20    know, it -- it could be a negative factor based on

21    other factors that are known to the officer as

22    they're reviewing these parole decisions.
```

1                    As -- as I -- it's an individualized

2      determination, so it's based on a number of

3      factors that are considered evidence that's

4      provided for each particular case that's reviewed.

5           Q     Okay.

6           A     So it's really --

7           Q     And that's currently --

8           A     -- case-dependent assessment there.

9           Q     And you're speaking about current

10     practices; is that correct?

11          A     Practices for the time that I was in

12     El Paso.

13          Q     Okay.  I'm sorry.  Can you clarify

14     exactly what periods of time those would be?

15          A     January 2017 through October 7, 2018.

16          Q     Okay.  And any periods of time before

17     that?

18          A     I was on detail in El Paso from

19     October 2016 through December 2016, but I

20     supervised enforcement operations there.

21          Q     Okay.  So when you say based on your --

22     when you say based on your experience in El Paso,

1      explain the contents of the notification to the

2      alien in a language he or she understands through

3      an interpreter if necessary.

4          Q      Currently, does this typically happen

5      for individuals who do not speak English?

6          A      If the alien speaks a language other

7      than a language the deportation officer speaks,

8      then a suitable interpreter is used.

9          Q      Okay.  And is that always the case that

10     a suitable interpreter is found to -- if the

11     person does not speak Spanish or English or a

12     language that a deportation officer speaks?

13         A      In the event that -- ERO has a language

14     line that has many different languages and

15     dialects available.  On occasion an officer will

16     have to schedule a time to speak with an

17     interpreter, so that may involve rescheduling of

18     an interview.  In the event that they cannot

19     locate someone who can speak the alien's

20     particular language, that presents a significant

21     difficulty.

22         Q      Okay.  And what would happen if that

1    were the case that they couldn't locate somebody

2    that spoke the language of the individual?

3        A    The officers make an effort to find a

4    language that the alien does understand because

5    oftentimes the alien will understand a second

6    language or to find a local interpreter who can

7    speak the dialect that the alien speaks.

8        Q    Okay.  And if the interview was

9    conducted in a language other than the applicant's

10   first language, how would the officer -- would the

11   officer assess whether there was a reasonable

12   amount of understanding?

13       A    Yes.

14       Q    Okay.  How would they do that?

15       A    That would be something that you need

16   to ask the officer.

17       Q    Are detainees ever required to provide

18   their own translators for parole interviews?

19       A    They're not required to provide

20   translators, but if there's someone they're

21   comfortable with using, they're generally allowed

22   to specify.

1        Q       Are you able to -- currently, do you

2    have any estimation of what percentage of class

3    members detained in your jurisdiction do not speak

4    Spanish or English?

5        A       I haven't been in the El Paso field

6    office since October.  I have no awareness of who

7    is detained in the field office right now.

8        Q       What about as of October?  Do you have

9    any sense of the proportion of non-English and

10   non-Spanish speakers?

11       A       No, I don't.

12       Q       When a parole decision is provided to

13   an applicant who doesn't speak the language of the

14   deportation officer, is the decision translated

15   for them typically in their native language?

16       A       Any time a deportation officer speaks

17   with an alien who is unable to communicate in a

18   language the officer communicates in, the officer

19   will use an interpreter or the language line to

20   communicate with that alien.

21       Q       Okay.  Do they always speak to the

22   individual -- does the deportation officer always

```
1        Q      Okay.  So it's possible that there was

2    a different understanding of that term as you used

3    it here in the April declaration?

4        A      I would simply need to refresh my

5    memory to be sure.

6        Q      Okay.  You mentioned that ICE officers

7    were trained in parole reviews following the

8    preliminary injunction to not use this phrase as a

9    term of art but instead to specify everything that

10   is being captured by the phrase; is that correct?

11       A      The deportation officers were

12   instructed to provide more detailed comments on

13   parole determination worksheets consistent with

14   the reasoning for each particular item that they

15   were taking into consideration.

16       Q      Okay.  Were they specifically

17   request -- or were they specifically instructed

18   not to use the term "recent entrant" at any point

19   in time?

20       A      I don't know if they were particularly

21   told not to use the term.  They were told to

22   provide greater detail in their statements.
```