**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ANSLEY DAMUS,** *et al.*, <br><br> **Plaintiffs,** <br><br><br> **v.** <br><br> **CHAD WOLF, Acting Secretary of the Department of Homeland Security,** *et al.*, <br><br> **Defendants.** | **Civil Action No.  18-578 (JEB)** |

**MEMORANDUM OPINION**

About nineteen months ago, the Court entered a preliminary injunction against several

Immigration and Customs Enforcement Field Offices across the country.  In so doing, it ordered

the Government to follow a 2009 ICE Parole Directive — a set of principles and procedures

establishing the processes by which the agency must determine whether an asylum-seeker will be

released from detention pending his immigration hearing.  Plaintiffs — members of a class of

asylum-seekers — believe that one of those Field Offices is currently flouting the injunction.

They thus turn to this Court, moving to hold the Government in contempt and proposing a

number of measures to ensure compliance.  Following an evidentiary hearing and a second round

of briefing, the Government, though maintaining it has carried out the Court's instructions to the

letter, has volunteered to implement some of these remedies.  The Court appreciates the

Government's commitment to do so, but also believes some further steps are required.  It will

deny the Motion for Contempt but mandate certain measures under its authority to enforce its

injunction.

I.       **Background**

The underlying facts of this litigation have been set forth in detail in a prior Opinion.  See

Damus v. Nielsen, 313 F. Supp. 3d 317, 322–25 (D.D.C. 2018).  Because the Court assumes the

reader's familiarity with this case, it offers only a few words on the procedural history to set the

stage.

In July 2018, the Court issued an injunction against five ICE Field Offices, ordering them

to follow the 2009 Directive.  See ECF No. 33 (PI Order); Damus, 313 F.3d at 343.  To be more

specific, it mandated that Defendants refrain from "denying parole to any provisional class

member absent an individualized determination"; that these determinations be based on the facts

of each class member's case; and that Defendants comply with the procedural requirements of

the Directive.  Id., ¶¶ 3–5.  Separately, the Court directed the Government to file monthly reports

reflecting parole determinations at each of the five Field Offices so that it could monitor

compliance with the Directive and the injunction.  See Minute Orders of July 24 and Aug. 28,

2018.

The first of these reports — issued six weeks after the injunction — revealed the

persistence of low parole rates across the board.  Not surprisingly, Plaintiffs became concerned

that the Government was defying the Court's mandate.  See Damus v. Nielsen, 328 F.R.D. 1, 3

(D.D.C. 2018).  Their concerns only intensified after practitioners in detention facilities reported

that asylum-seekers were still being detained without any individualized consideration.  Id. at 4.

Convinced that Plaintiffs had raised a sufficient question of noncompliance, the Court permitted

limited discovery.  Id. at 6.  In the months that followed, Plaintiffs deposed officials from each of

the Field Offices at issue.  See ECF No. 77 (Pl. Contempt Motion) at 2–3; ECF No. 86 (Def.

Opp. to Contempt Motion) at 3.

In the end, Plaintiffs concluded that the Los Angeles Field Office's noncompliance with the injunction was the most glaring.  See Pl. Contempt Mot. at 1–2, 2 n.2.  As evidence of this, they point to the Office's comparatively low grant rate — approximately 16% — from July 2018 to April 2019.  See ECF No. 81 (Pl. Supp. to Contempt Motion) at 1; Pl. Contempt Mot. at 8.  This stands in stark contrast to the rate of 43% during the years of the previous administration, which promulgated the Directive.  See ECF No. 112 (Def. Exhibits for Hearing) at 2 (2011–16).  They also rely on the deposition testimony of Gabriel Valdez, the Officer in Charge of the LAFO's Adelanto Processing Center, which is currently the only detention facility operating in the Los Angeles area.  See Pl. Contempt Mot. at 7–9; ECF No. 120 (Def. Response to Contempt Supp.) at 3 n.1.  According to Plaintiffs, Valdez all but confirmed that the Government was falling short of its obligations — namely, by acknowledging that the injunction did not affect the parole-determination process in the least.  See Pl. Contempt Mot. at 7–11.  In addition, testimony from immigration practitioners on the ground, asylum-seekers underscore, confirms noncompliance.  For example, these attorneys maintain that the LAFO, contrary to the Directive's instructions, is not providing detainees parole decisions in a language they can understand.  See, e.g., id., Exh. F (Declaration of Madelaine Behr), ¶ 6; Exh. I (Declaration of Elizabeth Hercules-Paez), ¶ 6.

With these grievances in mind, Plaintiffs moved for contempt against the LAFO in April 2019.  In response, the Government advances two main arguments.  First off, it contends that, because the Directive does not require a particular grant or denial rate, Plaintiffs' fixation on such rates is unavailing.  See Def. Opp. to Contempt Mot. at 8–9.  Second, it posits that Valdez's testimony does not stand for what asylum-seekers say it does.  Specifically, the reason he

confirmed that the Office did not changes its polices in response to the injunction was because there was no need to — it has been following the Parole Directive all along. Id. at 7–19.

With the parties unable to reach an agreement, the Court held an evidentiary hearing in October. See Minute Order of Sept. 30, 2019. It heard testimony from OIC Valdez, Andre Quinones (an LAFO Assistant Field Office Director), and an immigration practitioner. At the hearing's end, it asked both sides to provide supplemental briefing evaluating the testimony's effect on their positions. See Minute Order of Oct. 31, 2019. Armed with those submissions, the Court is now primed to proceed.

## II.      Legal Standard

Federal courts have "inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). Such power is vital to "the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." Broderick v. Donaldson, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting Ex parte Robinson, 86 U.S. (19 Wall) 505, 510 (1874)). To determine whether contempt is appropriate, a court evaluates whether "the putative contemnor has violated an order that is clear and unambiguous," and whether such a violation has been shown "by clear and convincing evidence." Id. (quoting Armstrong v. Exec. Office of the President, 1 F.3d 1274, 1289 (D.C. Cir. 1993)).

Along with the contempt power, a court has the authority to issue additional orders to enforce a prior injunction. See Hutto v. Finney, 437 U.S. 678, 687 (1978); see also Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin., 765 F. Supp. 1, 13 (D.D.C. 1991) (modifying injunction to ensure compliance without contempt finding). This equitable authority is broad, "particularly where the enjoined party has not 'fully complied with the court's earlier

orders.'"  Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin., 98 F. Supp. 2d

25, 26–27 (D.D.C. 2000) (quoting Hutto, 437 U.S. at 687).  As with the initial injunction,

however, further injunctive relief must be "narrowly tailored to remedy the specific harm."

Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 108 (D.C. Cir. 1976).

## III.    Analysis

In their Motion, Plaintiffs seek a finding of contempt and an order directing the

Government to implement several remedial measures.  See ECF No. 118 (Pl. Contempt Motion

Supp.).  According to them, the road to compliance entails four steps: (1) formal training to

instruct LAFO staff on the requirements of the Directive; (2) a systematic quality-assurance

process to ensure that asylum-seekers are afforded individualized determinations;

(3) individualized explanations of parole decisions instead of boilerplate forms; and (4) the

appointment of a special master to oversee the LAFO.  Id. at 9–11.  As just mentioned, the Court

may order some or all of these measures as a means to enforce its prior injunction without having

to resort to its contempt power.  Facilitating resolution here, the Government has agreed to adopt

two remedial measures — viz., additional formal training and a quality-assurance program.  See

Def. Resp. to Contempt Supp. at 18–19.

As to the former, Defendants have volunteered to: (1) train frontline LAFO staff on the

Directive "with a focus on proper procedures related to serving advisals, conducting parole

interviews, and making recommendations"; (2) train deciding officials on how to properly

review and evaluate these parole determinations; and (3) designate an LAFO officer and ICE

attorney to conduct periodic training in that Field Office.  Id. at 18–19.  On the quality-assurance

front, the Government has proposed that the OIC of the Adelanto detention facility review a

certain number of parole determinations on a monthly basis.  Id. at 19 (capping assessment at 20

cases every month).  Because these measures are reasonably aimed at ensuring the LAFO's

compliance with the prior injunction, the Court will impose them.

The Government is not yet off the hook, though, as the LAFO's parole rates continue to

raise the Court's antennae.  Since the issuance of the injunction in July 2018, Defendants have

considered 1,846 parole applications, denying over 80% of them.  See ECF No. 125 (Def. Jan.

2020 Status Report) at 3 (1,488 applicants detained as flight risks; 46 detained as danger to

community).  For perspective, consider that between 2011 and 2013, the LAFO grant rate

hovered around 80%.  See Def. Hearing Exhs. at 2.  Although that number decreased in the three

years that followed, the Government still granted parole nearly 40% of the time.  Id. (from 2014–

16, 1,523 grants out of 3,864 applications).  Only a year later, following the change in

administration, that rate plummeted to 7%.  Id.  This drop, of course, served as the impetus for

Plaintiffs to seek injunctive relief in the first place.  See Damus, 313 F. Supp. 3d at 323–25.  It is

no surprise, then, that Plaintiffs' takeaway from the recent statistics is that LAFO officials are

disregarding the Court's mandate.  See Pl. Contempt Mot. Supp. at 3–4.  Asylum-seekers also

highlight the testimony of an immigration lawyer, who indicated that all of her clients had been

categorically denied parole.  See ECF No. 121 (Pl. Reply) at 2–3; id., Exh. A (Pl. Hearing

Transcript) at 114:19–115:7.

On the flip side, Defendants believe that the LAFO has abided by the Directive since

2011.  See Def. Resp. to Contempt Supp. at 3.  To account for the persistence in low grant rates,

the Government points to the testimony of its witnesses Quinones and Valdez.  Id. at 6–12.  At

the hearing, both offered a number of reasons for why the denials have skyrocketed.  For

example, they recounted the influx of aliens arriving at our nation's border without proper

identification documents.  See, e.g., id., Exh. A (Def. Hearing Transcript) at 43:20–25 (Valdez

noting increase in "prepped documents"), 171:18–23 (Quinones pointing out lack of "correct or

sufficient documents" establishing applicant's identity).  Unlike in years past, Valdez elaborated,

recent parole applicants are not producing original identification documents.  Id. at 44:14–16.

Instead, they are providing copies of such documents, making it all the more difficult to suss out

an applicant's identity.  Id. at 44:16–23.  In his telling, scores of these aliens present nearly

identical, less-than-truthful accounts about their lack of original documentation.  Id. at 44:1–12

(several of those crossing through Central America alleged to have lost passports "in the jungles

of Colombia").

Valdez also noted that more and more asylum-seekers are identifying community

organizations — rather than family members — as potential parole sponsors.  Id. at 44:25–45:2.

The problem with that, in his view, is that these organizations tend to offer a temporary residence

only.  Id. at 45:3–14.  Without a stable living situation, an applicant is less likely to receive

notifications about immigration proceedings.  Id. at 58:13–59:9.  And without such notice, he is

less likely to show up at future proceedings, thereby posing a flight risk.  Id. at 58:13–59:9.

Last, Valdez rationalized that the improved practices of his staff have played a role in the

recent parole grants.  Around 2014, he recalled, officers at the Adelanto detention facility were

not adequately discharging their responsibilities.  Id. at 42:3–9; 46:7–20.  In his words, his staff

did not "do[] their due diligence in verifying the date that was being submitted [and] . . . was

being used to make evaluations."  Id. at 75:19–23.  Concerned about these practices, Valdez has

directed his officers to be more diligent when corroborating information.  Id. at 47:6–8.  These

efforts, he explained, have been a contributing factor to the "downward trend" in the grant rates.

Id. at 42:6–9.

Although the Court found no reason to doubt the credibility of Valdez and Quinones, their testimony does not plug every hole.  Start with the position that LAFO staff are now better at assessing parole applications.  As Plaintiffs note, an officer's decision on a particular application is merely "a recommendation."  Pl. Contempt Mot. Supp. at 4 (quoting Pl. Hearing Tr. at 69:24).  That decision is next reviewed by a supervisor, who likewise provides only his recommendation.  See Def. Hearing Tr. at 70:5–6, 21.  In the last step, an AFOD — the deciding official — "start[s] the whole [evaluation] process over again" and then renders the binding determination.  Id. at 71:16; Pl. Hearing Tr. at 88:24–25 ("[T]hey don't make the decision.  I do.").  Bearing in mind that every recommendation is reviewed by an AFOD, the drop in parole grants cannot be completely accounted for by more diligent lower-level staff.

As to documents, Valdez acknowledged that he had seen only "fluctuations," not "trends" in their quality.  See Pl. Hearing Tr. at 95:16–25.  The data, moreover, show a descending trajectory in grant rates, not the ebb and flow one would otherwise expect.  To be sure, there was one meaningful spike in those rates — in June of last year, the LAFO granted parole to more than 40% of applicants.  Id. at 16:16–17:3; compare ECF No. 114 (Pl. Exhibit List), Exh. 7 (Def. June 2019 Status Report) with Exh. 6 (Def. May 2019 Status Report) (46 grants out of 108 determinations).  That month appears to have been an anomaly, however.  An official noted that the June 2019 rate actually resulted from the closure of other facilities in the Los Angeles area.  See Pl. Exh. 8 (Declaration of Jennifer Herrera), ¶ 11.  Because that led to limited detention space in LAFO centers still in operation, officials had to release asylum-seekers who otherwise would have been detained.  Valdez offered "no information to challenge" that testimony.  See Pl. Hearing Tr. at 18:11.

Finally, as for potential sponsors, the hearing also laid bare the fact that most applicants continue to list family members and friends, rather than these organizations, as sponsors. Id. at 96:20–97:7. As such, Defendants' concern about the rise of community sponsorships — and the increased flight risk associated with them — seems overblown.

In sum, the Government has failed to persuasively justify the fall in parole grants or convincingly explain that it is following the Directive. The Court will therefore order further injunctive relief using Plaintiffs' requests as a framework.

First, they ask that LAFO staff receive training on the Directive's requirements. See Pl. Contempt Mot. Supp. at 9–10. To that end, the Government has volunteered to implement a number of training measures — remedies that the Court has already imposed. See *supra* Section III at 5–6. To ensure agency compliance, Plaintiffs may assign an attorney to review the LAFO's training procedures (or be present at some trainings) insofar as this review does not unduly intrude into ICE's operations.

Second, asylum-seekers request a quality-assurance program. See Pl. Contempt Mot. Supp. at 10. According to them, the LAFO last engaged in a quality-assurance audit in 2016. Id. In response, the Government has proposed a systematic review process that the Court believes sufficiently addresses Plaintiffs' concerns. See *supra* Section III at 5–6.

Third, they request that the LAFO provide individualized explanations of parole decisions. See Pl. Contempt Mot. Supp. at 10. Plaintiffs want more than a checked box on a boilerplate form or a cookie-cutter parole-denial letter. Id. So that asylum-seekers may be better informed of the reasoning behind a parole decision, the Court will require LAFO officials to provide a few-sentence explanation in rendering their decisions for the time being.

Fourth and finally, the Court will decline Plaintiffs' invitation to appoint a special master to oversee the LAFO's compliance with the injunction. It believes that the above measures are reasonably tailored to ensure compliance. That said, it reserves the opportunity to appoint a special master if asylum-seekers can show down the line that the Government is not complying with this mandate.

## IV.  Conclusion

Given the injunctive relief outlined above, the Court will deny Plaintiffs' Contempt Motion in part. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: February 7, 2020